1               UNITED STATES OF AMERICA
                UNITED STATES DISTRICT COURT
2               CENTRAL DISTRICT OF CALIFORNIA
                    WESTERN DIVISION
3
                        - - -
4               HONORABLE R. GARY KLAUSNER,
         UNITED STATES DISTRICT JUDGE PRESIDING
5                       - - -

6
    STRONG TRADING, INC.,           )
7                                   )   CERTIFIED COPY
                                    )
8              PLAINTIFF,           )
                                    )   CV 21-04206 RGK
9    VS.                            )
                                    )
10   UNIQUE DESIGNS, INC., et       )
     al.,                           )
11                                  )
                                    )
12             DEFENDANTS.          )
                                    )
13                                  )
                                    )
14                                  )
     _____)
15

16
                    TRIAL DAY 1
17      REPORTER'S TRANSCRIPT OF PROCEEDINGS
             WEDNESDAY, JUNE 15, 2022
18                 A.M. SESSION
             LOS ANGELES, CALIFORNIA
19

20

21

22

23          SHERI S. KLEEGER, CSR 10340
          FEDERAL OFFICIAL COURT REPORTER
24      312 NORTH SPRING STREET, ROOM 402
          LOS ANGELES, CALIFORNIA 90012
25              PH:  (213)894-6604

```
 1

 2

 3

 4
       APPEARANCES OF COUNSEL:
 5
       ON BEHALF OF PLAINTIFF:
 6
                   BY:  MICHAEL YORK, ESQUIRE
 7                       KATHLEEN APARCE, ATTORNEY AT LAW
                         JESSICA CRABBE, ATTORNEY AT LAW
 8

 9
       ON BEHALF OF DEFENDANT:
10
                   BY:  YASHDEEP SINGH, ESQUIRE
11                       GERALD OHN, ESQUIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

E X A M I N A T I O N

4

WITNESS:            DIRECT   CROSS   REDIRECT   RECROSS

5

6   AMY WEI CHU        81      114

7

8

9

10

11

E X H I B I T S

12

NUMBER     PAGE

13

51      89

14

15                     78     109

16

17

18

19

20

21

22

23

24

25

```
 1              CALIFORNIA, LOS ANGELES, JUNE 15, 2022
 2                          A.M. SESSION
 3
 4              THE CLERK:  Calling item two, CV 21-04206
 5   RGK:  Strong Trading, Inc., versus Unique Design, Inc.
 6              Counsel, please state your appearances.
 7              MR. YORK:  Good morning, Your Honor.
 8   Michael York representing plaintiff and
 9   cross-defendants.
10              THE COURT:  Okay.
11              And you don't have to approach the podium.
12              But go ahead, Counsel.
13              MR. YORK:  We me is Kathleen Alparce.
14              MS. ALPARCE:  Good morning, Your Honor.
15              MR. YORK:  And also Jessica Crabbe.
16              THE COURT:  Thank you, Counsel.
17              MR. SINGH:  Good morning, Your Honor.
18   Yashdeep Singh for defendant and counterclaimant Unique
19   Design.  And here with me is Gerald Ohn.
20              THE COURT:  Okay.  Thank you, Counsel.
21              MR. SINGH:  Thank you, Your Honor.
22              THE COURT:  I'm assuming that nothing came
23   of the settlement conference and you both got your
24   depositions in like ordered by the Court; is that
25   correct?
```

1                MR. SINGH:  That's correct, Your Honor.

2                MR. YORK:  Correct, Your Honor.

3                THE COURT:  Okay.  In this matter we have a

4    jury already.  They're going to be down here at 9:30.

5                There was a motion in limine that was filed

6    late.  It's not timely.  And it's not going to be ruled

7    on.

8                Although, the reality is it's really calling

9    for an evidentiary decision that can be made at the time

10   of trial.

11               I'm assuming everybody is ready to go on

12   this case.  And I can tell you that we will be starting

13   at -- as soon as jury gets down here -- about 9:30.

14               I talked to you at pretrial.  We covered

15   almost everything at pretrial.  The only thing we didn't

16   cover is I said you've got to have between two and half

17   to three hours on it.

18               The Court's going to make it three hours not

19   three and a half hours per side.

20               The three hours runs any time -- as I said

21   before -- you are either questioning the witness or on

22   direct examination or cross-examination.

23               It does not affect opening statement.

24   Opening statements will be limited to 15 minutes per

25   side.  Closing argument will determine that after the

1   case is over.

2                Keep in mind that if you use your time, that

3   once your three hours is up, you're through asking

4   questions, unless the Court finds in the interest of

5   justice that your case has been put on effectively and

6   efficiently and requires more time.

7                And, again, as I told you before, that's

8   only happened twice in the last 20 years.  It may

9   happen, it may not happen.  Don't count on it.

10               On voir dire, each side will get four

11  challenges because we are going to pick eight jurors.

12               I think I talked to you about how we are

13  going to do the voir dire the last time.  If you have

14  any questions, I'm more than happy to address those.

15               So let me ask you -- almost everything we've

16  talked about at pretrial.  Again, I will stress again,

17  because I know that there is not the greatest

18  cooperation up to this point between the attorneys on

19  this case, I'll warn you again, if there's any lack of

20  civility, God help you in this courtroom.

21               I expect as officers of the Court -- because

22  each side, as attorneys, your primary job is as officer

23  of the Court to conduct yourself as such, that when the

24  jury leaves here, they're going to think each side, each

25  attorney's side, has the utmost respect for the

1   attorneys on the other side professionally.

2            I don't care what happens after the jury is

3   out of here.  But in front of the jury, they are going

4   to see this Court act in such a way that there's total

5   respect and professionalism between the attorneys.  And

6   if there's not, we've got problems.

7            I don't expect that to happen, but I just

8   don't want to blindside anybody.

9            Any questions anybody has before?  I will

10  give you a few minutes to get -- to get the jury.

11           MR. SINGH:  If I may be heard on the issue

12  of Mr. Shah's trial testimony.  There was an ex parte

13  brought yesterday regarding continuing the trial.  I

14  understand the Court denied it.  But if I may be heard

15  on that issue.

16           THE COURT:  Are you talking about the ex

17  parte request to exclude him as a witness; is that what

18  you're saying?

19           MR. SINGH:  No.  So yesterday --

20           THE COURT:  Are you talking about the

21  invoices?

22           MR. SINGH:  So the ex parte, my office

23  brought -- Unique Designs brought yesterday was the

24  continue of trial because our lead witness, Mr. Shah --

25           THE COURT:  Oh, yeah, I remember that.

1          MR. SINGH:  So Mr. Shah flew out here to

2    provide his testimony.

3          I understand the Court's order; however, the

4    deposition testimony was only conducted by opposing

5    counsel.  I did not have an opportunity to inquire with

6    Mr. Shah about really critical issues that would need to

7    be brought out on our counterclaim.

8          For example, their inspection reports that

9    he can demonstrate are relevant and can authenticate

10   some of these documents.  The issue of damages.  The

11   loss that the company suffered.  He was the one

12   responsible for communicating --

13         THE COURT:  Counsel, what's your request?

14         MR. SINGH:  To allow him to give his

15   testimony by Zoom tomorrow morning.

16         THE COURT:  No, no.  That won't be granted.

17   He's an unavailable witness.  If he's sick, he is an

18   unavailable witness.

19         And there are clear rules that govern

20   unavailability of witnesses.  If you did not take their

21   deposition, that's not the Court's problem.  But this is

22   going to proceed without Zoom.

23         But as -- we can declare that's an

24   unavailable witness, if you wish, so we can use

25   deposition testimony.

1          MR. SINGH:  My expectation is that the

2    plaintiff will complete their case today and rest.  So

3    that if we're able to designate his testimony, we can

4    then just play his video live in Court.  Okay.

5          THE COURT:  Regular evidentiary procedures.

6          MR. SINGH:  Yeah.

7          THE COURT:  The Court has always been set up

8    and the legal system has been set up to cover areas

9    where if somebody gets sick or somebody dies, they're an

10   unavailable witness.  Those will apply in this case.

11         MR. SINGH:  Understood.  Thank you, Your

12   Honor.

13         THE COURT:  Counsel you had a question.

14         MR. YORK:  Yes, Your Honor.

15         THE COURT:  You can speak from there.  You

16   don't have to go to the podium.  Once the jury is in,

17   you go to the podium.

18         MR. YORK:  They are not really so much

19   questions, I guess, is to give the Court a heads-up --

20   excuse me.  I have something in my throat.  A heads-up

21   that there's maybe going to be some issues.  And I don't

22   know if we want to talk about them now, but I wanted to

23   at least raise them.

24         Two issues.  First issue is that they have

25   submitted an amended witness list that last Friday added

1    an additional witness.  I'm not sure how to pronounce

2    his name so I'm going to spell it.  It's M-a-u-m-g.

3    Last name H-t-u-t.  He was not on the pretrial

4    conference order.  He was not on the joint witness list.

5    He appears to be an expert and no expert testimony has

6    been designated.  So we will be objecting to his

7    testimony.

8                 The second issue is Mr. Franco's deposition.

9    We took a 30(b)(6) deposition of Unique Designs.  They

10   decided to hire a videographer to videotape Mr. Franco's

11   deposition without notice to us.

12                We objected to having the deposition

13   videotaped because they had not given notice to us under

14   the rule.

15                The problem for us, though, was that we had

16   prepared questions for deposition purposes, which, of

17   course, are not the same questions you would ask at

18   trial.

19                We met and conferred on the issue.  We were

20   not able to resolve it.

21                We had an emergency discovery conference

22   with Judge Castillo.  Judge Castillo ruled that they

23   could videotape the deposition, but that we had a right

24   to object to the use of the videotaped deposition.

25                THE COURT:  Those we can handle at the time

1    they come up.  If a witness was not designated as an

2    expert witness, they can't testify as an expert witness.

3    There's a difference between expert witness and regular

4    testimony.  We will handle that when they come up.

5              MR. YORK:  That's fine.  That's all I wanted

6    to --

7              THE COURT:  Okay.  You're putting both the

8    Court and the defense on notice that you will be making

9    that objection.  We will hear it at that time.

10             MR. YORK:  The third thing, finally, Your

11   Honor, is just truly procedural is, the number of

12   exhibits that are admissible under the pretrial

13   conference order, does the Court want us to handle the

14   admission of exhibits on a one-by-one basis as they come

15   up?

16             THE COURT:  Yes, please, on a one-by-one.

17             And handling exhibits, you should always

18   make sure the exhibit is received before it is

19   published.

20             MR. YORK:  Correct.

21             THE COURT:  And, again, if there is no

22   objection to an exhibit, you don't have to say no

23   objection.  I will listen to it.

24             If you say you want to introduce it, I'll

25   wait for two or three seconds on anything.  I'll wait

1  for two or three seconds, if there's no objection on it,

2  then I will rule on it.

3              MR. YORK:  Thank you, Your Honor.

4              I just wanted to raise those now.  Thank you

5  very much, Your Honor.

6              THE COURT:  Anything else?

7              MR. SINGH:  Just to respond to those very

8  briefly.

9              On the issue about the exhibits, the major

10  issue is going to be the invoices.  When we submitted

11  the exhibit list and the witness list, they had

12  designated certain witnesses who would be authenticating

13  or would be appearing to provide foundation for some of

14  these exhibits.

15              Since then they have notified me those

16  witnesses will not be appearing, which is what lead to

17  the motion in limine to exclude those invoices.

18              So defendant has reserved the right to

19  assert certain objections in the event that proper

20  foundation is not laid or we can still object on the

21  basis --

22              THE COURT:  Sure.  Sure.  Like I just talked

23  to plaintiffs attorney, those things we'll rule on at

24  the time they come up.  Thank you very much for giving

25  us a heads-up on both sides.

1          Okay.  At 9 o'clock we'll go ahead and start

2     with the jury selection on it.  Excuse me, 9:30.  As

3     soon as the jury comes down.

4          We'll be in recess.

5          THE CLERK:  All rise.  Court is in recess.

6          (RECESS.)

7          THE CLERK:  Calling case number CV 21-04206

8     RGK:  Strong Trading, Inc., versus Unique Design, Inc.

9     Counsel.

10          Please state your appearances.

11          MR. YORK:  Good morning, my name is --

12     excuse me, Michael York.  I represent Strong Trading and

13     Kurt Chien.  With me is Kathleen Alparce who also

14     represents Strong Trading and Kurt Chen.  Jessica Crabbe

15     will be here in a few moments.  She is also a part our

16     team.  Thank you.

17          MS. ALPARCE:  Good morning.

18          THE COURT:  Good morning.

19          Counsel.

20          MR. SINGH:  My name is Yashdeep Singh.  I'm

21     here with my co-counsel Gerald Ohn.  We represent the

22     defendant and counterclaimant Unique Design.

23          THE COURT:  Thank you very much, Counsel.

24          Ladies and gentlemen, what we are going to

25     be doing is we're going calling the name of 14 jurors.

1    They're going to come up and take the seats up here.

2              The first juror, if you go all the way to

3    the back row and all the way down to the end, then when

4    you fill up the first eight seats there, on the ninth

5    row, you go down all the way to the end of the front row

6    and fill that up.

7              There will be other jurors that are still

8    left over that may be called at a later time.

9              But I'll talk to all of you after we get you

10   in your seat.  So why don't you go ahead and call them.

11             THE COURT:  Calling Nadia SmithLeon,

12   S-m-i-t-h-l-e-o-n.

13             Ashley Ramirez, R-a-m-i-r-e-z.

14             Sebastian Twohey Jacobs.  T-w-o-h-e-y,

15   hyphen, J-a-c-o-b-s.

16             Raymond Maldonado, M-a-l-d-o-n-a-d-o.

17             Vicente de Castro Benedicto,

18   B-e-n-e-d-i-c-t-o.

19             Adela Agnote, A-g-n-o-t-e.

20             Kenia Velasco, V-e-l-a-s-c-o.

21             Andrew Chavez, C-h-a-v-e-z.

22             Vickie Moore, M-o-o-r-e.

23             Jennifer Munson, M-u-n-s-o-n.

24             Gloria Cuernovega, C-u-e-r-n-o-v-e-g-a.

25             Linda Romo, R-o-m-o.

1            Jeffrey Churchman, C-h-u-r-c-h-m-a-n.

2            And Michael Walea, W-a-l-e-a.

3            THE COURT:  Okay.  Ladies and gentlemen,

4    there are other jurors out there that have not been

5    called yet.  But you may be called.

6            So I'm going to ask you if you'll listen

7    very carefully to the questions I'm going to be asking.

8    I'll be asking those questions of the 14 jurors in the

9    here in the box and soliciting responses from them.  But

10   I'm going to ask you to pay just as much attention,

11   think about what your answers might have been to the

12   questions.  So that if we get to the point of asking you

13   to come up and take the place of one of these jurors, we

14   can save a lot of time because I'll just ask you, is

15   there anything you want to tell us about the case or if

16   you have any problems hearing this case.

17           Okay.  So if you can't see or hear anything,

18   raise your hand and let us know.  Because you're still

19   part of this jury at this time.  Okay?

20           Ladies and gentlemen, the case before the

21   Court is Strong Trading Incorporated versus Unique

22   Designs, Incorporated.

23           At this time, I'm going to tell you a little

24   bit about the -- what the case is about, just very, very

25   briefly about the case so you know what type of a case

1   it is.

2                    This is a civil case where the plaintiff

3   claims that the defendant ordered jewelry from the

4   plaintiff, and that the plaintiff delivered, and the

5   defendant has not yet paid for that property or returned

6   that property and owes a balance on the jewelry.

7                    The defendant says he denies he owes the

8   plaintiff any money.  And the defendant claims that he

9   did not receive the jewelry that he ordered or paid for.

10  And he suffered financial losses as a result.  And he

11  seeks recovery for the loss from the plaintiff.

12                   So in this particular matter, that's

13  basically what the trial is about.  Okay.

14                   So you know whether or not it is a murder

15  trial or whether or not it is -- that's what the case is

16  about.  Should be a short case.  We should finish this

17  in three to four days.

18                   At this time, what I'm going to do is I'm

19  going to have the parties introduce again themselves to

20  you and any witnesses they intend to call.

21                   And if you could tell us what city they live

22  in, because John Smith could be anybody.  So if you

23  could tell us what city they live in.

24                   The reason we're doing this is to see if you

25  know anything about this case at all or any of the

1    people involved in the case.

2                    So Counsel.

3                    MR. YORK:  Yes.  Thank you, Your Honor.

4                    Again, my name is Michael York.  I represent

5    plaintiffs Strong Trading and Kurt Chien who's also a

6    cross-defendant.

7                    Our law firm is named WHGC.  We are very

8    close to the Orange County Airport.  As I said, my

9    colleague Kathleen Alparce will be assisting.  Jessica

10   Crabbe, who had to run an errand is also assisting.

11                   My clients are again Strong Trading and Kurt

12   Chien.

13                   Strong Trading is based in Arcadia,

14   obviously, the east San Gabriel Valley.

15                   We expect to call two witnesses.  The first

16   witness is Amy Chu, Ms. Chu.  Perhaps if you can stand

17   up so everyone can see you.

18                   THE COURT:  Okay.

19                   MR. YORK:  Little difficult because of the

20   monitor.  Ms. Chu is the chief financial officer for

21   Strong Trading.

22                   As I said, our other client is Kurt Chien.

23   This is Mr. Chien.

24                   Both of them live in the San Gabriel Valley

25   area because the office is in Arcadia.

1           And one more -- I apologize.  Amy Wei.  Amy

2    Wei is the general manager for the company.  She also is

3    local.  I do not expect her to testify.  But it is

4    important you know who she is so that if you happen to

5    know her, you can raise it as an issue.

6           THE COURT:  Thank you very much.

7           Counsel.

8           MR. SINGH:  Good morning everybody.  My name

9    is Yashdeep Singh.  I'm the principal attorney at a firm

10   called Yash Law Group.  We're based out of Brea.

11          Here with me is Gerald Ohn who has his own

12   law firm called Law Offices of Gerald S. Ohn.

13          We intend to call two witnesses.  Mr. Tejas

14   Shah, S-h-a-h, who actually resides in East Coast, as

15   well as Albert Franco, who resides on the East Coast.

16   Thank you.

17          THE COURT:  Thank you very much, Counsel.

18          Ladies and gentlemen, we told you a little

19   bit about the case, what the allegations are.  We've

20   told you a little bit about who the parties will be and

21   who the witnesses will be.

22          My next question to you is:  Does anybody in

23   the jury, 14 of you, do any of you know anything about

24   this case or anybody involved in this case?

25          Okay.

1              Let me ask another question:  How many have

2    served on juries through deliberation in the past?

3              Nobody?  One.  Okay.

4              That's what I suspected.

5              Since we have new jurors, let me explain to

6    you, there's two ways to ask questions.  I can ask every

7    single question of every single juror and we'll probably

8    get you out of here by Thanksgiving.  Or we can ask

9    general questions of you and get responses and it will

10   go much quicker.

11             Let me suggest to you that when I ask these

12   general questions, I'm going to have to ask individually

13   if you don't give responses.  So if I ask the general

14   questions, if all 14 of you could indicate what your

15   response will be, and I don't care if you raise your

16   hand, shake your head, say no, but -- so that I have the

17   response of all 14 of you.  And then we can go on rather

18   than ask every single person that same question again.

19   Okay.  You with me on that?

20             COLLECTIVE JURORS:  (Nod heads.)

21             THE COURT:  So my first question is this --

22   and let me ask the question I asked before because I

23   didn't get a response from everybody.

24             Does any of the 14 of you know anything

25   about this case or anybody involved in this case that

1    has been introduced to you?

2              COLLECTIVE JURORS:  No.

3              THE COURT:  Okay.  Perfect.

4              Since you're new jurors and haven't been on

5    a jury before, except for one, let me explain to you --

6    it will be helpful to let you know what your function is

7    as a juror.  And very briefly, let me tell you, your

8    function is twofold.

9              Your first function is:  You must determine

10   what the facts of this case are.

11             How you going to do that?  You've already

12   told me you have no idea what the facts of the case are.

13             Well, the law is very specific.  It says,

14   you must determine the facts of the case from and only

15   from the evidence that you receive here in trial.  From

16   and only from that evidence.

17             Well, that may help a little bit.  But some

18   of you may say, Well, what's evidence?  The law is also

19   very clear on that.  The evidence is the testimony of

20   witnesses here in Court under oath; exhibits that are

21   received by the Court into evidence; and anything that

22   the two parties have -- the two sides have agreed on.

23             Those three things, and only those three

24   things are evidence in this Court.  And that is only

25   what you can determine what the facts of the case are.

1      That's the first duty of the jury.

2              Second duty of the jury is you must apply

3      the law when I give it to you at the end of the case,

4      whether you like the law or not.  If you don't like the

5      law, go up to Sacramento and change it.  Or go back to

6      Washington, D.C. and change it.

7              But if I ask the 14 of you, what the law

8      should be, I'm going to get 14 different responses.  And

9      you can't try a case that way.  You have to try it by

10     one set standard.  And that standard will be the law

11     that I give to you at the end of the case.

12             Whether you agree with it or whether you

13     think it's wrong, doesn't make any difference.  Apply

14     the law that I give to you.  That's the one standard we

15     can use to the facts as you find them, and tell us what

16     your verdict will be.

17             Any questions on that?

18             COLLECTIVE JURORS:  No.

19             THE COURT:  Let me talk to you a little bit

20     about the first part, about determining what the facts

21     are.  Sometimes it's best to explain that a little bit

22     because it's kind of interesting.

23             In jury trials, nobody asks the jury what

24     happened at a certain time at a certain place at a

25     certain location.  They ask the jury:  What does the

1   evidence show happened at a certain time and a certain

2   place and a certain location.  Sounds like a subtle

3   distinction, but it's not a subtle distinction.  It's

4   very important.

5              It's very humbling to be a juror because

6   nobody cares what you think or how you feel about it.

7   What your job is is to tell us what the evidence says,

8   whether you like it or not, and apply the law to it at

9   the end of the case.

10              Let me give you an example.  How many of you

11   have done jigsaw puzzles?  Everybody know what a jigsaw

12   puzzle is?

13              COLLECTIVE JURORS:  (Nod affirmatively.)

14              THE COURT:  What do you do?  You take the

15   box and throw the pieces out on the table and you start

16   putting the puzzle together.  And you put the box top up

17   there.

18              Nobody's asking you what's on that box top.

19   There may be a dog on there.  But when you put the

20   pieces together it may be a boat.  Somebody may have put

21   the wrong pieces in the puzzle.  Nobody's asking you

22   what's on the top.  We're asking you:  What is displayed

23   when you put the pieces of the puzzle together.  Whether

24   you like the image or not, what does the evidence show?

25   What do those pieces say?

1              And by the way, like a jigsaw puzzle, you

2      can't add pieces.  You can't subtract pieces.  All we're

3      asking you to do is, what is the image when you put all

4      of those pieces together in determining what the facts

5      are.

6              Does that make sense to everybody?

7              COLLECTIVE JURORS:  Yes.

8              THE COURT:  I mentioned to you that I'm

9      going to ask questions, and I am.

10              But before I do that, I have to ask some

11     foundational questions of each one of you individually.

12     Basically four questions.  They're not really that tough

13     for you to answer.  One is:  What's your name?  Number 2

14     is:  What location do you live in?  We don't want the

15     street address, just the city.  Third one is:  What's

16     your occupation.

17              If you're retired, don't say "retired,"

18     because that just makes me jealous.

19              So tell me what your occupation was before

20     you retired.  Or if you're unemployed, if you have been

21     employed before, tell me what you were employed with

22     when you were employed.

23              And the fourth question is:  Does anybody

24     live in the home with you that works outside of the

25     home?  And if so, what is their occupation?

1          Then I'll probably ask you some follow-up

2    questions.  Don't take those personally.  I ask

3    follow-up questions really to help me as a springboard

4    to instruct the jury as to what's going on.

5          And then when I get through those questions,

6    we will get back to the general questions.

7          So let me start off with -- and by the way,

8    I apologize, before we start, two things.

9          Number 1 is:  We have mic.  You're going to

10   have to speak into the mic because the reporter here has

11   to take down every word that's said, including the words

12   of the jurors.  So use the mic when you talk.

13         And No. 2 is, I apologize, because I will be

14   referring to you by number.  And if you can figure out

15   where you are, Juror No. 1, 2, 3, 4, 5 and through 14.

16   The reason I do that is because every now and then we

17   will be moving you around.  And it gets very confusing.

18   So it's just easier to refer to you by jury number.

19         I'm assuming everybody can figure out who

20   they are?  Okay.

21         Let me start out then with Juror No. 1.  Can

22   we have your name, please.

23              THE JUROR:  My name is Nadia Smithleon.

24              THE COURT:  And can we have the location you

25   live in.

1          THE JUROR:  Walnut, California.

2          THE COURT:  You don't have to stand.  If you

3   want to stand up, that's fine.

4          And what is your occupation?

5          THE JUROR:  I'm a funeral director.

6          THE COURT:  And is there anyone in the home

7   that works outside the home?

8          THE JUROR:  No.

9          THE COURT:  You don't know anything about

10   this case at this time because you haven't had the

11   evidence yet, other than what I have told you about it.

12          From what I've told you about it, can you

13   think of any reason why you would not be a good juror in

14   a case like this?

15          THE JUROR:  No, sir.  No, Your Honor.

16          THE COURT:  You understand those two

17   functions that I said.  Will you be able to tell us just

18   what the evidence is, whether you like it or not, just

19   tell us what the evidence says when you put it together?

20          THE JUROR:  Yes.

21          THE COURT:  You can apply the law that I

22   give to you at the end of the case?

23          THE JUROR:  Yes.

24          THE COURT:  So we have a perfect juror.  We

25   don't have to go further.  No, no, just joking.

```
 1              Next juror.
 2              THE JUROR:  My name is Ashley Ramirez.
 3              THE COURT:  And the location you live in.
 4              THE JUROR:  Sierra Madre, California.
 5              THE COURT:  And your occupation.
 6              THE JUROR:  I'm a registered dietician.
 7              THE COURT:  Anyone in the home that works
 8  outside the home?
 9              THE JUROR:  Yes.  My husband.
10              THE COURT:  What type of work does he do?
11              THE JUROR:  He does landscaping.
12              THE COURT:  Can you think of anything in
13  your background or past that would affect your ability
14  to be fair in a case like this?
15              THE JUROR:  No.
16              THE COURT:  You have no feelings of bias or
17  prejudice one way or the other that might affect you in
18  this case?
19              THE WITNESS:  None.
20              THE COURT:  Okay.  Next juror.
21              THE JUROR:  Hi.  I'm Sebastian Twohey
22  Jacobs.
23              THE COURT:  And the location you live in.
24              THE JUROR:  Glendale, California.
25              THE COURT:  Occupation.
```

```
 1                    THE JUROR:  Gymnastics instructor.

 2                    THE COURT:  And anyone in the home that

 3     works outside the home?

 4                    THE JUROR:  Yes.

 5                    THE COURT:  Okay.  What type of occupation?

 6                    THE JUROR:  Clinical psychologist.

 7                    THE COURT:  You haven't heard much about the

 8     case.  But can you think of anything at all that would

 9     affect your ability to be fair to both sides and just

10     tell us what the evidence is and apply the law?

11                    THE JUROR:  No.

12                    THE COURT:  Okay.  Next juror.

13                    THE JUROR:  My name is Raymond Maldonado.

14                    THE COURT:  And the location you live in.

15                    THE JUROR:  Los Angeles, California.

16                    THE COURT:  Los Angeles is a big place.  We

17     always ask you, can you break it down to south, west,

18     east, north, central.

19                    THE JUROR:  South central.

20                    THE COURT:  Is there -- occupation?

21                    THE JUROR:  Table busser at Disneyland.

22                    THE COURT:  Okay.  That's quite a drive for

23     you every day.

24                    Anyone that works outside the home?

25                    THE JUROR:  Yes.
```

```
 1                  THE COURT:  What type of work do they do?

 2                  THE JUROR:  Pest control.  And I'm not sure

 3    what the other ones do.

 4                  THE COURT:  Same question to you.  You

 5    probably don't know anything about the case yet.  But

 6    can you think of any reason at all why you would not be

 7    a good juror in a case like this?

 8                  THE JUROR:  When you explained the beginning

 9    of like the whole case, I kind of didn't understand

10    anything of what you said.

11                  THE COURT:  If you don't understand or if

12    you don't hear something, don't hesitate to raise your

13    hand.  Okay.

14                  So let me know so we can explain it to you.

15                  THE JUROR:  It sounded very complicated to

16    me.

17                  THE COURT:  Let me tell you, what I said is,

18    is that the plaintiff is alleging that he sold jewelry

19    to the defendant that the defendant didn't pay for.

20    Okay?  And the -- and kept the jewelry and didn't pay

21    for it.

22                  The defendant is saying, I don't owe you

23    anything.  You did not send me what I ordered.  And, by

24    the way, that cost me money.

25                  That's basically what the case is about.
```

1   You understand that part?

2                    THE JUROR:  Yes.

3                    THE COURT:  Is there any other reason why

4   you think you would not be fair to both sides?

5                    THE JUROR:  No, I don't think so.

6                    THE COURT:  Pass over to the next juror.

7                    THE JUROR:  My name is Vicente Benedicto.

8                    THE COURT:  The location you live in.

9                    THE JUROR:  I live in San Pedro, California.

10                   THE COURT:  And your occupation.

11                   THE JUROR:  I'm a certified MRI technician,

12  technologist.

13                   THE COURT:  Okay.  On MRI's?

14                   THE JUROR:  Yes.

15                   THE COURT:  Anyone in the home that works

16  outside the home?

17                   THE JUROR:  My wife works once a week --

18  once a month downtown L.A.  She's senior accountant.

19  And my son works in Cerritos.  So -- in the restaurant?

20                   THE COURT:  Your wife works once a month?

21                   THE JUROR:  Yeah.  Sometimes they --

22                   THE COURT:  It's okay.  I just want to know

23  where to apply.

24                   All right.  You've heard what we talked

25  about the case, what it's about, people involved.

```
 1                  Is there any reason why you think you could
 2   not be fair and be a good juror in a case like this?
 3                  THE JUROR:  No.
 4                  THE COURT:  Okay.  Next juror.
 5                  THE JUROR:  My name Adela Agnote.
 6                  THE COURT:  Okay.
 7                  THE JUROR:  I live in La Mirada, California.
 8                  THE COURT:  Where?
 9                  THE JUROR:  La Mirada.
10                  THE COURT:  Okay.  And occupation.
11                  THE JUROR:  I'm a retired registered nurse.
12                  THE COURT:  And is there anyone in the home
13   that works outside of the home?
14                  THE JUROR:  No.
15                  THE COURT:  Didn't I see you raise your hand
16   that you've been on a jury before?
17                  THE JUROR:  Yes.
18                  THE COURT:  I will ask you some questions
19   about that later on.
20                  But you feel you could be fair to both
21   sides?
22                  THE JUROR:  Yes.
23                  THE COURT:  Okay.  Next juror.
24                  THE JUROR:  Hello.  I'm Kenia Velasco.  I
25   reside in --
```

```
 1                    THE COURT:  Location you live in.

 2                    THE JUROR:  South central.  I am a college

 3   student.

 4                    THE COURT:  Anyone in the home that works

 5   outside the home?

 6                    THE JUROR:  Yes.  They are employed in the

 7   fast food corporation.

 8                    THE COURT:  Say it again.

 9                    THE JUROR:  They are employed in the fast

10   food corporation.

11                    THE COURT:  Okay.  Thank you.

12                    You are in school now?

13                    THE JUROR:  Yes.

14                    THE COURT:  What subjects are you taking;

15   what's your course?

16                    THE JUROR:  Right now, I am taking like

17   electives.  They are kind of introducing me to like --

18                    THE COURT:  Do you have a major?

19                    THE JUROR:  Yes.

20                    THE COURT:  What is that?

21                    THE JUROR:  I am majoring in Chicana and

22   Latin-X studies.

23                    THE COURT:  So you're not in the study of

24   law or anything like that?

25                    THE JUROR:  No.
```

```
 1                    THE COURT:  How about you, you've heard a

 2       little bit about the case --

 3                    THE JUROR:  No.

 4                    THE COURT:  No.  I'm saying I just told you

 5       a little bit about the case.  You heard that, right?

 6                    THE JUROR:  Yes.

 7                    THE COURT:  Is there anything that you heard

 8       so far that would cause you to say that you could not be

 9       a good juror in a case like this?

10                    THE JUROR:  No.

11                    THE COURT:  Okay.  Next juror, please.

12                    THE JUROR:  Good morning.  Andrew Chavez.  I

13       live in Pasadena, California.  I work as an advisor for

14       graduate students.

15                    THE COURT:  Anyone in the home that works

16       outside the home?

17                    THE JUROR:  No.

18                    THE COURT:  It is so important that both

19       sides feel like they have had a fair and impartial jury.

20                    So let me ask you this:  If you are the

21       plaintiff, or if you are the defendant, would you be

22       satisfied that jurors like you would give you a fair

23       trial?  By fair trial, I mean you'd tell us just what

24       the evidence is and apply the law, and not have bias or

25       motive entered into it at all.  Do you think you can do
```

```
 1  that?
 2              THE JUROR:  Yes.
 3              THE COURT:  So you would be comfortable
 4  sitting on either side that jurors like you would give
 5  you a fair trial?
 6              THE JUROR:  Yes.
 7              THE COURT:  The next problem is getting that
 8  microphone down to Juror No. 9.
 9              Juror No. 9, could we have your name,
10  please.
11              THE JUROR:  My name is Vickie Moore.  I
12  reside in west L.A.
13              THE COURT:  Okay.
14              THE JUROR:  My occupation is patient
15  transporter for hospitals.
16              THE COURT:  Anyone in the home that works
17  outside of the home?
18              THE JUROR:  No.
19              THE COURT:  Can you think of any reason at
20  all why you would not be a good juror in a case like
21  this?
22              THE JUROR:  No.
23              THE COURT:  You realize how important it
24  is -- and, again, I ask these questions in general.  You
25  realize how important it is that this case is decided
```

1    just on the evidence you receive here in Court.  We

2    don't want somebody going back to the jury room and

3    saying, I didn't hear about it in Court, but let me tell

4    you how it really works.  We have to decide it just on

5    what the evidence is.  And you will tell us what that

6    evidence is whether you like it or not.

7              Do you think you can do that?

8              THE JUROR:  Yes.

9              THE COURT:  Okay.  Next juror.

10             THE JUROR:  My name is Jennifer Munson.  I

11   live in Newbury Park, California.

12             THE COURT:  Okay.  Occupation.

13             THE JUROR:  Registered nurse.

14             THE COURT:  At least we got some nurses here

15   in case anyone gets sick.

16             Anyone that works outside of the home?

17             THE WITNESS:  Yes.  My husband's the E.R.

18   technician.

19             THE COURT:  You've heard everything.  Is

20   there anything you should call to our attention as to

21   why you would not be an excellent juror?

22             THE JUROR:  No.

23             THE COURT:  Okay.  Next juror.

24             THE JUROR:  My name is Gloria Cuernoveg.  I

25   live in north L.A.

```
 1                THE COURT:  Okay.  Occupation.

 2                THE JUROR:  B and B.

 3                THE COURT:  Anyone that works outside the

 4    home?

 5                THE JUROR:  Yes.  My twin sister.  Surgical

 6    tech.

 7                THE COURT:  Is what?

 8                THE JUROR:  My twin sister is surgical tech.

 9                THE COURT:  You've heard everything that we

10    asked.  Anything come to you mind that might cause you a

11    problem as far as being a good juror?

12                THE JUROR:  No.

13                THE COURT:  You think you can be fair to

14    both sides?

15                THE JUROR:  I think so.

16                THE COURT:  Next juror.

17                THE JUROR:  My name is Linda Romo.  And I

18    live in Southgate, California.

19                THE COURT:  Occupation?

20                THE JUROR:  I'm a case manager for childcare

21    services.

22                THE COURT:  Is there anyone in the home that

23    works outside the home?

24                THE JUROR:  Yes.

25                THE COURT:  What type of work do they do?
```

```
 1                THE JUROR:  A machinist and a custodian.

 2                THE COURT:  Anything about their occupation

 3   or your occupation or any experiences you have had that

 4   you think that you would bring into a case like this?

 5                THE JUROR:  No.

 6                THE COURT:  You can be fair and impartial?

 7                THE JUROR:  Yes.

 8                THE COURT:  Just tell us what the evidence

 9   says, let the cards fall where they may.  You think you

10   can do that?

11                THE JUROR:  Yes.

12                THE COURT:  Next juror.

13                THE JUROR:  Good morning.  My name is

14   Jeffrey Churchman.  I'm a law student at Pepperdine.

15   And I live in Westlake Village.

16                THE COURT:  Anyone in the home that works

17   outside the home?

18                THE JUROR:  My wife works in medical

19   technology sales.

20                THE COURT:  So you have both the medical and

21   the legal field covered, right?

22                THE JUROR:  Trying.

23                THE COURT:  You know I'm going to ask you

24   some questions.

25                The second duty you have is to apply the law
```

```
 1    that I give to you at the end of the case.
 2              You're a law student.  You've been exposed
 3    to all kinds of law.  I may say something that differs
 4    with something that you may have heard in the classroom
 5    or someplace else, yet the requirement is that you
 6    follow the law that I give to you at the end of the
 7    case.
 8              Do you understand that?
 9              THE JUROR:  I understand.
10              THE COURT:  And oddly enough, the reality is
11    I've had jurors who were judges.  And I asked them the
12    same question, you know, whether you agree with the law
13    or not will you follow the law.  And they know they say
14    yes they would.
15              Do you have any problem following the law
16    that I give to you, whether you think it may be right or
17    wrong, you will follow the law that I give to you at the
18    end of the case?
19              THE JUROR:  I will follow that, yes.
20              THE COURT:  Can you think of any other
21    reason why you would not be a good juror?
22              THE JUROR:  My sister-in-law is a jeweler.
23              THE COURT:  I'll be asking you questions
24    about that.  We'll get back to that on the general
25    questions.
```

```
 1                    Thank you for bringing that up.

 2                    Next juror.

 3                    THE JUROR:  Hi.  My name is Michael Walea.

 4                    THE COURT:  Okay.

 5                    THE JUROR:  I'm an account executive for

 6       educational sales.  And I own an apparel business.

 7                    THE COURT:  I'm sorry.

 8                    THE JUROR:  I own an apparel business.

 9                    THE COURT:  I must have missed what you

10       said, where you're from, what location?

11                    THE JUROR:  I'm sorry.  I'm Camarillo,

12       California.

13                    THE COURT:  Long drove.

14                    THE JUROR:  Little bit, yep.

15                    THE COURT:  Anyone in the home work outside

16       the home?

17                    THE JUROR:  My wife does.  She is a swim

18       instructor.

19                    THE COURT:  You know, you're in the retail

20       business.  I'm assuming the two parties here are

21       affiliated with retail businesses also.  There may be

22       discussions as to how business is conducted and how

23       invoices are set, things like that.

24                    And you may be tempted to say, Well, I know

25       how it's -- it's done this way.
```

```
 1                THE JUROR:  Sure.

 2                THE COURT:  You can't assume it's done that

 3  way unless it comes in as evidence here and you hear it

 4  here in court.  You understand that?

 5                THE JUROR:  I understand that.

 6                THE COURT:  You have no problem limiting

 7  yourself just to what comes in in court?

 8                THE JUROR:  I have no problem to that.

 9                THE COURT:  You think you can be a good

10  juror?

11                THE JUROR:  Yes.

12                THE COURT:  We are going to get to some

13  general questions now.  If you raise your hand I am

14  going to be asking you questions.  Please wait until the

15  mic gets to you.

16                First of all -- and I think most of you have

17  indicated, but we have a plaintiff and a defendant and

18  we have some names here.  Have any of you dealt with

19  either of these companies in the past?

20                COLLECTIVE JURORS:  No.

21                THE COURT:  One of the things we are going

22  to talk about, I'm assuming, is going to be if one -- if

23  the defendant says I didn't get what I asked for or the

24  quality of what I asked for, we may be getting into

25  types of jewelry and evaluating jewelry, et cetera;
```

 1   whether or not it's consistent or not consistent with

 2   what was ordered.

 3              Anybody here has any expertise or experience

 4   with or friends or relatives that have experience with

 5   the jewelry -- we have one I'm going to be talking to.

 6   With the jewelry industry, or gems and how to evaluate

 7   and the quality of gems?

 8              Anybody here?

 9              THE JURORS:  No.

10              THE COURT:  Other than Juror No. 13.  Who is

11   it again that -- your sister?

12              THE JUROR:  My sister-in-law.

13              THE COURT:  Does she talk to you about her

14   work?

15              THE JUROR:  A little bit.

16              THE COURT:  Anything that she may tell you

17   as far as the quality of gems or what the jewelry

18   business is like?  Again, same question I asked about

19   law, can you leave it out of your deliberation here and

20   only consider what the evidence is that you presented

21   here in Court?

22              THE JUROR:  Yes, Your Honor.

23              THE COURT:  And if they say, this is A, and

24   you think from your sister, you know, I'm familiar with

25   that being B, you can take -- this is A, because that's

1   the only testimony you have, do you think you can do

2   that?

3                    THE JUROR:  Yes, Your Honor.

4                    THE COURT:  You don't think that will affect

5   you one way or the other in a case like this?

6                    THE JUROR:  No, Your Honor.

7                    THE COURT:  Okay.  Thank you.

8                    Has any of you been in a situation where you

9   have provided either services or products, whatever, and

10  not been paid?  By the way, all of us have been in this

11  situation.  What I want to know is, has anybody been in

12  a situation where they provided services or products,

13  not been paid for it, and you feel that that may affect

14  you or color your deliberation in a case like this?

15                   COLLECTIVE JURORS:  No.

16                   THE COURT:  I just asked the gentleman here,

17  whatever happened to you, you can't assume happened in

18  this case.  It has to be here in evidence.  Okay?

19                   Let me ask it the other way around:  Has

20  anybody ordered something, bought something, not gotten

21  the quality or not gotten what they expected to get?

22                   Again, we've all been there.  But the

23  question is:  Has anyone been in that situation where

24  it's so significant to you that it might filter its way

25  into this case and you wouldn't be limited just to the

1    evidence in this case?

2             Anybody at all?

3             COLLECTIVE JURORS:  No.

4             THE COURT:  Okay.  I should tell you before

5    we get started that this case -- I told you about three

6    or four days.  I'm hoping if we can to finish it this

7    week.  It may bleed into Monday.  But I think we can

8    finish it this week.

9             So I want you to be familiar with the timing

10   on it.  I also want you to be familiar with what you'll

11   be doing if you're picked as a juror as far as time is

12   concerned.

13            We -- starting tomorrow.  Today is all

14   messed up because we are picking the jury.

15            But starting tomorrow, every Court day will

16   start right at 8:30 in the morning, and it will go until

17   right at 4 o'clock in the evening.

18            At 4 o'clock, if the witness is testifying

19   and somebody asks a question, I'm going to say:  Ask it

20   tomorrow morning.  If they say, Well, this witness has

21   to go back to Chicago and I've only got two more minutes

22   left.  Tough.  At 4 o'clock I'm guaranteeing you as a

23   juror that you will be set free at 4 o'clock to do

24   whatever you have to do; pick up kids, make

25   appointments, whatever it is, 4 o'clock you know it's

1    your time from then on in.

2           The price you pay for that is 8:30 in the

3    morning, we start right at 8:30 in morning.  Not at 8:31

4    or 8:32.  Because if that happens, we might have to make

5    up time at the 4 o'clock dismissal.  But we start right

6    at 8:30.

7           In fact, I can even tell you more than that.

8    The morning session will be from 8:30 until 11:30.  You

9    set your clocks by this.  8:30 until 11:30.  It's a

10   three-hour block.  We'll give you a 15-minute break in

11   that three hours.  11:30 until 1 o'clock is your lunch

12   area.  At 1 o'clock, until 4 o'clock, which is another

13   three-hour block, will be just jurors.  We start right

14   at 1 o'clock.  End right at 4 o'clock.  We'll have a

15   15-minute break in there.

16          So that's what your day will be like.  And

17   you'll be concentrating into those three-hour blocks so

18   we can finish this on time and efficiently.  So I just

19   wanted to tell you.

20          Anybody have any problem with those times

21   we've been talking about?

22          COLLECTIVE JURORS:  No.

23          THE COURT:  Let me get to the jury.  We had

24   one juror that said they had been on a jury before.

25   Juror No. 6.  Juror No. 6.

```
 1                    What type of case were you on?
 2                    THE JUROR:  It was like a drunk driver
 3    that --
 4                    THE COURT:  Okay.  So that was a criminal
 5    case, drunk driving?
 6                    THE WITNESS:  Yeah.
 7                    THE COURT:  In a criminal case, they
 8    instructed you that you had to find -- in order to come
 9    back with a verdict against the defendant, you had to
10    find the defendant guilty beyond a reasonable doubt.
11    Very high standard.
12                    This is a civil case.  In a civil case, the
13    standard is much different.  In a civil case, it's one
14    person suing another person, who's going to win?
15    Whoever preponderates -- which means their case -- if
16    they preponderate by 51 percent or 50.1 percent, they
17    just tip the scales, they win.  They get all the marbles
18    and go home.
19                    So it's that tipping point at 50 percent.
20    It's the preponderance of evidence.  Whoever
21    preponderates.  It's not beyond a reasonable doubt.
22                    You understand the distinction in that
23    burden of proof.
24                    THE JUROR:  Yes.
25                    THE COURT:  You understand that this one
```

 1   is -- by preponderance of the evidence, it's not a

 2   criminal case?  Okay?

 3                  THE JUROR:  Yes.

 4                  THE COURT:  Were you able to reach a verdict

 5   in the case you tried?

 6                  THE JUROR:  Yes.

 7                  THE COURT:  I'm assuming there's nothing

 8   about that case that was similar to this case or

 9   anything you'd bring into this case; is that correct?

10                  THE JUROR:  No.  It is different.

11                  THE COURT:  Everybody on the jury, are you

12   comfortable with the fact that you can follow the

13   Court's instruction insofar as preponderance of

14   evidence, not beyond a reasonable doubt?  Everybody

15   clear on that.  Okay.

16                  Let me ask you one more question then I am

17   going to be talking to the attorneys over here.

18                  But before I get there, I want you to think

19   about this scenario.  I asked one of the jurors this

20   earlier.  But I want to make sure that if you were on

21   either side, the plaintiff or the defendant, would you

22   be satisfied that people like you, a jury made up of

23   people like you would give you a fair trial?  Not that

24   you'd win.  But you would get a fair trial under the

25   rules that I've just stated.

1          And that you would be comfortable with

2  people like you hearing your case.  Everybody feel that

3  way?

4          COLLECTIVE JURORS:  Okay.

5          THE COURT:  I will have counsel come over.

6  I need one attorney from each side over here at the side

7  bench.

8          We're going to be talking over here.  We're

9  going to turn the microphones off.

10          You may not believe it, but we are turning

11  the microphones off because we don't particularly want

12  you to hear what we're talking about over here.  In

13  fact, we will be whispering over here.

14          So can I have all of you promise that

15  nobody's going to try to read lips or eavesdrop?

16          COLLECTIVE JURORS:  Yes, Your Honor.

17          THE COURT:  You 'd be bored to death if you

18  heard what we're talking about over here.

19          But we will come back in after we have a few

20  minutes of discussion over here.

21          During that period of time, I'm going to ask

22  you to be quiet if you can, because we will be talking

23  over a microphone that the reporter will be picking up

24  on, so we need quietness at that time.

25          (OUT OF JURORS PRESENCE)

1          THE COURT:  When you speak would you

2     identify yourself, because the reporter can't see who is

3     talking.

4          The first question I have is:  Does anybody

5     have any challenges for cause?

6          MR. YORK:  No.

7          MR. SINGH:  No.

8          THE COURT:  Now, we have peremptory

9     challenges.  Each side gets four peremptory challenges.

10    You don't lose it if you pass -- both pass.  First

11    peremptory strike with the plaintiff.

12         MR. YORK:  Number 4, Mr. Maldonado.

13         THE COURT:  Okay.  And Juror 9 will go into

14    4's position.

15         Peremptory strike now with the defense.

16         MR. SINGH:  Yashdeep Singh.  Number 14.

17         THE COURT:  Only as to the first eight.

18         MR. SINGH:  Sorry.

19         THE COURT:  You don't want to challenge

20    until you have to.  These are the first eight.

21         MR. SINGH:  Pass.

22         THE COURT:  With the plaintiff?

23         MR. YORK:  Number -- you said just the first

24    eight?

25         THE COURT:  Otherwise the others aren't

1   there yet.

2                MR. SINGH:  Alternates?

3                THE COURT:  I can touch upon that in a

4   second.

5                MR. YORK:  Pass.

6                THE COURT:  Okay.  We have a jury then.

7                As far as in a civil case in federal court,

8   it has to be unanimous verdict of six or more.  We

9   choose eight.  Which gives us six.  We have a leeway.

10  We choose eight.  Has to be eight, seven, six.  Has to

11  be at least six.  No alternate.  Just part of the jury.

12  Okay.  Let's see.  Okay.

13               I will take a break before you have to talk

14  on it.

15               I probably give preliminary instructions

16  first, and then we will take a break before either one

17  of you have to talk.

18               (OPEN COURT.)

19               THE COURT:  Okay.  Juror No. 9, if you could

20  stand up, please.  Excuse me.  Juror No. -- not 9.

21  Juror No. 4.  Okay.

22               At this time you are excused to go back to

23  the jury room.  Thank you very much for being with us.

24               Okay.  Juror No. 9, I will have you to back

25  and take seat No. 4, please.  Juror No. 9.

```
 1              Okay.  Now I'm going to have the eight

 2   jurors in the back row please stand up.

 3              Juror No. 9, you are now Juror No. 4.  If

 4   you would stand up, please.

 5              And if the eight of you would please raise

 6   your right hand and be sworn in as a jury in this case.

 7              THE CLERK:  Ladies and gentlemen of the

 8   jury, do you solemnly swear that you will well and truly

 9   try the cause now before this Court, and a true verdict

10   therein render according to the evidence and

11   instructions of the Court, so help you God?

12              THE JURORS:  Yes.

13              THE COURT:  Thank you.  You can have a seat.

14              The remaining jurors and the remaining

15   jurors out there, we picked a jury much faster than we

16   thought, and so at this time I'm going to excuse you to

17   go back to the jury room.  If you want to come back and

18   sit in on the trial, feel free to because it's a public

19   trial.  But you probably won't want to.

20              But one way or the other if you want to go

21   back to the jury room, they may have another case for

22   you at this time.  So I'm going to excuse the remaining

23   jurors here in the front row and the jurors here to go

24   back to the jury room.

25              Ladies and gentlemen, we are moving very
```

1    efficiently here.  We will start the trial pretty soon.

2    But before we start the trial, I've got to talk to you a

3    little bit about two things.

4              One is just in general your conduct.  And

5    number two is the preinstructions.  The preinstructions

6    are just instructions that I will give you at this time

7    to help you understand what's going on and what's coming

8    into trial.  At the end of the case I'll give you the

9    final instructions that govern the case.  Okay?

10             So preinstructions are just kind of an

11   insight to what might be happening.

12             First of all, let me talk to you about

13   conduct.  And I will be reading an instruction on that

14   also.  But during the course of the case, it is very

15   important -- and I'll be instructing you every time we

16   break, you're not to discuss the case among yourselves

17   or with anybody else or form or express any opinions

18   about the matter until you retire to the jury room for

19   your deliberations.

20             You may say, well, that doesn't make any

21   sense.  I'm a juror in this case.  What do you mean I

22   can't form or express any opinions about the matter?

23             Jury trials are very unique.  Jury trials

24   are set up for you to listen to all the evidence.  And

25   after you have listened to the evidence, go back to the

1   jury room, deliberate, and hear what all the other

2   jurors have to say.  And then form or express your

3   opinion on it.

4             But not until you've heard the evidence and

5   heard what the other jurors said.  And, of course,

6   that's obvious why that's true, because if you right

7   away say, Well, I'm forming an opinion, maybe very hard,

8   even though it's wrong, for you to come off that opinion

9   because of pride whatever it is.

10             So in a jury, you never form or express an

11   opinion until you heard all the evidence and heard the

12   input of all the other jurors, and then form or express

13   your opinion.

14             Also it's very important that you not talk

15   to anybody.  And I will be addressing that a little bit

16   in the instructions.  But you may be -- anybody involved

17   in this case or anything to do with the case.  You may

18   be out in the elevator and one person says hello to you.

19   Or you may say hello to them.  You may say good morning,

20   just being polite.

21             If you do, they'll look through you just

22   like you don't exist.  That's because they're under a

23   Court order also not to talk to you at all.

24             You may say, well, what's "Good morning"?

25   How does that help or hurt one way or the other?

1             If one side sees a juror talking to somebody

2    on the other side, and they don't know what you're

3    talking about, it's going to make they very

4    uncomfortable.

5             So we don't want you talking or having any

6    communication with anybody involved in the case until

7    the case is over.

8             So at this time, let me go ahead and give

9    you some of the preliminary instructions on it and then

10   we will take a short break.

11            Now that you're the jury in this case, I

12   want to take a few minutes to tell you something about

13   your duties as jurors and to give you some preliminary

14   instructions.

15            At the end of the trial, I'll give you more

16   detailed written instructions that will control your

17   deliberations.

18            When you deliberate, it will be your duty to

19   weigh and evaluate all the evidence received in this

20   case, and in that process to decide the facts.

21            To the facts as you find them, you will

22   apply the law as I give to you, whether you agree with

23   that law or not.

24            You must decide this case solely on the

25   evidence and the law before you.

1            Perform these duties fairly and impartially.

2   Do not allow personal likes or dislikes simply prejudice

3   fear or public opinion to influence you.

4            You should also not be influenced by

5   anybody's race, color, religion, national ancestry or

6   gender.

7            The evidence you are to consider in deciding

8   this case consists of the sworn testimony of witness,

9   number one; any exhibits that are received into

10  evidence, number two; and any facts to which both

11  parties have agreed.  Those three and only those three

12  you are to use to decide what the evidence is.

13           The following things are not evidence and

14  you must not consider them as evidence in deciding the

15  facts of the case.  Statements and arguments of

16  attorneys is not evidence.  Questions or objections of

17  the attorneys, not evidence.  Testimony that you are

18  instructed to disregard, obviously, is not evidence.

19  And anything that you may see or hear when Court is not

20  in session, even though what you see or hear may have

21  been done by one of the parties or one of the witnesses,

22  it is not evidence.

23           Remember, evidence only comes from the sworn

24  testimony of witnesses under oath and the exhibits.

25           Evidence may be either direct or

1    circumstantial.

2              Direct evidence is direct proof of a fact,

3    such as the testimony by a witness about what that

4    witness personally saw or heard or did.

5              Circumstantial evidence is indirect

6    evidence; that is, it is proof of one or more facts from

7    which you can find another fact to be true.

8              You are to consider both direct and

9    circumstantial evidence.  Either can be used to prove

10   any fact.  The law makes no distinction between the

11   weight to be given to either direct or circumstantial

12   evidence.  It is for you to decide how much weight any

13   evidence is entitled to.

14             There are rules of evidence that control

15   what can be received into evidence.  When a lawyer asks

16   a question or offers an exhibit into evidence, and the

17   lawyer on the other side thinks it is not permitted by

18   the rules of evidence, that lawyer may object.

19             If I overrule the objection, the question

20   may be answered and the exhibit received.  If I sustain

21   the objection, the question cannot be answered and the

22   exhibit cannot be received.

23             Whenever I sustain an objection to a

24   question, you must ignore that question, and must not

25   guess as to what the answer might have been.  An example

1   everybody knows about is:  Have you stopped beating your

2   wife?  And it's sustained as a question.  You can't

3   assume that they ever were beating their wife, because

4   it never came in as evidence.  It's only part of the

5   question.

6           So the questions are not evidence.  All they

7   do is give meaning to what the answers might be.

8           Sometimes I order that evidence be stricken

9   from the record or that I -- you disregard that or

10  ignore that evidence.

11          That means that when you are deciding this

12  case, you must not consider the evidence I've you to

13  disregard.

14          In deciding the facts of this case, you may

15  have to decide which fact to believe and which testimony

16  not to believe.

17          You may believe everything that a witness

18  says or part of it or none of it.

19          In considering the testimony of a witness,

20  you may take into account, number one, the witness'

21  opportunity and ability to see or hear or know the

22  things testified to.

23          Or number two, the witness' memory.

24          Three, the witness' manner while testifying.

25          Four, the witness' interest in the outcome

1   of the case, if any.

2              Five, the witness' bias or prejudice, if

3   any.

4              Six, whether other evidence contradicts the

5   witness' testimony.

6              Seven, the reasonableness of the witness'

7   testimony in light of all the other evidence.

8              And eight, any other factor that bears on

9   believability.

10             The weight of the evidence as to a fact does

11  not necessarily depend on the number of witnesses who

12  have testified about it.  It is important -- what is

13  important is how believable the witnesses are and how

14  much weight you feel that their testimony deserves.

15             I've talked to you about conduct of the

16  jury.  Let me say a few words about that.  First, keep

17  an open mind through the trial and do not decide what

18  your verdict should be until you and your fellow jurors

19  have completed your deliberations at the end of the

20  case.

21             Because you must decide this case based only

22  on the evidence received in this case and on my

23  instructions as to what the law applies, you must not be

24  exposed to any other information about this case or the

25  issues it involves during the course of your jury duty.

1    Thus until the end of the case or until I tell you

2    otherwise, do not communicate with anyone in any way,

3    and do not let anyone communicate with you in any way

4    about the merits of the case or anything to do with it.

5               This includes discussing the case in person,

6    in writing, by phone, by electronic means, via email or

7    any other form of social media.

8               I will give you -- well, until I give you

9    this case for deliberation, it is -- it applies to

10   communication with everyone else, including your family

11   members or employer and the people that are involved in

12   this trial.

13              Although you may notify your family or your

14   employer that you have been seated on a jury in this

15   case and how long you expect the trial to last, but if

16   you are asked or approached in any way about your jury

17   service or anything to do with this case, you must

18   respond that you have been ordered not to discuss the

19   matter and report it to the -- report that conduct to

20   the Court immediately.

21              A jury who violates these restrictions

22   jeopardizes the fairness of these proceedings and a

23   mistrial could result which would require the entire

24   trial process to start over again.

25              If a jury is exposed to any outside

1    information, please notify the Court immediately.

2                    At the end of the trial you will have to

3    make a decision based on what you recall of the

4    evidence.

5                    You will not have a written transcript of

6    trial, so I urge you to pay very close attention to the

7    testimony that is given.  If you wish, you may take

8    notes to help you remember the evidence.

9                    If you do take notes, though, please keep

10   them to yourselves until you and your fellow jurors go

11   back to the jury room and decide this case.

12                   Do not let notetaking distract you from

13   being attentive to the evidence.

14                   When you leave the Court for recess, your

15   notes should be left in the courtroom, And we will

16   guarantee that nobody will read those notes.

17                   Whether or not you take notes, you should

18   rely on your own memory of the evidence.  Notes are only

19   there to assist your memory.  You should not be overly

20   influenced by your notes and the notes of others.  It is

21   your memory, not the notes that control.

22                   We are going to take a short break.  When we

23   come back from that break, we will get into what we call

24   open statements.

25                   Let me talk a little bit about that.  The

1    next phase of the trial will -- first, each side will

2    have an opportunity to make an opening statement.

3              Opening statement is not evidence.  It's

4    simply an outline to help you understand what the

5    parties expect the evidence will show.  The party is not

6    required to make an opening statement if they don't want

7    to.

8              After opening statements are made, the

9    plaintiff will have the opportunity to call their

10   witnesses, and the defendant then can cross-examine.

11             Then the defendant can call their witnesses

12   and the plaintiff's attorney can cross-examine.

13             After they both have rested, we will have

14   the -- argue the case to you.  And after they argue the

15   case to you, I will instruct you on the law that

16   applies to the case.  And we'll send you back for your

17   deliberations.

18             Do you have any questions at this time?

19             If not, we will take a break at this time.

20   And we'll come back in and we'll go into opening

21   statements as soon as you come back.

22             So we'll take about 15 minutes.  And, again,

23   I told you I'd try to remember to say this every time we

24   break:  You are to form or express any opinions about

25   the matter until it is submitted to you and you retire

1   to the jury room.  Keep that in mind.  See you back

2   there in 15 minutes.

3              (RECESS.)

4              THE COURT:  Let the record reflect that all

5   the members of the jury are in their respective seats in

6   the jury box.  Okay.

7              Ladies and gentlemen, we've come to that

8   point where I talked to you before that this is the time

9   for opening statement.  Each side will have an

10  opportunity if they wish to make an opening statement to

11  you.

12             Again, keep in mind, opening statements --

13  it's not an opportunity to argue the case to you.  They

14  get that at the end of the case.  It is not an

15  opportunity to present evidence, because they get to do

16  that during the evidence.

17             It is an opportunity for them to show or to

18  say what they think the evidence will show.  That's so

19  you can track the evidence as it come in.  So it's kind

20  of a preliminary what they think the evidence will show.

21             Counsel for the plaintiff.

22             MR. YORK:  Thank you, Your Honor.

23             So ladies and gentlemen, I'm going to be

24  showing you some slides in a few minutes.  For now you

25  can see on the monitors it's just the name of the case.

1    And there's a monitor also on this side, although it may

2    not be easy to see, depending on where you're sitting.

3              So, again, I represent plaintiff Strong

4    Trading.  Plaintiff means that we are the company that

5    filed the lawsuit.  And we are suing Unique Designs, who

6    is the company on the other side.

7              As I mentioned before, you will hear from

8    two witnesses.  The first witness is going to be Amy

9    Chu, who is sitting here, who is the chief financial

10   officer of Strong Trading.  And you will also hear from

11   Kurt Chien seated here who is an employee of Strong

12   Trading.

13             There are some Court cases that are

14   entertaining.  They may have juicy facts.  There may be

15   a certain amount of drama.  There may be celebrities

16   involved.

17             This is not one of those cases.  This is a

18   simple case, breach of contract.  And it is pretty dry.

19   Because of the kind of case this is, there is really

20   nothing that can be done about the fact that the case is

21   pretty dry.

22             At the same time, your time is important.

23   So what we are going to do is to reduce the amount of

24   time that we are going to spend presenting our case as

25   much as possible, obviously to minimize then the amount

1   of time that you have to spend as much as possible, and

2   also to try to make up for the fact that this case is

3   pretty dry.

4           So we are going to be presenting our case in

5   short, sweet, get-to-the-point process as possible.

6           So let me get right to my opening statement.

7   The purpose of an opening statement is to tell you what

8   this case is about and give you an overview of our case

9   and explain what we believe the evidence will show.

10          In this case the evidence will show the

11   following:

12          As I said, there are two companies involved

13   in the case:  Strong Trading and Unique Designs.

14          Strong Trading is a company based locally,

15   as you heard, in Arcadia, and has about 13 employees.

16          Strong Trading is a company based in New

17   Jersey.  It's got a number of employees.  Certainly it's

18   a larger company than Strong Trading.

19          Strong Trading and Unique Designs are both

20   in the jewelry business.

21          Unique Designs is a wholesaler and

22   distributor, which means it purchases jewelry and

23   resells it.

24          On the other hand, Strong Trading is what is

25   known as a trading company as the name suggests.  And

1    what a trading company does and what Strong Trading does

2    is it acts as a go-between between companies like Unique

3    Designs that want to purchase jewelry.  And a factory

4    that will manufacture the jewelry.

5              Basically Unique Design orders jewelry from

6    Strong Trading.  And Strong Trading then orders the

7    jewelry from a factory.

8              As I said, this is a simple case of breach

9    of contract.

10             Let me show you the first slide.

11             In this case there are basically four

12   questions.  Number one:  Did Strong Trading, Unique

13   Designs enter into a contract for the purchase of goods?

14             Excuse me.  Your Honor.  This is what is

15   known as operator error.

16             THE COURT:  That's why we are lawyers and

17   not technicians, Counsel.

18             MR. YORK:  Let me start over.  I apologize.

19             Did Strong Trading, Unique Designs enter

20   into a purchase of goods?  The answer is yes.

21             Did Unique Designs receive those goods?  The

22   answer is yes.

23             Did Unique Designs ever return those goods?

24   The answer is no.

25             Did Unique Designs pay for those goods?  The

1    answer is no.

2              What is the balance due?  Unique Designs

3    owes Strong Trading $369,441.12.

4              Obviously, we may from time to time refer to

5    that as $370,000 just so we don't have to keep track of

6    the pennies.

7              So what's the relationship between the two

8    companies?  So let me show you the next slide.

9              You will see on the left-hand side there is

10   a box that says "Unique Designs" in it.  And on the

11   right-hand side there is a box that says "Strong

12   Trading" in it.

13             There is a contract between Unique Designs

14   and Strong Trading.  You will notice that on the far

15   right there is a reference to some factories.  The

16   reason that that reference is there is because I

17   mentioned Strong Trading orders jewelry from factories.

18             And on the left-hand side you will see that

19   there's some reference to customers.  Those references

20   are there because Unique Designs is a wholesaler and

21   distributor, and they in turn resell jewelry to

22   customers.

23             Who was the contract between?  Now, don't

24   worry about trying to look at the documents on the page

25   right now because it is too small to read.  This is the

1    face page of the contract.  And obviously, again, it is

2    too small to read, so what I'm going to do is I'm going

3    to blow up parts of it.

4              So the first part that we have blown up

5    is -- you will see in the paragraph referring to Payment

6    Terms, the first highlight says, "New customers of

7    Strong Trading."

8              You will notice that the second highlight,

9    again, the name Strong Trading is highlighted, and it

10   says basically, If Strong Trading doesn't pay, Strong

11   Trading has a right to take legal action against Unique

12   Designs.

13             The third highlighted part says, "I/we," and

14   I/we in this case is Unique Designs, "have read the

15   above contract" that again refers to "Strong Trading."

16   It again says, "accept these terms as a basis for

17   transaction business between my/our company and Strong

18   Trading."

19             And finally the last part of it is the

20   signature.  The contract was signed by Unique Designs.

21             So this is the contract.  And the contract

22   is between Unique Designs and Strong Trading.

23             The next slide is another page from the

24   contract.  And, again, the left-hand side is a little

25   too small to read so I've blown up the right-hand side.

1        Strong Trading has an office in Hong Kong.

2    And the office is called Strong Jewelry.  In some

3    cases -- and you can hear about this in trial.  In some

4    case the invoices are sent by Strong Trading's Hong Kong

5    office.  And the invoices have the name of Strong

6    Trading's Hong Kong office on the invoice.

7        And what this particular paragraph or page

8    from the contract says is, If the invoice has Strong

9    Jewelry's name on it; in other words, Strong Trading's

10   Hong Kong's main office -- excuse me, the name of Strong

11   Trading's Hong Kong office on it, you send the payment

12   to Strong Trading's Hong Kong office.

13       And if the invoice has the name of Strong

14   Trading, you send the payment to Strong Trading.

15       And again, you will notice at the bottom

16   this information is coming from the accounting

17   department at Strong Trading.  So Strong Trading is

18   telling people that when you pay, you send the payment

19   one place.  If the invoice says one thing, you send the

20   payment someplace else, if the invoice says something

21   else.  Okay.

22       So how does the process start?  The next

23   slide.

24       Unique Designs sends a design to Strong

25   Trading.  Strong Trading then sends that information to

1    a factory.  The factory manufactures the jewelry and

2    ships it to Unique Designs.

3              And then Unique Designs tests and approves

4    the jewelry.  How does the ordering process work?

5              By the way, just to clarify, this is for

6    ordering samples not the final goods that somebody

7    decides to buy.

8              So how does the ordering process work?

9    Number one, Unique Designs sends an order to Strong

10   Trading.

11             Number two, Strong Trading sends an order to

12   the factory.

13             Number three, the factory, of course,

14   manufactures the jewelry.

15             Number four, the factory ships the jewelry

16   to Strong Trading's Hong Kong office.  Strong Trading

17   Hong Kong office then adds an invoice to the shipment.

18   Then they forward the shipment on to Unique Designs.

19             Unique Designs receives the jewelry and

20   approves it.  And then Unique Designs pays Strong

21   Trading through Strong Trading's Hong Kong office.

22             Now, at least that's what supposed to

23   happen.  In this particular case Unique Designs did not

24   pay Strong Trading for the jewelry.  But at least this

25   is the way the process is supposed to work.

1          Now, during this trial, you are going to

2   hear about different types of stones.  So I wanted to

3   give you a little chart on stones just so you will have

4   some idea of what we are talking about.

5          If you'll notice on the chart there are

6   three levels of stones.

7          Genuine stones, real stones are the most

8   expensive.  They are at the top.

9          The next level down are lab-created stones,

10  which are not real stones.

11         And there's also semi-precious stones which

12  are real stones but they're less expensive.

13         You will notice that the price is about the

14  same in those two in the second level.

15         Number three, the least expensive is glass.

16         I have one more slide to show you.  This

17  will be the last slide.

18         This is a chart that shows Unique Designs'

19  orders, invoices and balances due.

20         So first of all, you notice that there is a

21  timeline across the bottom from June 2020 through

22  March 2021.

23         Next I've added a line.  What this line does

24  is it show the amounts that Unique Designs owed to

25  Strong Trading at various points in time along this

1    timeline.

2              You will notice that from June through

3    August 2020, the amount that Unique Designs owed was

4    from 136,000 to 167,000.

5              The next month, September 2020, the amount

6    that Unique Designs owed skyrocketed.  Went way up.  All

7    the way -- went up over 300,000 to about 476,000.

8              Now, the balance went down a little bit the

9    next month.

10             But starting from August -- excuse me,

11   October 2020, all the way through March 2021, the

12   balance due was always over $300,000.  It was a

13   substantial amount of money.

14             Strong Trading tried for months and months

15   to get Unique Designs to pay its bills.  Unique Designs

16   would not do so.

17             So in January 2021, Strong Trading told

18   Unique Designs, We can't do any more business with you

19   unless you pay for the jewelry you've already received.

20             In the meantime, you will see the invoices

21   not paid.  These are the invoices that have been piling

22   up and not paid during this period of time.

23             What happened next?  35 days went by.

24   Another 35 days from January 2021.  So we started out in

25   June 2020.  We've gone all the way to January 2021.

1    35 days goes by and Unique Designs claims for the very

2    first time that there has been a bait and switch

3    involving jewelry.

4              After all this time that was the first time

5    that they raised this issue.

6              THE COURT:  You have about three minutes.

7              MR. YORK:  Thank you, Your Honor.

8              Let me just tell you what the evidence will

9    show, again, Strong Trading sold jewelry to Unique

10   Designs.  Unique Designs received it.  It didn't pay for

11   the jewelry.  And it did not return the goods.

12             Now, briefly let me tell you one other

13   thing.  Mr. Chien is also being sued in this case.

14   Mr. Chien is an employee who has worked for Strong

15   Trading for 18 years.  He's not an owner.  He's an

16   employee.  He happened to handle the account with Unique

17   Designs.  You will hear testimony that he has handled

18   hundreds of orders, dealt with hundreds of customers,

19   dealt with ten of thousands of pieces of jewelry.  And

20   until he told Unique Designs that we would not do any

21   more business with Unique Designs until it paid its

22   balance, that was the first time he had ever received a

23   complaint that he had engaged in some kind of bait and

24   switch conduct.

25             Again, we believe the case is simple.  We

1    believe the conclusion is also simple.  And that is

2    Unique Designs owes Strong Trading again in round

3    numbers $370,000.

4              Thank you for your time.

5              THE COURT:  Thank you very much, Counsel.

6              Counsel, would you care to make an opening

7    statement?

8              MR. SINGH:  Thank you, Your Honor.

9              Thank you, Your Honor.

10             Ladies and gentlemen of the jury, good

11   morning.  I'm sure you're getting tired of me

12   introducing myself, but I will do it one last time.

13   Mr. Ohn and I represent the defendant and

14   counterclaimant Unique Designs.  I had also hoped to

15   introduce the president of the company Tejas Shah, who

16   flew out here from the East Coast to be present today.

17   Sadly he tested positive for COVID yesterday.  So he

18   will not be able to join us.  But we will try to do this

19   without him.

20             This case like any business dispute case

21   centers on what promises were made and by whom.

22             Both sides have responsibilities and

23   obligations.  Strong Trading focuses only on what it

24   believes Unique Designs was supposed to do.  It ignores

25   everything else.  It ignores what the rights of the

1    actual parties are, and whether it's even the right

2    party to claim it was harmed.

3              Strong Trading also ignores that Unique

4    Designs was made promises and that Strong Trading

5    ignored its own responsibilities.

6              When you hear the evidence in the case, you

7    will understand why Strong Trading has tried so hard to

8    ignore its promises, its responsibilities and the rights

9    of the parties.

10             So let's turn to Strong Trading's one and

11   only claim in this case:  Breach of contract.

12             To recover anything in this case, Strong

13   Trading must prove that it was harmed by a breach of

14   contract.

15             This is what I will call the wrong party

16   issue.  Back in 2017, Unique Designs began a business

17   relationship with a company to buy particular jewelry

18   items for its customers.  Strong Trading claims it was

19   that company.

20             In fact, as you just saw in Mr. York's

21   opening statement, the company that Unique Designs

22   actually entered the business relationship was with a

23   company called Strong Jewelry H.K. Company Limited.

24             I'll refer to as Strong Jewelry or Strong

25   Jewelry Hong Kong to avoid any confusion.  And for my

1    own ease.  It's a Hong Kong based company.

2                Over the course of that business

3    relationship, Unique Designs bought about two and a half

4    million dollars worth of jewelry from Strong Jewelry

5    Hong Kong.

6                I don't have a fancy flow chart to show

7    that.  But the process is very simple.  For every order

8    from Unique Designs, Strong Jewelry processed the orders

9    in Hong Kong.  Delivered the items from Hong Kong.

10   Prepared invoices in Hong Kong.  And issued invoices

11   from Hong Kong on its letterhead; that is, on Strong

12   Jewelry Hong Kong's letterhead.  And Unique Designs paid

13   Strong Jewelry Hong Kong.

14               Yet, it's Strong Trading in California

15   that's brought this lawsuit to get involved in a dispute

16   between Strong Jewelry and Unique Designs.

17               To find out about the relationship between

18   these two companies that have a very similar name, I

19   took the deposition of a representative of Strong

20   Trading here in California.

21               At the deposition, the witness was asked

22   questions and answered them under oath, just as she will

23   here.

24               The witness' name is Amy Wade Chu.  She is

25   the chief financial officer of Strong Trading and

1    account manager at Strong Trading.

2              At her deposition I showed Ms. Chu a copy of

3    the contract that was just shown to you in the opening

4    statement of Strong Trading.  That is a contract it

5    claims was breached in this case.

6              What Strong Trading ignored is that there

7    was an additional party identified in that contract.  So

8    I asked Ms. Chu about this.  Here's her testimony.  This

9    is from page 78 of her deposition, lines 6 through 11.

10              "QUESTION:  Is this agreement marked as

11    Exhibit C" -- and that's the contract that we were just

12    talking about that's the subject of this lawsuit -- "an

13    agreement between Strong Jewelry and Hong Kong and

14    Unique Designs?"

15              "ANSWER:  Under oath, yes."

16              MR. SINGH:  But Ms. Chu's sworn testimony

17    continued.

18              I will go back to my previous slide.  If you

19    look at the Strong Trading column, that's also from

20    Ms. Chu's testimony.  She made clear that Strong Trading

21    is a completely separate company from Strong Jewelry

22    Hong Kong.  Neither company owns the other.

23              And Ms. Chu, the CFO of Strong Trading,

24    admitted the invoices at issue in this case are all from

25    Strong Jewelry Hong Kong.

```
 1              But it is Strong Trading in California
 2    that's seeking to collect those Strong Jewelry invoices.
 3              So I ask the most logical questions:
 4    "First, according to these payment instructions," again,
 5    from the contract we just saw from Strong Trading's
 6    opening statement, "an invoice from Strong Jewelry has
 7    to be paid to Strong Jewelry, right?  According to the
 8    document?"
 9              The answer.  "The shipment, yes.  Because
10    the shipment coming out of Hong Kong so payment goes to
11    Hong Kong."
12              From Ms. Chu's deposition again, page 8,
13    lines 22 to 25.
14              "QUESTION:  Strong Trading isn't owed any
15    money on an invoice that comes from Strong Jewelry Hong
16    Kong, is it?
17              "ANSWER:  Unambiguously and under oath, no."
18              MR. SINGH:  So what damages did Strong
19    Trading in California suffer if all the invoices in this
20    case are payable to a different company?
21              There is another critical element of Strong
22    Trading's case, and that is, whether the obligations
23    owed to Unique Designs and the promises made to Unique
24    Designs were fulfilled.
25              I'll call this the wrong items issue.  Over
```

1    the three-plus years that Unique Designs purchased

2    numerous jewelry items from Strong Jewelry Hong Kong,

3    frequently reordering the same items for its customers,

4    Strong Trading, a self-described middle person, will

5    claim it was involved in fulfilling orders for jewelry

6    that Unique Designs placed with Strong Jewelry.

7              From the start of that relationship all the

8    way through September 2020, Unique Designs fully paid

9    all the Strong Jewelry invoices.  That's undisputed.

10              But in October 2020, the relationship

11    soured.  Unique Design was promised throughout its

12    orders, reorders, paying on the invoices that it would

13    receive and was receiving all the goods that it ordered.

14              By October 2020, Unique Designs had already

15    paid Strong Jewelry over $2 million for thousands and

16    thousands of jewelry items.  And that's when Unique

17    Designs learned they were sent the wrong jewelry items.

18    Or as Strong Trading referred -- Strong Trading refers

19    to it, the, quote, wrong stone issue.

20              It was clear, based on emails from the

21    manager of Strong Trading, Kurt Chien, that the wrong

22    stone issue had been ongoing since the beginning.

23              For example, rather than the beautiful

24    emerald, sapphire and ruby jewelry Unique Designs had

25    actually ordered, Strong Jewelry sent colored glass.

1    Let me say that again.  Colored glass.  Colored glass is

2    not even a gem stone.

3              And rather than admit that Unique Designs

4    was sent the wrong items and mistakes were made, Strong

5    Trading doubled down.

6              The CFO, Ms. Chu, actually testified that

7    even if a customer is sent a different, lower quality

8    item than what the customer actually ordered, it is

9    still not a wrong item.

10              Let me show you that testimony.  This is

11    from Ms. Chu's deposition, page 150, lines 9 through 13.

12              "If the purchase order, that's a purchase

13    order coming from a customer, says we're ordering

14    aquamarine, which is a higher quality blue-colored

15    stone, and they are sent topaz, which we saw earlier was

16    a lower quality, also blue-colored stone, do you agree

17    with me that the customer has been sent an improper

18    good?  In other words, customer orders aquamarine,

19    higher quality blue-colored stone but gets something

20    else, a topaz, lower quality blue stone, the answer

21    again, unequivocally, under oath, no."

22              This most unusual testimony notwithstanding,

23    Strong Trading cannot deny that wrong items were sent to

24    Unique Designs.  In fact, didn't even mention it during

25    the opening statement.

1           And how could it deny Unique Designs was

2    sent the wrong items?  No one from Strong Trading was in

3    Hong Kong to oversee the delivery of the items.  It did

4    not inspect the items.  It was never involved in the

5    delivery process at all.  It had no idea what items were

6    actually sent to Unique Designs.

7           On the other hand, Unique Designs did confer

8    that the items were wrong.  In fact, a third-party

9    testing laboratory that Strong Trading hired, a company

10   called Mutual Cornel, confirmed that the same jewelry

11   items that Unique Designs had purchased were glass.

12          The financial impact of these wrong items

13   was huge.  Unique Designs was purchasing these jewelry

14   items based on its customer's needs and specifications,

15   which Strong Trading knew.  After the wrong items were

16   delivered, customers -- Unique Designs' customers

17   rejected the goods and penalized financially Unique

18   Designs which Strong Trading also new.

19          Before this lawsuit was filed, Unique

20   Designs was offered a partial credit for the jewelry

21   items and partial payment for the lost profit with its

22   customers.

23          Obviously, Strong Trading recognized the

24   role it had played in the financial harm caused to

25   Unique Designs.  The amount offer was insulting and

1   nowhere close to the actual impact to Unique Designs'

2   business.

3            At the conclusion of this case -- at the

4   conclusion of this case, Unique Designs respectfully

5   request that you the jury award Strong Trading nothing,

6   nothing for the Strong jewelry invoices.

7            Awarding anything to Strong Trading would

8   only add to the financial damage suffered by Unique

9   Designs.  Unique Designs also respectfully requests that

10   an award of damages for the harm and loss it was caused

11   by Strong Trading and its manager Kurt Chien be awarded

12   too.

13            Thank you.

14            THE COURT:  Thank you very much, Counsel.

15            Ladies and gentlemen, normally, as I said,

16   we go right up to 11:30.  We will breaking at this time.

17   I have another jury that's deliberating.  I've got to

18   also talk to them.

19            So I'm going to break for lunch at this

20   time, about ten minutes early, if you don't mind.

21            See you back in at 1 o'clock.  1 o'clock

22   sharp.

23            Again, I can't stress how important it is

24   that we start right on time.  So at 1 o'clock.  And

25   we'll go until 4 o'clock.

1
2    Remember the admonishment not to discuss the case among
3    yourselves or with anybody else or form or express any
4    opinions about the matter until it's submitted to you
5    and you retire to the jury room.
6              At 1 o'clock we'll start right in with the
7    evidence.
8              (LUNCH TAKEN.)
9              THE CLERK:  All rise.  This Court is again
10   in session.
11             THE COURT:  Let the record reflect that all
12   the members of the jury are in their respective seats in
13   the jury box.
14             I apologize.  I hate when we don't do things
15   on time.  We had another jury and we were taking the
16   verdict.
17             Now they are gone.  The Court is yours.
18   We're not going to have any more distractions.  We will
19   go straight through without any delays.
20             We're getting to the point now where you
21   will hear the evidence that you will use to determine
22   what the facts are.
23             Counsel, ready to proceed?
24             MS. ALPARCE:  Yes, Your Honor.
25             THE COURT:  You may call your first witness.

1          MS. ALPARCE:  Plaintiff and

2    counter-defendants would like to call Amy Wei Chu to the

3    stand.

4          THE CLERK:  Please raise your right hand.

5          (Witness sworn.)

6          THE WITNESS:  Yes.

7          THE CLERK:  Please be seated.  Please adjust

8    the microphone so that you are speaking into it at all

9    times.

10          Please state your full name and spell your

11    last name.

12          THE WITNESS:  Amy Wei Chu.  C-h-u.

13          THE COURT:  Okay.  Thank you very much.

14          Counsel, you may inquire.

15          MS. ALPARCE:  Thank you, Your Honor.

16          **DIRECT EXAMINATION**

17    BY MS. ALPARCE:

18    Q.  Good afternoon, Ms. Chu.

19    A.  Good afternoon.

20    Q.  Ms. Chu, where do you currently work?

21    A.  Strong Trading Inc.

22    Q.  Where is that located?

23    A.  In California.  Arcadia, California.

24    Q.  How long have you worked at Strong Trading?

25    A.  Since 1999.  So it is about 23 years.

1    Q.   What is the highest level of education that

2    you've completed?

3    A.   UC Davis.  A bachelor degree in economics.

4    Q.   When did you start working for Strong Trading?

5    A.   After I graduated.

6    Q.   And what is your current position?

7    A.   Accounting manager and CFO.

8    Q.   Let's start with accounting manager.  How long

9    have you had that position?

10   A.   About -- I'm not sure, about 20 -- I -- I'm not

11   sure.

12   Q.   Okay.  What about a CFO, how long have you --

13   A.   2015.  Since 2015.

14   Q.   It was during the time that you were working as

15   an accounting manager that you were responsible for --

16   what are you responsible for?

17   A.   Basically the accounts receivable and accounts

18   payable.  And oversee the office expense overhead.

19   Q.   Okay.  Can you please tell us, what is Strong

20   Trading.

21   A.   Sorry.  I'm kind of -- this is the first time I'm

22   doing testimony here.

23   Q.   Take your time, Ms. Wang -- Chu.

24   A.   Strong Trading is a jewelry trading company.  It

25   is like a middle person.  Getting the information --

1    getting the orders from the customer.  And then we send

2    the order to the factory.  So it's a middle person.

3        Q.  And you mentioned customers.  Who are Strong

4    Trading's customers?

5        A.  Mainly the retailer, distributors or wholesalers.

6        Q.  And does Strong Trading do business under any

7    other names?

8        A.  We do have -- no, we don't have other name.  But

9    we do have a trade name.  Chong Chong Jewelry.

10       Q.  What do you mean by "trade name"?

11       A.  Trade name.  Because Chong Chong Jewelry since

12   the -- around -- 1979, the owner of the Strong Trading

13   start working the business in Taiwan, so they use the

14   name Chong Chong Jewelry.

15           Around the time, 1990, 1991, he move to U.S.

16   And then start a business.  So use the name Strong

17   Trading.  So we use the name Strong Trading in U.S.

18       Q.  And does Chong Chong Jewelry still do business in

19   Taiwan?

20       A.  No.

21       Q.  And who was the owner of Strong Trading?

22       A.  Richard Wei.

23       Q.  Are you related to Mr. Wei?

24       A.  Yes.  Richard Wei is my father.  And my step-mom

25   and my sister also work in the company too.

1     Q.   So you work with your family?

2     A.   Yes.  Family-operated business.

3     Q.   And you all reside in California?

4     A.   Yes, we reside in Arcadia, California.

5     Q.   And how many employees does Strong Trading have?

6     A.   Currently right now about seven -- 13.

7     Q.   As a trading company, does Strong Trading

8     manufacture or create any jewelry at all?

9     A.   No, we don't.

10    Q.   And what about distribution?

11    A.   No, we don't.

12    Q.   How does Strong Trading conduct its business?

13    A.   We getting orders -- we have a new -- we have a

14    customer from U.S. and then we getting order from them.

15    And then we generate the invoice.  And then we send --

16    we share the information to our factory and also the

17    Hong Kong office that we have.  And that's how we do

18    business.

19    Q.   You said the customers in the U.S.  How do you

20    generally meet your customers?

21    A.   We have a jewelry show twice a year in Hong Kong.

22    So we will attend the show to get a new customer.

23    Q.   And that's where you meet your customers?

24    A.   Yes.

25    Q.   And how does -- how do you start your

1    relationship with your customers at these jewelry shows?

2    A.   When customer came to us, and then may be they

3    will discuss about the item they interested, and then

4    after they select samples they probably interested.

5    They have interest doing business.  And we will send

6    them new customer agreement.

7    Q.   And you mentioned that Strong Trading has an

8    office in Hong Kong?

9    A.   Yes.

10   Q.   And what is the name of that office?

11   A.   It's Strong Jewelry HK Company Limited.

12   Q.   What do you mean by that's an office?

13   A.   Strong Trading Hong Kong Company Limited is kind

14   of extension to our Strong Trading.  So he can -- that

15   company -- that office can help us to do the shipping

16   function to U.S.

17   Q.   And is Strong -- does Strong Trading own Strong

18   Jewelry?

19   A.   No, it don't.

20   Q.   Does Strong Jewelry own Strong Trading?

21   A.   No.

22   Q.   Do you have any understanding as to how many

23   employees Strong Jewelry has?

24   A.   Two.

25   Q.   How long have you been working or using Strong

```
 1   Jewelry as your -- as Strong Trading's office?

 2      A.   Since I start working with Strong Trading.

 3      Q.   Can you please elaborate on the relationship

 4   between Strong Trading and Strong Jewelry.

 5      A.   Elaborate?

 6      Q.   Explain for us what the relationship is.

 7      A.   So Strong Trading will get order.

 8               THE COURT:  Can you get a little closer to

 9   the mic.  May be pull the mic.

10               That's fine.  Thank you.

11               THE WITNESS:  The question?  Elaborate.

12   BY MS. ALPARCE:

13      Q.   Describe.

14      A.   So Strong Trading will get order from customer.

15   And then we will enter the information into our system.

16   And we will send the shared information with the factory

17   and then Hong Kong office.

18               And then after all the product's produced,

19   the factor will send to our Hong Kong office.  And they

20   will handle the shipment and they send it to our

21   customer.

22      Q.   And you mentioned that they -- Strong Jewelry

23   also assists in shipping?

24      A.   Yes.

25      Q.   Can you please describe for us what you mean by
```

```
 1   that.
 2      A.  When they -- when they do the shipping from Hong
 3   Kong, all the information they will -- we will -- sorry.
 4      Q.  Take your time.
 5             THE COURT:  Just relax.
 6             THE WITNESS:  So when -- so when -- what was
 7   the question?
 8             THE COURT:  Repeat the question, Counsel.
 9             THE WITNESS:  Sorry.  Repeat the question.
10   BY MS. ALPARCE:
11      Q.  You mentioned that they were shipping.
12             Can you please describe for us what they do
13   as far as shipping.
14      A.  The factory will send the shipment from China to
15   Hong Kong office.  And Hong Kong office will just print
16   out the final invoice.  And then will -- including that
17   shipment in shipping to customer through the Custom.
18      Q.  Now, you mentioned earlier about customers and
19   meeting new customers.
20             Can you describe for us the process and what
21   you -- what Strong Trading does when they have new
22   customers.
23      A.  When there's a new customer -- like I said, after
24   the show, sometimes after the show, when they pick up
25   the interest samples, and then we will send them --
```

1    because we have interest to doing business forward.  So

2    we will send them the new customer account agreement for

3    them to sign.  After they sign the agreement, then we

4    can assign a customer ID so we can build up the

5    relationship from there.

6         Q.  And then this new customer agreement, this is in

7    writing?

8         A.  Yes, in writing.

9         Q.  And is this a general agreement that you send all

10   new customers?

11        A.  Yes.

12        Q.  And can you tell us what type of terms are in

13   this new customer agreement?

14        A.  The agreement indicate the -- at first we have a

15   minimum order for all the jewelry that the customer want

16   to order.  And then we also have a payment term.  And

17   also have a return policy.  And also the payment

18   instructions.

19        Q.  And when it comes to payment instructions --

20   strike that.

21              In the agreement, does it mention anything

22   about Strong Jewelry?

23        A.  Strong Jewelry, you mean Strong Jewelry HK?

24        Q.  Yes.

25        A.  In that payment instruction, we do have that.

1    Q.  Ms. Chu, I would like to direct your attention to

2    Exhibit 51.  There should be binders by you.

3                   Volume 1 of 3, Exhibit 51.

4    A.  51?

5    Q.  Yes, ma'am.

6    A.  Yes.

7    Q.  Do you recognize the document in front of you?

8    A.  Yes.  This is our new customer purchase order

9    payment agreement.

10   Q.  And what is the name on the top of that document?

11   A.  Strong Trading, Inc.

12   Q.  Okay.

13                  MS. ALPARCE:  Your Honor, this is one of the

14   exhibits that the parties have raised no objections to.

15                  I would like to enter it and publish it,

16   Your Honor.

17                  THE COURT:  It will be received.  And it may

18   be published.

19                  MS. ALPARCE:  Thank you, Your Honor.

20                  (Exhibit 51 is received.)

21   BY MS. ALPARCE:

22   Q.  Ms. Chu, it is also on the screen if that helps

23   you.

24                  This specific agreement, Ms. Chu, at the

25   bottom, do you see -- next to "company," what does it

1  say?

2     A.   Unique Designs.

3     Q.   And -- but this type of contract is -- strike

4  that.

5            Is this type of contract used for all of

6  Strong Trading's new customers?

7     A.   Yes.

8     Q.   And the payment instructions that you mentioned,

9  are they on this document in front of you?

10    A.   Yes.

11    Q.   And then I'm asking you to turn to page 51 --

12    A.   6?

13    Q.   6, yes.

14    A.   Yes.

15    Q.   Okay.  Can you turn to 51, 6.

16           Okay.  This is the instruction that you

17  referenced?

18    A.   Yes.

19    Q.   Ms. Chu?

20    A.   Yes.

21    Q.   And at the top of the document it says "Strong

22  Trading"?

23    A.   Yes.

24    Q.   Do you see that?

25    A.   Uh-huh.

1    Q.  Can you please describe for us what the reason

2  for these payment instructions were?

3    A.  Well, the payment is to Strong Trading.  Because

4  the shipment is coming from Hong Kong.  So the payment

5  has to go to the Hong Kong.  So we ask the customer to

6  pay the payment to Strong Jewelry Hong Kong.

7    Q.  And towards the middle -- the middle part, it

8  also says that payment's also to be made directly to

9  Strong Trading.

10          Do you see that?

11    A.  Yes.

12    Q.  Can you please tell us why, under what

13  circumstance that payment would be made directly to

14  Strong Trading?

15    A.  If the shipment's coming out from Strong Trading

16  California office, then the payment goes to our office.

17    Q.  And this document came from Strong Trading Inc.

18  Correct?

19    A.  Yes.

20    Q.  And do you see that at the bottom, it says,

21  "Sincerely yours"?

22    A.  Yes.

23    Q.  So in this -- let's turn back to the first page.

24    A.  Yes.

25    Q.  This new customer agreement, this is between what

1    two companies?

2        A.   Strong Trading Inc. and Unique Designs Inc.

3        Q.   Is Strong Jewelry Hong Kong a party to this

4    contract?

5        A.   No.

6        Q.   Who is this customer between?  Strong Trading

7    as --

8        A.   Strong Trading as the seller.  And then customer

9    is -- Unique Designs is the buyer.

10       Q.   Did Strong Jewelry Hong Kong ever sell any

11   jewelry directly to Unique Designs?

12       A.   No, they don't.

13       Q.   Is Strong Jewelry Hong Kong in the business of

14   selling jewelry to United States customers?

15       A.   No, they don't.

16       Q.   What else, if anything, does the contract say

17   about payment terms?

18       A.   30 days, I think, somewhere.

19       Q.   What do you mean by 30 days?

20       A.   Actually, first -- first few order, we may ask

21   the customer to do the prepayment, 50 percent deposit.

22   After we establish some business, then we can give them

23   30 days term.  30 days from the day of invoice.

24       Q.   That's when payment is due?

25       A.   Yes.

1      Q.  What about the return policy?  You mentioned

2  earlier that the contract also refers to return policy.

3  What is Strong Trading's return policy?

4      A.  We do have 30 days return policy.  If there's any

5  damage or improper --

6      Q.  Are there ever any instances or occasions where

7  Strong Trading makes an exception to go beyond the

8  30-day return policy?

9      A.  If -- yes.  If -- if customer claim there's

10  anything after 30 days, we need to know what the reason

11  for it.  And then we need to ask the customer to return

12  all this.  And then we can look into it.  And then see

13  if we can replace or refund for the customer.

14      Q.  What type of reasons would the customer want to

15  return any type of merchandise?

16      A.  Return?

17      Q.  Yes.

18      A.  If they want to return, may be they broken or

19  they have -- they have wrong items.

20      Q.  Let's talk about the broken, what you just -- can

21  you please explain for us, what do you mean by broken?

22      A.  Broken.  Because in jewelry, sometimes when

23  there's a bracelet, when they ship it to the customer,

24  may be it's broken or may be the stone falling out.  So

25  that would be like a broken, damage goods the customer

1  receives.

2     Q.  What is the process if the customer says, I have

3  a piece of merchandise that's broken?  What is the

4  policy that Strong Trading applies?

5     A.  We ask the customer to return the broken jewelry

6  to us or any jewelry that's not -- that is damaged, they

7  return to us.  And then we can see if we replace that or

8  repair for the -- the correct -- it's already broken.

9  We just replace that or give the customer refund.

10    Q.  And you also mentioned that a reason you would

11 offer a return policy would be if the merchandise was

12 "improper."  What does that mean?

13    A.  "Improper" means that there's sometimes when

14 customer order earrings but accidentally we ship pendant

15 to them.  It is two different type of jewelry.

16    Q.  So in these circumstances, then, what would

17 Strong Trading do if a customer said that Strong Trading

18 sent the wrong stone?

19    A.  If there is a wrong stone, we need to know how

20 the customer know it is a wrong stone.  But still we

21 still need to ask the customer to return the jewelry

22 with the wrong stone so we can either fix for them or

23 replace the correct one for them or refund them.

24    Q.  Is it Strong Trading's policy to always ask the

25 customer to return the goods that they haven't issued

1  first so that you can examine it?

2     A.  We wish them to return it so that we can look at

3  it to see if there is any problem with the jewelry.

4          MS. ALPARCE:  You can take down the exhibit.

5  Thank you.

6          THE COURT:  Counsel, again, the exhibit --

7  the content of the exhibit, what number was it?

8          MS. ALPARCE:  51, Your Honor.

9          THE COURT:  Exhibit 51.

10          MS. ALPARCE:  Yes.

11  BY MS. ALPARCE:

12     Q.  So Ms. Chu, you mentioned earlier the customer

13  Unique Designs.  You're familiar with Unique Designs,

14  correct?

15     A.  Yes.

16     Q.  When did you first become familiar with Unique

17  Designs?

18     A.  By the end of 2017.

19     Q.  How did you become familiar?

20     A.  After the September show in Hong Kong, they

21  approach us.  And then that's how we meet them.

22     Q.  And who at Strong Trading was at the Hong Kong

23  show?

24     A.  Lily Wei, our general manager who handle the

25  sales.

1    Q.  And she works at the Arcadia office?

2    A.  Yes.

3    Q.  And who at Strong Trading -- excuse me.  Who at

4    Unique Designs did Strong Trading meet at the Hong Kong

5    show?

6    A.  I heard it's Albert Franco.  He went to the show

7    and meet Lily at show.  And then they discuss about the

8    type of jewelry they are interested.

9    Q.  And what happened after Ms. Lily met with Albert

10   Franco.  What happened to the relationship between

11   Unique Designs and Strong Trading then?

12   A.  After the show, they select some samples.  And

13   our sales Kurt Chien also send the payment -- the new

14   customer agreement to the customer, and also some kind

15   of picture of the sample they will select.

16           And I believe Lily went to their office in

17   New York at that time to visit them to discuss more

18   about the business they were going to working with.  And

19   eventually they signed the agreement.  And we are --

20   they are one of our customer.

21   Q.  Just out of curiosity, does Lily Wei work for

22   Strong Jewelry?

23   A.  No.

24   Q.  Was Strong Jewelry at the Hong Kong show that she

25   and Mr. Franco attended?

1    A.  Can you repeat that question.

2    Q.  Strong Jewelry.  Was anyone from Strong

3  Jewelry --

4    A.  No.

5    Q.  -- at the Hong Kong show?

6    A.  No.

7    Q.  Does Strong Jewelry, to your knowledge, ever

8  attend or participate at the Hong Kong show?

9    A.  No, they don't attend the show.

10    Q.  Is Unique Designs still a customer of Strong

11  Trading?

12    A.  I would say yes and no, because they still owe us

13  money.  But they don't -- because they don't pay us

14  money, so we stopped doing business with them.  So there

15  is no more ongoing P.O. right now.

16    Q.  You said "they still owe us money."

17        Do you have any understanding of how much

18  that they owe?

19    A.  369,000-something.

20    Q.  Now, let's talk about Unique Designs for a

21  second.  Did they place orders with Strong Trading in

22  the same way as regular -- as other customers did with

23  Strong Trading?

24    A.  Yes.

25    Q.  And how did they do that?

1     A.   Usually by email.  And may be sometimes in the

2  phone calls.

3     Q.   Is there anyone at Strong Trading that

4  particularly handles Unique Designs' account?

5     A.   For Unique Designs, we assign new -- we assign

6  account to Kurt Chien.

7     Q.   Briefly describe for us how a -- strike that.

8          Who's Kurt Chien?

9     A.   Kurt Chien is our salesperson.

10    Q.   How are sales accounts assigned to salespersons?

11    A.   Lily Wei will assign the accounts.

12    Q.   And how long has Mr. Chien been with the company?

13    A.   He work with us for 18 years.

14    Q.   When you say "us," you are talking about Strong

15  Trading?

16    A.   Strong Trading.

17    Q.   Has he ever worked for Strong Jewelry?

18    A.   No.

19    Q.   He says his position is a sales representative?

20    A.   Representative.

21    Q.   Does he still work for Strong Trading?

22    A.   He still work for Strong Trading.

23    Q.   Who does he report to?

24    A.   He reports to Lily Wei.

25    Q.   And how does Strong Trading communicate?  You

1   mentioned email.

2       A.  Yes.

3       Q.  What do you mean by that?

4       A.  Most of the communication will be between

5   customer.  And our sales will be like emails or phone

6   calls.

7       Q.  Did -- to your knowledge, did Unique Designs ever

8   communicate with Strong Jewelry in Hong Kong?

9       A.  No.

10      Q.  How often does Strong Trading communicate with

11  Hong Kong?

12      A.  Depends on orders.

13      Q.  What do you mean by that?

14      A.  Depends on order that we have and the shipment

15  they are going out.  So it depends on -- most likely

16  couple times a week.

17      Q.  Now, when the Hong Kong office receives

18  information from Strong Trading, what information is

19  communicated?

20      A.  The order information?

21      Q.  Yes.

22      A.  The invoice.  The invoice, the -- our sales

23  employee enter our system.  So that will share with our

24  Hong Kong office.  So they get access to that.

25      Q.  This invoice that you mentioned is prepared, you

1    said it was Strong Trading that prepared the invoice?

2       A.   Yes.

3       Q.   Does Strong Jewelry in Hong Kong ever prepare the

4    invoice?

5       A.   No.

6       Q.   Does Strong Trading ever input anything into the

7    intra system that you mentioned?

8       A.   Who?

9       Q.   Strong Jewelry in Hong Kong.  Did they ever enter

10   the customer information into the system?

11      A.   Strong Jewelry don't enter the information.

12      Q.   Now, let's go back to your job -- your duties and

13   responsibilities.

14           So what exactly again are your duties as

15   Strong Trading's account manager.

16      A.   Payable and accounts receivable.

17      Q.   And so what does accounts payable mean?

18      A.   Accounts payable means that we receive the

19   invoice from vendor or any bills, so we need to keep

20   track to make sure we pay them on time.

21      Q.   What about accounts receivable, what do you do

22   for accounts receivable?

23      A.   When the shipment coming off of Hong Kong, there

24   will be an invoice.  And I will enter the information

25   into our Peachtree system, our accounting software.  We

1  call it Peachtree.

2     Q.  Can you please just describe for us what exactly

3  this Peachtree accounting system is.

4     A.  It's a -- just accounting system that keep track

5  with the payments, receivables and all kind of

6  accounting stuff.

7     Q.  Does Peachtree generate the invoices?

8     A.  No.  We don't use it to generate invoice.

9     Q.  Where does the information come from that you use

10  to generate -- to enter into Peachtree?

11     A.  We use part of the information on the invoice,

12  like the date, customer ID, invoice number and that.

13     Q.  How is that information then entered into the

14  Peachtree?

15     A.  How?

16     Q.  Yes.

17     A.  I just enter the information that I need into the

18  system so they can generate the report.

19     Q.  And you said "a report," what do you mean by

20  "report"?

21     A.  For account receivable it's called H Receivable

22  Report.

23     Q.  So let's talk about the invoices for a minute.

24  Who sends invoices to the customers?

25     A.  Strong Trading will send invoice to the customer

1  by email.

2      Q.  Do the invoices ever come from the Hong Kong

3  office?

4      A.  No.

5      Q.  Do the -- what does -- does the Hong Kong office

6  ever use the invoices?

7      A.  They will print out the invoice from the system

8  that we send to them, and then they will print out the

9  information with their lettering on it, and they'll put

10  in with the shipment and then ship it to U.S.

11      Q.  Why did they put it on their letterhead?

12      A.  Because it's international shipment.  So we need

13  to have a shipper name on the invoice.  So the name will

14  be on the invoice to go with the shipment.

15      Q.  When -- are invoices ever sent directly from

16  Strong Trading to any other customers?

17      A.  Can you repeat that?

18      Q.  Are invoices ever sent directly?  You mentioned

19  that Strong Trading sends the customers emails.

20      A.  Yes.

21      Q.  Is there any other instance where the invoice

22  would go -- come from Strong Trading versus the Hong

23  Kong office?

24      A.  Yes.  We will also have invoice from Strong

25  Trading when there's a simple invoice or a small invoice

1    that we ship it from our California office to the

2    customer.   Then we will also have the invoice for the

3    shipment and then email to customer.

4        Q.   And does -- what about the factory?   Does the

5    factory send goods directly to the customers?

6        A.   Rarely.   The factory send the shipment to Hong

7    Kong.   And then Hong Kong will ship it to our Strong

8    Trading customer in the U.S.

9        Q.   But does the factory ever receive any information

10   from Strong Trading?

11       A.   We share the information, so they can have the

12   order information, so that they can process the order

13   and find the -- whoever the -- can manufacture the

14   jewelry.

15       Q.   Does Strong Trading own the factory?

16       A.   No.

17       Q.   Now, you mentioned that the Hong Kong company,

18   you know, assists with shipping and Customs.   What do

19   you mean by that?

20       A.   Because it international shipment, so when

21   shipment coming from oversea, they need to have

22   shipper's name on the invoice so that they can send it

23   to the Customs or they can do import.

24       Q.   This is done for all of Strong Trading's

25   customers who items are shipped from overseas?

1    A.  Yes.

2    Q.  That included Unique Designs?

3    A.  Yes.

4    Q.  Who does the customer pay once they receive the

5    goods?

6    A.  Customer pay to Strong Trading through our Hong

7    Kong office.

8    Q.  Do the customers ever pay Strong Trading

9    directly?

10    A.  They will pay our invoice.  Strong Trading's

11    invoice to Strong Trading.

12    Q.  Now, you mentioned earlier about these aged

13    receivable reports?

14    A.  Yes.

15    Q.  Can you please describe for us what those are.

16    A.  Aged receivable report basically list of all the

17    open invoices that haven't paid, and with the amount and

18    the dates and how old the invoice are.

19    Q.  And this is generated through that Peachtree

20    system that --

21    A.  Yes.

22    Q.  -- you testified to?

23         Okay.  How are these reports generated

24    through Peachtree?

25    A.  I can select the customer ID and then the date,

     1   and then they will run the report.

     2      Q.   How often do you generate reports?

     3      A.   Whenever I need to collect money from customer.

     4      Q.   In order to generate these aged receivable

     5   reports, do you rely on any information from the

     6   factory?

     7      A.   No.

     8      Q.   Do you rely on any information from Strong

     9   Jewelry in Hong Kong?

    10      A.   No.

    11      Q.   As the accounting manager, do you rely on these

    12   aged receivable reports to do your job?

    13      A.   Yes.

    14      Q.   For what purpose?

    15      A.   To collect the payment from the customer.

    16      Q.   You mentioned earlier that Unique Designs owes

    17   Strong Trading money.

    18      A.   Yes.

    19      Q.   When, if you recall, did they start owing Strong

    20   Trading money?

    21      A.   They become paying very slow by the end of the

    22   2020.  And, yeah, that's the -- when they start paying

    23   very slowly.

    24      Q.   Was it in 2020 the last time you received any

    25   payment from Unique Designs?

1     A.   The last time we received payment for Unique

2  Designs in November 2020.

3     Q.   Do you remember what that payment was for?

4     A.   The payment was for the September -- part of

5  September 2020 invoice.

6     Q.   And how much, if you can recall, was that

7  payment?

8     A.   I remember it's 141,000-something.

9     Q.   Did that cover or pay for all the amounts that

10  Unique Designs owed Strong Trading at that time?

11     A.   No.  Just part of it.

12     Q.   So even with that payment, do you recall at that

13  time how much Unique Designs owed Strong Trading?

14     A.   After that payment applied to the open invoices,

15  the open invoice amount is about 350,000.

16     Q.   This aged receivable report for Unique Designs,

17  did you ever share it with Unique Designs?

18     A.   Yes.  I send the report to them.

19     Q.   When was the first time you sent them that

20  report, if you can recall?

21     A.   First time.  So may be when they start doing

22  business, I would say 2017, end of 2017 when we start

23  working, if there is a shipment coming out.  But I'm not

24  sure the first time.

25     Q.   What about the last time, do you remember when

1   the last time you sent them an aged receivable report?

2       A.   2021, January.

3       Q.   As of that time, how much did they owe Strong

4   Trading?

5       A.   Around 350,000; 360,000.

6       Q.   So Ms. Chu, I want to direct your attention to

7   Exhibit 78 in the binder in front of you.

8       A.   78?

9       Q.   78, please.

10      A.   All right.  Yes.

11      Q.   Can you -- do you recognize this document?

12      A.   Yes.  These are our account on aged receivable

13  report.

14           MS. ALPARCE:  Your Honor, may I introduce

15  this into evidence since there's no objection?  That was

16  identified in the joint trial report and the --

17           THE COURT:  It is Exhibit 78?

18           MS. ALPARCE:  Yes, Your Honor.

19           MR. SINGH:  Objection, Your Honor.  Hearsay.

20  Lacks foundation.  Relevance.

21           THE COURT:  Do you want to lay the

22  foundation, Counsel?

23           MS. ALPARCE:  Sure.

24  BY MS. ALPARCE:

25      Q.   Ms. Chu, this aged -- how do you know this is an

 1   aged receivable report?

 2       A.   It's receivable report that I run it report.

 3       Q.   You say you run this report.  Is this the type of

 4   report that comes out of Peachtree system that --

 5       A.   Yes.

 6       Q.   -- you testified to earlier?

 7       A.   Yes.  That is the report I run out of Peachtree

 8   system.

 9       Q.   You personally generate this report?

10       A.   Yes.

11       Q.   And you entered this information into the

12   Peachtree to generate this report?

13       A.   Yes.

14       Q.   What information in the Peachtree software system

15   generates this report?

16       A.   I enter the dates, the invoice number, and the

17   amount.  And -- yeah, date, invoice amount.  And then

18   the customer ID.

19       Q.   And this aged receivable report, there's a date

20   at the top?

21       A.   Yes.

22       Q.   Do you see that?  Can you tell us what date that

23   was?

24       A.   I run the date on December 31st, 2021.

25       Q.   Towards the bottom left, can you tell us for

```
 1   which customer you ran this aged report for?

 2       A.  It's ID S 492.

 3       Q.  At the bottom left it says "Report total."

 4           Do you see the customer name?

 5       A.  Unique Designs.

 6               MS. ALPARCE:  Your Honor.

 7               MR. SINGH:  Objection; hearsay.

 8               THE COURT:  Overruled.

 9               MS. ALPARCE:  May I enter into evidence and

10   publish, Your Honor?

11               THE COURT:  Yes.

12               MS. ALPARCE:  Thank you.

13           (Exhibit 78 is received.)

14   BY MS. ALPARCE:

15       Q.  Do you see this report is only one page?

16       A.  Yes.  One page.

17       Q.  Are aged receivable reports one page?

18       A.  Depends on the open invoices, if there is a lot,

19   may be two page or three page.

20       Q.  Can you tell us on this particular report what

21   time period it covers.

22       A.  It covers September 20, 2020 to March 2021.

23       Q.  Can you please tell us why it covers for such a

24   long period, from September 2020 to March 2021?

25       A.  They don't pay those invoices.  Those are the
```

1    open invoices they haven't paid.

2       Q.   When you say "they," who are you referring to?

3       A.   Unique Designs.

4       Q.   You indicated that you used -- on the second

5    column it says "Invoice Number"; do you see that?

6       A.   Yes.

7       Q.   And the invoice number is what you are referring

8    to to generate this report to get this information?

9       A.   I'm sorry.  Can you repeat.

10      Q.   The invoice in the second column, do you see

11   that?

12      A.   Yes.  Yes.

13      Q.   Those invoice number -- what are those invoice

14   numbers?  Where do those invoice numbers come from?

15      A.   Those invoice numbers come from the invoice that

16   we have in the shipment.  So we have that also in our

17   system.

18      Q.   For this particular aged receivable report, there

19   is approximately, if you count, 24 invoices.

20      A.   Yes.  24 invoices.  And there are two credits.

21      Q.   It is from September to March 2021?

22      A.   Yes.

23      Q.   I would like to direct your attention to Exhibits

24   54 to 77 in your binder, please.

25      A.   54 to --

1     Q.   77.  You are flipping through.  Do you recognize

2     those invoices?

3     A.   Those are our invoices to Unique Designs.

4     Q.   Let's turn to Exhibit 54.

5     A.   54, uh-huh.  Yes.

6     Q.   Okay.  Can you please describe for us what this

7     invoice is for.

8     A.   This is invoice for Unique Designs for two P.O.

9     they order from us.

10    Q.   At the top it says "Invoice Number."  Can you

11    read that for us?

12    A.   H20S4920023-A.

13    Q.   And that's the same invoice number that's located

14    on this aged receivables dated September 16, 2020?

15    A.   Yes.  The first one on the aged receivable.

16    Q.   And this invoice is the invoice that you use to

17    generate the receivables, aged receivables correct?

18    A.   Yes.

19    Q.   Where does the information come from for this

20    invoice?

21    A.   The information come from our sales.

22    Q.   When you say come from your sales, who would that

23    be?

24    A.   For this particular account, it is Kurt Chien.

25    Q.   And this invoice says "Strong Jewelry Hong Kong"

1    at the top.  Do you see that?

2        A.  Yes.

3        Q.  Can you explain for us why it says "Strong

4    Jewelry Hong Kong" at the top?

5        A.  Because when the Hong Kong need to ship out the

6    merchandise, they need to have a letterhead.  They have

7    to ship on the invoice.  So they have access to our

8    intra system to get the data for which order they are

9    going to ship.  And then they will print out on their

10   letterhead.  So they can include in the shipment, so

11   they can ship it from oversea to United States.

12              MS. ALPARCE:  Your Honor, may I introduce

13   Exhibit 54 into evidence.

14              MR. SINGH:  Objection; hearsay.

15              THE COURT:  I will treat it as a continued

16   objection to all these invoices.  Overruled.

17              MS. ALPARCE:  Your Honor, may I introduce

18   the invoices of 55 through 77 as they're reflective and

19   included in the aged receivable report?

20              THE COURT:  Yes.

21              MS. ALPARCE:  Thank you, Your Honor.

22              THE COURT:  All these invoices are

23   summarized in Exhibit 28; is that correct?

24              MS. ALPARCE:  That's correct, Your Honor.

25              THE COURT:  Go ahead.

```
 1                    MS. ALPARCE:  Oh.  It's Exhibit 78, yes.

 2                    THE COURT:  I'm sorry.  78?

 3                    MS. ALPARCE:  Yes.

 4                    Thank you, Your Honor.

 5                    THE COURT:  Okay.

 6   BY MS. ALPARCE:

 7      Q.  So Ms. Chu, did Unique Designs ever return the

 8   merchandise described in the invoice on the aged

 9   receivable reports that's reflected?

10      A.  No.

11      Q.  And Unique Designs has never -- to this day

12   hasn't paid for them, correct?

13      A.  They have not paid anything yet.

14      Q.  And again, to date, how much does Unique Designs

15   oh Strong Trading?

16      A.  $369,441.12.

17      Q.  That's the number that's located on this aged

18   receivable?

19      A.  Yes.

20                    MS. ALPARCE:  Thank you, Ms. Chu.  No

21   further questions.

22                    THE COURT:  Okay.

23                    Cross-examination?

24                    MR. SINGH:  Thank you, Your Honor.

25                    THE COURT:  Counsel, to help you out and the
```

1    jury out, because we got started late, we will take our

2    break about 2:45.  We will take a 15-minute break at

3    that time.

4                MR. SINGH:  Thank you, Your Honor.

5                        **CROSS-EXAMINATION**

6    BY MR. SINGH:

7        Q.   Good afternoon, Ms. Chu.  Nice to see you.

8        A.   Yes.

9        Q.   I was directing your attention to Exhibit 51.

10   Should be on your screen now.

11       A.   Yes.

12       Q.   Do you see that?

13       A.   Yes.

14       Q.   This is was agreement entered into with Unique

15   Designs; is that correct?

16       A.   Yes.

17       Q.   You are the person most knowledgeable at Strong

18   Trading regarding this agreement, right?

19       A.   Yes.

20       Q.   There is no one more knowledgeable at Strong

21   Trading than you about this agreement, right?

22       A.   Our sales also know the agreement.

23       Q.   But there is no one more knowledgeable about this

24   agreement than you?

25       A.   You can say that.

1     Q.  Before I go there, at the bottom right of the

2    page you will see throughout the day today a sequence of

3    letters followed by numbers.  Just know that I may refer

4    to these -- that are referred to as Bates numbers.  If

5    it is a document that starts with the letters STI, it's

6    something that Strong Trading has produced in the case.

7    If it starts with the leader UD, it's something that

8    Unique Designs produced in the case.

9          Does that make sense.

10   A.  Okay.

11   Q.  Directing your attention to the middle of the

12   page for STI 200, Exhibit 51.  You will see there is a

13   name here.  It says "Strong Trading."  Do you see that?

14   You can zoom.

15   A.  Yes.  I thought you cross out.

16          THE COURT:  I think you zoomed a little too

17   much.  See if you can center it.

18          THE WITNESS:  Okay.

19          THE COURT:  There you go.

20   BY MR. SINGH:

21   Q.  There's a name here, that's Strong Trading.

22          Do you see that?

23   A.  Yes.

24   Q.  Next to it is another name, Chong Chong Jewelry

25   Group.

1              Do you see that?

2       A.   Yes.

3       Q.   Strong Trading incorporated in 1991; is that

4    right?

5       A.   Yes.

6       Q.   Strong Jewelry Hong Kong incorporated in 1979; is

7    that right?

8       A.   No.

9       Q.   It is not right?

10      A.   No.

11      Q.   What year did Strong Jewelry incorporate?

12      A.   Strong Jewelry Hong Kong?

13      Q.   Correct.

14      A.   I not -- well, I don't know.

15      Q.   The year -- Chong Chong Jewelry Group is a trade

16   name; is that right?

17      A.   Yes.

18      Q.   Does it also apply to a company Strong Jewelry HK

19   Inc.?

20      A.   No.

21      Q.   Directing your attention to STI 205.

22      A.   Okay.

23      Q.   That is the payment instruction.  Do you see

24   that?

25      A.   Yes.  Payment instruction.

 1     Q.  The full name of the Strong Jewelry company --
 2  Strong Jewelry company appears on this document, right?
 3     A.  Yes.
 4     Q.  Do you agree with me that this agreement, marked
 5  as Exhibit 51, was entered into between Unique Designs
 6  and Strong Jewelry?
 7     A.  No.  It's Strong Jewelry -- it is Strong Trading
 8  and Unique Designs.
 9     Q.  You gave your deposition in this case?
10     A.  Yes.
11     Q.  You were designated as the witness on behalf of
12  Strong Trading, right?
13     A.  Yes.
14     Q.  When you gave your testimony, it was your best
15  and most truthful testimony, right?
16     A.  Yes.
17     Q.  You didn't lie, right?
18     A.  No.
19          MR. SINGH:  Your Honor, may I play the video
20  clip for Ms. Chu's deposition transcript of May 31,
21  2022, page 66, lines 18 to 25, page 78, line 6 through
22  11, for impeachment purposes only.
23          THE COURT:  Okay.
24          MR. YORK:  Your Honor, if I may, we
25  submitted a list of objections to several portions of

1    the deposition that Mr. Singh wants to play, primarily

2    because the question --

3              THE COURT:  Before we get to -- why don't

4    you give page and line number again, Counsel.

5              MR. SINGH:  Page 66, lines 18 to 25.

6              THE COURT:  Starting with "For the record"?

7              MR. SINGH:  Lines 18 to 25.

8              THE COURT:  18, does the line say, "Question

9    for the record"?

10             MR. SINGH:  Correct.

11             THE COURT:  Is there any objection to those

12   four lines?

13             MR. YORK:  Your Honor, again, our objection

14   is that the questions are incomplete because he is

15   taking selective portions.  And we did submit a list of

16   objections to various portions of the deposition unless

17   a more complete and --

18             THE COURT:  You are talking about the rule

19   of completeness, Counsel, right?

20             MR. YORK:  Yes, Your Honor.

21             THE COURT:  What is the other page you are

22   talking about?

23             MR. SINGH:  Page 78, lines 6 through 11.

24             THE COURT:  Okay.  You may read those into

25   the record.

```
1              And counsel for the plaintiff, if they wish,

2    can add additional, for the rule of completeness, if

3    they wish.

4              So you may read it into the record at this

5    time.

6              MR. SINGH:  Thank you, Your Honor.  I am

7    just going to play the video clip for it.

8              (VIDEO PLAYED.)

9              THE COURT:  It may help on this, Counsel,

10   which lines do you wish to read for rule of

11   completeness?  If you know now.

12             MS. ALPARCE:  Yes, Your Honor.  If we may

13   read from starting at line 2, Your Honor.

14             THE COURT:  On page 66?

15             MS. ALPARCE:  On page 78, Your Honor.

16             I apologize, Your Honor.  Was counsel

17   referring to on page 66?

18             THE COURT:  Line 18 to 25 on that page.

19             MS. ALPARCE:  Okay.  If Counsel wishes to

20   read from 66, line 18 through 25, we request that he

21   also includes lines 2 through 5 on page 78.

22             THE COURT:  Counsel, any objection to that?

23             MR. SINGH:  We had the start of the

24   question -- yes, Your Honor.

25             THE COURT:  What is the objection?
```

```
 1              MR. SINGH:  The full question is already

 2   encompassed within lines 6 through 11.

 3              MS. ALPARCE:  I apologize, Your Honor.  It

 4   does not.

 5              THE COURT:  I don't want to argue in front

 6   of the jury.

 7              MS. ALPARCE:  Thank you, Your Honor.

 8              THE COURT:  Okay.  You may play for

 9   impeachment purposes page 66, line 18 -- is that

10   correct?  Excuse me.  18, through 67, line 2; is that

11   what you said, Counsel?

12              MR. SINGH:  88 -- 66, 18 through 25.

13              THE COURT:  What were you asking for on the

14   rule of completeness?  To continue to what line?

15              MS. ALPARCE:  Page 78, Your Honor.

16              THE COURT:  No, no.  On 66.

17              MS. ALPARCE:  On 66, there's nothing further

18   on that.

19              THE COURT:  Okay.  That's fine.

20              On 78, you want to start at line 2?

21              MS. ALPARCE:  Yes, Your Honor.

22              THE COURT:  Okay.  You may play those,

23   Counsel.  66, the items that you asked for.  And on 78,

24   start on line 2.

25              MR. SINGH:  Thank you, Your Honor.
```

```
 1                    (VIDEO PLAYED.)

 2   BY MR. SINGH:

 3      Q.   You are the person most knowledgeable at Strong

 4   Trading about the relationship with Strong Jewelry; is

 5   that right?

 6      A.   Yes.

 7             MR. YORK:  Excuse me, Your Honor.  I

 8   apologize.  But I thought that the Court was saying that

 9   he was also required to play that other portion.

10             THE COURT:  You're going to play both of

11   them, aren't you?

12             MR. SINGH:  Your Honor, I created just video

13   clips of these portions.  I can read onto the record

14   additional lines that Counsel is requesting.

15             THE COURT:  Okay.  Why don't you do that

16   then.

17             MR. SINGH:  Line -- page 77, lines --

18   Counsel, could you remind me the lines?

19             THE COURT:  Page 78, line 2, I believe.

20             MS. ALPARCE:  Yes, Your Honor.

21             Lines 2 through 5 in addition to your 6.

22             THE COURT:  2 through 5 in addition to --

23   what did you say?

24             MS. ALPARCE:  Your Honor, I believe Counsel

25   is seeking to start at line 6 on page 78.
```

1          THE COURT:  Yes.  Okay.

2          MR. SINGH:  Line 2, on page 78.

3          THE COURT:  Yes.

4          (AUDIO PLAYED.)

5    BY MR. SINGH:

6      Q.  Ms. Chu, you are the person most knowledgeable at

7    Strong Trading about the relationship between Strong

8    Trading and Strong Jewelry, right?

9      A.  Yes.

10     Q.  You did not work for Strong Jewelry?

11     A.  No, never.

12     Q.  You never worked for Strong Jewelry, right?

13     A.  No.

14     Q.  Is that correct?

15          THE COURT:  You asked the question in the

16   negative.  Why don't you ask it again.

17   BY MR. SINGH:

18     Q.  You never worked for Strong Jewelry?

19     A.  I never work for Strong Jewelry.

20          THE COURT:  Okay.  Thank you.

21          MR. SINGH:  Thank you, Your Honor.

22   BY MR. SINGH:

23     Q.  Strong Jewelry is a completely separate and

24   distinct entity from Strong Trading; is that right?

25     A.  Yes.

1    Q.  And neither company owns the other, right?

2    A.  No.

3           THE COURT:  When you said "no," is it

4    correct that neither company owns the other?  Is that

5    correct?

6           THE WITNESS:  Yes.  It does not own each

7    other, no.

8    BY MR. SINGH:

9    Q.  Directing -- back to Exhibit 51.  Directing your

10   attention to the payment instruction of Exhibit 51.

11          You've reviewed this payment instruction

12   before today, right?

13   A.  Yes.

14   Q.  In this contract, invoices from that company

15   Strong Jewelry, are only going to be paid to Strong

16   Jewelry, right?

17   A.  Can you repeat.

18   Q.  Yeah.  If an invoice comes from Strong Jewelry,

19   the payment goes to Strong Jewelry, right?

20   A.  No.  The invoice coming from Strong Jewelry Hong

21   Kong is a shipment coming from Strong Jewelry Hong Kong.

22   But Strong Trading's payment.

23   Q.  The payment goes to Strong Jewelry, though,

24   right?

25   A.  The payment is going to Strong Trading through

1    the Hong Kong office per the agreement here.

2       Q.   Correct.  So just that first part of it, the

3    payment from the customer is going to Strong Jewelry

4    directly, right?

5       A.   They wire the payment.  But the payment is to

6    Strong Trading through the Strong Jewelry Hong Kong

7    account.

8       Q.   And invoices from Strong Trading are payable to

9    Strong Trading, right?  When an invoice comes from

10   Strong Trading, that payment is going to go to Strong

11   Trading, right?

12      A.   Yes.

13      Q.   Strong Trading isn't owed any money on an invoice

14   from Strong Jewelry Hong Kong, correct?

15      A.   No.  Unique Designs owe Strong Trading money.

16      Q.   I'm not asking you about Unique Designs right

17   now.

18            I'm just asking, Strong Trading would never

19   be owed money on an invoice that's coming from Strong

20   Jewelry, correct?

21      A.   Strong Trading not owe money.

22      Q.   So if there is an invoice to Strong Jewelry to a

23   customer, the payment from the customer isn't going to

24   Strong Trading, correct?

25      A.   The payment coming to Strong Trading but through

1    the account -- Strong Jewelry Hong Kong account.

2            MR. SINGH:  Your Honor, I request to play

3    the deposition testimony of Ms. Chu, page 78, line 13

4    through page 79, line 13.  And page 80, 8 through 25.

5            THE COURT:  Any objection?

6            MS. ALPARCE:  Yes, Your Honor.  We would

7    like to object.  First of all --

8            THE COURT:  I'm sorry.  First of all, 77 to

9    what, Counsel?  Page 77 --

10           MR. SINGH:  78, 13 to 79, 13.

11           THE COURT:  78, 13 to 79, 13.

12           What is the objection on that, Counsel?

13           MS. ALPARCE:  First of all, Your Honor, the

14   excerpt that Counsel is referring to is incomplete as

15   Ms. Chu submitted an errata clarifying her testimony,

16   number one.  And number two, if he intends to read that

17   portion, we request that he continue to read from the

18   transcript from page 79, line 14 to page 80, line 7 for

19   completeness.

20           THE COURT:  Next group is what?

21           MR. SINGH:  Page 80, line 8.

22           THE COURT:  Through?

23           MR. SINGH:  Through 14.  And 22 to 25.

24           THE COURT:  Through?  I'm sorry.

25           MR. SINGH:  8 through 14.  22 to 25.

 1                 THE COURT:  Okay.  22 to 25.

 2                 Counsel, any objection?

 3                 MS. ALPARCE:  Yes, Your Honor.  If he can

 4  continue it from the preceding, because it is

 5  continuation of the testimony, from 79, 14 to 87.

 6                 Counsel is omitting certain excerpts from

 7  the testimony.  That lacks completeness.

 8                 THE COURT:  I don't want to know what he is

 9  omitting.

10                 What other -- what other lines are you

11  asking to be played?

12                 MS. ALPARCE:  The preceding ones, Your

13  Honor.

14                 THE COURT:  You're asking as long as he

15  reads from 78, line 13 to page 80, line 25 you have no

16  objection?

17                 MS. ALPARCE:  That's correct, Your Honor.

18                 THE COURT:  Counsel, why don't you do that

19  for rule of completeness.

20                 That makes sense.  Line 13, page 78.

21                 (VIDEO PLAYED.)

22                 MR. SINGH:  If I may, can I start that

23  again?  Sorry about that.

24                 THE COURT:  Sure.

25                 (VIDEO PLAYED.)

1   BY MR. SINGH:

2       Q.   You are the CFO of Strong Trading?

3       A.   Yes.

4       Q.   You received a bachelor degree from UC Davis?

5       A.   Yes.

6       Q.   Based on your work experience and background, you

7   understand that Strong Trading has no right to take

8   money that belongs to Strong Jewelry, right?

9       A.   I don't understand your question.

10      Q.   Strong Trading has -- the company Strong Trading

11  has no right to take the money that belongs to Strong

12  Jewelry, right?

13      A.   They are our office in Hong Kong.

14      Q.   Strong Jewelry has no right to take money that

15  belongs to Strong Jewelry, right?

16      A.   They also help us to do the payment issue in Hong

17  Kong.

18      Q.   But --

19              (Unreportable crosstalk.)

20              THE COURT:  Why don't you ask the question,

21  Counsel.  They have separate...

22  BY MR. SINGH:

23      Q.   They have separate bank accounts, right?

24      A.   Who?

25      Q.   Strong Trading and Strong Jewelry, they have

1   separate bank accounts, right?

2       A.   They have two different country.

3       Q.   So they must have separate bank accounts?

4       A.   Yes.   Two different accounts.

5       Q.   And Strong Trading and Strong Jewelry, they keep

6   their assets separate, right?

7       A.   Yes.

8       Q.   And you agree that Strong Trading is not entitled

9   to receive money from another company's invoices, right?

10      A.   No.   It is not how it works.

11      Q.   If there was an invoice that Strong Trading had

12   to pay, Strong Jewelry wouldn't be responsible for

13   paying that invoice, right?

14           MR. YORK:   Objection, Your Honor.

15   Argumentative.

16           THE COURT:   Overruled.

17           THE WITNESS:   Sorry.   Can you repeat that

18   question.

19   BY MR. SINGH:

20      Q.   Of course.   If there is an invoice that Strong

21   Trading had to pay, Strong Jewelry Hong Kong would not

22   be responsible for paying that invoice, right?

23      A.   Yes.

24      Q.   And if there was an invoice --

25           THE COURT:   I'm going to interrupt you at

1    this time because it is 2:45.  I told you we will break

2    at that time.

3              See you back in 15 minutes and we will go

4    until 4 o'clock at that time.

5              Remember the admonishment not to discuss the

6    case among yourselves or with anybody else or form or

7    express any opinions about the matter until it's

8    submitted to you and you retire to the jury room.

9              (RECESS.)

10              THE COURT:  The record will reflect that all

11    members of the jury are in their seats in the jury box.

12    The witness is on the witness stand.  Remember, you are

13    still under oath.

14              Counsel, you may continue your cross.

15              MR. SINGH:  Thank you, Your Honor.

16    BY MR. SINGH:

17        Q.  Ms. Chu, if there is an invoice that's issued to

18    Strong Jewelry, Strong Trading is not responsible for

19    paying that invoice, right?

20        A.  Yes.

21        Q.  I'll direct your attention to what was previously

22    marked Exhibit 78.  You can see it on your screen,

23    ma'am?

24        A.  Yes.

25        Q.  This is a list of open invoices, right?

1      A.  Yes.

2      Q.  At the top of the page, it says "Strong Jewelry

3   HK Company Limited."

4           Do you see that?

5      A.  Yes.

6      Q.  All the invoices that are identified in the

7   invoice column are from Strong Jewelry to Unique

8   Designs; is that right?

9      A.  The -- can you repeat that question.

10      Q.  Yes.  Are all the invoices shown in the invoice

11   column from Strong Jewelry Hong Kong to Unique Designs?

12      A.  Those are the shipment coming from Strong Jewelry

13   Hong Kong.

14      Q.  I'm talking about the invoices.  Are these

15   invoices -- were these invoices issued from Strong

16   Jewelry Hong Kong to Unique Designs?

17      A.  Those invoices are printed with Strong Jewelry

18   Hong Kong letterhead.  Not issued.

19      Q.  But they are coming from Strong Jewelry in Hong

20   Kong.  And they are going with the shipment to Unique

21   Designs in New Jersey, right?

22      A.  Yes.  Coming with the package.

23      Q.  There's a column, again, that's with a heading

24   invoice /CM#.

25           Do you see that?  That's what I circled

1   there for you for your convenience.

2      A.   C?

3      Q.   CM# or hashtag.

4      A.   Oh, okay.

5      Q.   All of the invoices -- all of the invoice numbers

6   that are in that column were assigned by Strong Jewelry,

7   right?

8      A.   No.

9      Q.   They were not?  The numbers, those were assigned

10  by Strong Jewelry, right?  Strong Jewelry gave those

11  invoice numbers to these invoices, right?

12     A.   The invoice number generate number by number

13  so...

14     Q.   That number generation is done by Strong Jewelry

15  in Hong Kong, right?

16            THE COURT:  If you know.

17            THE WITNESS:  I don't think that is the way

18  it is.

19            THE COURT:  So you don't know one way or

20  another who generated those numbers?

21            THE WITNESS:  They get -- they get data from

22  our system, and then they generate.

23            THE COURT:  The only question:  Do you know

24  who generated those numbers?  Who gave those numbers

25  out.

1                THE WITNESS:  Just the computer will pump

2    out the number.

3                THE COURT:  You don't know who is

4    responsible for that input to the computer, who gave the

5    number?  You have no idea?

6                THE WITNESS:  Yeah.  No.

7    BY MR. SINGH:

8       Q.  At the top -- at the top there is a filter

9    criteria.  And it says ID S492.

10               Do you see that?

11      A.  Yes.

12      Q.  That is the customer ID number that Strong

13   Jewelry gave to Unique Designs, right?

14      A.  It is the customer ID assigned by Strong Trading.

15      Q.  Okay.  Today you testified that Strong Trading

16   prepared all these invoices, right?

17      A.  Yes.

18      Q.  At your deposition, you testified that all the

19   invoices were prepared by Strong Jewelry, right?

20      A.  I cannot recall.

21      Q.  At your deposition you testified under oath that

22   all of the invoices were maintained by Strong Jewelry,

23   right?

24      A.  Maintained.

25               THE COURT:  If you recall.

```
 1                  THE WITNESS:  I don't remember.
 2    BY MR. SINGH:
 3       Q.  At your deposition you said Strong Trading had no
 4    involvement in preparing the invoices, right?
 5       A.  Yes.
 6       Q.  You also testified under oath at your deposition
 7    that you do not know who prepared the invoices for
 8    Strong Jewelry, right?
 9       A.  After I --
10       Q.  I'm sorry.  This is yes or no.
11                  At your deposition you testified that you do
12    not know who prepared the invoices, right?
13       A.  I don't remember the deposition question.
14                  THE COURT:  Okay.
15                  MR. SINGH:  If I may play the video clip
16    deposition testimony of Ms. Chu.
17                  THE COURT:  Yes.
18                  MR. SINGH:  Page 65, line 24, through 66, 1.
19    I'm sorry.  Let's go all the way to 14.  65, 24 through
20    66, 14.
21                  THE COURT:  Okay.
22                  MS. ALPARCE:  Objection, Your Honor.
23    Incomplete as well.  If Counsel intends to introduce
24    that, we would also like to include starting from page
25    64, line 9 to 65, line 23, immediately prior.
```

1                    THE COURT:  Okay.  Any problem with that,

2    Counsel?

3                    MR. SINGH:  64, 9.  I have no problem with

4    starting with 64, 9.  And reading to 66, 14.

5                    THE COURT:  Okay.  Go ahead.

6                    (VIDEO PLAYED.)

7    BY MR. SINGH:

8       Q.  All of the items in the -- all of the items that

9    are the subject of these invoices in Exhibit 78, were

10   all sent from Hong Kong, right?

11      A.  Sent from Hong Kong, yes.

12      Q.  And the invoices were slipped in those packages

13   when they were sent from Hong Kong, right?

14      A.  This invoice are with the package.

15      Q.  And the payments on the invoices were to be made

16   to Strong Jewelry in Hong Kong because the shipments

17   were coming from Strong Jewelry Hong Kong, right?

18      A.  The payment is for Strong Trading.

19      Q.  But you testified earlier, too, I believe that

20   the payments on the invoices are to be made to Strong

21   Jewelry Hong Kong because that's where the shipments are

22   coming from; is that correct?

23      A.  The payments is to Strong Trading by our payment

24   term in the contract.

25      Q.  I'm -- may be I missed something.  Please excuse

1    me.

2                 You are familiar with the term "drop

3    shipment," right?

4       A.   I'm not really sure.

5       Q.   A drop shipment describes the process of an order

6    coming from overseas and paying the shipper for that

7    order.

8                 Do you understand that?

9                 THE COURT:  If you do.  If you don't, say

10   you don't.

11                THE WITNESS:  I don't know.

12   BY MR. SINGH:

13      Q.   Has Strong Trading ever received a shipment from

14   Strong Jewelry in Hong Kong?

15      A.   No.

16      Q.   Are you familiar at all with the Customs process

17   when a product is delivered from Hong Kong to U.S.?

18      A.   They need to have -- another shipper has to be on

19   the invoice.

20      Q.   Right.  There's a Customs declaration that needs

21   to be completed; is that right?

22      A.   That's their part.  I'm not doing that, so I'm

23   not sure.

24      Q.   You're unfamiliar with the Customs process when

25   shipping an item from Hong Kong to U.S., right?

```
 1     A.  I'm not sure.

 2     Q.  All of the documents that must be completed in

 3  order to ship a product from Hong Kong to U.S., all of

 4  that is done by Strong Jewelry Hong Kong, right?

 5     A.  Yes, they are handling the shipments.

 6     Q.  Strong Trading has no involvement whatsoever in

 7  preparing the delivery from Strong Jewelry in Hong Kong,

 8  right?

 9     A.  When you say "delivery," I --

10     Q.  Strong Trading has no involvement in preparing

11  the Customs' forms, for example?

12     A.  Our Hong Kong office people will prepare those

13  necessary document for the Custom.

14     Q.  And Strong trading is not involved in the

15  delivery of the product from Hong Kong to the U.S., to

16  the customer, correct?

17     A.  Because we are not an importer.  Because they

18  ship it to the customer.  So the customer, they should

19  know.

20     Q.  Exactly.

21              In this Exhibit 78, the oldest invoice is

22  from September 16, 2020.

23              Do you see that?

24     A.  Yes.  Unique Designs began doing business with --

25  strike that.
```

1            Unique Designs began receiving shipments

2   well before September 16, 2020, correct?

3      A.   Can you repeat that.

4      Q.   Unique Designs received shipments prior to

5   September 16, 2020, right?

6      A.   Yes.

7      Q.   Do you agree with me that all of the invoices to

8   Unique Designs for the three years prior to

9   September 16, 2020, were all timely and fully paid?

10      A.   I'm not sure timely, but they paid the invoice

11   before the date for that.

12      Q.   Did Strong Trading take any steps to investigate

13   whether the invoices in Exhibit 78 are correct?

14      A.   Investigate?

15      Q.   Did you take any steps to determine whether all

16   these invoices are true and accurate?

17      A.   I believe that we -- I personally enter the

18   information into our system.  So...

19      Q.   Right.  I understand.  You manually enter all

20   this information, right?

21      A.   Yes.

22      Q.   Relying on invoices that were provided to you by

23   Strong Jewelry, right?

24      A.   It is all in our system.

25      Q.   Did you -- I understand you were inputting the

1    information that's on the invoice.  But were you

2    actually taking any steps to determine whether the

3    information in the invoices was actually correct?

4    A.  You mean, I look at line by line?

5    Q.  Anything.  Did you do anything to determine

6    whether the invoices themselves were actually correct?

7    A.  I just enter the date, customer ID invoice number

8    and amount to record the invoices, the accounts

9    receivable.

10    Q.  On October 14, 2020 -- that was a very bad

11    underlying job.  I hope you can see that.

12          There's another invoice here -- I'm sorry.

13    Document here.  November 9, 2020.

14          Do you see that?

15    A.  Oh, okay.  Yes.

16    Q.  The invoice numbers for these start with RMA.

17          Do you see that?

18    A.  Yes.

19    Q.  These are adjustments to Unique Designs invoices,

20    correct?

21    A.  I'm not sure what you said "adjustment" here.

22    Q.  It's not a payment that's due from Unique Designs

23    to anybody, right?

24    A.  It is the return credit.

25    Q.  Okay.  And that return credit is due to having

1   issues with these orders, correct?

2      A.  Can you repeat?

3      Q.  The reason for these adjustments, these downward

4   adjustments, is because there were issues with these

5   particular orders; is that correct?

6      A.  They make the return.

7      Q.  And the return was a result of some issue with

8   the order, correct?

9      A.  Issue as --

10     Q.  A problem, a defect, a wrong item?

11     A.  I know the first one, because after the

12  deposition, I check.  The first one, I think because

13  they don't like the color, so return it to us.

14             And then we replaced the right color they

15  wanted.

16             So I'm not sure if that is an issue.

17     Q.  So the answer to my question is the return was

18  provided because of a problem with the order that the

19  customer told you about.  The answer is yes, right?

20     A.  You can say that.

21     Q.  Okay.  There was a payment made by Unique Designs

22  in November 2020, correct?

23     A.  Yes.

24     Q.  That payment is not shown on this aged receivable

25  report, correct?

1     A.  Yes.

2     Q.  If you look there is a -- there is a payment

3   column here.

4          Do you see that?

5     A.  Yes.

6     Q.  The payment made by Unique Designs is not shown

7   there, correct?

8     A.  Yes.

9     Q.  You chose not to include that payment in this

10  report, right?

11    A.  No.  The age --

12    Q.  Is that correct, you chose not to include the

13  payment?  Just yes or no.

14          THE COURT:  It doesn't have to be answered

15  yes or no, Counsel.

16          Can you answer the question?

17          THE WITNESS:  I can answer the question

18  because the payment here show is the -- because

19  sometimes customer pay partial payment.  For example,

20  for this big invoice, 167,000, may be they only make

21  50,000.  That will show 50,000 here.  And then the

22  balance for that invoice they haven't paid.  That's the

23  aged receivable report shows.

24  BY MR. SINGH:

25    Q.  But you agree with me that looking at this

1  document there is a field here for payments, there is an

2  option for you to include payments in this document,

3  correct?

4     A.  No.  It is not -- it -- like I said, the payment

5  column here shows if there is a partial payment for that

6  invoice.

7     Q.  You are the person most knowledgeable at Strong

8  Trading regarding all these invoices shown in

9  Exhibit 78, correct?

10    A.  Yes.

11    Q.  There is no one more knowledgeable, correct?

12    A.  Yes.

13    Q.  Let's review one of these individual invoices

14  together.  I'm going to take -- in the fourth row, the

15  first of the fourth row is this invoice that ends in

16  20026A.

17           Are you with me?

18    A.  Yes.

19           MR. SINGH:  Your Honor.  Strike that.

20  BY MR. SINGH:

21    Q.  Directing your attention to what was previously

22  marked Exhibit 56.  Let me know when you are there.

23    A.  Yes.

24    Q.  This is an invoice from Strong Jewelry to Unique

25  Designs, correct?

1     A.   It is the invoice to Unique Designs.

2     Q.   At the top of the page it reads, "Strong Jewelry

3   HK Company Limited, Chong Chong Jewelry Group"?

4          Do you see that?

5     A.   Yes.   That is the shipper's name.

6     Q.   The invoice number here, that was assigned along

7   with this invoice when Strong Jewelry generated it,

8   correct?

9     A.   It is generated just by the system.   So I cannot

10   say who assigned the number here.

11     Q.   And the invoice date is October 12th, 2020.

12          Do you see that?

13     A.   Yes.   Yes.

14     Q.   This is the invoice that's referenced in

15   Exhibit 78, right?

16     A.   Yes.

17     Q.   There is an address listed here and a telephone

18   fax number.

19          Do you see that?

20     A.   Yes.

21     Q.   There's actually contact information for Strong

22   Jewelry in Hong Kong, correct?

23     A.   Yes.

24     Q.   What is this -- there's a check number here.

25          Do you see that?

1      A.  Yes.

2      Q.  What does that check number mean?

3      A.  Like in the deposition you ask me the same

4  question.  I said I don't know, because I really don't

5  know.

6      Q.  Okay.  Now, directing your attention to the box

7  where "Payment terms."

8              Do you see that?

9      A.  Yes.

10     Q.  Do you know what this payment terms means?

11     A.  I think it's the -- actually the reference number

12 from the factory to Hong Kong office.

13     Q.  There's A20.  Do you see that?

14     A.  Yes.

15     Q.  That's a vendor code, right?

16              THE COURT:  If you know.

17              THE WITNESS:  Usually 20 is the year 2020.

18 Every year we jump up one number.

19 BY MR. SINGH:

20     Q.  Next there is HK.

21              Do you see that?

22     A.  Yes.

23     Q.  That is the Hong Kong vendor, correct?

24     A.  Hong Kong vendor.

25     Q.  The shipment is from Hong Kong, correct?

 1    A.  No.

 2           THE COURT:  What does HK stand for?  What

 3    does the HK stand for?

 4           THE WITNESS:  Yeah.  I'm explain this

 5    number.  Because it is the factory in China, they ship

 6    this shipment to Hong Kong.

 7           THE COURT:  The only question we are asking

 8    you is:  Do you know what the HK, those two initials,

 9    stand for?

10           THE WITNESS:  Hong Kong.

11           THE COURT:  Okay.  Counsel.

12    BY MR. SINGH:

13    Q.  Strong Trading had no involvement in completing

14    these payment terms, correct?

15    A.  I'm not sure the question is.

16    Q.  Strong Trading -- there is no way Strong Trading

17    could have known how to complete this field called

18    "Payment Terms," right?  Correct?

19    A.  I don't know.  It just pop up.

20    Q.  The tracking number there is also a number that's

21    generated by Strong Jewelry in Hong Kong sending it by a

22    particular carrier to the U.S., right?

23    A.  Yes.

24    Q.  So there is no way Strong Trading could have

25    provided this tracking number to be completed in the

1    invoice, correct?

2       A.   We couldn't do the shipment from Hong Kong.  So

3    we have Hong Kong office to help us to do the shipping.

4       Q.   Okay.  Directing your attention back to

5    Exhibit 78.  For all the other invoices that are -- for

6    all the other invoices that are shown in Exhibit 78, the

7    format of the invoice will be exactly the same, right?

8       A.   Yes.

9       Q.   In other words, the invoice number, date and

10   description may change, but the header and the general

11   format remain the same, right?

12      A.   Yes.

13      Q.   All right.  Ms. Chu, we've talked about the

14   contract, the invoices.

15            Now let's talk about the items that are

16   subject of the invoices.

17            You described Strong Trading as a middle

18   person, right?

19      A.   Yes.

20      Q.   It is the middle person between the retailer

21   who's buying jewelry, and the manufacture that's selling

22   the jewelry, correct?

23      A.   We don't manufacture.

24      Q.   Right.  But the -- you are the middle person

25   between the manufacturer and the retailer buying,

1   correct?

2      A.   Yeah.   Middle person.

3      Q.   Strong Jewelry is also a middle person, correct?

4      A.   It is the middle person to us, to Strong Trading.

5      Q.   When Unique Designs -- strike that.

6           When Unique Designs placed an order for

7   jewelry, the items that it ordered were obtained by a

8   factory in China; is that right?

9      A.   Can you repeat the -- you said "obtain"?

10      Q.   When Unique Designs placed an order for any

11   jewelry items, those items were collected or retrieved

12   by a factory in China, correct?

13      A.   I'm not sure what you mean by "collect,

14   retrieve."

15      Q.   Well, Strong Jewelry Hong Kong is getting the --

16   Strong Jewelry is not a manufacturer, right?

17      A.   Strong Jewelry is not a manufacturer.

18           THE COURT:   Where were the manufacturers?

19           THE WITNESS:   In China.

20           THE COURT:   Okay.

21   BY MR. SINGH:

22      Q.   And that's a single factory in China that's

23   providing all the jewelry to Strong Jewelry in Hong

24   Kong, right?

25      A.   I'm not sure how many factory in China.

1    Q.   Isn't it true that all the jewelry items that

2  Strong Jewelry shipped to Unique Designs all came from

3  the same factory?

4    A.   I don't know.

5    Q.   Isn't it true that all of them came from one

6  factory in China?

7    A.   I -- I -- I don't know who are the manufacturers.

8              MR. SINGH:  Your Honor, if I may play the

9  video clip of Ms. Chu's deposition testimony, page 54,

10  lines 6 through 10.

11             MS. ALPARCE:  54, Counsel, 6 through 10?

12             MR. SINGH:  Yes.

13             THE COURT:  You may play it, Counsel.

14             (VIDEO PLAYED.)

15  BY MR. SINGH:

16    Q.   The items that are sent from the factory in China

17  to Strong -- strike that.

18             Is there a minimum number of items that --

19  I'm sorry about that.

20    A.   I'm kind of confused.  Which ones are you?

21  Because I cannot hear.

22             THE COURT:  Wait a second.  Counsel, do you

23  want to play more?

24             MR. SINGH:  No.  It inadvertently kept

25  playing.

1                   THE COURT:  Okay.

2    BY MR. SINGH:

3        Q.   The items that were sent from the factory in

4    China were sent to the Strong Jewelry Hong Kong, right?

5        A.   Yes.

6        Q.   And then the items that Strong Jewelry received

7    went to Unique Designs, correct?

8        A.   Went to Unique Designs?  Yes.

9        Q.   Strong Trading did not check or verify that any

10   of the items were actually what Unique Designs ordered,

11   correct?

12       A.   Because we don't receive the goods.

13       Q.   Right.

14       A.   Goods go directly to --

15                  THE COURT:  The answer would be yes?

16                  THE WITNESS:  Yes.

17                  THE COURT:  I know being a witness is tough.

18   Just listen to the question.  Answer that question.

19                  If your counsel wants to explain it more,

20   they will ask you further questions.

21                  Just answer the questions asked.

22                  MR. SINGH:  Thank you, Your Honor.

23   BY MR. SINGH:

24       Q.   Strong Trading did not open and inspect any

25   packages delivered from Strong Jewelry to Unique

1   Designs, right?

2      A.   Sorry.   I think my alarm was on at this time.   I

3   usually pick up my kids.   I have alarm.

4           THE COURT:   Listen to the question again.

5   BY MR. SINGH:

6      Q.   Strong Trading did not open or inspect any of the

7   packages from Strong Jewelry Hong Kong to Unique

8   Designs, right?

9      A.   No.   Because shipment directly to Unique Designs.

10     Q.   And you are not aware of any quality control

11  protocol that's used by Strong Trading to ensure that

12  the correct items are delivered to Unique Designs,

13  right?

14     A.   The -- I think the receive -- the customer

15  receive the merchandise, they would check the quality.

16     Q.   Right.   But does Strong Trading have any kind of

17  quality control protocol?

18     A.   Strong Trading, no.

19     Q.   Sometimes a customer may order a sample item,

20  right?

21     A.   Yes.

22     Q.   If a customer is satisfied with the sample, then

23  the customer may order a large or bulk order that

24  matches the characteristics of that sample, right?

25     A.   Yes.

```
 1      Q.   When Strong Jewelry fulfills a bulk order, it
 2  will match that sample exactly, right?
 3      A.   Yes.
 4      Q.   In quality, right?
 5      A.   Yes.
 6      Q.   Shape?
 7      A.   Yes.
 8      Q.   Color?
 9      A.   Yes.
10      Q.   What is your best estimate as to how many total
11  items Unique Designs ordered?
12               THE COURT:  If you know.
13               MR. SINGH:  If you know.
14               THE WITNESS:  I don't know.
15  BY MR. SINGH:
16      Q.   Do you know how many total orders Unique Designs
17  placed?
18      A.   Orders, no, I don't know.
19      Q.   Is it fair to estimate that Unique Designs
20  ordered at least 100,000 individual pieces?
21               THE COURT:  If you know.
22               THE WITNESS:  I don't know.
23  BY MR. SINGH:
24      Q.   Unique Designs paid about two and a half million
25  dollars for the jewelry items it bought from Strong
```

1    Jewelry; is that fair?

2        A.   No, they didn't pay the full 2.5 million.

3        Q.   Was it closer to 2 million?

4        A.   Yes.

5        Q.   These payments were all made to Strong Jewelry,

6    right?

7        A.   Made to Strong Trading through Hong Kong account.

8        Q.   You are not aware -- strike that.

9             As a CFO of Strong Trading, you are not

10   aware of any payments from Unique Designs directly to

11   Strong Trading, correct?

12       A.   Can you clarify the question.

13            THE COURT:  Let me try to help you out

14   because it's getting confusing.

15            How did they pay?  Did they pay by check?

16            THE WITNESS:  They do wire transfer.

17            THE COURT:  Wire transfer.  Were the wire

18   transfers to Strong Jewelry Hong Kong?

19            THE WITNESS:  Yes.  Strong Jewelry Hong

20   Kong.

21            THE COURT:  Okay.

22            MR. SINGH:  Thank you.

23   BY MR. SINGH:

24       Q.   Unique Designs disputed the invoices that are

25   shown in Exhibit 78, right?

1          Ms. Chu, Unique Designs disputed the

2    invoices in the Exhibit 78, right?

3          THE COURT:  If you know.

4          THE WITNESS:  Can you repeat that question?

5    BY MR. SINGH:

6    Q.   Unique Designs disputed the invoices shown in

7    Exhibit 78, right?

8    A.   "Dispute"?

9    Q.   Contested or disagreed with.

10   A.   I'm not sure which one, but may be.

11   Q.   Strong Trading was notified that Unique Designs

12   was disputing the invoices because it was sent the wrong

13   goods, right?

14   A.   We didn't sell the wrong goods.

15   Q.   Did Strong Trading ever become aware that there

16   was a dispute because Unique Designs believed it was

17   sent the wrong goods?

18   A.   There was dispute because they claim there is a

19   wrong color stones.

20          THE COURT:  Okay.

21   BY MR. SINGH:

22   Q.   Is it true that Unique Designs was sent items

23   other than what it was charged for in the invoices in

24   Exhibit 78?

25   A.   Can you repeat that question.  I don't

1    understand.

2    Q.   Is it true that Unique Designs was sent items

3    other than what was ordered and charged for in the

4    Exhibit 78?

5    A.   You mean we send the wrong item?

6    Q.   Correct.

7    A.   We didn't send wrong item.

8    Q.   Did it ever happen?

9    A.   I -- which -- we ship whatever is on the invoice.

10   Q.   There is no document confirming that every item

11   Unique Designs ordered was sent to it, right?

12   A.   Can you simplify the question?

13   Q.   Is there a document that would show every item

14   that was sent to Unique Designs?

15   A.   The invoice?

16   Q.   Okay.  For the items that the factory in China

17   sent, was there a list that would describe all the

18   individual items it got?

19   A.   The invoice?

20           THE COURT:  She is saying, is there any

21   document that listed all the items that were sent to --

22           THE WITNESS:  Yes.  Because we have intra

23   system.  So everything we share.  So they have access to

24   see what order is going to ship.

25           THE COURT:  There was a document that lists

1    all those?

2                  THE WITNESS:  Documents.  Yeah.

3                  THE COURT:  Okay.

4    BY MR. SINGH:

5      Q.  And those lists are available to Strong Trading,

6    right?

7      A.  Yes.

8      Q.  You never requested them though, right?

9      A.  Who requested who?

10     Q.  You never requested those documents that would

11   show all the items Unique Designs was delivered?

12     A.  I'm not sure the question.

13     Q.  Did you see those document that would show what

14   items were actually delivered to Unique Designs?

15     A.  Just the invoice.

16     Q.  Okay.  But the actual items --

17     A.  I'm not sure.

18                  THE COURT:  No, no.  You got to listen to

19   the question.

20                  He didn't ask you about invoices.

21                  He said, was there any document that listed

22   all the items that were sent.  And you said Yes, there

23   was such a document.

24                  Then he said, Have you ever seen that

25   document?  That's what he asked:  Have you ever seen

1   that document?

2            THE WITNESS:  If it was, yes.  But other

3   than that, I don't know.

4            THE COURT:  You told us that there is a

5   document that listed all the items.

6            He asked you:  Have you seen that document?

7            He is not asking you about invoices.  He

8   said, Have you seen that document that lists all those

9   items?

10           THE WITNESS:  The purchase order?

11           THE COURT:  You said there is a document

12   that listed all the items.

13           THE WITNESS:  Yes.  The invoice -- I said --

14           THE COURT:  Listen to the question.  The

15   question was:  Was there a document that listed all the

16   items that you sent to Unique Designs.  And you said

17   there was a document.

18           THE WITNESS:  There was a document.

19           THE COURT:  Have you seen -- have you seen

20   that document?

21           We are not asking you about invoices.  We

22   are just saying that one document, have you seen it?

23           It is a pretty simple question.

24           THE WITNESS:  (Unintelligible.)

25           THE COURT:  The witness will not answer the

1  question.  Next question.

2  BY MR. SINGH:

3    Q.  If I may play the deposition transcript of

4  Ms. Chu, page 48, 20 through 49, 4, and 49, 21 to 50,

5  10.

6              THE COURT:  Yes.

7              MR. SINGH:  Thank you, Your Honor.

8              (VIDEO PLAYED.)

9  BY MR. SINGH:

10    Q.  There's no steps Strong Trading took to verify

11  that the actual items that Unique ordered were actually

12  delivered to it, right?

13    A.  Sorry.  Can you repeat that.

14    Q.  Did Strong Trading do anything to verify that it

15  actually -- that Unique Designs actually got the items

16  that it ordered?

17    A.  Oh, if anything wrong, the customer will tell us.

18  So if they don't -- so we don't do anything after

19  delivery.

20    Q.  Nothing before delivery either, right?  Strong

21  Trading has not done anything at any time to confirm

22  that the items are actually being delivered to the

23  customer, right?

24    A.  No.  After the shipment is made, we will tell

25  them the shipment is coming, and then the tracking

1    number and everything.  So they know when the shipment

2    is coming, yes, so they can check when the shipment is

3    delivered.

4        Q.  Ms. Chu, did you look through any emails between

5    you and other Strong employees about the shipments to

6    Unique Designs?

7        A.  Did --

8        Q.  Did you look for any e-mails?

9        A.  I look for emails?  Sorry.  Can you repeat that.

10       Q.  As part of this case, did you ever look for any

11   email between you and another Strong employee that shows

12   anything about the shipments made to Unique Designs?

13   No?

14       A.  Not the shipment made.

15       Q.  Did you look for e-mails between you and Strong

16   employees at all?

17       A.  Yes, we look at it.

18       Q.  Did you personally look for any emails?

19       A.  Yes, I looked at some emails.

20       Q.  Did you look at any emails between you and Strong

21   Jewelry as part of this case?

22       A.  Can you repeat that.

23       Q.  You did not look for any emails between you and

24   Strong Jewelry as part of this case, right?

25       A.  Strong -- no.

1    Q.  You didn't turn over or produce any emails

2    between you and any Strong employee, right?

3    A.  Can you slow down because it's kind of fast.  I

4    cannot catch the question.

5    Q.  Of course.  Did you look -- strike that.

6         You didn't turn over any emails between you

7    and any Strong Trading employee, correct?

8    A.  Turn over?

9    Q.  Produce.

10   A.  Produce email to Strong Trading to Unique

11   Designs?

12   Q.  No.  Did you look for -- strike that.

13        Isn't it true that other than Kurt Chien,

14   the manager at Strong Trading, no one from Strong

15   Trading has searched for any email as part of this case?

16   A.  No.  And Kurt is not a manager.  He's sales

17   representative.

18        MR. SINGH:  Your Honor, if I may play the

19   video clip of Ms. Chu's deposition testimony, page 16,

20   lines 4 through 21?

21        THE COURT:  Yes.

22        MS. ALPARCE:  I apologize, Counsel.

23        MR. SINGH:  16, 4 through 21.

24        MS. ALPARCE:  No objection, Your Honor.

25        (VIDEO PLAYED.)

1   BY MR. SINGH:

2      Q.   At some point after October 2020, Strong Trading

3   had certain gem stones inspected by a third-party

4   testing laboratory, right?

5      A.   Who did the test?

6      Q.   Yes.  Did you do a test?

7      A.   We did some tests.

8      Q.   And this came after Unique Designs disputed the

9   invoices due to the wrong stone issue, correct?

10     A.   I'm not sure the timeline.  But we send out some

11  product to the outside laboratory.

12     Q.   Between January 2017 and October of 2020, Strong

13  Trading had done zero lab tests on any gem stones,

14  correct?

15     A.   Yeah, we didn't do test.

16     Q.   In February 2021, Strong Trading had tested gem

17  stones for the first time in over five years, correct?

18     A.   I would say that.

19     Q.   And between February 2021 and August 2021, Strong

20  Trading had gemstones tested three times, right?

21     A.   Yes.

22     Q.   And each time the gemstones were tested, they

23  were tested by a third-party testing laboratory called

24  Mutual Cornell, correct?

25     A.   Yes.  Yes.

```
 1      Q.   Directing your attention to Exhibit 262.

 2           Let me know when you are there.

 3      A.   Yes.

 4      Q.   You have seen this document before, right?

 5      A.   Yes.

 6      Q.   This is an inspection report identifying --

 7           MR. YORK:  Objection, Your Honor.  Hearsay.

 8           THE COURT:  Lay the foundation.

 9 BY MR. SINGH:

10      Q.   This is an inspection report by Mutual Cornell?

11           THE COURT:  If you know.

12           THE WITNESS:  Yes.

13 BY MR. SINGH:

14      Q.   This was the report created for certain gemstones

15 that were tested, correct?

16      A.   Yes.

17      Q.   Strong Trading hired Mutual Cornell, correct?

18      A.   We use their service.

19      Q.   The gemstones that were tested and that this

20 report corresponds to were all provided by Strong

21 Trading to Mutual Cornell, right?

22      A.   Yes.

23      Q.   Mutual Cornell was specifically hired to test

24 these gem stones and prepare a report; is that right?

25      A.   We use their service.
```

1    Q.   To prepare this particular report, right?

2    A.   When we do the test, they will run report.

3    Q.   This -- the report was prepared around the time

4    that the gemstones were sent by Strong Trading to Mutual

5    Cornell, right?

6    A.   Yeah, we sent them March.

7    Q.   Mutual Cornell was paid for preparing these

8    reports; is that right?

9    A.   Including with the service, yes.

10    Q.   At the top left of the each page there's an

11    address.

12          Do you see that?

13          THE COURT:  Before you get there, Counsel.

14    Were these reports prepared by them for --

15          THE WITNESS:  For the testing result.

16          THE COURT:  For Strong Trading?

17          THE WITNESS:  Yes.

18          THE COURT:  Go ahead, Counsel.

19    BY MR. SINGH:

20    Q.   And you turned over these reports to your lawyers

21    in this case, right?

22    A.   Yes.

23          MR. SINGH:  Your Honor, defendant moves to

24    admit Exhibit 262.

25          MR. YORK:  Objection, Your Honor.  Hearsay.

```
 1                    THE COURT:  It will be received.

 2                    MR. YORK:  Your Honor, if I may finish my

 3    objection.  It is also --

 4                    THE COURT:  You finished it, Counsel.  You

 5    say "hearsay."  It is overruled.

 6                    Counsel, you may continue.

 7                    We do not argue objections in front of the

 8    jury.  Either side.

 9                    Okay.  Go ahead, Counsel.

10                    MR. YORK:  May I just clarify, Your Honor?

11                    THE COURT:  No.

12    BY MR. SINGH:

13       Q.  Strong Trading did not -- Strong Trading did not

14    dispute or contest the findings in this report; is that

15    correct?

16       A.  "Dispute"?

17       Q.  Did not disagree with or dispute any of the

18    findings in this report, correct?

19       A.  We trust their report.

20       Q.  At the bottom of each page of Exhibit 262 there

21    is a photograph.

22                    Do you see that?

23       A.  Yes.

24       Q.  And that photograph depicts the item that was

25    sent from Strong Trading to Mutual Cornell, right?
```

1      A.   Yes.

2      Q.   According to these reports, it shows there is a

3  sample date of March 9th, right?

4      A.   Yes.

5      Q.   Do you see that?

6      A.   Yes.

7      Q.   And the actual report was prepared April 6, 2021.

8           Do you see that?

9      A.   Yes.

10     Q.   So it took about a month for these reports to be

11  prepared, right?

12     A.   Yes.

13     Q.   Directing your attention to the final page of

14  Exhibit 262 which is STI 193.

15           Let me know when you're there.

16     A.   Yes.

17     Q.   A single item was tested by Mutual Cornell,

18  right?

19     A.   Yes.

20     Q.   And the photograph at the bottom depicts the

21  jewelry item that was sent for testing, right?

22     A.   Yes.

23     Q.   At the top of the page, there's a field that says

24  "gem stone identification."

25           Do you see that?

1     A.   Yes.

2     Q.   It shows that the gem stone was identified by

3   Mutual Cornell as glass, correct?

4     A.   Yes.

5     Q.   This particular item was purchased by Strong

6   Trading from an online retailer, right?

7     A.   This one, the glass one, no.

8     Q.   Correct.   It was not?

9     A.   Can I see the picture again?

10    Q.   Yes.

11    A.   Yes.

12    Q.   It was.   Was it purchased from a company called

13   Helzberg Diamonds?

14    A.   I don't remember which one.   The website.   I

15   don't remember because we bought two.

16              MR. SINGH:   Your Honor, if I may play the

17   deposition testimony of Ms. Chu, page 199, 20 to 24.

18              THE COURT:   Why don't you check to see if

19   there's any objection to it.

20              199.

21              MR. SINGH:   Yes.

22              THE COURT:   What line?

23              MR. SINGH:   20 to 24.

24              MS. ALPARCE:   No objection, Your Honor.

25              THE COURT:   Okay.   You may play it.

1                    (VIDEO PLAYED.)

2     BY MR. SINGH:

3        Q.  Ms. Chu, these items were bought from

4     Helzberg because -- strike that.

5                    You -- Strong Trading purchased these --

6     this item that's highlighted in this photograph from a

7     customer of Unique Designs, correct?

8        A.  I don't know.

9        Q.  Did you know that Unique had purchased emerald

10    green earrings from -- strike that.

11                   Strong Trading was aware that Unique had

12    purchased emerald earrings from Strong Jewelry to sell

13    to Helzberg, correct?

14       A.  I don't know.

15       Q.  Directing your attention to Exhibit 269.  Let me

16    know when you are there.

17       A.  Okay.

18       Q.  This is a purchase order from Unique Designs to

19    Strong Trading, right?

20                   MR. YORK:  Objection, Your Honor.  No

21    foundation.

22                   THE COURT:  Let's find out.

23                   THE WITNESS:  I don't --

24                   MR. SINGH:  Yes.

25                   THE COURT:  If you know.  He just asked is

1   that an invoice.

2   BY MR. SINGH:

3      Q.  Purchase order.

4            THE COURT:  Purchase order.  I'm sorry.

5            If you know.

6            THE WITNESS:  No.

7   BY MR. SINGH:

8      Q.  Have you seen purchase orders from --

9            THE COURT:  Excuse me, Counsel.

10           When you say "no," it is not a purchase

11  order?  Or you don't know if it is or not?

12           THE WITNESS:  I don't think it is a purchase

13  order.

14           THE COURT:  Okay.  Next question.

15  BY MR. SINGH:

16     Q.  Have you seen a purchase order from Unique

17  Designs to Strong Trading before?

18     A.  After lawsuit filed, I seen purchase order.

19     Q.  Is the document you're currently looking at the

20  purchase order you saw after the lawsuit was filed?

21     A.  This one doesn't look like the purchase order.

22           You said 269?

23     Q.  Correct.  It should be a colored document.

24     A.  I don't think it is a purchase order.

25           THE COURT:  Okay.  Next question.

1    BY MR. SINGH:

2       Q.   The item that was tested and came back as glass

3    was tested as a result of Unique Designs complaining

4    about the wrong stone being sent to them; is that

5    correct?

6       A.   No.   It is different style.   Different item.

7               MR. SINGH:   Your Honor, if I may play a

8    video clip of Ms. Chu's deposition testimony, 199, 25 to

9    200, 2 -- 200, line 2.

10              THE COURT:   What's the first page?

11              MR. SINGH:   199.

12              THE COURT:   Line --

13              MR. SINGH:   25.   Your Honor, I realize --

14              THE COURT:   Any objection?

15              MS. ALPARCE:   No objection.

16              THE COURT:   Okay.   Go ahead, play it.

17              MR. SINGH:   Actually, Your Honor, I flipped

18   these clips.   If I may play 199, 20 through 200, 2.

19              MS. ALPARCE:   No objection, Your Honor.

20              THE COURT:   You may play it, Counsel.

21              (VIDEO PLAYED.)

22   BY MR. SINGH:

23      Q.   Ms. Chu, directing your attention to Exhibit 295.

24              Let me know when you are there.

25      A.   295?

1     Q.  Yes.

2     A.  Okay.

3     Q.  The first page -- are you there, Ms. Chu?

4     A.  Yeah.

5     Q.  The first page of Exhibit 295, that is a web page

6  of an online retailer known as Helzberg Diamonds, right?

7     A.  Yes.

8     Q.  This document was printed out by someone at

9  Strong Trading and given to their lawyers, correct?

10    A.  Yes.

11    Q.  This printout accurately depicts the web page

12  from the Helzberg website, correct?

13    A.  Yes.

14    Q.  You visited this website to purchase these two

15  earrings, correct?

16    A.  No, I didn't.

17    Q.  Someone from Strong Trading did?

18    A.  Yes.

19    Q.  This is a particular website you purchased the

20  green earrings that were tested by Mutual Cornell,

21  correct?

22    A.  Yes.

23    Q.  Directing your attention to the next two pages

24  212 and 213.

25            Have you seen these two photographs before?

```
 1     A.   No.

 2     Q.   These photographs depict jewelry items.

 3           Do you see that?

 4     A.   Yes.   That is jewelry item.

 5     Q.   The photographs were taken by someone at Strong

 6  Trading, right?

 7           THE COURT:  If you know.  If you know who

 8  took them.

 9           THE WITNESS:  May be.  Because we provide

10  it, yes.

11  BY MR. SINGH:

12     Q.   Yes.   These were also provided by someone from

13  Strong Trading to your lawyers, right?

14     A.   Yes.

15     Q.   They depict photographs of jewelry items that

16  were purchased from Helzberg, correct?

17     A.   This?

18           THE COURT:  If you know.  Can you identify

19  those photos?

20           THE WITNESS:  No, I can't.

21  BY MR. SINGH:

22     Q.   If you look closely -- and hopefully your quality

23  is well enough to do this -- if you look closely at the

24  two jewelry items, you will see there's tags attached to

25  the jewelry items.
```

1           Do you see that?

2     A.   Yes.

3     Q.   Take a moment to review those.  And let me know

4  if they help you in any way refreshing your recollection

5  as to whether these are jewelry items that were

6  purchased from the Helzberg website.

7     A.   I cannot recognize this --

8               THE COURT:  Okay.

9               THE WITNESS:  -- pictures.

10              THE COURT:  Next question.

11 BY MR. SINGH:

12    Q.   Do you have any reason to dispute that these are

13 photographs depicting emerald jewelry, the three-piece

14 set; the pendant, ring and earrings?

15    A.   "Dispute"?

16    Q.   Do you have any reason to disagree with that?

17    A.   Agree?

18    Q.   Disagree?

19    A.   I'm sorry.  Can you complete the --

20    Q.   Yes, of course.

21              Do you have any reason to disagree with me

22 when I say that these are photographs depicting emerald

23 jewelry, specifically a three-piece set; the earrings,

24 ring and pendant?

25    A.   No.

 1          MR. SINGH:  Your Honor, defendant moves to

 2   admit Exhibit 295.

 3          MR. YORK:  Objection, Your Honor.

 4   Foundation.

 5          THE COURT:  Denied.

 6          MR. YORK:  In addition, the website --

 7          THE COURT:  I've already denied it.

 8   BY MR. SINGH:

 9    Q.  Directing your attention back to Exhibit 262.

10          THE COURT:  Sorry, Counsel, 262?

11          MR. SINGH:  262.

12          THE COURT:  Okay.

13   BY MR. SINGH:

14    Q.  At the time Strong Trading sent this item to

15   Mutual Cornell, it believed the item was emerald,

16   correct?

17    A.  We bought it -- you say when we bought it?

18    Q.  When you bought it.

19    A.  Yeah, we bought it from Helzberg website.

20    Q.  It was an emerald -- it was purchased as an

21   emerald item, correct?

22    A.  I have to look at the website again.

23    Q.  Okay.  At the time that Strong Trading provided

24   this item to Mutual Cornell, did it expect the item to

25   be emerald?

1      A.   No.

2      Q.   Glass jewelry is considered cheap in terms of

3   price and quality, right?

4      A.   Yes.

5      Q.   Emerald is not considered cheap in terms of price

6   and quality, right?

7      A.   Yes.

8      Q.   Did you notify anybody about the results of

9   Exhibit 262?

10      A.   Notify -- no.

11      Q.   Directing your attention to Exhibit 261.

12           THE COURT:   Counsel, I am going to stop you

13   at this time.   It's 4 o'clock.

14           I told you you will be released right at

15   4 o'clock, which we are going to do at this time.

16

17   Remember the admonishment not to discuss the case among

18   yourselves or with anybody else or form or express any

19   opinions about the matter until it's submitted to you

20   and you retire to the jury room.

21           See you back in tomorrow morning at 8:30.   I

22   would recommend -- because we have had problems with

23   jurors in the past, I would recommend coming in about

24   8:15, get a cup of coffee or something.   Because

25   somebody is always late because of traffic or an

1   accident or something.  I don't want to have to hold us

2   over past 4:00 tomorrow.  Come in about 8:15.  We will

3   start right at 8:30.

4            There's a chance that we may even finish the

5   testimony by tomorrow or Friday.

6            Have a pleasant evening.  Don't think about

7   this case.  Watch TV.  Enjoy what you want to do.  See

8   you back in tomorrow 8:30.  If you leave quietly, I have

9   to talk to the attorneys.

10           (Jury out.)

11           THE COURT:  You may step down also.  Okay.

12           You can have seats.  Let the record reflect

13   the jury has left the courtroom.

14           As I indicated to you in the pretrial and

15   before the trial, if there's any objection, you can name

16   what the objection is.  Do not argue or explain in front

17   of the jury.  But we will pick it up the next time that

18   there's a recess, which is now.

19           And if it has to be corrected, we can

20   correct it.

21           So, Counsel, you had an objection that the

22   Court overruled.

23           MR. YORK:  Yes, Your Honor.  If I may.

24   First st of all, I apologize if it came out as argument.

25   What I was trying to say is --

1          THE COURT:  Let me help you out.  It is not

2     that it's an argument.  It's just that in front of jury

3     you just state what it is, hearsay, whatever it is.  I

4     feel confident enough to rule on those things.  Am I

5     always right?  No.  So that's why we bring it up in the

6     next recess because we may have to correct it.

7          MR. YORK:  Your Honor, if I may.  What I

8     intended to do is object on the grounds of hearsay and

9     expert testimony.  I didn't have time to say expert

10    testimony.  It seemed to me that the Court had already

11    ruled after I said hearsay.  But I had another ground.

12    So what I was trying to do is get my other ground into

13    the record so the Court would understand I had two

14    objections.

15          THE COURT:  And your argument on the expert

16    testimony?

17          MR. YORK:  The argument, Your Honor, is that

18    there is no expert testimony allowed in this case

19    because there has been no designations under Rule 26;

20    there's also been no designations provided prior to

21    trial.  So there is no expert testimony allowed in this

22    case.

23          THE COURT:  And the expert testimony you are

24    objecting to was?

25          MR. YORK:  The expert testimony, which is

1    the report by Mutual Cornell that this item of jewelry

2    was tested, and it was determined to be glass.  That

3    requires expertise, obviously.  Someone who says, I

4    tested it.  This is the testing procedures I followed,

5    et cetera, et cetera.  That is experts testimony.

6              I believe it's also hearsay.  But I believe

7    it's primarily expert testimony.

8              So in my opinion, this is an expert report

9    that has now come into evidence with no expert

10   testimony.

11             THE COURT:  Counsel.

12             MR. SINGH:  Your Honor, the -- Mutual

13   Cornell is receiving the actual item that's at issue

14   here.  So it is not -- there is no specialized

15   information that is being provided.  Simply testing an

16   item.

17             And Counsel's sort of speculating about what

18   that process is.  But as soon as the item was

19   provided -- the actual item that was bought from

20   Helzberg, it was tested and Strong Trading actually

21   relied on that information.

22             THE COURT:  So you are saying that there is

23   no expert testimony here?

24             MR. SINGH:  There is no expert testimony.

25             THE COURT:  So it's not being introduced to

1   tell the truth of the matter of the report itself, that

2   is it or is not a particular gem?

3                  It's being introduced to show knowledge of

4   the plaintiff as to whether or not it is or not?

5                  MR. SINGH:  Yeah.  Basically that it is --

6                  THE COURT:  That's what I thought.

7                  It will be received for that limited

8   purpose.

9                  The Court's not going to treat it as expert

10  testimony.  It's going to be treated, as I said before,

11  for the belief of the plaintiff based on whatever was in

12  the report.

13                 Okay.  See you all -- let me talk to you

14  about the timing on it.  The plaintiff has used 39

15  minutes of their 180 minutes.  So you have 141 minutes

16  left.

17                 The defendant has used 76 minutes of the

18  180.  So they have 104 minutes left.

19                 So any time if you want you can ask me and I

20  can probably give you pretty close to how many minutes

21  you have left.

22                 See you all back in tomorrow morning at

23  8:30.  I'm going to ask also, if you'd do like the jury,

24  come in a little early, because attorneys can get caught

25  up in traffic like anybody else.

1                    See you back in the morning.

2                    (PROCEEDINGS CONCLUDED.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4

5    COUNTY OF LOS ANGELES      )

6                               )   SS.

7    STATE OF CALIFORNIA        )

8

9    I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN AND FOR

10   THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

11   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

12   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE

13   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

14   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

15   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

16   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE

17   JUDICIAL CONFERENCE OF THE UNITED STATES.

18   JUNE 20, 2022

19

20   /S/_____

21   SHERI S. KLEEGER, CSR

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$300,000** [1] - 69:12
**$369,441.12** [2] - 64:3, 113:16
**$370,000** [2] - 64:5, 71:3

## /

**/CM#** [1] - 130:24
**/S** [1] - 178:20

## 1

**1** [13] - 1:16, 24:9, 24:15, 24:21, 43:11, 43:12, 43:14, 79:21, 79:24, 80:6, 89:3, 133:18
**10** [3] - 147:10, 147:11, 156:5
**100,000** [1] - 150:20
**10340** [1] - 1:23
**104** [1] - 176:18
**109** [1] - 3:15
**11** [4] - 74:9, 117:22, 118:23, 120:2
**114** [1] - 3:6
**11:30** [4] - 43:8, 43:9, 43:11, 79:16
**12th** [1] - 142:11
**13** [12] - 40:10, 62:15, 77:11, 84:6, 125:3, 125:4, 125:10, 125:11, 126:15, 126:20
**136,000** [1] - 69:4
**14** [18] - 13:25, 15:8, 18:23, 19:14, 19:17, 19:24, 21:7, 21:8, 24:15, 47:16, 125:18, 125:23, 125:25, 126:5, 133:19, 133:20, 134:4, 138:10
**141** [1] - 176:15
**141,000-something** [1] - 106:8
**15** [6] - 1:17, 4:1, 5:24, 59:22, 60:2, 129:3
**15-minute** [3] - 43:10, 43:15, 114:2
**150** [1] - 77:11
**16** [7] - 111:14, 136:22, 137:2, 137:5, 137:9, 158:19, 158:23
**167,000** [2] - 69:4, 140:20

**18** [11] - 70:15, 98:13, 117:21, 118:5, 118:7, 118:8, 119:18, 119:20, 120:9, 120:10, 120:12
**180** [2] - 176:15, 176:18
**193** [1] - 163:14
**1979** [2] - 83:12, 116:6
**199** [5] - 164:17, 164:20, 167:8, 167:11, 167:18
**1990** [1] - 83:15
**1991** [2] - 83:15, 116:3
**1999** [1] - 81:25

## 2

**2** [17] - 23:13, 24:13, 24:15, 76:15, 119:13, 119:21, 120:10, 120:20, 120:24, 121:19, 121:21, 121:22, 122:2, 151:3, 167:9, 167:18
**2.5** [1] - 151:2
**20** [9] - 6:8, 82:10, 109:22, 143:17, 156:4, 164:17, 164:23, 167:18, 167:18
**200** [4] - 115:12, 167:9, 167:18
**20026A** [1] - 141:16
**2015** [2] - 82:13
**2017** [5] - 72:16, 95:18, 106:22, 159:12
**2020** [26] - 68:21, 69:3, 69:5, 69:11, 69:25, 76:8, 76:10, 76:14, 105:22, 105:24, 106:2, 106:5, 109:22, 109:24, 111:14, 136:22, 137:2, 137:5, 137:9, 138:10, 138:13, 139:22, 142:11, 143:17, 159:2, 159:12
**2021** [14] - 68:22, 69:11, 69:17, 69:24, 69:25, 107:2, 108:24, 109:22, 109:24, 110:21, 159:16, 159:19, 163:7
**2022** [4] - 1:17, 4:1,

117:21, 178:18
**205** [1] - 116:21
**21** [3] - 156:4, 158:20, 158:23
**21-04206** [3] - 1:8, 4:4, 13:7
**212** [1] - 168:24
**213** [1] - 168:24
**213)894-6604** [1] - 1:25
**22** [4] - 75:13, 125:23, 125:25, 126:1
**23** [2] - 81:25, 133:25
**24** [6] - 110:19, 110:20, 133:18, 133:19, 164:17, 164:23
**25** [14] - 75:13, 117:21, 118:5, 118:7, 119:18, 119:20, 120:12, 125:4, 125:23, 125:25, 126:1, 126:15, 167:8, 167:13
**26** [1] - 174:19
**261** [1] - 172:11
**262** [8] - 160:1, 161:24, 162:20, 163:14, 171:9, 171:10, 171:11, 172:9
**269** [2] - 165:15, 166:22
**28** [2] - 112:23, 178:12
**295** [4] - 167:23, 167:25, 168:5, 171:2
**2:45** [2] - 114:2, 129:1

## 3

**3** [2] - 24:15, 89:3
**30** [6] - 92:18, 92:19, 92:23, 93:4, 93:10
**30(b)(6** [1] - 10:9
**30-day** [1] - 93:8
**300,000** [1] - 69:7
**31** [1] - 117:20
**312** [1] - 1:24
**31st** [1] - 108:24
**35** [3] - 69:23, 69:24, 70:1
**350,000** [2] - 106:15, 107:5
**360,000** [1] - 107:5
**369,000-something** [1] - 97:19
**39** [1] - 176:14

## 4

**4** [20] - 24:15, 42:17, 42:18, 42:22, 42:23, 42:25, 43:5, 43:12, 43:14, 47:12, 48:21, 48:25, 49:3, 79:25, 129:4, 156:4, 158:20, 158:23, 172:13, 172:15
**4's** [1] - 47:14
**402** [1] - 1:24
**476,000** [1] - 69:7
**48** [1] - 156:4
**49** [2] - 156:4
**492** [1] - 109:2
**4:00** [1] - 173:2

## 5

**5** [4] - 24:15, 119:21, 121:21, 121:22
**50** [3] - 44:19, 92:21, 156:4
**50,000** [2] - 140:21
**50.1** [1] - 44:16
**51** [15] - 3:13, 44:16, 89:2, 89:3, 89:4, 89:20, 90:11, 90:15, 95:8, 95:9, 114:9, 115:12, 117:5, 123:9, 123:10
**54** [7] - 110:24, 110:25, 111:4, 111:5, 112:13, 147:9, 147:11
**55** [1] - 112:18
**56** [1] - 141:22

## 6

**6** [14] - 43:25, 74:9, 90:12, 90:13, 90:15, 117:21, 118:23, 120:2, 121:21, 121:25, 147:10, 147:11, 163:7
**64** [3] - 133:25, 134:3, 134:4
**65** [3] - 133:18, 133:19, 133:25
**66** [13] - 117:21, 118:5, 119:14, 119:17, 119:20, 120:9, 120:12, 120:16, 120:17, 120:23, 133:18, 133:20, 134:4
**67** [1] - 120:10

## 7

**7** [1] - 125:18
**753** [1] - 178:12
**76** [1] - 176:17
**77** [6] - 110:24, 111:1, 112:18, 121:17, 125:8, 125:9
**78** [37] - 3:15, 74:9, 107:7, 107:8, 107:9, 107:17, 109:13, 113:1, 113:2, 117:21, 118:23, 119:15, 119:21, 120:15, 120:20, 120:23, 121:19, 121:25, 122:2, 125:3, 125:10, 125:11, 126:15, 126:20, 129:22, 134:9, 136:21, 137:13, 141:9, 142:15, 145:5, 145:6, 151:25, 152:2, 152:7, 152:24, 153:4
**79** [5] - 125:4, 125:10, 125:11, 125:18, 126:5

## 8

**8** [4] - 75:12, 125:4, 125:21, 125:25
**80** [4] - 125:4, 125:18, 125:21, 126:15
**81** [1] - 3:6
**87** [1] - 126:5
**88** [1] - 120:12
**89** [1] - 3:13
**8:15** [2] - 172:24, 173:2
**8:30** [10] - 42:16, 43:2, 43:3, 43:6, 43:8, 43:9, 172:21, 173:3, 173:8, 176:23
**8:31** [1] - 43:3
**8:32** [1] - 43:4

## 9

**9** [14] - 13:1, 33:8, 33:9, 47:13, 48:19, 48:20, 48:24, 48:25, 49:3, 77:11, 133:25, 134:3, 134:4, 138:13
**90012** [1] - 1:24
**9:30** [3] - 5:4, 5:13, 13:2
**9th** [1] - 163:3

# A

**A-g-n-o-t-e** [1] - 14:19
**A.M** [2] - 1:18, 4:2
**A20** [1] - 143:13
**ability** [3] - 26:13, 27:9, 55:21
**able** [5] - 9:3, 10:20, 25:17, 45:4, 71:18
**ABOVE** [1] - 178:15
**ABOVE-ENTITLED** [1] - 178:15
**accept** [1] - 65:16
**access** [3] - 99:24, 112:7, 153:23
**accident** [1] - 173:1
**accidentally** [1] - 94:14
**according** [4] - 49:10, 75:4, 75:7, 163:2
**account** [12] - 38:5, 55:20, 70:16, 74:1, 88:2, 98:4, 98:6, 100:15, 101:21, 107:12, 111:24, 124:7, 125:1, 151:7
**accountant** [1] - 29:18
**accounting** [9] - 66:16, 82:7, 82:8, 82:15, 100:25, 101:3, 101:4, 101:6, 105:11
**accounts** [4] - 82:17, 98:10, 98:11, 100:16, 100:17, 100:18, 100:21, 100:22, 127:23, 128:1, 128:3, 128:4, 138:8
**accurate** [1] - 137:16
**accurately** [1] - 168:11
**act** [1] - 7:4
**action** [1] - 65:11
**acts** [1] - 63:2
**actual** [7] - 72:1, 79:1, 154:16, 156:11, 163:7, 175:13, 175:19
**add** [3] - 23:2, 79:8, 119:2
**added** [2] - 9:25, 68:23
**addition** [3] - 121:21, 121:22, 171:6
**additional** [4] - 10:1, 74:7, 119:2, 121:14
**address** [4] - 6:14, 23:15, 142:17, 161:11
**addressing** [1] - 51:15
**adds** [1] - 67:17
**Adela** [2] - 14:19, 30:5
**adjust** [1] - 81:7
**adjustment** [1] - 138:21
**adjustments** [3] - 138:19, 139:3, 139:4
**admissible** [1] - 11:12
**admission** [1] - 11:14
**admit** [3] - 77:3, 161:24, 171:2
**admitted** [1] - 74:24
**admonishment** [1] - 80:2, 129:5, 172:17
**advisor** [1] - 32:13
**affect** [6] - 5:23, 26:13, 26:17, 27:9, 41:4, 41:13
**affiliated** [1] - 38:21
**affirmatively** [1] - 22:13
**afternoon** [3] - 81:18, 81:19, 114:7
**age** [1] - 140:11
**aged** [21] - 104:12, 104:16, 105:4, 105:12, 106:16, 107:1, 107:12, 107:25, 108:1, 108:19, 109:1, 109:17, 110:18, 111:14, 111:15, 111:17, 112:19, 113:8, 113:17, 139:24, 140:23
**Agnote** [2] - 14:19, 30:5
**agree** [8] - 21:12, 37:12, 52:22, 77:16, 117:4, 128:8, 137:7, 140:25
**Agree** [1] - 170:17
**agreed** [2] - 20:22, 53:11
**agreement** [22] - 74:10, 74:13, 85:6, 88:2, 88:3, 88:6, 88:9, 88:13, 88:14, 88:21, 89:9, 89:24, 91:25, 96:14, 96:19, 114:14, 114:18, 114:21, 114:22, 114:24, 117:4, 124:1
**ahead** [9] - 4:12, 13:1, 14:10, 52:8, 112:25, 134:5, 161:18, 162:9, 167:16
**Airport** [1] - 17:8
**al** [1] - 1:10
**alarm** [2] - 149:2, 149:3
**Albert** [3] - 18:15, 96:6, 96:9
**allegations** [1] - 18:19
**alleging** [1] - 28:18
**allow** [2] - 8:14, 53:2
**allowed** [2] - 174:18, 174:21
**almost** [2] - 5:15, 6:15
**Alparce** [3] - 4:13, 13:13, 17:9
**ALPARCE** [53] - 4:14, 13:17, 80:24, 81:1, 81:15, 81:17, 86:12, 87:10, 89:13, 89:19, 89:21, 95:4, 95:8, 95:10, 95:11, 107:14, 107:18, 107:23, 107:24, 109:6, 109:9, 109:12, 109:14, 112:12, 112:17, 112:21, 112:24, 113:1, 113:3, 113:6, 113:20, 119:12, 119:15, 119:19, 120:3, 120:7, 120:15, 120:17, 120:21, 121:20, 121:24, 125:6, 125:13, 126:3, 126:12, 126:17, 133:22, 147:11, 158:22, 158:24, 164:24, 167:15, 167:19
**alternate** [1] - 48:11
**alternates** [1] - 48:2
**amended** [1] - 9:25
**AMERICA** [1] - 1:1
**amount** [12] - 61:15, 61:23, 61:25, 69:3, 69:5, 69:13, 78:25, 104:17, 106:15, 108:17, 138:8
**amounts** [2] - 68:24, 106:9
**AMY** [1] - 3:6
**Amy** [7] - 17:16, 18:1, 61:8, 73:24, 81:2, 81:12
**ancestry** [1] - 53:5
**AND** [3] - 178:9, 178:13, 178:15
**Andrew** [2] - 14:21, 32:12
**ANGELES** [4] - 1:18, 1:24, 4:1, 178:5
**Angeles** [2] - 27:15,
27:16
**ANSWER** [2] - 74:15, 75:17
**answer** [16] - 23:13, 54:25, 63:20, 63:22, 63:24, 64:1, 75:9, 77:20, 139:17, 139:19, 140:16, 140:17, 148:15, 148:18, 148:21, 155:25
**answered** [4] - 54:20, 54:21, 73:22, 140:14
**answers** [2] - 15:11, 55:7
**APARCE** [1] - 2:7
**apologize** [10] - 18:1, 24:8, 24:13, 63:18, 80:14, 119:16, 120:3, 121:8, 158:22, 173:24
**apparel** [2] - 38:6, 38:8
**appearances** [2] - 4:6, 13:10
**APPEARANCES** [1] - 2:4
**appearing** [2] - 12:13, 12:16
**applied** [1] - 106:14
**applies** [4] - 56:23, 57:9, 59:16, 94:4
**apply** [11] - 9:10, 21:2, 21:13, 22:8, 25:21, 27:10, 29:23, 32:24, 36:25, 52:22, 116:18
**appointments** [1] - 42:25
**approach** [2] - 4:11, 95:21
**approached** [1] - 57:16
**approves** [2] - 67:3, 67:20
**April** [1] - 163:7
**aquamarine** [2] - 77:14, 77:18
**Arcadia** [6] - 17:13, 17:25, 62:15, 81:23, 84:4, 96:1
**area** [2] - 17:25, 43:12
**areas** [1] - 9:8
**argue** [6] - 59:14, 60:13, 120:5, 162:7, 173:16
**argument** [5] - 5:25, 173:24, 174:2, 174:15, 174:17
**argumentative** [1] - 128:15
**arguments** [1] - 53:15
**Ashley** [1] - 26:2
**ashley** [1] - 14:13
**assert** [1] - 12:19
**assets** [1] - 128:6
**assign** [4] - 88:4, 98:5, 98:11
**assigned** [6] - 98:10, 131:6, 131:9, 132:14, 142:6, 142:10
**assist** [1] - 58:19
**assisting** [2] - 17:9, 17:10
**assists** [2] - 86:23, 103:18
**assume** [3] - 39:2, 41:17, 55:3
**assuming** [6] - 4:22, 5:11, 24:19, 38:20, 39:22, 45:7
**AT** [2] - 2:7, 2:7
**attached** [1] - 169:24
**attend** [3] - 84:22, 97:8, 97:9
**attended** [1] - 96:25
**attention** [21] - 15:10, 34:20, 58:6, 89:1, 107:6, 110:23, 114:9, 115:11, 116:21, 123:10, 129:21, 141:21, 143:6, 145:4, 160:1, 163:13, 165:15, 167:23, 168:23, 171:9, 172:11
**attentive** [1] - 58:13
**attorney** [4] - 12:23, 18:9, 46:6, 59:12
**ATTORNEY** [2] - 2:7, 2:7
**attorney's** [1] - 6:25
**attorneys** [9] - 6:18, 6:22, 7:1, 7:5, 45:17, 53:16, 53:17, 173:9, 176:24
**AUDIO** [1] - 122:4
**August** [3] - 69:3, 69:10, 159:19
**authenticate** [1] - 8:9
**authenticating** [1] - 12:12
**available** [1] - 154:5
**avoid** [1] - 72:25
**award** [2] - 79:5, 79:10
**awarded** [1] - 79:11
**awarding** [1] - 79:7
**aware** [5] - 149:10, 151:8, 151:10, 152:15, 165:11

## B

**B-e-n-e-d-i-c-t-o** [1] - 14:18
**bachelor** [2] - 82:3, 127:4
**background** [2] - 26:13, 127:6
**bad** [1] - 138:10
**bait** [2] - 70:2, 70:23
**balance** [6] - 16:6, 64:2, 69:8, 69:12, 70:22, 140:22
**balances** [1] - 68:19
**bank** [3] - 127:23, 128:1, 128:3
**based** [11] - 17:13, 18:10, 56:21, 58:3, 62:14, 62:16, 73:1, 76:20, 78:14, 127:6, 176:11
**basis** [3] - 11:14, 12:21, 65:16
**Bates** [1] - 115:4
**bears** [1] - 56:8
**beating** [2] - 55:1, 55:3
**beautiful** [1] - 76:23
**become** [4] - 95:16, 95:19, 105:21, 152:15
**began** [3] - 72:16, 136:24, 137:1
**beginning** [2] - 28:8, 76:22
**behalf** [1] - 117:11
**BEHALF** [2] - 2:5, 2:9
**belief** [1] - 176:11
**believability** [1] - 56:9
**believable** [1] - 56:13
**believes** [1] - 71:24
**belongs** [3] - 127:8, 127:11, 127:15
**bench** [1] - 46:7
**Benedicto** [2] - 14:17, 29:7
**best** [3] - 21:21, 117:14, 150:10
**between** [33] - 5:16, 6:18, 7:5, 11:3, 54:10, 63:2, 64:7, 64:13, 64:23, 65:17, 65:22, 73:16, 73:17, 74:13, 86:4, 91:25, 92:6, 96:10, 99:4, 117:5, 122:7, 145:20, 145:25, 157:4, 157:11, 157:15, 157:20, 157:23, 158:2,
158:6, 159:12, 159:19
**beyond** [4] - 44:10, 44:21, 45:14, 93:7
**bias** [3] - 26:16, 32:24, 56:2
**big** [2] - 27:16, 140:20
**bills** [2] - 69:15, 100:19
**binder** [2] - 107:7, 110:24
**binders** [1] - 89:2
**bit** [14] - 15:24, 18:19, 18:20, 20:17, 21:19, 21:21, 32:2, 32:5, 38:14, 40:15, 50:3, 51:15, 58:25, 69:8
**bleed** [1] - 42:7
**blindside** [1] - 7:8
**block** [2] - 43:10, 43:13
**blocks** [1] - 43:17
**blow** [1] - 65:3
**blown** [2] - 65:4, 65:25
**blue** [4] - 77:14, 77:16, 77:19, 77:20
**blue-colored** [3] - 77:14, 77:16, 77:19
**boat** [1] - 22:20
**bored** [1] - 46:17
**bottom** [9] - 66:15, 68:21, 89:25, 91:20, 108:25, 109:3, 115:1, 162:20, 163:20
**bought** [10] - 41:20, 73:3, 150:25, 164:15, 165:3, 171:17, 171:18, 171:19, 175:19
**box** [10] - 15:9, 22:15, 22:16, 22:18, 60:6, 64:10, 64:11, 80:13, 129:11, 143:6
**bracelet** [1] - 93:23
**Brea** [1] - 18:10
**breach** [4] - 61:18, 63:8, 72:11, 72:13
**breached** [1] - 74:5
**break** [15] - 27:17, 43:10, 43:15, 48:13, 48:16, 50:16, 52:10, 58:22, 58:23, 59:19, 59:24, 79:19, 114:2, 129:1
**breaking** [1] - 79:16
**briefly** [5] - 12:8, 15:25, 20:7, 70:12, 98:7
**bring** [3] - 36:4, 45:9,
174:5
**bringing** [1] - 38:1
**broken** [9] - 93:18, 93:20, 93:21, 93:22, 93:24, 93:25, 94:3, 94:5, 94:8
**brought** [5] - 7:13, 7:23, 8:7, 73:15
**build** [1] - 88:4
**bulk** [2] - 149:23, 150:1
**burden** [1] - 44:23
**business** [29] - 38:6, 38:8, 38:20, 38:22, 40:18, 62:20, 65:17, 69:18, 70:21, 71:20, 72:16, 72:22, 73:2, 79:2, 83:6, 83:13, 83:16, 83:18, 84:2, 84:12, 84:18, 85:5, 88:1, 92:13, 92:22, 96:18, 97:14, 106:22, 136:24
**businesses** [1] - 38:21
**busser** [1] - 27:21
**buy** [2] - 67:7, 72:17
**buyer** [1] - 92:9
**buying** [2] - 145:21, 145:25
**BY** [58] - 2:6, 2:10, 81:17, 86:12, 87:10, 89:21, 95:11, 107:24, 109:14, 113:6, 114:6, 115:20, 121:2, 122:5, 122:17, 122:22, 123:8, 127:1, 127:22, 128:19, 129:16, 132:7, 133:2, 134:7, 135:12, 140:24, 141:20, 143:19, 144:12, 146:21, 147:15, 148:2, 148:23, 149:5, 150:15, 150:23, 151:23, 152:5, 152:21, 154:4, 156:2, 156:9, 159:1, 160:9, 160:13, 161:19, 162:12, 165:2, 166:2, 166:7, 166:15, 167:1, 167:22, 169:11, 169:21, 170:11, 171:8, 171:13

## C

**C-h-a-v-e-z** [1] - 14:21
**c-h-u** [1] - 81:12
**C-h-u-r-c-h-m-a-n** [1] - 15:1
**C-u-e-r-n-o-v-e-g-a** [1] - 14:24
**CALIFORNIA** [6] - 1:2, 1:18, 1:24, 4:1, 178:7, 178:11
**California** [20] - 25:1, 26:4, 26:24, 27:15, 29:9, 30:7, 32:13, 34:11, 35:18, 38:12, 73:14, 73:20, 75:1, 75:19, 81:23, 84:3, 84:4, 91:16, 103:1
**Camarillo** [1] - 38:11
**cannot** [8] - 54:21, 54:22, 77:23, 132:20, 142:9, 147:21, 158:4, 170:7
**cards** [1] - 36:9
**care** [3] - 7:2, 19:15, 71:6
**carefully** [1] - 15:7
**cares** [1] - 22:6
**carrier** [1] - 144:22
**case** [152] - 5:12, 6:1, 6:5, 6:19, 9:2, 9:10, 13:7, 15:15, 15:16, 15:20, 15:24, 15:25, 16:2, 16:15, 16:16, 16:25, 17:1, 18:19, 18:24, 19:25, 20:10, 20:12, 20:14, 20:25, 21:3, 21:9, 21:11, 22:9, 25:10, 25:14, 25:22, 26:14, 26:18, 27:8, 28:5, 28:7, 28:9, 28:25, 29:25, 30:2, 32:2, 32:5, 32:9, 33:20, 33:25, 34:15, 35:20, 36:4, 37:1, 37:7, 37:18, 41:5, 41:14, 41:18, 41:25, 42:1, 42:5, 44:1, 44:5, 44:7, 44:12, 44:13, 44:15, 45:2, 45:5, 45:8, 45:9, 46:2, 48:7, 49:6, 49:21, 50:8, 50:9, 50:14, 50:16, 50:21, 51:17, 52:6, 52:7, 52:11, 52:20, 52:24, 53:8, 53:15, 55:12, 55:14, 56:1, 56:20, 56:21, 56:22, 56:24, 57:1, 57:4,
57:5, 57:9, 57:15, 57:17, 58:11, 59:14, 59:15, 59:16, 60:13, 60:14, 60:25, 61:18, 61:19, 61:20, 61:24, 62:2, 62:4, 62:8, 62:10, 62:13, 63:8, 63:11, 65:14, 66:4, 67:23, 70:13, 70:25, 71:20, 72:6, 72:11, 72:12, 74:5, 74:24, 75:20, 75:22, 79:3, 79:4, 80:2, 115:6, 115:8, 117:9, 129:6, 157:10, 157:21, 157:24, 158:15, 161:21, 172:17, 173:7, 174:18, 174:22
**cases** [3] - 61:13, 61:17, 66:3
**Castillo** [2] - 10:22
**Castro** [1] - 14:17
**catch** [1] - 158:4
**caught** [1] - 176:24
**caused** [2] - 78:24, 79:10
**celebrities** [1] - 61:15
**center** [1] - 115:17
**centers** [1] - 71:21
**CENTRAL** [2] - 1:2, 178:10
**central** [3] - 27:18, 27:19, 31:2
**Cerritos** [1] - 29:19
**certain** [12] - 12:12, 12:19, 21:24, 21:25, 22:1, 22:2, 61:15, 126:6, 159:3, 160:14
**certainly** [1] - 62:17
**cERTIFICATE** [1] - 178:3
**CERTIFIED** [1] - 1:7
**certified** [1] - 29:11
**CERTIFY** [1] - 178:11
**cetera** [3] - 39:25, 175:5
**CFO** [6] - 74:23, 77:6, 82:7, 82:12, 127:2, 151:9
**challenge** [1] - 47:19
**challenges** [4] - 6:11, 47:5, 47:9
**chance** [1] - 173:4
**change** [3] - 21:5, 21:6, 145:10
**characteristics** [1] - 149:24
**charged** [2] - 152:23, 153:3

**chart** [4] - 68:3, 68:5, 68:18, 73:6
**Chavez** [2] - 14:21, 32:12
**cheap** [2] - 172:2, 172:5
**check** [8] - 139:12, 142:24, 143:2, 148:9, 149:15, 151:15, 157:2, 164:18
**Chen** [1] - 13:14
**Chicago** [1] - 42:21
**Chicana** [1] - 31:21
**chief** [3] - 17:20, 61:9, 73:25
**Chien** [17] - 13:13, 17:5, 17:12, 17:22, 17:23, 61:11, 70:13, 70:14, 76:21, 79:11, 96:13, 98:6, 98:8, 98:9, 98:12, 111:24, 158:13
**childcare** [1] - 35:20
**China** [11] - 87:14, 144:5, 146:8, 146:12, 146:19, 146:22, 146:25, 147:6, 147:16, 148:4, 153:16
**Chong** [14] - 83:9, 83:11, 83:14, 83:18, 115:24, 116:15, 142:3
**choose** [2] - 48:9, 48:10
**chose** [2] - 140:9, 140:12
**CHU** [1] - 3:6
**Chu** [37] - 17:16, 17:20, 61:9, 73:24, 74:2, 74:8, 74:23, 77:6, 81:2, 81:12, 81:18, 81:20, 82:23, 89:1, 89:22, 89:24, 90:19, 95:12, 107:6, 107:25, 113:7, 113:20, 114:7, 122:6, 125:3, 125:15, 129:17, 133:16, 145:13, 152:1, 156:4, 157:4, 164:17, 165:3, 167:23, 168:3
**Chu's** [8] - 74:16, 74:20, 75:12, 77:11, 117:20, 147:9, 158:19, 167:8
**Churchman** [2] - 15:1, 36:14

**circled** [1] - 130:25
**circumstance** [1] - 91:13
**circumstances** [1] - 94:16
**circumstantial** [4] - 54:1, 54:5, 54:9, 54:11
**city** [3] - 16:21, 16:23, 23:15
**civil** [5] - 16:2, 44:12, 44:13, 48:7
**civility** [1] - 6:20
**claim** [5] - 72:2, 72:11, 76:5, 93:9, 152:18
**claims** [5] - 16:3, 16:8, 70:1, 72:18, 74:5
**clarify** [3] - 67:5, 151:12, 162:10
**clarifying** [1] - 125:15
**classroom** [1] - 37:4
**clear** [5] - 8:19, 20:19, 45:15, 74:20, 76:20
**CLERK** [7] - 4:4, 13:5, 13:7, 49:7, 80:9, 81:4, 81:7
**client** [1] - 17:22
**clients** [1] - 17:11
**clinical** [1] - 27:6
**clip** [6] - 117:20, 119:7, 133:15, 147:9, 158:19, 167:8
**clips** [2] - 121:13, 167:18
**clocks** [1] - 43:9
**close** [4] - 17:8, 58:6, 79:1, 176:20
**closely** [2] - 169:22, 169:23
**closer** [2] - 86:8, 151:3
**closing** [1] - 5:25
**CM** [1] - 131:3
**co** [1] - 13:21
**co-counsel** [1] - 13:21
**Coast** [3] - 18:14, 18:15, 71:16
**code** [1] - 143:15
**CODE** [1] - 178:12
**coffee** [1] - 172:24
**colleague** [1] - 17:9
**collect** [4] - 75:2, 105:3, 105:15, 146:13
**collected** [1] - 146:11
**COLLECTIVE** [11] - 19:20, 20:2, 21:18, 22:13, 23:7, 39:20, 41:15, 42:3, 43:22, 46:4, 46:16

**college** [1] - 31:2
**color** [6] - 41:14, 53:5, 139:13, 139:14, 150:8, 152:19
**colored** [7] - 76:25, 77:1, 77:14, 77:16, 77:19, 166:23
**column** [9] - 74:19, 110:5, 110:10, 130:7, 130:11, 130:23, 131:6, 140:3, 141:5
**comfortable** [3] - 33:3, 45:12, 46:1
**coming** [22] - 50:7, 66:16, 75:10, 77:13, 91:4, 91:15, 100:23, 103:21, 106:23, 123:20, 123:21, 124:19, 124:25, 130:12, 130:19, 130:22, 134:17, 134:22, 135:6, 156:25, 157:2, 172:23
**communicate** [5] - 57:2, 57:3, 98:25, 99:8, 99:10
**communicated** [1] - 99:19
**communicating** [1] - 8:12
**communication** [3] - 52:6, 57:10, 99:4
**companies** [6] - 39:19, 62:12, 63:2, 64:8, 73:18, 92:1
**Company** [5] - 72:23, 85:11, 85:13, 130:3, 142:3
**company** [35] - 8:11, 18:2, 61:4, 61:6, 62:14, 62:16, 62:18, 62:25, 63:1, 65:17, 71:15, 72:17, 72:19, 72:21, 72:23, 73:1, 74:21, 74:22, 75:20, 78:9, 82:24, 83:25, 84:7, 85:15, 89:25, 98:12, 103:17, 116:18, 117:1, 117:2, 123:1, 123:4, 123:14, 127:10, 164:12
**company's** [1] - 128:9
**complaining** [1] - 167:3
**complaint** [1] - 70:23
**complete** [4] - 9:2, 118:17, 144:17,

170:19
**completed** [5] - 56:19, 82:2, 135:21, 136:2, 144:25
**completely** [2] - 74:21, 122:23
**completeness** [7] - 118:19, 119:2, 119:11, 120:14, 125:19, 126:7, 126:19
**completing** [1] - 144:13
**complicated** [1] - 28:15
**computer** [2] - 132:1, 132:4
**concentrating** [1] - 43:17
**concerned** [1] - 42:12
**CONCLUDED** [1] - 177:2
**conclusion** [3] - 71:1, 79:3, 79:4
**conduct** [7] - 6:23, 50:4, 50:13, 56:15, 57:19, 70:24, 84:12
**conducted** [2] - 8:4, 38:22
**confer** [1] - 78:7
**conference** [4] - 4:23, 10:4, 10:21, 11:13
**CONFERENCE** [1] - 178:17
**conferred** [1] - 10:19
**confident** [1] - 174:4
**confirm** [1] - 156:21
**confirmed** [1] - 78:10
**confirming** [1] - 153:10
**CONFORMANCE** [1] - 178:16
**confused** [1] - 147:20
**confusing** [2] - 24:17, 151:14
**confusion** [1] - 72:25
**consider** [5] - 40:20, 53:7, 53:14, 54:8, 55:12
**considered** [2] - 172:2, 172:5
**considering** [1] - 55:19
**consistent** [2] - 40:1
**consists** [1] - 53:8
**contact** [1] - 142:21
**content** [1] - 95:7
**contest** [1] - 162:14
**contested** [1] - 152:9
**continuation** [1] -

126:5
**continue** [6] - 7:24, 120:14, 125:17, 126:4, 129:14, 162:6
**continued** [2] - 74:17, 112:15
**continuing** [1] - 7:13
**contract** [27] - 61:18, 63:9, 63:13, 64:13, 64:23, 65:1, 65:15, 65:20, 65:21, 65:24, 66:8, 72:11, 72:14, 74:3, 74:4, 74:7, 74:11, 75:5, 90:3, 90:5, 92:4, 92:16, 93:2, 123:14, 134:24, 145:14
**contradicts** [1] - 56:4
**control** [6] - 28:2, 52:16, 54:14, 58:21, 149:10, 149:17
**convenience** [1] - 131:1
**cooperation** [1] - 6:18
**copy** [1] - 74:2
**COPY** [1] - 1:7
**Cornel** [1] - 78:10
**Cornell** [15] - 159:24, 160:10, 160:17, 160:21, 160:23, 161:5, 161:7, 162:25, 163:17, 164:3, 168:20, 171:15, 171:24, 175:1, 175:13
**corporation** [2] - 31:7, 31:10
**correct** [82] - 4:25, 5:1, 11:20, 45:9, 91:18, 94:8, 94:23, 95:14, 111:17, 112:23, 112:24, 113:12, 114:15, 116:13, 118:10, 120:14, 122:14, 123:4, 123:5, 124:2, 124:14, 124:20, 124:24, 126:17, 134:22, 136:16, 137:2, 137:13, 138:3, 138:6, 138:20, 139:1, 139:3, 139:8, 139:22, 139:25, 140:7, 140:12, 141:3, 141:9, 141:11, 141:25, 142:8, 142:22, 143:23, 143:25, 144:14, 144:18,

145:1, 145:22, 146:1, 146:3, 146:12, 148:7, 148:11, 149:12, 151:11, 153:6, 158:7, 159:9, 159:14, 159:17, 159:24, 160:15, 160:17, 162:15, 162:18, 164:3, 164:8, 165:7, 165:13, 166:23, 167:5, 168:9, 168:12, 168:15, 168:21, 169:16, 171:16, 171:21, 173:20, 174:6

**CORRECT** [1] - 178:13

**Correct** [1] - 5:2

**corrected** [1] - 173:19

**corresponds** [1] - 160:20

**cost** [1] - 28:24

**Counsel** [40] - 4:6, 4:12, 4:16, 4:20, 13:9, 13:23, 17:2, 18:17, 63:17, 71:5, 79:14, 87:8, 107:22, 118:4, 118:19, 119:9, 119:19, 120:11, 120:23, 121:14, 121:18, 121:24, 125:9, 125:12, 125:14, 127:21, 133:23, 134:2, 140:15, 147:11, 147:13, 158:22, 161:13, 161:18, 162:4, 162:9, 166:9, 167:20, 171:10, 173:21

**counsel** [26] - 8:5, 8:13, 9:13, 13:19, 13:21, 18:7, 46:5, 60:21, 71:6, 80:23, 81:14, 95:6, 113:25, 119:1, 119:16, 119:22, 126:2, 126:6, 126:18, 129:14, 144:11, 147:22, 148:19, 162:6, 172:12, 175:11

**COUNSEL** [1] - 2:4

**Counsel's** [1] - 175:17

**count** [2] - 6:9, 110:19

**counter** [1] - 81:2

**counter-defendants**

[1] - 81:2

**counterclaim** [1] - 8:7

**counterclaimant** [3] - 4:18, 13:22, 71:14

**country** [1] - 128:2

**County** [1] - 17:8

**COUNTY** [1] - 178:5

**couple** [1] - 99:16

**course** [10] - 10:17, 31:15, 50:14, 51:5, 56:25, 67:13, 73:2, 128:20, 158:5, 170:20

**Court** [34] - 4:24, 6:4, 6:21, 6:23, 7:4, 7:14, 9:4, 9:7, 9:19, 11:8, 11:13, 13:5, 15:21, 20:20, 20:21, 20:24, 34:1, 34:3, 40:21, 42:15, 49:9, 49:11, 51:23, 53:19, 57:20, 58:1, 58:14, 61:13, 80:9, 80:17, 121:8, 173:22, 174:10, 174:13

**court** [3] - 39:4, 39:7, 48:7

**COURT** [317] - 1:1, 1:23, 4:10, 4:16, 4:20, 4:22, 5:3, 7:16, 7:20, 7:25, 8:13, 8:16, 9:5, 9:7, 9:13, 9:15, 10:25, 11:7, 11:16, 11:21, 12:6, 12:22, 13:18, 13:23, 14:11, 15:3, 17:18, 18:6, 18:17, 19:21, 20:3, 21:19, 22:14, 23:8, 24:24, 25:2, 25:6, 25:9, 25:16, 25:21, 25:24, 26:3, 26:5, 26:7, 26:10, 26:12, 26:16, 26:20, 26:23, 26:25, 27:2, 27:5, 27:7, 27:12, 27:14, 27:16, 27:20, 27:22, 28:1, 28:4, 28:11, 28:17, 29:3, 29:6, 29:8, 29:10, 29:13, 29:15, 29:20, 29:22, 30:4, 30:6, 30:8, 30:10, 30:12, 30:15, 30:18, 30:23, 31:1, 31:4, 31:8, 31:11, 31:14, 31:18, 31:20, 31:23, 32:1, 32:4, 32:7, 32:11, 32:15, 32:18, 33:3, 33:7, 33:13, 33:16, 33:19, 33:23, 34:9,

34:12, 34:14, 34:19, 34:23, 35:1, 35:3, 35:7, 35:9, 35:13, 35:16, 35:19, 35:22, 35:25, 36:2, 36:6, 36:8, 36:12, 36:16, 36:20, 36:23, 37:10, 37:20, 37:23, 38:4, 38:7, 38:9, 38:13, 38:15, 38:19, 39:2, 39:6, 39:9, 39:12, 39:21, 40:10, 40:13, 40:16, 40:23, 41:4, 41:7, 41:16, 42:4, 43:23, 44:4, 44:7, 44:25, 45:4, 45:7, 45:11, 46:5, 46:17, 47:1, 47:8, 47:13, 47:17, 47:19, 47:22, 47:25, 48:3, 48:6, 48:18, 48:19, 49:13, 60:4, 63:16, 70:6, 71:5, 79:14, 80:11, 80:25, 81:13, 86:8, 87:5, 87:8, 89:17, 95:6, 95:9, 107:17, 107:21, 109:8, 109:11, 112:15, 112:20, 112:22, 112:25, 113:2, 113:5, 113:22, 113:25, 115:16, 115:19, 117:23, 118:3, 118:6, 118:8, 118:11, 118:18, 118:21, 118:24, 119:9, 119:14, 119:18, 119:22, 119:25, 120:5, 120:8, 120:13, 120:16, 120:19, 120:22, 121:10, 121:15, 121:19, 121:22, 122:1, 122:3, 122:15, 122:20, 123:3, 125:5, 125:8, 125:11, 125:20, 125:22, 125:24, 126:1, 126:8, 126:14, 126:18, 126:24, 127:20, 128:16, 128:25, 129:10, 131:16, 131:19, 131:23, 132:3, 132:25, 133:14, 133:17, 133:21, 134:1, 134:5, 135:9, 140:14, 143:16, 144:2, 144:7,

144:11, 146:18, 146:20, 147:13, 147:22, 148:1, 148:15, 148:17, 149:4, 150:12, 150:21, 151:13, 151:17, 151:21, 152:3, 152:20, 153:20, 153:25, 154:3, 154:18, 155:4, 155:11, 155:14, 155:19, 155:25, 156:6, 158:21, 160:8, 160:11, 161:13, 161:16, 161:18, 162:1, 162:4, 162:11, 164:18, 164:22, 164:25, 165:22, 165:25, 166:4, 166:9, 166:14, 166:25, 167:10, 167:12, 167:14, 167:16, 167:20, 169:7, 169:18, 170:8, 170:10, 171:5, 171:7, 171:10, 171:12, 172:12, 173:11, 174:1, 174:15, 174:23, 175:11, 175:22, 175:25, 176:6, 178:9, 178:10, 178:22

**Court's** [5] - 5:18, 8:3, 8:21, 45:13, 176:9

**courtroom** [3] - 6:20, 58:15, 173:13

**cover** [3] - 5:16, 9:8, 106:9

**covered** [2] - 5:14, 36:21

**covers** [3] - 109:21, 109:22, 109:23

**COVID** [1] - 71:17

**CRABBE** [1] - 2:7

**Crabbe** [3] - 4:15, 13:14, 17:10

**create** [1] - 84:8

**created** [3] - 68:9, 121:12, 160:14

**credit** [3] - 78:20, 138:24, 138:25

**credits** [1] - 110:20

**criminal** [3] - 44:4, 44:7, 45:2

**criteria** [1] - 132:9

**critical** [2] - 8:6, 75:21

**CROSS** [2] - 3:4,

114:5

**cross** [8] - 4:9, 5:22, 17:6, 59:10, 59:12, 113:23, 115:15, 129:14

**cross-defendant** [1] - 17:6

**cross-defendants** [1] - 4:9

**CROSS-EXAMINATION** [1] - 114:5

**cross-examination** [2] - 5:22, 113:23

**cross-examine** [2] - 59:10, 59:12

**crosstalk** [1] - 127:19

**CSR** [2] - 1:23, 178:21

**Cuernoveg** [1] - 34:24

**Cuernovega** [1] - 14:24

**cup** [1] - 172:24

**curiosity** [1] - 96:21

**current** [1] - 82:6

**custodian** [1] - 36:1

**Custom** [2] - 87:17, 136:13

**customer** [77] - 77:7, 77:8, 77:13, 77:17, 77:18, 83:1, 84:14, 84:22, 85:2, 85:6, 86:14, 86:21, 87:17, 87:23, 88:2, 88:4, 88:6, 88:13, 88:15, 89:8, 91:5, 91:25, 92:6, 92:8, 92:21, 93:9, 93:11, 93:13, 93:14, 93:23, 93:25, 94:2, 94:5, 94:9, 94:14, 94:17, 94:20, 94:21, 94:25, 95:12, 96:14, 96:20, 97:10, 99:5, 100:10, 101:12, 101:25, 103:2, 103:3, 103:8, 104:4, 104:6, 104:25, 105:3, 105:15, 108:18, 109:1, 109:4, 124:3, 124:23, 132:12, 132:14, 136:16, 136:18, 138:7, 139:19, 140:19, 149:14, 149:19, 149:22, 149:23, 156:17, 156:23, 165:7

**customer's** [1] - 78:14

**customers** [28] - 64:19, 64:22, 65:6,

70:18, 72:18, 76:3, 78:16, 78:22, 83:3, 83:4, 84:19, 84:20, 84:23, 85:1, 87:18, 87:19, 87:22, 88:10, 90:6, 92:14, 97:22, 101:24, 102:16, 102:19, 103:5, 103:25, 104:8
**Customs** [5] - 103:18, 103:23, 135:16, 135:20, 135:24
**Customs'** [1] - 136:11
**CV** [3] - 1:8, 4:4, 13:7

# D

**D.C** [1] - 21:6
**damage** [3] - 79:8, 93:5, 93:25
**damaged** [1] - 94:6
**damages** [3] - 8:10, 75:18, 79:10
**data** [2] - 112:8, 131:21
**date** [12] - 101:12, 104:25, 108:17, 108:19, 108:22, 108:24, 113:14, 137:11, 138:7, 142:11, 145:9, 163:3
**dated** [1] - 111:14
**dates** [2] - 104:18, 108:16
**Davis** [2] - 82:3, 127:4
**DAY** [1] - 1:16
**days** [11] - 16:17, 42:6, 69:23, 69:24, 70:1, 92:18, 92:19, 92:23, 93:4, 93:10
**de** [1] - 14:17
**dealt** [3] - 39:18, 70:18, 70:19
**death** [1] - 46:17
**December** [1] - 108:24
**decide** [9] - 34:4, 52:20, 52:24, 53:12, 54:12, 55:15, 56:17, 56:21, 58:11
**decided** [2] - 10:10, 33:25
**decides** [1] - 67:7
**deciding** [4] - 53:7, 53:14, 55:11, 55:14
**decision** [2] - 5:9, 58:3
**declaration** [1] - 135:20
**declare** [1] - 8:23
**defect** [1] - 139:10

**DEFENDANT** [1] - 2:9
**defendant** [23] - 4:18, 12:18, 13:22, 16:3, 16:5, 16:7, 16:8, 17:6, 28:19, 28:22, 32:21, 39:17, 39:23, 44:9, 44:10, 45:21, 59:10, 59:11, 71:13, 161:23, 171:1, 176:17
**DEFENDANTS** [1] - 1:12
**defendants** [2] - 4:9, 81:2
**defense** [2] - 11:8, 47:15
**degree** [2] - 82:3, 127:4
**delays** [1] - 80:19
**deliberate** [2] - 51:1, 52:18
**deliberating** [1] - 79:17
**deliberation** [4] - 19:2, 40:19, 41:14, 57:9
**deliberations** [4] - 50:19, 52:17, 56:19, 59:17
**delivered** [11] - 16:4, 73:9, 78:16, 135:17, 148:25, 149:12, 154:11, 154:14, 156:12, 156:22, 157:3
**delivery** [7] - 78:3, 78:5, 136:7, 136:9, 136:15, 156:19, 156:20
**demonstrate** [1] - 8:9
**denied** [3] - 7:14, 171:5, 171:7
**denies** [1] - 16:7
**deny** [2] - 77:23, 78:1
**department** [1] - 66:17
**depict** [2] - 169:2, 169:15
**depicting** [2] - 170:13, 170:22
**depicts** [3] - 162:24, 163:20, 168:11
**deposit** [1] - 92:21
**deposition** [35] - 8:4, 8:21, 8:25, 10:8, 10:9, 10:11, 10:12, 10:16, 10:23, 10:24, 73:19, 73:21, 74:2, 74:9, 75:12, 77:11, 117:9, 117:20, 118:1, 118:16, 125:3, 132:18,

132:21, 133:3, 133:6, 133:11, 133:13, 133:16, 139:12, 143:3, 147:9, 156:3, 158:19, 164:17, 167:8
**depositions** [1] - 4:24
**describe** [10] - 86:13, 86:25, 87:12, 87:20, 91:1, 98:7, 101:2, 104:15, 111:6, 153:17
**described** [3] - 76:4, 113:8, 145:17
**describes** [1] - 135:5
**description** [1] - 145:10
**deserves** [1] - 56:14
**design** [1] - 66:24
**Design** [6] - 4:5, 4:19, 13:8, 13:22, 63:5, 76:11
**designate** [1] - 9:3
**designated** [4] - 10:6, 11:1, 12:12, 117:11
**designations** [2] - 174:19, 174:20
**DESIGNS** [1] - 1:10
**Designs** [159] - 7:23, 10:9, 15:22, 61:5, 62:13, 62:19, 62:21, 63:3, 63:13, 63:19, 63:21, 63:23, 63:25, 64:2, 64:10, 64:13, 64:20, 65:12, 65:14, 65:20, 65:22, 66:24, 67:2, 67:3, 67:9, 67:18, 67:19, 67:20, 67:23, 68:24, 69:3, 69:6, 69:15, 69:18, 70:1, 70:10, 70:17, 70:20, 70:21, 71:2, 71:14, 71:24, 72:4, 72:16, 72:21, 73:3, 73:8, 73:12, 73:16, 74:14, 75:23, 75:24, 76:1, 76:6, 76:8, 76:14, 76:17, 76:24, 77:3, 77:24, 78:1, 78:6, 78:7, 78:11, 78:13, 78:18, 78:20, 78:25, 79:4, 79:9, 90:2, 92:2, 92:9, 92:11, 95:13, 95:17, 96:4, 96:11, 97:10, 97:20, 98:5, 99:7, 104:2, 105:16, 105:25, 106:2, 106:10, 106:13,

106:16, 106:17, 109:5, 110:3, 111:3, 111:8, 113:7, 113:11, 113:14, 114:15, 115:8, 117:5, 117:8, 124:15, 124:16, 130:8, 130:11, 130:16, 130:21, 132:13, 136:24, 137:1, 137:4, 137:8, 138:19, 138:22, 139:21, 140:6, 141:25, 142:1, 146:5, 146:6, 146:10, 147:2, 148:7, 148:8, 148:10, 149:1, 149:8, 149:9, 149:12, 150:11, 150:16, 150:19, 150:24, 151:10, 151:24, 152:1, 152:6, 152:11, 152:16, 152:22, 153:2, 153:11, 153:14, 154:11, 154:14, 155:16, 156:15, 157:6, 157:12, 158:11, 159:8, 165:7, 165:18, 166:17, 167:3
**Designs'** [4] - 68:18, 78:16, 79:1, 98:4
**detailed** [1] - 52:16
**determine** [8] - 5:25, 20:9, 20:14, 20:25, 80:21, 137:15, 138:2, 138:5
**determined** [1] - 175:2
**determining** [2] - 21:20, 23:4
**Diamonds** [2] - 164:13, 168:6
**dies** [1] - 9:9
**dietician** [1] - 26:6
**difference** [2] - 11:3, 21:13
**different** [11] - 21:8, 44:13, 45:10, 68:2, 75:20, 77:7, 94:15, 128:2, 128:4, 167:6
**differs** [1] - 37:3
**difficult** [1] - 17:19
**dire** [2] - 6:10, 6:13
**DIRECT** [2] - 3:4, 81:16
**direct** [10] - 5:22, 53:25, 54:2, 54:8,

54:11, 89:1, 107:6, 110:23, 129:21
**directing** [2] - 114:9, 115:11, 116:21, 123:9, 141:21, 143:6, 145:4, 160:1, 163:13, 165:15, 167:23, 168:23, 171:9, 172:11
**directly** [11] - 91:8, 91:13, 92:11, 102:15, 102:18, 103:5, 104:9, 124:4, 148:14, 149:9, 151:10
**director** [1] - 25:5
**disagree** [3] - 162:17, 170:16, 170:21
**Disagree** [1] - 170:18
**disagreed** [1] - 152:9
**discovery** [1] - 10:21
**discuss** [8] - 50:16, 57:18, 80:2, 85:3, 96:7, 96:17, 129:5, 172:17
**discussing** [1] - 57:5
**discussion** [1] - 46:20
**discussions** [1] - 38:22
**dislikes** [1] - 53:2
**dismissal** [1] - 43:5
**Disneyland** [1] - 27:21
**displayed** [1] - 22:22
**dispute** [10] - 71:20, 73:15, 152:8, 152:16, 152:18, 162:14, 162:16, 162:17, 170:12, 170:15
**disputed** [4] - 151:24, 152:1, 152:6, 159:8
**disputing** [1] - 152:12
**disregard** [3] - 53:18, 55:9, 55:13
**distinct** [1] - 122:24
**distinction** [4] - 22:3, 44:22, 54:10
**distract** [1] - 58:12
**distractions** [1] - 80:18
**distribution** [1] - 84:10
**distributor** [2] - 62:22, 64:21
**distributors** [1] - 83:5
**DISTRICT** [5] - 1:1, 1:2, 1:4, 178:10, 178:11
**DIVISION** [1] - 1:2
**DO** [1] - 178:11

**document** [35] - 75:8, 89:7, 89:10, 90:9, 90:21, 91:17, 107:11, 115:5, 117:2, 136:13, 138:13, 141:1, 141:2, 153:10, 153:13, 153:21, 153:25, 154:13, 154:21, 154:23, 154:25, 155:1, 155:5, 155:6, 155:8, 155:11, 155:15, 155:17, 155:18, 155:20, 155:22, 160:4, 166:19, 166:23, 168:8

**documents** [5] - 8:10, 64:24, 136:2, 154:2, 154:10

**dog** [1] - 22:19

**dollars** [2] - 73:4, 150:25

**done** [10] - 22:11, 38:25, 39:2, 53:21, 61:20, 103:24, 131:14, 136:4, 156:21, 159:13

**doubled** [1] - 77:5

**doubt** [3] - 44:10, 44:21, 45:14

**down** [14] - 5:4, 5:13, 13:3, 14:3, 14:5, 24:11, 27:17, 33:8, 68:9, 69:8, 77:5, 95:4, 158:3, 173:11

**downtown** [1] - 29:18

**downward** [1] - 139:3

**drama** [1] - 61:15

**drive** [1] - 27:22

**driver** [1] - 44:2

**driving** [1] - 44:5

**drop** [2] - 135:2, 135:5

**drove** [1] - 38:13

**drunk** [2] - 44:2, 44:5

**dry** [3] - 61:18, 61:21, 62:3

**due** [7] - 64:2, 68:19, 69:12, 92:24, 138:22, 138:25, 159:9

**during** [8] - 46:21, 50:14, 56:25, 60:16, 68:1, 69:22, 77:24, 82:14

**duties** [4] - 52:13, 53:1, 100:12, 100:14

**duty** [5] - 21:1, 21:2, 36:25, 52:18, 56:25

# E

**e-mails** [2] - 157:8, 157:15

**E.R** [1] - 34:17

**early** [2] - 79:20, 176:24

**earrings** [7] - 94:14, 165:10, 165:12, 168:15, 168:20, 170:14, 170:23

**ease** [1] - 73:1

**easier** [1] - 24:18

**East** [3] - 18:14, 18:15, 71:16

**east** [2] - 17:14, 27:18

**easy** [1] - 61:2

**eavesdrop** [1] - 46:15

**economics** [1] - 82:3

**education** [1] - 82:1

**educational** [1] - 38:6

**effectively** [1] - 6:5

**efficiently** [3] - 6:6, 43:18, 50:1

**eight** [11] - 6:11, 14:4, 47:17, 47:20, 47:24, 48:9, 48:10, 49:1, 49:5, 56:8

**either** [12] - 5:21, 33:4, 39:19, 41:9, 45:21, 48:16, 53:25, 54:9, 54:11, 94:22, 156:20, 162:8

**elaborate** [3] - 86:3, 86:5, 86:11

**electives** [1] - 31:17

**electronic** [1] - 57:6

**element** [1] - 75:21

**elevator** [1] - 51:18

**email** [8] - 57:6, 98:1, 99:1, 102:1, 103:3, 157:11, 158:10, 158:15

**emails** [11] - 76:20, 99:5, 102:19, 157:4, 157:9, 157:18, 157:19, 157:20, 157:23, 158:1, 158:6

**emerald** [10] - 76:24, 165:9, 165:12, 170:13, 170:22, 171:15, 171:20, 171:21, 171:25, 172:5

**emergency** [1] - 10:21

**employed** [5] - 23:21, 23:22, 31:6, 31:9

**employee** [7] - 61:11, 70:14, 70:16, 99:23, 157:11, 158:2, 158:7

**employees** [6] - 62:15, 62:17, 84:5, 85:23, 157:5, 157:16

**employer** [2] - 57:11, 57:14

**encompassed** [1] - 120:2

**end** [19] - 14:3, 14:5, 21:3, 21:11, 22:9, 25:22, 37:1, 37:6, 37:18, 43:14, 50:8, 52:15, 56:19, 57:1, 58:2, 60:14, 95:18, 105:21, 106:22

**ends** [1] - 141:15

**engaged** [1] - 70:23

**enjoy** [1] - 173:7

**ensure** [1] - 149:11

**enter** [15] - 63:13, 63:19, 86:15, 89:15, 99:23, 100:9, 100:11, 100:24, 101:10, 101:17, 108:16, 109:9, 137:17, 137:19, 138:7

**entered** [6] - 32:25, 72:22, 101:13, 108:11, 114:14, 117:5

**entertaining** [1] - 61:14

**entire** [1] - 57:23

**ENTITLED** [1] - 178:15

**entitled** [2] - 54:13, 128:8

**entity** [1] - 122:24

**errand** [1] - 17:10

**errata** [1] - 125:15

**error** [1] - 63:15

**ESQUIRE** [3] - 2:6, 2:10, 2:11

**establish** [1] - 92:22

**estimate** [2] - 150:10, 150:19

**et** [4] - 1:10, 39:25, 175:5

**evaluate** [2] - 40:6, 52:19

**evaluating** [1] - 39:25

**evening** [2] - 42:17, 173:6

**event** [1] - 12:19

**eventually** [1] - 96:19

**evidence** [83] - 20:15, 20:16, 20:18, 20:19, 20:21, 20:24, 22:1, 22:7, 22:24, 25:11, 25:18, 25:19, 27:10, 32:24, 34:1, 34:5, 34:6, 36:8, 39:3, 40:20, 41:18, 42:1, 44:20, 45:1, 45:14, 49:10, 50:24, 50:25, 51:4, 51:11, 52:19, 52:25, 53:7, 53:10, 53:12, 53:13, 53:14, 53:16, 53:17, 53:18, 53:22, 53:23, 53:25, 54:2, 54:5, 54:6, 54:9, 54:12, 54:13, 54:14, 54:15, 54:16, 54:18, 55:4, 55:6, 55:8, 55:10, 55:12, 56:4, 56:7, 56:10, 56:22, 58:4, 58:8, 58:13, 58:18, 59:3, 59:5, 60:15, 60:16, 60:18, 60:19, 60:20, 62:9, 62:10, 70:8, 72:6, 80:7, 80:21, 107:15, 109:9, 112:13, 175:9

**evidentiary** [2] - 5:9, 9:5

**ex** [3] - 7:12, 7:16, 7:22

**exactly** [5] - 100:14, 101:2, 136:20, 145:7, 150:2

**EXAMINATION** [2] - 81:16, 114:5

**examination** [3] - 5:22, 113:23

**examine** [3] - 59:10, 59:12, 95:1

**example** [6] - 8:8, 22:10, 54:25, 76:23, 136:11, 140:19

**excellent** [1] - 34:21

**except** [1] - 20:5

**exception** [1] - 93:7

**excerpt** [1] - 125:14

**excerpts** [1] - 126:6

**exclude** [2] - 7:17, 12:17

**excuse** [14] - 9:20, 13:2, 13:12, 48:20, 49:16, 49:22, 63:14, 66:10, 69:10, 96:3, 120:10, 121:7, 134:25, 166:9

**excused** [1] - 48:22

**executive** [1] - 38:5

**Exhibit** [42] - 74:11, 89:2, 89:3, 89:20, 95:9, 107:7, 107:17, 109:13, 111:4, 112:13, 112:23, 113:1, 114:9, 115:12, 117:5, 123:9, 123:10, 129:22, 134:9, 136:21, 137:13, 141:9, 141:22, 142:15, 145:5, 145:6, 151:25, 152:2, 152:7, 152:24, 153:4, 160:1, 161:24, 162:20, 163:14, 165:15, 167:23, 168:5, 171:2, 171:9, 172:9, 172:11

**exhibit** [9] - 11:18, 11:22, 12:11, 54:16, 54:20, 54:22, 95:4, 95:6, 95:7

**Exhibits** [1] - 110:23

**exhibits** [9] - 11:12, 11:14, 11:17, 12:9, 12:14, 20:20, 53:9, 53:24, 89:14

**exist** [1] - 51:22

**expect** [7] - 6:21, 7:7, 17:15, 18:3, 57:15, 59:5, 171:24

**expectation** [1] - 9:1

**expected** [1] - 41:21

**expense** [1] - 82:18

**expensive** [3] - 68:8, 68:12, 68:15

**experience** [2] - 40:3, 40:4, 127:6

**experiences** [1] - 36:3

**expert** [18] - 10:5, 11:2, 11:3, 174:9, 174:15, 174:18, 174:21, 174:23, 174:25, 175:7, 175:8, 175:9, 175:23, 175:24, 176:9

**expertise** [2] - 40:3, 175:3

**experts** [1] - 175:5

**explain** [11] - 19:5, 20:5, 21:21, 28:14, 62:9, 86:6, 93:21, 112:3, 144:4, 148:19, 173:16

**explained** [1] - 28:8

**exposed** [2] - 37:2, 56:24, 57:25

**express** [9] - 50:17, 50:22, 51:2, 51:10, 51:12, 59:24, 80:3, 129:7, 172:18

**extension** [1] - 85:14

## F

178:22
**face** [1] - 65:1
**fact** [13] - 43:7, 45:12, 46:13, 54:2, 54:7, 54:10, 55:15, 56:10, 61:20, 62:2, 72:20, 77:24, 78:8
**factor** [2] - 56:8, 86:19
**factories** [2] - 64:15, 64:17
**factory** [28] - 63:3, 63:7, 67:1, 67:12, 67:13, 67:15, 83:2, 84:16, 86:16, 87:14, 103:4, 103:5, 103:6, 103:9, 103:15, 105:6, 143:12, 144:5, 146:8, 146:12, 146:22, 146:25, 147:3, 147:6, 147:16, 148:3, 153:16
**facts** [15] - 20:10, 20:12, 20:14, 20:25, 21:15, 21:20, 23:4, 52:20, 52:21, 53:10, 53:15, 54:6, 55:14, 61:14, 80:22
**fair** [15] - 26:14, 27:9, 29:4, 30:2, 30:20, 32:19, 32:22, 32:23, 33:5, 35:13, 36:6, 45:23, 45:24, 150:19, 151:1
**fairly** [1] - 53:1
**fairness** [1] - 57:22
**fall** [1] - 36:9
**falling** [1] - 93:24
**familiar** [8] - 40:24, 42:9, 42:10, 95:13, 95:16, 95:19, 135:2, 135:16
**family** [4] - 57:10, 57:13, 84:1, 84:2
**family-operated** [1] - 84:2
**fancy** [1] - 73:6
**far** [7] - 32:8, 35:11, 40:17, 42:11, 48:7, 64:14, 87:13
**fast** [3] - 31:7, 31:9, 158:3
**faster** [1] - 49:15
**father** [1] - 83:24
**fax** [1] - 142:18
**fear** [1] - 53:3
**February** [2] - 159:16, 159:19
**FEDERAL** [2] - 1:23,

**federal** [1] - 48:7
**feelings** [1] - 26:16
**fellow** [2] - 56:18, 58:10
**few** [7] - 7:10, 13:15, 46:19, 52:12, 56:16, 60:24, 92:20
**field** [4] - 36:21, 141:1, 144:17, 163:23
**figure** [2] - 24:14, 24:19
**filed** [5] - 5:5, 61:5, 78:19, 166:18, 166:20
**fill** [2] - 14:4, 14:6
**filter** [2] - 41:24, 132:8
**final** [4] - 50:9, 67:6, 87:16, 163:13
**finally** [2] - 11:10, 65:19
**financial** [7] - 16:10, 17:20, 61:9, 73:25, 78:12, 78:24, 79:8
**financially** [1] - 78:17
**findings** [2] - 162:14, 162:18
**fine** [4] - 11:5, 25:3, 86:10, 120:19
**finish** [6] - 16:16, 42:6, 42:8, 43:18, 162:2, 173:4
**finished** [1] - 162:4
**firm** [3] - 17:7, 18:9, 18:12
**first** [51] - 9:24, 14:2, 14:4, 17:15, 19:21, 20:9, 21:1, 21:20, 39:16, 47:4, 47:10, 47:17, 47:20, 47:23, 48:16, 50:12, 56:16, 59:1, 61:8, 63:10, 65:4, 65:6, 68:20, 70:2, 70:4, 70:22, 75:4, 80:25, 82:21, 88:14, 91:23, 92:20, 95:1, 95:16, 106:19, 106:21, 106:24, 111:15, 124:2, 125:7, 125:8, 125:13, 139:11, 139:12, 141:15, 159:17, 167:10, 168:3, 168:5, 173:24
**five** [2] - 56:2, 159:17
**fix** [1] - 94:22
**flew** [2] - 8:1, 71:16
**flipped** [1] - 167:17
**flipping** [1] - 111:1
**flow** [1] - 73:6

**focuses** [1] - 71:23
**follow** [7] - 24:1, 24:3, 37:6, 37:13, 37:17, 37:19, 45:12
**follow-up** [2] - 24:1, 24:3
**followed** [2] - 115:3, 175:4
**following** [3] - 37:15, 53:13, 62:11
**food** [2] - 31:7, 31:10
**FOR** [2] - 178:9, 178:10
**FOREGOING** [1] - 178:13
**form** [10] - 50:17, 50:22, 51:2, 51:10, 51:12, 57:7, 59:4, 80:3, 129:6, 172:18
**format** [2] - 145:7, 145:11
**FORMAT** [1] - 178:16
**forming** [1] - 51:7
**forms** [1] - 136:11
**forward** [2] - 67:18, 88:1
**foundation** [7] - 12:13, 12:20, 107:20, 107:22, 160:8, 165:21, 171:4
**foundational** [1] - 23:11
**four** [9] - 6:10, 16:17, 23:12, 42:6, 47:9, 55:25, 63:11, 67:15, 118:12
**fourth** [3] - 23:23, 141:14, 141:15
**Franco** [4] - 18:15, 96:6, 96:10, 96:25
**Franco's** [2] - 10:8, 10:10
**free** [2] - 42:23, 49:18
**frequently** [1] - 76:3
**Friday** [2] - 9:25, 173:5
**friends** [1] - 40:4
**front** [10] - 7:3, 14:5, 49:23, 89:7, 90:9, 107:7, 120:5, 162:7, 173:16, 174:2
**fulfilled** [1] - 75:24
**fulfilling** [1] - 76:5
**fulfills** [1] - 150:1
**full** [4] - 81:10, 117:1, 120:1, 151:2
**fully** [2] - 76:8, 137:9
**function** [4] - 20:6, 20:8, 20:9, 85:16
**functions** [1] - 25:17

**funeral** [1] - 25:5

## G

**Gabriel** [2] - 17:14, 17:24
**GARY** [1] - 1:4
**gem** [8] - 77:2, 159:3, 159:13, 159:16, 160:24, 163:24, 164:2, 176:2
**gems** [3] - 40:6, 40:7, 40:17
**gemstones** [5] - 159:20, 159:22, 160:14, 160:19, 161:4
**gender** [1] - 53:6
**general** [12] - 18:2, 19:9, 19:12, 19:13, 24:6, 33:24, 37:24, 39:13, 50:4, 88:9, 95:24, 145:10
**generally** [1] - 84:20
**generate** [13] - 84:15, 101:7, 101:8, 101:10, 101:18, 105:2, 105:4, 108:9, 108:12, 110:8, 111:17, 131:12, 131:22
**generated** [7] - 104:19, 104:23, 131:20, 131:24, 142:7, 142:9, 144:21
**generates** [1] - 108:15
**generation** [1] - 131:14
**gentleman** [1] - 41:16
**gentlemen** [10] - 13:24, 15:3, 15:20, 18:18, 49:7, 49:25, 60:7, 60:23, 71:10, 79:15
**genuine** [1] - 68:7
**GERALD** [1] - 2:11
**Gerald** [4] - 4:19, 13:21, 18:11, 18:12
**get-to-the-point** [1] - 62:5
**given** [4] - 10:13, 54:11, 58:7, 168:9
**glass** [10] - 68:15, 76:25, 77:1, 78:11, 164:3, 164:7, 167:2, 172:2, 175:2
**Glendale** [1] - 26:24
**Gloria** [2] - 14:24, 34:24
**go-between** [1] - 63:2

**God** [2] - 6:20, 49:11
**goods** [18] - 63:13, 63:20, 63:23, 63:23, 63:25, 67:6, 70:11, 76:13, 78:17, 93:25, 94:25, 103:5, 104:5, 148:12, 148:14, 152:13, 152:14, 152:17
**govern** [2] - 8:19, 50:9
**graduate** [1] - 32:14
**graduated** [1] - 82:5
**granted** [1] - 8:16
**greatest** [1] - 6:17
**green** [2] - 165:10, 168:20
**ground** [2] - 174:11, 174:12
**grounds** [1] - 174:8
**Group** [4] - 18:10, 115:25, 116:15, 142:3
**group** [1] - 125:20
**guarantee** [1] - 58:16
**guaranteeing** [1] - 42:22
**guess** [2] - 9:19, 54:25
**guilty** [1] - 44:10
**gymnastics** [1] - 27:1

## H

**H-t-u-t** [1] - 10:3
**H.K** [1] - 72:23
**H20S4920023-A** [1] - 111:12
**half** [4] - 5:16, 5:19, 73:3, 150:24
**hand** [14] - 15:18, 19:16, 28:13, 30:15, 39:13, 49:6, 62:24, 64:9, 64:11, 64:18, 65:24, 65:25, 78:7, 81:4
**handle** [6] - 10:25, 11:4, 11:13, 70:16, 86:20, 95:24
**handled** [1] - 70:17
**handles** [1] - 98:4
**handling** [2] - 11:17, 136:5
**happy** [1] - 6:14
**hard** [2] - 51:7, 72:7
**harm** [2] - 78:24, 79:10
**harmed** [2] - 72:2, 72:13
**hashtag** [1] - 131:3
**hate** [1] - 80:14
**head** [1] - 19:16

**header** [1] - 145:10
**heading** [1] - 130:23
**heads** [4] - 9:19, 9:20, 12:25, 19:20
**heads-up** [3] - 9:19, 9:20, 12:25
**hear** [18] - 11:9, 15:17, 28:12, 34:3, 39:3, 46:12, 51:1, 53:19, 53:20, 55:21, 61:7, 61:10, 66:3, 68:2, 70:17, 72:6, 80:21, 147:21
**heard** [18] - 7:11, 7:14, 27:7, 29:24, 32:1, 32:5, 32:7, 34:19, 35:9, 37:4, 46:18, 51:4, 51:5, 51:11, 54:4, 62:15, 96:6
**hearing** [2] - 15:16, 46:2
**hearsay** [10] - 107:19, 109:7, 112:14, 160:7, 161:25, 162:5, 174:3, 174:8, 174:11, 175:6
**HELD** [1] - 178:14
**hello** [3] - 30:24, 51:18, 51:19
**help** [16] - 6:20, 20:17, 24:3, 49:11, 50:7, 51:25, 58:8, 59:4, 85:15, 113:25, 119:9, 127:16, 145:3, 151:13, 170:4, 174:1
**helpful** [1] - 20:6
**helps** [1] - 89:22
**Helzberg** [9] - 164:13, 165:4, 165:13, 168:6, 168:12, 169:16, 170:6, 171:19, 175:20
**HEREBY** [1] - 178:11
**hesitate** [1] - 28:12
**Hi** [1] - 38:3
**hi** [1] - 26:21
**high** [1] - 44:11
**higher** [2] - 77:14, 77:19
**highest** [1] - 82:1
**highlight** [2] - 65:6, 65:8
**highlighted** [3] - 65:9, 65:13, 165:6
**hire** [1] - 10:10
**hired** [3] - 78:9, 160:17, 160:23
**HK** [9] - 85:11, 88:23, 116:18, 130:3,

142:3, 143:20, 144:2, 144:3, 144:8
**hold** [1] - 173:1
**home** [28] - 23:24, 23:25, 25:6, 25:7, 26:7, 26:8, 27:2, 27:3, 27:24, 29:15, 29:16, 30:12, 30:13, 31:4, 31:5, 32:15, 32:16, 33:16, 33:17, 34:16, 35:4, 35:22, 35:23, 36:16, 36:17, 38:15, 38:16, 44:18
**Hong** [113] - 66:1, 66:4, 66:6, 66:10, 66:11, 66:12, 67:16, 67:17, 67:21, 72:25, 73:1, 73:5, 73:9, 73:10, 73:11, 73:12, 73:13, 74:13, 74:22, 74:25, 75:10, 75:11, 75:15, 76:2, 78:3, 84:17, 84:21, 85:8, 85:13, 86:17, 86:19, 87:2, 87:15, 91:4, 91:5, 91:6, 92:3, 92:10, 92:13, 95:20, 95:22, 96:4, 96:24, 97:5, 97:8, 99:8, 99:11, 99:17, 99:24, 100:3, 100:9, 100:23, 102:2, 102:5, 102:22, 103:6, 103:7, 103:17, 104:6, 105:9, 111:25, 112:4, 112:5, 116:6, 116:12, 123:20, 123:21, 124:1, 124:6, 124:14, 125:1, 127:13, 127:16, 128:21, 130:11, 130:13, 130:16, 130:18, 130:19, 131:15, 134:10, 134:11, 134:13, 134:16, 134:17, 134:21, 135:14, 135:17, 135:25, 136:3, 136:4, 136:7, 136:12, 136:15, 142:22, 143:12, 143:23, 143:24, 143:25, 144:6, 144:10, 144:21, 145:2, 145:3, 146:15, 146:23, 148:4, 149:7, 151:7, 151:18, 151:19
**Honor** [93] - 4:7, 4:14,

4:17, 4:21, 5:1, 5:2, 9:12, 9:14, 11:11, 12:3, 12:5, 17:3, 25:15, 40:22, 41:3, 41:6, 46:16, 60:22, 63:14, 70:7, 71:8, 71:9, 80:24, 81:15, 89:13, 89:16, 89:19, 95:8, 107:14, 107:18, 107:19, 109:6, 109:10, 112:12, 112:17, 112:21, 112:24, 113:4, 113:24, 114:4, 117:19, 117:24, 118:13, 118:20, 119:6, 119:12, 119:13, 119:15, 119:16, 119:24, 120:3, 120:7, 120:15, 120:21, 120:25, 121:7, 121:12, 121:20, 121:24, 122:21, 125:6, 125:13, 126:3, 126:13, 126:17, 128:14, 129:15, 133:22, 141:19, 147:8, 148:22, 156:7, 158:18, 158:24, 160:7, 161:23, 161:25, 162:2, 162:10, 164:16, 164:24, 165:20, 167:7, 167:13, 167:17, 167:19, 171:1, 171:3, 173:23, 174:7, 174:17, 175:12
**HONORABLE** [1] - 1:4
**hope** [1] - 138:11
**hoped** [1] - 71:14
**hopefully** [1] - 169:22
**hoping** [1] - 42:6
**hospitals** [1] - 33:15
**hour** [3] - 43:10, 43:13, 43:17
**hours** [6] - 5:17, 5:18, 5:19, 5:20, 6:3, 43:11
**huge** [1] - 78:13
**humbling** [1] - 22:5
**hundreds** [2] - 70:18
**hurt** [1] - 51:25
**husband** [1] - 26:9
**husband's** [1] - 34:17
**hyphen** [1] - 14:15

**I**

**I/we** [2] - 65:13, 65:14
**ID** [9] - 88:4, 101:12, 104:25, 108:18, 109:2, 132:9, 132:12, 132:14, 138:7
**idea** [4] - 20:12, 68:4, 78:5, 132:5
**identification** [1] - 163:24
**identified** [4] - 74:7, 107:16, 130:6, 164:2
**identify** [2] - 47:2, 169:18
**identifying** [1] - 160:6
**ignore** [3] - 54:24, 55:10, 72:8
**ignored** [2] - 72:5, 74:6
**ignores** [3] - 71:24, 71:25, 72:3
**image** [2] - 22:24, 23:3
**immediately** [3] - 57:20, 58:1, 133:25
**impact** [2] - 78:12, 79:1
**impartial** [2] - 32:19, 36:6
**impartially** [1] - 53:1
**impeachment** [2] - 117:22, 120:9
**import** [1] - 103:23
**important** [11] - 18:4, 22:4, 32:18, 33:23, 33:25, 50:15, 51:14, 56:12, 56:13, 61:22, 79:23
**importer** [1] - 136:17
**improper** [4] - 77:17, 93:5, 94:12, 94:13
**IN** [3] - 178:9, 178:14, 178:16
**inadvertently** [1] - 147:24
**INC** [2] - 1:6, 1:10
**Inc** [10] - 4:5, 13:8, 81:21, 89:11, 91:17, 92:2, 116:19
**include** [5] - 112:10, 133:24, 140:9, 140:12, 141:2
**included** [2] - 104:2, 112:19
**includes** [2] - 57:5, 119:21
**including** [4] - 24:11, 57:10, 87:16, 161:9
**incomplete** [3] -

118:14, 125:14, 133:23
**incorporate** [1] - 116:11
**Incorporated** [2] - 15:21, 15:22
**incorporated** [2] - 116:3, 116:6
**indicate** [2] - 19:14, 88:14
**indicated** [3] - 39:17, 110:4, 173:14
**indirect** [1] - 54:5
**individual** [3] - 141:13, 150:20, 153:18
**individually** [2] - 19:12, 23:11
**industry** [1] - 40:6
**influence** [1] - 53:3
**influenced** [2] - 53:4, 58:20
**information** [37] - 56:24, 58:1, 66:16, 66:25, 82:25, 84:16, 86:15, 86:16, 87:3, 99:18, 99:20, 100:10, 100:11, 100:24, 101:9, 101:11, 101:13, 101:17, 102:9, 103:9, 103:11, 103:12, 105:5, 105:8, 108:11, 108:14, 110:8, 111:19, 111:21, 137:18, 137:20, 138:1, 138:3, 142:21, 175:15, 175:21
**initials** [1] - 144:8
**input** [3] - 51:12, 100:6, 132:4
**inputting** [1] - 137:25
**inquire** [2] - 8:5, 81:14
**insight** [1] - 50:11
**insofar** [1] - 45:13
**inspect** [3] - 78:4, 148:24, 149:6
**inspected** [1] - 159:3
**inspection** [3] - 8:8, 160:6, 160:10
**instance** [1] - 102:21
**instances** [1] - 93:6
**instruct** [2] - 24:4, 59:15
**instructed** [2] - 44:8, 53:18
**instructing** [1] - 50:15
**instruction** [8] -

45:13, 50:13, 88:25,
90:16, 116:23,
116:25, 123:10,
123:11
**instructions** [14] -
48:15, 49:11, 50:6,
50:9, 51:16, 52:9,
52:14, 52:16, 56:23,
75:4, 88:18, 88:19,
90:8, 91:2
**instructor** [2] - 27:1,
38:18
**insulting** [1] - 78:25
**intend** [2] - 16:20,
18:13
**intended** [1] - 174:8
**intends** [2] - 125:16,
133:23
**interest** [5] - 6:4,
55:25, 85:5, 87:25,
88:1
**interested** [3] - 85:3,
85:4, 96:8
**interesting** [1] - 21:22
**international** [2] -
102:12, 103:20
**interrupt** [1] - 128:25
**intra** [3] - 100:7,
112:8, 153:22
**introduce** [7] - 11:24,
16:19, 71:15,
107:14, 112:12,
112:17, 133:23
**introduced** [3] - 20:1,
175:25, 176:3
**introducing** [2] -
31:17, 71:12
**investigate** [2] -
137:12, 137:14
**Invoice** [2] - 110:5,
111:10
**invoice** [100] - 66:6,
66:8, 66:13, 66:19,
66:20, 67:17, 75:6,
75:15, 84:15, 87:16,
92:23, 99:22, 99:25,
100:1, 100:4,
100:19, 100:24,
101:8, 101:11,
101:12, 101:25,
102:7, 102:13,
102:14, 102:21,
102:24, 102:25,
103:2, 103:22,
104:10, 104:11,
104:18, 106:5,
106:15, 108:16,
108:17, 110:7,
110:10, 110:13,
110:14, 110:15,

111:7, 111:8,
111:13, 111:16,
111:20, 111:25,
112:7, 113:8,
123:18, 123:20,
124:9, 124:13,
124:19, 124:22,
128:11, 128:13,
128:20, 128:22,
128:24, 129:17,
129:19, 130:7,
130:10, 130:24,
131:5, 131:11,
131:12, 134:14,
135:19, 136:21,
137:10, 138:1,
138:7, 138:12,
138:16, 140:20,
140:22, 141:6,
141:15, 141:24,
142:1, 142:6, 142:7,
142:11, 142:14,
145:1, 145:7, 145:9,
153:9, 153:15,
153:19, 154:15,
155:13, 166:1
**invoices** [81] - 7:21,
12:10, 12:17, 38:23,
66:4, 66:5, 68:19,
69:20, 69:21, 73:10,
74:24, 75:2, 75:19,
76:9, 76:12, 79:6,
101:7, 101:23,
101:24, 102:2,
102:6, 102:15,
102:18, 104:17,
106:14, 109:18,
109:25, 110:1,
110:19, 110:20,
111:2, 111:3,
112:16, 112:18,
112:22, 123:14,
124:8, 128:9,
129:25, 130:6,
130:10, 130:14,
130:15, 130:17,
131:5, 131:11,
132:16, 132:19,
132:22, 133:4,
133:7, 133:12,
134:9, 134:12,
134:15, 134:20,
137:7, 137:13,
137:16, 137:22,
138:3, 138:6, 138:8,
138:19, 141:8,
141:13, 145:5,
145:6, 145:14,
145:16, 151:24,
152:2, 152:6,
152:12, 152:23,

154:20, 155:7,
155:21, 159:9
**involved** [13] - 17:1,
18:24, 19:25, 29:25,
51:16, 52:6, 57:11,
61:16, 62:12, 73:15,
76:5, 78:4, 136:14
**involvement** [4] -
133:4, 136:6,
136:10, 144:13
**involves** [1] - 56:25
**involving** [1] - 70:3
**IS** [2] - 178:13, 178:16
**issue** [21] - 7:11, 7:15,
8:10, 9:24, 10:8,
10:19, 12:9, 12:10,
18:5, 70:5, 72:16,
74:24, 75:25, 76:19,
76:22, 127:16,
139:7, 139:9,
139:16, 159:9,
175:13
**issued** [5] - 73:10,
94:25, 129:17,
130:15, 130:18
**issues** [6] - 8:6, 9:21,
9:24, 56:25, 139:1,
139:4
**item** [29] - 4:4, 77:8,
77:9, 85:3, 135:25,
139:10, 149:19,
153:5, 153:7,
153:10, 153:13,
162:24, 163:17,
163:21, 164:5,
165:6, 167:2, 167:6,
169:4, 171:14,
171:15, 171:21,
171:24, 175:1,
175:13, 175:16,
175:18, 175:19
**items** [59] - 72:18,
73:9, 75:25, 76:2,
76:3, 76:16, 76:17,
77:4, 77:23, 78:2,
78:3, 78:4, 78:5,
78:8, 78:11, 78:12,
78:14, 78:15, 78:21,
93:19, 103:25,
120:23, 134:8,
145:15, 146:7,
146:11, 147:1,
147:16, 147:18,
148:3, 148:6,
148:10, 149:12,
150:11, 150:25,
152:22, 153:2,
153:16, 153:18,
153:21, 154:11,
154:14, 154:16,

154:22, 155:5,
155:9, 155:12,
155:16, 156:11,
156:15, 156:22,
165:3, 169:2,
169:15, 169:24,
169:25, 170:5
**itself** [1] - 176:1

**J**

**J-a-c-o-b-s** [1] - 14:15
**Jacobs** [2] - 14:14,
26:22
**January** [5] - 69:17,
69:24, 69:25, 107:2,
159:12
**jealous** [1] - 23:18
**Jeffrey** [2] - 15:1,
36:14
**Jennifer** [2] - 14:23,
34:10
**jeopardizes** [1] -
57:22
**Jersey** [2] - 62:17,
130:21
**JESSICA** [1] - 2:7
**Jessica** [2] - 4:15,
13:14, 17:9
**jeweler** [1] - 37:22
**jewelry** [73] - 16:3,
16:6, 16:9, 28:18,
28:20, 39:25, 40:5,
40:6, 40:17, 62:20,
62:22, 63:3, 63:4,
63:5, 63:7, 64:17,
64:21, 67:1, 67:4,
67:14, 67:15, 67:19,
67:24, 69:19, 70:3,
70:9, 70:11, 70:19,
72:17, 73:4, 76:2,
76:5, 76:16, 76:17,
76:24, 78:10, 78:13,
78:20, 79:6, 82:24,
84:8, 84:21, 85:1,
88:15, 92:11, 92:14,
93:22, 94:5, 94:6,
94:15, 94:21, 95:3,
96:8, 103:14,
145:21, 145:22,
146:7, 146:11,
146:23, 147:2,
150:25, 163:21,
169:2, 169:4,
169:15, 169:24,
169:25, 170:5,
170:13, 170:23,
172:2, 175:1
**Jewelry** [137] - 66:2,
72:23, 72:24, 72:25,

73:4, 73:8, 73:12,
73:13, 73:16, 74:13,
74:21, 74:25, 75:2,
75:6, 75:7, 75:15,
76:2, 76:6, 76:9,
76:15, 76:25, 83:9,
83:11, 83:14, 83:18,
85:11, 85:18, 85:20,
85:23, 86:1, 86:4,
86:22, 88:22, 88:23,
91:6, 92:3, 92:10,
92:13, 96:22, 96:24,
97:2, 97:3, 97:7,
98:17, 99:8, 100:3,
100:9, 100:11,
105:9, 111:25,
112:4, 115:24,
116:6, 116:11,
116:12, 116:15,
116:18, 117:1,
117:2, 117:6, 117:7,
121:4, 122:8,
122:10, 122:12,
122:18, 122:19,
122:23, 123:15,
123:16, 123:18,
123:19, 123:20,
123:21, 123:23,
124:3, 124:6,
124:14, 124:20,
124:22, 125:1,
127:8, 127:12,
127:14, 127:15,
127:25, 128:5,
128:12, 128:21,
129:18, 130:2,
130:7, 130:11,
130:12, 130:16,
130:17, 130:19,
131:6, 131:10,
131:14, 132:13,
132:19, 132:22,
133:8, 134:16,
134:17, 134:21,
135:14, 136:4,
136:7, 137:23,
141:24, 142:2,
142:3, 142:7,
142:22, 144:21,
146:3, 146:15,
146:16, 146:17,
146:23, 147:2,
148:4, 148:6,
148:25, 149:7,
150:1, 151:1, 151:5,
151:18, 151:19,
157:21, 157:24,
165:12
**Jewelry's** [1] - 66:9
**jigsaw** [3] - 22:11,
23:1

**job** [5] - 6:22, 22:7, 100:12, 105:12, 138:11

**John** [1] - 16:22

**join** [1] - 71:18

**joint** [2] - 10:4, 107:16

**joking** [1] - 25:25

**JUDGE** [1] - 1:4

**Judge** [1] - 10:22

**judge** [1] - 10:22

**judges** [1] - 37:11

**JUDICIAL** [1] - 178:17

**juicy** [1] - 61:14

**jump** [1] - 143:18

**June** [3] - 68:21, 69:2, 69:25

**JUNE** [3] - 1:17, 4:1, 178:18

**juries** [1] - 19:2

**JUROR** [106] - 24:23, 25:1, 25:5, 25:8, 25:15, 25:20, 25:23, 26:2, 26:4, 26:6, 26:9, 26:11, 26:15, 26:21, 26:24, 27:1, 27:4, 27:6, 27:11, 27:13, 27:15, 27:19, 27:21, 27:25, 28:2, 28:8, 28:15, 29:2, 29:5, 29:7, 29:9, 29:11, 29:14, 29:17, 29:21, 30:3, 30:5, 30:7, 30:9, 30:11, 30:14, 30:17, 30:22, 30:24, 31:2, 31:6, 31:9, 31:13, 31:16, 31:19, 31:21, 31:25, 32:3, 32:6, 32:10, 32:12, 32:17, 33:2, 33:6, 33:11, 33:14, 33:18, 33:22, 34:8, 34:10, 34:13, 34:22, 34:24, 35:2, 35:5, 35:8, 35:12, 35:15, 35:17, 35:20, 35:24, 36:1, 36:5, 36:7, 36:11, 36:13, 36:18, 36:22, 37:9, 37:19, 37:22, 38:3, 38:5, 38:8, 38:11, 38:14, 38:17, 39:1, 39:5, 39:8, 39:11, 40:12, 40:15, 40:22, 41:3, 41:6, 44:2, 44:24, 45:3, 45:6, 45:10

**juror** [35] - 14:2, 19:7, 20:7, 22:5, 25:13, 25:24, 26:1, 26:20, 27:12, 28:7, 29:6, 30:2, 30:4, 30:23,

32:9, 32:11, 33:9, 33:20, 34:9, 34:21, 34:23, 35:11, 35:16, 36:12, 37:21, 38:2, 39:10, 42:11, 42:23, 43:24, 43:25, 48:20, 50:21, 52:1

**Juror** [11] - 24:15, 24:21, 33:8, 40:10, 47:13, 48:19, 48:21, 48:24, 48:25, 49:3

**JURORS** [14] - 19:20, 20:2, 21:18, 22:13, 23:7, 39:20, 40:9, 41:15, 42:3, 43:22, 44:6, 46:16, 46:25, 49:12

**jurors** [26] - 6:11, 13:25, 14:7, 15:4, 15:8, 15:13, 19:5, 20:4, 24:12, 32:22, 33:4, 37:11, 43:13, 45:19, 49:2, 49:14, 49:15, 49:23, 51:2, 51:5, 51:12, 52:13, 56:18, 58:10, 172:23

**jury** [71] - 5:4, 5:13, 6:24, 7:2, 7:3, 7:10, 9:16, 13:2, 13:3, 15:19, 18:23, 20:5, 21:1, 21:2, 21:23, 21:25, 24:4, 24:18, 30:16, 32:19, 34:2, 42:14, 43:23, 43:24, 45:11, 45:22, 48:6, 48:11, 48:23, 49:6, 49:8, 49:15, 49:17, 49:21, 49:24, 50:18, 50:23, 51:1, 51:10, 52:11, 56:16, 56:25, 57:14, 57:16, 57:21, 57:25, 58:11, 60:1, 60:5, 60:6, 71:10, 79:5, 79:17, 80:5, 80:12, 80:13, 80:15, 114:1, 120:6, 129:8, 129:11, 162:8, 172:20, 173:10, 173:13, 173:17, 174:2, 176:23

**justice** [1] - 6:5

## K

**KATHLEEN** [1] - 2:7

**Kathleen** [3] - 4:13, 13:13, 17:9

**keep** [9] - 6:2, 56:16, 58:9, 60:1, 60:12, 64:5, 100:19, 101:4, 128:5

**Kenia** [2] - 14:20, 30:24

**kept** [2] - 28:20, 147:24

**kids** [2] - 42:24, 149:3

**kind** [14] - 21:22, 28:9, 31:17, 50:10, 60:19, 61:19, 70:23, 82:21, 85:13, 96:14, 101:5, 147:20, 149:16, 158:3

**kinds** [1] - 37:3

**KLAUSNER** [1] - 1:14

**KLEEGER** [3] - 1:23, 178:9, 178:21

**knowledge** [3] - 97:7, 99:7, 176:3

**knowledgeable** [7] - 114:17, 114:20, 114:23, 121:3, 122:6, 141:7, 141:11

**known** [4] - 62:25, 63:15, 144:17, 168:6

**knows** [1] - 55:1

**Kong** [111] - 66:1, 66:4, 66:6, 66:11, 66:12, 67:16, 67:17, 67:21, 72:25, 73:1, 73:5, 73:9, 73:10, 73:11, 73:13, 74:13, 74:22, 74:25, 75:10, 75:11, 75:16, 76:2, 78:3, 84:17, 84:21, 85:8, 85:13, 86:17, 86:19, 87:3, 87:15, 91:4, 91:5, 91:6, 92:3, 92:10, 92:13, 95:20, 95:22, 96:4, 96:24, 97:5, 97:8, 99:8, 99:11, 99:17, 99:24, 100:3, 100:9, 100:23, 102:2, 102:5, 102:23, 103:7, 103:17, 104:7, 105:9, 111:25, 112:4, 112:5, 116:6, 116:12, 123:21, 124:1, 124:6, 124:14, 125:1, 127:13, 127:17, 128:21, 130:11, 130:13, 130:16, 130:18, 130:20, 131:15, 134:10, 134:11, 134:13, 134:16, 134:17, 134:21, 135:14, 135:17, 135:25, 136:3, 136:4, 136:7,

136:12, 136:15, 142:22, 143:12, 143:23, 143:24, 143:25, 144:6, 144:10, 144:21, 145:2, 145:3, 146:15, 146:24, 148:4, 149:7, 151:7, 151:18, 151:20

**Kong's** [2] - 66:10, 73:12

**Kurt** [15] - 13:13, 13:14, 17:5, 17:11, 17:22, 61:11, 76:21, 79:11, 96:13, 98:6, 98:8, 98:9, 111:24, 158:13, 158:16

## L

**L.A** [3] - 29:18, 33:12, 34:25

**lab** [2] - 68:9, 159:13

**lab-created** [1] - 68:9

**laboratory** [4] - 78:9, 159:4, 159:11, 159:23

**lack** [1] - 6:19

**lacks** [2] - 107:20, 126:7

**Ladies** [2] - 60:7, 79:15

**ladies** [8] - 13:24, 15:3, 15:20, 18:18, 49:7, 49:25, 60:23, 71:10

**laid** [1] - 12:20

**landscaping** [1] - 26:11

**large** [1] - 149:23

**larger** [1] - 62:18

**last** [13] - 6:8, 6:13, 9:25, 10:3, 57:15, 65:19, 68:17, 71:12, 81:11, 105:24, 106:1, 106:25, 107:1

**late** [3] - 5:6, 114:1, 172:25

**Latin** [1] - 31:22

**Latin-X** [1] - 31:22

**LAW** [2] - 2:7, 2:7

**Law** [2] - 18:10, 18:12

**law** [33] - 17:7, 18:12, 20:13, 20:18, 21:3, 21:4, 21:5, 21:7, 21:10, 21:14, 22:8, 25:21, 27:10, 31:24, 32:24, 36:14, 36:25, 37:2, 37:3, 37:6, 37:12, 37:13, 37:15,

37:17, 37:22, 40:12, 40:19, 52:22, 52:23, 52:25, 54:10, 56:23, 59:15

**lawsuit** [6] - 61:5, 73:15, 74:12, 78:19, 166:18, 166:20

**lawyer** [2] - 54:15, 54:17, 54:18

**lawyers** [4] - 63:16, 161:20, 168:9, 169:13

**lay** [2] - 107:21, 160:8

**lead** [2] - 7:24, 12:16

**leader** [1] - 115:7

**learned** [1] - 76:17

**least** [7] - 9:23, 34:14, 48:11, 67:22, 67:24, 68:15, 150:20

**leave** [3] - 40:19, 58:14, 173:8

**leaves** [1] - 6:24

**leeway** [1] - 48:9

**left** [13] - 14:8, 42:22, 58:15, 64:9, 64:18, 65:24, 108:25, 109:3, 161:10, 173:13, 176:16, 176:18, 176:21

**left-hand** [3] - 64:9, 64:18, 65:24

**legal** [3] - 9:8, 36:21, 65:11

**less** [1] - 68:12

**letterhead** [6] - 73:11, 73:12, 102:11, 112:6, 112:10, 130:18

**lettering** [1] - 102:9

**letters** [2] - 115:3, 115:5

**level** [3] - 68:9, 68:14, 82:1

**levels** [1] - 68:6

**lie** [1] - 117:17

**light** [1] - 56:7

**likely** [1] - 99:15

**Lily** [6] - 95:24, 96:7, 96:16, 96:21, 98:11, 98:24

**lily** [1] - 96:9

**limine** [2] - 5:5, 12:17

**Limited** [5] - 72:23, 85:11, 85:13, 130:3, 142:3

**limited** [3] - 5:24, 41:25, 176:7

**limiting** [1] - 39:6

**Linda** [2] - 14:25, 35:17

**line** [33] - 68:23,
117:21, 118:4,
118:8, 119:13,
119:18, 119:20,
120:9, 120:10,
120:14, 120:20,
120:24, 121:17,
121:19, 121:25,
122:2, 125:3, 125:4,
125:18, 125:21,
126:15, 126:20,
133:18, 133:25,
138:4, 164:22,
167:9, 167:12
**lines** [18] - 74:9,
75:13, 77:11,
117:21, 118:5,
118:7, 118:12,
118:23, 119:10,
119:21, 120:2,
121:14, 121:17,
121:18, 121:21,
126:10, 147:10,
158:20
**lips** [1] - 46:15
**list** [9] - 9:25, 10:4,
12:11, 104:16,
117:25, 118:15,
129:25, 153:17
**listed** [6] - 142:17,
153:21, 154:21,
155:5, 155:12,
155:15
**listen** [7] - 11:23, 15:6,
50:24, 148:18,
149:4, 154:18,
155:14
**listened** [1] - 50:25
**lists** [3] - 153:25,
154:5, 155:8
**live** [19] - 9:4, 16:21,
16:23, 17:24, 23:14,
23:24, 24:25, 26:3,
26:23, 27:14, 29:8,
29:9, 30:7, 31:1,
32:13, 34:11, 34:25,
35:18, 36:15
**local** [1] - 18:3
**locally** [1] - 62:14
**located** [3] - 81:22,
111:13, 113:17
**location** [10] - 21:25,
22:2, 23:14, 24:24,
26:3, 26:23, 27:14,
29:8, 31:1, 38:10
**logical** [1] - 75:3
**look** [22] - 51:21,
64:24, 74:19, 93:12,
95:2, 138:4, 140:2,
157:4, 157:8, 157:9,

157:10, 157:15,
157:17, 157:18,
157:20, 157:23,
158:5, 158:12,
166:21, 169:22,
169:23, 171:22
**looked** [1] - 157:19
**looking** [2] - 140:25,
166:19
**Los** [2] - 27:15, 27:16
**LOS** [4] - 1:18, 1:24,
4:1, 178:5
**lose** [1] - 47:10
**loss** [3] - 8:11, 16:11,
79:10
**losses** [1] - 16:10
**lost** [1] - 78:21
**lower** [3] - 77:7, 77:16,
77:20
**lunch** [2] - 43:11,
79:19
**LUNCH** [1] - 80:8

# M

**M-a-l-d-o-n-a-d-o** [1] -
14:16
**M-a-u-m-g** [1] - 10:2
**M-o-o-r-e** [1] - 14:22
**M-u-n-s-o-n** [1] -
14:23
**ma'am** [2] - 89:5,
129:23
**machinist** [1] - 36:1
**Madre** [1] - 26:4
**mails** [2] - 157:8,
157:15
**main** [1] - 66:10
**maintained** [2] -
132:22, 132:24
**major** [2] - 12:9, 31:18
**majoring** [1] - 31:21
**Maldonado** [3] -
14:16, 27:13, 47:12
**manager** [13] - 18:2,
35:20, 74:1, 76:21,
79:11, 82:7, 82:8,
82:15, 95:24,
100:15, 105:11,
158:14, 158:16
**manner** [1] - 55:24
**manually** [1] - 137:19
**manufacture** [6] -
63:4, 84:8, 103:13,
145:21, 145:23
**manufacturer** [3] -
145:25, 146:16,
146:17
**manufacturers** [2] -
146:18, 147:7

**manufactures** [2] -
67:1, 67:14
**marbles** [1] - 44:17
**March** [7] - 68:22,
69:11, 109:22,
109:24, 110:21,
161:6, 163:3
**marked** [4] - 74:10,
117:4, 129:22,
141:22
**match** [1] - 150:2
**matches** [1] - 149:24
**matter** [10] - 5:3,
16:12, 50:18, 50:22,
57:19, 59:25, 80:4,
129:7, 172:19, 176:1
**MATTER** [1] - 178:15
**mean** [18] - 32:23,
50:21, 83:10, 85:12,
86:25, 88:23, 92:19,
93:21, 94:12, 99:3,
99:13, 100:17,
101:19, 103:19,
138:4, 143:2,
146:13, 153:5
**meaning** [1] - 55:7
**means** [8] - 44:15,
55:11, 57:6, 61:4,
62:22, 94:13,
100:18, 143:10
**meantime** [1] - 69:20
**media** [1] - 57:7
**medical** [2] - 36:18,
36:20
**meet** [5] - 84:20,
84:23, 95:21, 96:4,
96:7
**meeting** [1] - 87:19
**members** [4] - 57:11,
60:5, 80:12, 129:11
**memory** [4] - 55:23,
58:18, 58:19, 58:21
**mention** [2] - 77:24,
88:21
**mentioned** [19] - 23:8,
61:7, 64:17, 83:3,
85:7, 86:22, 87:11,
87:18, 90:8, 93:1,
94:10, 95:12, 99:1,
99:25, 100:7,
102:18, 103:17,
104:12, 105:16
**merchandise** [6] -
93:15, 94:3, 94:11,
112:6, 113:8, 149:15
**merits** [1] - 57:4
**messed** [1] - 42:14
**met** [2] - 10:19, 96:9
**mic** [6] - 24:9, 24:10,
24:12, 39:15, 86:9

**MICHAEL** [1] - 2:6
**Michael** [5] - 4:8,
13:12, 15:2, 17:4,
38:3
**microphone** [3] -
33:8, 46:23, 81:8
**microphones** [2] -
46:9, 46:11
**middle** [12] - 76:4,
82:25, 83:2, 91:7,
115:11, 145:17,
145:20, 145:24,
146:2, 146:3, 146:4
**might** [8] - 15:11,
26:17, 35:10, 41:24,
43:4, 50:11, 54:25,
55:7
**million** [5] - 73:4,
76:15, 150:24,
151:2, 151:3
**mind** [6] - 6:2, 35:10,
56:17, 60:1, 60:12,
79:20
**minimize** [1] - 61:25
**minimum** [2] - 88:15,
147:18
**minute** [1] - 101:23
**minutes** [17] - 5:24,
7:10, 42:21, 46:20,
52:12, 59:22, 60:2,
60:24, 70:6, 79:20,
129:3, 176:15,
176:17, 176:18,
176:20
**Mirada** [2] - 30:7, 30:9
**missed** [2] - 38:9,
134:25
**mistakes** [1] - 77:4
**mistrial** [1] - 57:23
**mom** [1] - 83:24
**moment** [1] - 170:3
**moments** [1] - 13:15
**Monday** [1] - 42:7
**money** [18] - 16:8,
28:24, 69:13, 75:15,
97:13, 97:14, 97:16,
105:3, 105:17,
105:20, 124:13,
124:15, 124:19,
124:21, 127:8,
127:11, 127:14,
128:9
**monitor** [2] - 17:20,
61:1
**monitors** [1] - 60:25
**month** [5] - 29:18,
29:20, 69:5, 69:9,
163:10
**months** [2] - 69:14
**Moore** [2] - 14:22,

33:11
**morning** [21] - 4:7,
4:14, 4:17, 8:15,
13:11, 13:17, 13:18,
18:8, 32:12, 36:13,
42:16, 42:20, 43:3,
43:8, 51:19, 51:24,
71:11, 172:21,
176:22, 177:1
**most** [11] - 39:16,
68:7, 75:3, 77:22,
99:4, 99:15, 114:17,
117:15, 121:3,
122:6, 141:7
**motion** [2] - 5:5, 12:17
**motive** [1] - 32:25
**move** [1] - 83:15
**moves** [2] - 161:23,
171:1
**moving** [2] - 24:17,
49:25
**MR** [159] - 4:7, 4:13,
4:15, 4:17, 4:21, 5:1,
5:2, 7:11, 7:19, 7:22,
8:1, 8:14, 9:1, 9:6,
9:11, 9:14, 9:18,
11:5, 11:10, 11:20,
12:3, 12:7, 13:11,
13:20, 17:3, 17:19,
18:8, 47:6, 47:7,
47:12, 47:16, 47:18,
47:21, 47:23, 48:2,
48:5, 60:22, 63:18,
70:7, 71:8, 74:16,
75:18, 107:19,
109:7, 112:14,
113:24, 114:4,
114:6, 115:20,
117:19, 117:24,
118:5, 118:7,
118:10, 118:13,
118:20, 118:23,
119:6, 119:23,
120:1, 120:12,
120:25, 121:2,
121:7, 121:12,
121:17, 122:2,
122:5, 122:17,
122:21, 122:22,
123:8, 125:2,
125:10, 125:21,
125:23, 125:25,
126:22, 127:1,
127:22, 128:14,
128:19, 129:15,
129:16, 132:7,
133:2, 133:15,
133:18, 134:3,
134:7, 135:12,
140:24, 141:19,

141:20, 143:19,
144:12, 146:21,
147:8, 147:12,
147:15, 147:24,
148:2, 148:22,
148:23, 149:5,
150:13, 150:15,
150:23, 151:22,
151:23, 152:5,
152:21, 154:4,
156:2, 156:7, 156:9,
158:18, 158:23,
159:1, 160:7, 160:9,
160:13, 161:19,
161:23, 161:25,
162:2, 162:10,
162:12, 164:16,
164:21, 164:23,
165:2, 165:20,
165:24, 166:2,
166:7, 166:15,
167:1, 167:7,
167:11, 167:13,
167:17, 167:22,
169:11, 169:21,
170:11, 171:1,
171:3, 171:6, 171:8,
171:11, 171:13,
173:23, 174:7,
174:17, 174:25,
175:12, 175:24,
176:5
**MRI** [1] - 29:11
**MRI's** [1] - 29:13
**MS** [53] - 4:14, 13:17,
80:24, 81:1, 81:15,
81:17, 86:12, 87:10,
89:13, 89:19, 89:21,
95:4, 95:8, 95:10,
95:11, 107:14,
107:18, 107:23,
107:24, 109:6,
109:9, 109:12,
109:14, 112:12,
112:17, 112:21,
112:24, 113:1,
113:3, 113:6,
113:20, 119:12,
119:15, 119:19,
120:3, 120:7,
120:15, 120:17,
120:21, 121:20,
121:24, 125:6,
125:13, 126:3,
126:12, 126:17,
133:22, 147:11,
158:22, 158:24,
164:24, 167:15,
167:19
**Munson** [2] - 14:23,
34:10

**murder** [1] - 16:14
**must** [15] - 20:9,
20:14, 21:2, 38:9,
52:24, 53:14, 54:24,
55:12, 56:21, 56:23,
57:17, 72:13, 128:3,
136:2
**Mutual** [15] - 78:10,
159:24, 160:10,
160:17, 160:21,
161:4, 161:7,
162:25, 163:17,
164:3, 168:20,
171:15, 171:24,
175:1, 175:12
**mutual** [1] - 160:23
**my/our** [1] - 65:17

## N

**Nadia** [2] - 14:11,
24:23
**name** [52] - 10:2, 10:3,
13:11, 13:20, 13:25,
17:4, 18:8, 23:13,
24:22, 24:23, 26:2,
27:13, 29:7, 30:5,
33:9, 33:11, 34:10,
34:24, 35:17, 36:13,
38:3, 60:25, 62:25,
65:9, 66:5, 66:9,
66:10, 66:13, 73:18,
73:24, 81:10, 81:11,
83:8, 83:9, 83:10,
83:11, 83:14, 83:16,
83:17, 85:10, 89:10,
102:13, 103:22,
109:4, 115:13,
115:21, 115:24,
116:16, 117:1,
142:5, 173:15
**named** [1] - 17:7
**names** [2] - 39:18,
83:7
**national** [1] - 53:5
**necessarily** [1] - 56:11
**necessary** [1] - 136:13
**need** [15] - 8:6, 46:6,
46:24, 93:10, 93:11,
94:19, 94:21,
100:19, 101:17,
102:12, 103:21,
105:3, 112:5, 112:6,
135:18
**needs** [2] - 78:14,
135:20
**negative** [1] - 122:16
**never** [11] - 51:10,
55:4, 78:4, 113:11,
122:11, 122:12,

122:18, 122:19,
124:18, 154:8,
154:10
**new** [18] - 19:5, 20:4,
78:18, 84:13, 84:22,
85:6, 87:19, 87:21,
87:23, 88:2, 88:6,
88:10, 88:13, 89:8,
90:6, 91:25, 96:13,
98:5
**New** [4] - 62:16, 65:6,
96:17, 130:21
**Newbury** [1] - 34:11
**next** [34] - 18:22, 26:1,
26:20, 27:12, 29:6,
30:4, 30:23, 32:11,
33:7, 34:9, 34:23,
35:16, 36:12, 38:2,
59:1, 64:8, 65:23,
66:22, 68:9, 68:23,
69:5, 69:9, 69:23,
89:25, 115:24,
125:20, 143:20,
156:1, 166:14,
166:25, 168:23,
170:10, 173:17,
174:6
**nice** [1] - 114:7
**ninth** [1] - 14:4
**nobody** [4] - 19:3,
21:23, 22:6, 58:16
**nobody's** [3] - 22:18,
22:21, 46:15
**none** [2] - 26:19,
55:18
**normally** [1] - 79:15
**north** [2] - 27:18,
34:25
**NORTH** [1] - 1:24
**notes** [9] - 58:8, 58:9,
58:15, 58:16, 58:17,
58:18, 58:20, 58:21
**notetaking** [1] - 58:12
**nothing** [7] - 4:22,
45:7, 61:20, 79:5,
79:6, 120:17, 156:20
**notice** [10] - 10:11,
10:13, 11:8, 64:14,
65:8, 66:15, 68:5,
68:13, 68:20, 69:2
**notified** [2] - 12:15,
152:11
**notify** [4] - 57:13,
58:1, 172:8, 172:10
**notwithstanding** [1] -
77:22
**November** [3] - 106:2,
138:13, 139:22
**nowhere** [1] - 79:1
**NUMBER** [1] - 3:12

**Number** [9] - 23:13,
47:12, 47:16, 67:11,
67:13, 67:15, 68:15,
110:5, 111:10
**number** [47] - 11:11,
13:7, 24:9, 24:14,
24:18, 47:23, 50:5,
53:9, 53:10, 55:20,
55:23, 56:11, 62:17,
63:12, 67:9, 95:7,
101:12, 108:16,
110:7, 110:13,
111:13, 113:17,
118:4, 125:16,
131:12, 131:14,
132:2, 132:5,
132:12, 138:7,
142:6, 142:10,
142:18, 142:24,
143:2, 143:11,
143:18, 144:5,
144:20, 144:25,
145:9, 147:18, 157:1
**numbers** [13] - 71:3,
110:14, 110:15,
115:3, 115:4, 131:5,
131:9, 131:11,
131:20, 131:24,
138:16
**numerous** [1] - 76:2
**nurse** [2] - 30:11,
34:13
**nurses** [1] - 34:14

## O

**o'clock** [20] - 13:1,
42:17, 42:18, 42:22,
42:23, 42:25, 43:5,
43:11, 43:12, 43:14,
79:21, 79:24, 79:25,
80:6, 129:4, 172:13,
172:15
**oath** [9] - 20:20,
53:24, 73:22, 74:15,
75:17, 77:21,
129:13, 132:21,
133:6
**object** [5] - 10:24,
12:20, 54:18, 125:7,
174:8
**objected** [1] - 10:12
**objecting** [2] - 10:6,
174:24
**Objection** [7] -
107:19, 128:14,
133:22, 160:7,
161:25, 165:20,
171:3
**objection** [29] - 11:9,

11:22, 11:23, 12:1,
54:19, 54:21, 54:23,
107:15, 109:7,
112:14, 112:16,
118:11, 118:13,
119:22, 119:25,
125:5, 125:12,
126:2, 126:16,
158:24, 162:3,
164:19, 164:24,
167:14, 167:15,
167:19, 173:15,
173:16, 173:21
**objections** [7] - 12:19,
53:16, 89:14,
117:25, 118:16,
162:7, 174:14
**obligations** [2] -
71:23, 75:22
**obtain** [1] - 146:9
**obtained** [1] - 146:7
**obvious** [1] - 51:6
**obviously** [7] - 17:14,
53:18, 61:25, 64:4,
65:1, 78:23, 175:3
**occasions** [1] - 93:6
**occupation** [16] -
23:16, 23:19, 23:25,
25:4, 26:5, 26:25,
27:5, 27:20, 29:10,
30:10, 33:14, 34:12,
35:1, 35:19, 36:2,
36:3
**October** [7] - 69:11,
76:10, 76:14,
138:10, 142:11,
159:2, 159:12
**oddly** [1] - 37:10
**OF** [14] - 1:1, 1:2,
1:17, 2:4, 2:5, 2:9,
46:25, 178:3, 178:5,
178:7, 178:11,
178:13, 178:16,
178:17
**offer** [2] - 78:25, 94:11
**offered** [1] - 78:20
**offers** [1] - 54:16
**office** [39] - 7:22,
17:25, 66:1, 66:2,
66:5, 66:6, 66:10,
66:11, 66:12, 67:16,
67:17, 67:21, 82:18,
84:17, 85:8, 85:10,
85:12, 85:15, 86:1,
86:17, 86:19, 87:15,
91:16, 96:1, 96:16,
99:17, 99:24, 102:3,
102:5, 102:23,
103:1, 104:7, 124:1,
127:13, 136:12,

143:12, 145:3
**officer** [4] - 6:22, 17:20, 61:10, 73:25
**officers** [1] - 6:21
**Offices** [1] - 18:12
**OFFICIAL** [3] - 1:23, 178:9, 178:22
**often** [2] - 99:10, 105:2
**OHN** [1] - 2:11
**Ohn** [5] - 4:19, 13:21, 18:11, 18:12, 71:13
**old** [1] - 104:18
**oldest** [1] - 136:21
**omitting** [2] - 126:6, 126:9
**ON** [2] - 2:5, 2:9
**once** [6] - 6:3, 9:16, 29:17, 29:18, 29:20, 104:4
**One** [1] - 50:4
**one** [69] - 8:11, 11:14, 11:16, 15:13, 18:1, 19:3, 20:5, 21:10, 21:14, 23:11, 23:13, 23:15, 26:17, 39:21, 39:22, 40:5, 41:5, 43:24, 44:13, 44:25, 45:16, 45:19, 46:6, 48:16, 49:20, 51:18, 51:25, 52:1, 53:9, 53:21, 54:6, 55:20, 61:17, 63:12, 66:19, 67:9, 68:16, 70:12, 71:12, 72:10, 78:2, 89:13, 94:23, 96:20, 109:15, 109:16, 109:17, 111:15, 114:20, 114:23, 125:16, 131:19, 139:11, 139:12, 141:11, 141:13, 143:18, 147:5, 152:10, 155:22, 158:14, 164:7, 164:14, 166:21
**one-by-one** [2] - 11:14, 11:16
**ones** [3] - 28:3, 126:12, 147:20
**ongoing** [2] - 76:22, 97:15
**online** [2] - 164:6, 168:6
**open** [10] - 56:17, 58:24, 104:17, 106:14, 106:15, 109:18, 110:1, 129:25, 148:24, 149:6

**OPEN** [1] - 48:18
**opening** [17] - 5:23, 5:24, 59:2, 59:3, 59:6, 59:8, 59:20, 60:9, 60:10, 60:12, 62:6, 62:7, 71:6, 72:21, 74:3, 75:6, 77:25
**operated** [1] - 84:2
**operator** [1] - 63:15
**opinion** [7] - 51:3, 51:7, 51:8, 51:11, 51:13, 53:3, 175:8
**opinions** [6] - 50:17, 50:22, 59:24, 80:4, 129:7, 172:19
**opportunity** [8] - 8:5, 55:21, 59:2, 59:9, 60:10, 60:13, 60:15, 60:17
**opposing** [1] - 8:4
**option** [1] - 141:2
**Orange** [1] - 17:8
**order** [50] - 8:3, 10:4, 11:13, 44:8, 51:23, 55:8, 67:9, 67:11, 73:7, 77:12, 77:13, 83:2, 84:14, 86:7, 86:14, 88:15, 88:16, 89:8, 92:20, 94:14, 99:14, 99:20, 103:12, 105:4, 111:9, 112:8, 135:5, 135:7, 136:3, 139:8, 139:18, 146:6, 146:10, 149:19, 149:23, 150:1, 153:24, 155:10, 165:18, 166:3, 166:4, 166:11, 166:13, 166:16, 166:18, 166:20, 166:21, 166:24
**ordered** [18] - 4:24, 16:3, 16:9, 28:23, 40:2, 41:20, 57:18, 76:13, 76:25, 77:8, 146:7, 148:10, 150:11, 150:20, 153:3, 153:11, 156:11, 156:16
**ordering** [4] - 67:4, 67:6, 67:8, 77:13
**orders** [18] - 63:5, 63:6, 64:17, 68:19, 70:18, 73:8, 76:5, 76:12, 77:18, 83:1, 84:13, 97:21, 99:12, 139:1, 139:5, 150:16, 150:18,

166:8
**otherwise** [2] - 47:25, 57:2
**OUT** [1] - 46:25
**outcome** [1] - 55:25
**outline** [1] - 59:4
**outside** [17] - 23:24, 25:7, 26:8, 27:3, 27:24, 29:16, 30:13, 31:5, 32:16, 33:17, 34:16, 35:3, 35:23, 36:17, 38:15, 57:25, 159:11
**overhead** [1] - 82:18
**overly** [1] - 58:19
**overrule** [1] - 54:19
**overruled** [7] - 109:8, 112:16, 128:16, 162:5, 173:22
**oversea** [2] - 103:21, 112:11
**overseas** [1] - 103:25, 135:6
**oversee** [2] - 78:3, 82:18
**overview** [1] - 62:8
**owe** [7] - 28:22, 97:12, 97:16, 97:18, 107:3, 124:15, 124:21
**owed** [9] - 68:24, 69:3, 69:6, 75:14, 75:23, 106:10, 106:13, 124:13, 124:19
**owes** [5] - 16:6, 16:7, 64:3, 71:2, 105:16
**owing** [1] - 105:19
**own** [10] - 18:11, 38:6, 38:8, 58:18, 72:5, 73:1, 85:17, 85:20, 103:15, 123:6
**owner** [3] - 70:15, 83:12, 83:21
**owns** [3] - 74:22, 123:1, 123:4

## P

**P.O** [2] - 97:15, 111:8
**package** [2] - 130:22, 134:14
**packages** [3] - 134:12, 148:25, 149:7
**page** [59] - 64:24, 65:1, 65:23, 66:7, 74:9, 75:12, 77:11, 90:11, 91:23, 109:15, 109:16, 109:17, 109:19, 115:2, 115:12, 117:21, 118:4,

118:5, 118:21, 118:23, 119:14, 119:15, 119:17, 119:18, 119:21, 120:9, 120:15, 121:17, 121:19, 121:25, 122:2, 125:3, 125:4, 125:9, 125:18, 125:21, 126:15, 126:20, 130:2, 133:18, 133:24, 142:2, 147:9, 156:4, 158:19, 161:10, 162:20, 163:13, 163:23, 164:17, 167:10, 168:3, 168:5, 168:11
**PAGE** [2] - 3:12, 178:15
**pages** [1] - 168:23
**paid** [21] - 16:5, 16:9, 41:10, 41:13, 69:21, 69:22, 70:21, 73:12, 75:7, 76:8, 76:15, 104:17, 110:1, 113:12, 113:13, 123:15, 137:9, 137:10, 140:22, 150:24, 161:7
**paragraph** [2] - 65:5, 66:7
**Park** [1] - 34:11
**part** [20] - 13:15, 15:19, 21:20, 29:1, 48:11, 55:4, 55:18, 65:4, 65:13, 65:19, 91:7, 101:11, 106:4, 106:11, 124:2, 135:22, 157:10, 157:21, 157:24, 158:15
**parte** [3] - 7:12, 7:17, 7:22
**partial** [4] - 78:20, 78:21, 140:19, 141:5
**participate** [1] - 97:8
**particular** [13] - 16:12, 66:7, 67:23, 72:17, 109:20, 110:18, 111:24, 139:5, 144:22, 161:1, 164:5, 168:19, 176:2
**particularly** [2] - 46:11, 98:4
**parties** [10] - 16:19, 18:20, 20:22, 38:20, 53:11, 53:21, 59:5, 72:1, 72:9, 89:14
**parts** [1] - 65:3

**party** [8] - 59:5, 72:2, 72:15, 74:7, 78:8, 92:3, 159:3, 159:23
**Pasadena** [1] - 32:13
**pass** [5] - 29:6, 47:10, 47:21, 48:5
**past** [5] - 19:2, 26:13, 39:19, 172:23, 173:2
**patient** [1] - 33:14
**pay** [27] - 15:10, 28:19, 28:20, 43:2, 58:6, 63:25, 65:10, 66:18, 67:24, 69:15, 69:19, 70:10, 91:6, 97:13, 100:20, 104:4, 104:6, 104:8, 104:10, 106:9, 109:25, 128:12, 128:21, 140:19, 151:2, 151:15
**payable** [6] - 75:20, 82:18, 100:16, 100:17, 100:18, 124:8
**paying** [7] - 76:12, 105:21, 105:22, 128:13, 128:22, 129:19, 135:6
**Payment** [3] - 65:5, 143:7, 144:18
**payment** [60] - 66:11, 66:14, 66:18, 66:20, 75:4, 75:10, 78:21, 88:16, 88:17, 88:19, 88:25, 89:9, 90:8, 91:2, 91:3, 91:4, 91:6, 91:13, 91:16, 92:17, 92:24, 96:13, 105:15, 105:25, 106:1, 106:3, 106:4, 106:7, 106:12, 106:14, 116:23, 116:25, 123:10, 123:11, 123:19, 123:22, 123:23, 123:25, 124:3, 124:5, 124:10, 124:23, 124:25, 127:16, 134:18, 134:23, 138:22, 139:21, 139:24, 140:2, 140:6, 140:9, 140:13, 140:18, 140:19, 141:4, 141:5, 143:10, 144:14
**payment's** [1] - 91:8
**payments** [6] - 101:5, 134:15, 134:20, 134:23, 141:1,

141:2, 151:5, 151:10
**pays** [1] - 67:20
**Peachtree** [12] -
100:25, 101:1,
101:3, 101:7,
101:10, 101:14,
104:19, 104:24,
108:4, 108:7,
108:12, 108:14
**Pedro** [1] - 29:9
**penalized** [1] - 78:17
**pendant** [3] - 94:14,
170:14, 170:24
**pennies** [1] - 64:6
**people** [8] - 17:1,
29:25, 45:22, 45:23,
46:2, 57:11, 66:18,
136:12
**Pepperdine** [1] -
36:14
**per** [3] - 5:19, 5:24,
124:1
**percent** [4] - 44:16,
44:19, 92:21
**peremptory** [4] - 47:8,
47:9, 47:11, 47:15
**perfect** [2] - 20:3,
25:24
**perform** [1] - 53:1
**perhaps** [1] - 17:16
**period** [4] - 46:21,
69:22, 109:21,
109:24
**permitted** [1] - 54:17
**person** [18] - 19:18,
44:14, 51:18, 57:5,
76:4, 82:25, 83:2,
114:17, 121:3,
122:6, 141:7,
145:18, 145:20,
145:24, 146:2,
146:3, 146:4
**personal** [1] - 53:2
**personally** [5] - 24:2,
54:4, 108:9, 137:17,
157:18
**pest** [1] - 28:2
**PH** [1] - 1:25
**phase** [1] - 59:1
**phone** [3] - 57:6, 98:2,
99:5
**photograph** [4] -
162:21, 162:24,
163:20, 165:6
**photographs** [6] -
168:25, 169:2,
169:5, 169:15,
170:13, 170:22
**photos** [1] - 169:19
**pick** [5] - 6:11, 42:24,

87:24, 149:3, 173:17
**picked** [2] - 42:11,
49:15
**picking** [2] - 42:14,
46:23
**picture** [2] - 96:15,
164:9
**pictures** [1] - 170:9
**piece** [3] - 94:3,
170:13, 170:23
**pieces** [10] - 22:15,
22:20, 22:21, 22:23,
22:25, 23:2, 23:4,
70:19, 150:20
**piling** [1] - 69:21
**place** [6] - 15:13,
21:24, 22:2, 27:16,
66:19, 97:21
**placed** [4] - 76:6,
146:6, 146:10,
150:17
**plaintiff** [22] - 4:8, 9:2,
16:2, 16:4, 16:8,
16:11, 28:18, 32:21,
39:17, 45:21, 47:11,
47:22, 59:9, 60:21,
61:3, 61:4, 81:1,
119:1, 176:4,
176:11, 176:14
**PLAINTIFF** [2] - 1:8,
2:5
**plaintiff's** [1] - 59:12
**plaintiffs** [2] - 12:23,
17:5
**play** [21] - 9:4, 117:19,
118:1, 119:7, 120:8,
120:22, 121:9,
121:10, 125:2,
133:15, 147:8,
147:13, 147:23,
156:3, 158:18,
164:16, 164:25,
167:7, 167:16,
167:18, 167:20
**played** [2] - 78:24,
126:11
**PLAYED** [11] - 119:8,
121:1, 122:4,
126:21, 126:25,
134:6, 147:14,
156:8, 158:25,
165:1, 167:21
**playing** [1] - 147:25
**pleasant** [1] - 173:6
**plus** [1] - 76:1
**podium** [3] - 4:11,
9:16, 9:17
**point** [7] - 6:18, 15:12,
44:19, 60:8, 62:5,
80:20, 159:2

points [1] - 68:25
**policy** [9] - 88:17,
93:1, 93:2, 93:3,
93:4, 93:8, 94:4,
94:11, 94:24
**polite** [1] - 51:20
**pop** [1] - 144:19
**portion** [2] - 121:9,
125:17
**portions** [4] - 117:25,
118:15, 118:16,
121:13
**position** [4] - 47:14,
82:6, 82:9, 98:19
**positive** [1] - 71:17
**possible** [3] - 61:25,
62:1, 62:5
**preceding** [2] - 126:4,
126:12
**precious** [1] - 68:11
**preinstructions** [3] -
50:5, 50:10
**prejudice** [3] - 26:17,
53:2, 56:2
**preliminary** [4] -
48:15, 52:9, 52:13,
60:20
**prepare** [4] - 100:3,
136:12, 160:24,
161:1
**prepared** [12] - 10:16,
73:10, 99:25, 100:1,
132:16, 132:19,
133:7, 133:12,
161:3, 161:14,
163:7, 163:11
**preparing** [4] - 133:4,
136:7, 136:10, 161:7
**prepayment** [1] -
92:21
**preponderance** [3] -
44:20, 45:1, 45:13
**preponderate** [1] -
44:16
**preponderates** [2] -
44:15, 44:21
**PRESENCE** [1] -
46:25
**present** [2] - 60:15,
71:16
**presented** [1] - 40:20
**presenting** [2] - 61:24,
62:4
**president** [1] - 71:15
**PRESIDING** [1] - 1:4
**pretrial** [6] - 5:14,
5:15, 6:16, 10:3,
11:12, 173:14
**pretty** [6] - 50:1,
61:18, 61:21, 62:3,

155:23, 176:20
**previous** [1] - 74:18
**previously** [2] -
129:21, 141:21
**price** [4] - 43:2, 68:13,
172:3, 172:5
**pride** [1] - 51:9
**primarily** [2] - 118:1,
175:7
**primary** [1] - 6:22
**principal** [1] - 18:9
**print** [4] - 87:15,
102:7, 102:8, 112:9
**printed** [2] - 130:17,
168:8
**printout** [1] - 168:11
**problem** [13] - 8:21,
10:15, 33:7, 35:11,
37:15, 39:6, 39:8,
43:20, 95:3, 134:1,
134:3, 139:10,
139:18
**problems** [3] - 7:6,
15:16, 172:22
**procedural** [1] - 11:11
**procedures** [2] - 9:5,
175:4
**proceed** [2] - 8:22,
80:23
**proceedings** [1] -
57:22
**PROCEEDINGS** [3] -
1:17, 177:2, 178:14
**process** [16] - 52:20,
57:24, 62:5, 66:22,
67:4, 67:8, 67:25,
73:7, 78:5, 87:20,
94:2, 103:12, 135:5,
135:16, 135:24,
175:18
**processed** [1] - 73:8
**produce** [3] - 158:1,
158:9, 158:10
**produced** [3] - 86:18,
115:6, 115:8
**product** [4] - 135:17,
136:3, 136:15,
159:11
**product's** [1] - 86:18
**products** [2] - 41:9,
41:12
**professionalism** [1] -
7:5
**professionally** [1] -
7:1
**profit** [1] - 78:21
**promise** [1] - 46:14
**promised** [1] - 76:11
**promises** [4] - 71:21,
72:4, 72:8, 75:23

pronounce [1] - 10:1
**proof** [3] - 44:23, 54:2,
54:6
**proper** [1] - 12:19
**property** [2] - 16:5,
16:6
**protocol** [2] - 149:11,
149:17
**prove** [2] - 54:9, 72:13
**provide** [3] - 8:2,
12:13, 169:9
**provided** [11] - 41:9,
41:12, 137:22,
139:18, 144:25,
160:20, 169:12,
171:23, 174:20,
175:15, 175:19
**providing** [1] - 146:23
**psychologist** [1] -
27:6
**public** [2] - 49:18,
53:3
**publish** [2] - 89:15,
109:10
**published** [2] - 11:19,
89:18
**pull** [1] - 86:9
**pump** [1] - 132:1
**purchase** [19] - 63:3,
63:13, 63:20, 77:12,
89:8, 155:10,
165:18, 166:3,
166:4, 166:8,
166:10, 166:12,
166:16, 166:18,
166:20, 166:21,
166:24, 168:14
**purchased** [11] - 76:1,
78:11, 164:5,
164:12, 165:5,
165:9, 165:12,
168:19, 169:16,
170:6, 171:20
**purchases** [1] - 62:22
**purchasing** [1] - 78:13
**purpose** [3] - 62:7,
105:14, 176:8
**purposes** [3] - 10:16,
117:22, 120:9
**PURSUANT** [1] -
178:11
**put** [9] - 6:5, 22:16,
22:19, 22:20, 22:23,
23:3, 25:19, 102:9,
102:11
**putting** [2] - 11:7,
22:16
**puzzle** [5] - 22:12,
22:16, 22:21, 22:23,
23:1

**puzzles** [1] - 22:11

## Q

**quality** [16] - 39:24, 40:7, 40:17, 41:21, 77:7, 77:14, 77:16, 77:19, 77:20, 149:10, 149:15, 149:17, 150:4, 169:22, 172:3, 172:6
**QUESTION** [2] - 74:10, 75:14
**questioning** [1] - 5:21
**questions** [38] - 6:4, 6:14, 7:9, 9:19, 10:16, 10:17, 15:7, 15:8, 15:12, 19:6, 19:9, 19:12, 19:14, 21:17, 23:9, 23:11, 23:12, 24:2, 24:3, 24:5, 24:6, 30:18, 33:24, 36:24, 37:23, 37:25, 39:13, 39:14, 53:16, 55:6, 59:18, 63:12, 73:22, 75:3, 113:21, 118:14, 148:20, 148:21
**quicker** [1] - 19:10
**quiet** [1] - 46:22
**quietly** [1] - 173:8
**quietness** [1] - 46:24
**quite** [1] - 27:22
**quote** [1] - 76:19

## R

**R-a-m-i-r-e-z** [1] - 14:13
**R-o-m-o** [1] - 14:25
**race** [1] - 53:5
**raise** [10] - 9:23, 12:4, 15:18, 18:5, 19:15, 28:12, 30:15, 39:13, 49:5, 81:4
**raised** [2] - 70:5, 89:14
**Ramirez** [2] - 14:13, 26:2
**ran** [1] - 109:1
**rarely** [1] - 103:6
**rather** [3] - 19:17, 76:23, 77:3
**Raymond** [2] - 14:16, 27:13
**reach** [1] - 45:4
**read** [15] - 46:15, 58:16, 64:25, 65:2, 65:14, 65:25, 111:11, 118:24,

119:4, 119:10, 119:13, 119:20, 121:13, 125:16, 125:17
**reading** [2] - 50:13, 134:4
**reads** [2] - 126:15, 142:2
**ready** [2] - 5:11, 80:23
**real** [3] - 68:7, 68:10, 68:12
**reality** [2] - 5:8, 37:10
**realize** [3] - 33:23, 33:25, 167:13
**really** [9] - 5:8, 8:6, 9:18, 23:12, 24:3, 34:4, 61:19, 135:4, 143:4
**reason** [16] - 16:24, 24:16, 25:13, 28:6, 29:3, 30:1, 33:19, 37:21, 64:16, 91:1, 93:10, 94:10, 139:3, 170:12, 170:16, 170:21
**reasonable** [3] - 44:10, 44:21, 45:14
**reasonableness** [1] - 56:6
**reasons** [1] - 93:14
**receivable** [24] - 82:17, 100:16, 100:21, 100:22, 101:21, 104:13, 104:16, 105:4, 105:12, 106:16, 107:1, 107:12, 108:1, 108:2, 108:19, 109:17, 110:18, 111:15, 112:19, 113:9, 113:18, 138:9, 139:24, 140:23
**Receivable** [1] - 101:21
**receivables** [4] - 101:5, 111:14, 111:17
**receive** [12] - 16:9, 20:15, 34:1, 63:21, 76:13, 100:18, 103:9, 104:4, 128:9, 148:12, 149:14, 149:15
**received** [22] - 11:18, 20:21, 52:19, 53:9, 54:15, 54:20, 54:22, 56:22, 69:19, 70:10, 70:22, 89:17, 89:20, 105:24, 106:1,

109:13, 127:4, 135:13, 137:4, 148:6, 162:1, 176:7
**receives** [3] - 67:19, 94:1, 99:17
**receiving** [3] - 76:13, 137:1, 175:13
**recess** [5] - 13:4, 13:5, 58:14, 173:18, 174:6
**RECESS** [3] - 13:6, 60:3, 129:9
**recognize** [4] - 89:7, 107:11, 111:1, 170:7
**recognized** [1] - 78:23
**recollection** [1] - 170:4
**recommend** [2] - 172:22, 172:23
**record** [12] - 55:9, 60:4, 80:11, 118:6, 118:9, 118:25, 119:4, 121:13, 129:10, 138:8, 173:12, 174:13
**recover** [1] - 72:12
**recovery** [1] - 16:11
**RECROSS** [1] - 3:4
**REDIRECT** [1] - 3:4
**reduce** [1] - 61:23
**refer** [4] - 24:18, 64:4, 72:24, 115:3
**reference** [4] - 64:15, 64:16, 64:19, 143:11
**referenced** [2] - 90:17, 142:14
**references** [1] - 64:19
**referred** [2] - 76:18, 115:4
**referring** [6] - 24:14, 65:5, 110:2, 110:7, 119:17, 125:14
**refers** [3] - 65:15, 76:18, 93:2
**reflect** [4] - 60:4, 80:11, 129:10, 173:12
**reflected** [1] - 113:9
**reflective** [1] - 112:18
**refreshing** [1] - 170:4
**refund** [3] - 93:13, 94:9, 94:23
**regarding** [3] - 7:13, 114:18, 141:8
**registered** [3] - 26:6, 30:11, 34:13
**regular** [3] - 9:5, 11:3, 97:22
**REGULATIONS** [1] - 178:16
**rejected** [1] - 78:17

**related** [1] - 83:23
**relationship** [14] - 64:7, 72:17, 72:22, 73:3, 73:17, 76:7, 76:10, 85:1, 86:3, 86:6, 88:5, 96:10, 121:4, 122:7
**relatives** [1] - 40:4
**relax** [1] - 87:5
**released** [1] - 172:14
**relevance** [1] - 107:20
**relevant** [1] - 8:9
**relied** [1] - 175:21
**religion** [1] - 53:5
**rely** [4] - 58:18, 105:5, 105:8, 105:11
**relying** [1] - 137:22
**remain** [1] - 145:11
**remaining** [3] - 49:14, 49:22
**remember** [12] - 7:25, 53:23, 58:8, 59:23, 106:3, 106:8, 106:25, 129:12, 133:1, 133:13, 164:14, 164:15
**Remember** [3] - 80:2, 129:5, 172:17
**remind** [1] - 121:18
**render** [1] - 49:10
**reordering** [1] - 76:3
**reorders** [1] - 76:12
**repair** [1] - 94:8
**repeat** [16] - 87:8, 87:9, 97:1, 102:17, 110:9, 123:17, 128:17, 130:9, 137:3, 139:2, 146:9, 152:4, 152:25, 156:13, 157:9, 157:22
**replace** [4] - 93:13, 94:7, 94:9, 94:23
**replaced** [1] - 139:14
**report** [49] - 57:19, 98:23, 101:18, 101:19, 101:20, 104:16, 105:1, 106:16, 106:18, 106:20, 107:1, 107:13, 107:16, 108:1, 108:2, 108:3, 108:4, 108:7, 108:9, 108:12, 108:15, 108:19, 109:1, 109:15, 109:20, 110:8, 110:18, 112:19, 139:25, 140:10, 140:23, 160:6, 160:10,

160:14, 160:20, 160:24, 161:1, 161:2, 161:3, 162:14, 162:18, 162:19, 163:7, 175:1, 175:8, 176:1, 176:12
**Report** [2] - 101:22, 109:3
**REPORTED** [1] - 178:14
**REPORTER** [4] - 1:23, 178:3, 178:9, 178:22
**reporter** [3] - 24:10, 46:23, 47:2
**REPORTER'S** [1] - 1:17
**reports** [11] - 8:8, 98:24, 104:13, 104:23, 105:2, 105:5, 105:12, 109:17, 113:9, 161:8, 161:14, 161:20, 163:2, 163:10
**represent** [5] - 13:12, 13:21, 17:4, 61:3, 71:13
**representative** [4] - 73:19, 98:19, 98:20, 158:17
**representing** [1] - 4:8
**represents** [1] - 13:14
**request** [6] - 7:17, 8:13, 79:5, 119:20, 125:2, 125:17
**requested** [3] - 154:8, 154:9, 154:10
**requesting** [1] - 121:14
**requests** [1] - 79:9
**require** [1] - 57:23
**required** [2] - 59:6, 121:9
**requirement** [1] - 37:5
**requires** [2] - 6:6, 175:3
**resell** [1] - 64:21
**resells** [1] - 62:23
**reserved** [1] - 12:18
**reside** [4] - 30:25, 33:12, 84:3, 84:4
**resides** [2] - 18:14, 18:15
**resolve** [1] - 10:20
**respect** [2] - 6:25, 7:5
**respectfully** [2] - 79:4, 79:9
**respective** [2] - 60:5, 80:12

respond [2] - 12:7,
57:18
response [3] - 19:15,
19:17, 19:23
responses [4] - 15:9,
19:9, 19:13, 21:8
responsibilities [4] -
71:22, 72:5, 72:8,
100:13
responsible [7] - 8:12,
82:15, 82:16,
128:12, 128:22,
129:18, 132:4
rest [1] - 9:2
restaurant [1] - 29:19
rested [1] - 59:13
restrictions [1] - 57:21
result [5] - 16:10,
57:23, 139:7,
161:15, 167:3
results [1] - 172:8
retail [2] - 38:19,
38:21
retailer [5] - 83:5,
145:20, 145:25,
164:6, 168:6
retire [5] - 50:18,
59:25, 80:5, 129:8,
172:20
retired [4] - 23:17,
23:20, 30:11
retrieve [1] - 146:14
retrieved [1] - 146:11
return [25] - 63:23,
70:11, 88:17, 93:1,
93:2, 93:3, 93:4,
93:8, 93:11, 93:15,
93:16, 93:18, 94:5,
94:7, 94:11, 94:21,
94:25, 95:2, 113:7,
138:24, 138:25,
139:6, 139:7,
139:13, 139:17
returned [1] - 16:5
review [2] - 141:13,
170:3
reviewed [1] - 123:11
RGK [3] - 1:8, 4:5,
13:8
Richard [2] - 83:22,
83:24
right-hand [2] - 64:11,
65:25
rights [2] - 71:25, 72:8
ring [2] - 170:14,
170:24
rise [2] - 13:5, 80:9
RMA [1] - 138:16
role [1] - 78:24
Romo [2] - 14:25,

35:17
room [12] - 34:2,
48:23, 49:17, 49:21,
49:24, 50:18, 51:1,
58:11, 60:1, 80:5,
129:8, 172:20
ROOM [1] - 1:24
round [1] - 71:2
row [7] - 14:3, 14:5,
49:2, 49:23, 141:14,
141:15
ruby [1] - 76:24
rule [10] - 11:4, 12:2,
12:23, 118:18,
119:2, 119:10,
120:14, 126:19,
174:4
Rule [1] - 174:19
ruled [3] - 5:6, 10:22,
174:11
rules [4] - 8:19, 45:25,
54:14, 54:18
run [7] - 17:10, 105:1,
108:2, 108:3, 108:7,
108:24, 161:2
runs [1] - 5:20

## S

S-m-i-t-h-l-e-o-n [1] -
14:12
S492 [1] - 132:9
Sacramento [1] - 21:5
sadly [1] - 71:17
sales [12] - 36:19,
38:6, 95:25, 96:13,
98:10, 98:19, 99:5,
99:22, 111:21,
111:22, 114:22,
158:16
salesperson [1] - 98:9
salespersons [1] -
98:10
sample [6] - 96:15,
149:19, 149:22,
149:24, 150:2, 163:3
samples [4] - 67:6,
85:4, 87:25, 96:12
San [3] - 17:14, 17:24,
29:9
sapphire [1] - 76:24
satisfied [3] - 32:22,
45:22, 149:22
save [1] - 15:14
saw [5] - 54:4, 72:20,
75:5, 77:15, 166:20
scales [1] - 44:17
scenario [1] - 45:19
school [1] - 31:12
screen [3] - 89:22,

114:10, 129:22
searched [1] - 158:15
seat [3] - 14:10, 48:25,
49:13
seated [1] - 57:14,
61:11, 81:7
seats [6] - 14:1, 14:4,
60:5, 80:12, 129:11,
173:12
Sebastian [2] - 14:14,
26:21
second [10] - 10:8,
21:2, 36:25, 48:4,
65:8, 68:14, 97:21,
110:4, 110:10,
147:22
seconds [2] - 11:25,
12:1
SECTION [1] - 178:12
see [74] - 7:4, 15:17,
16:24, 17:17, 30:15,
47:2, 48:12, 53:19,
53:20, 55:21, 60:1,
60:25, 61:2, 64:9,
64:18, 65:5, 69:20,
79:21, 89:25, 90:24,
91:10, 91:20, 93:12,
94:7, 95:3, 108:22,
109:4, 109:15,
110:5, 110:10,
112:1, 114:7,
114:12, 115:2,
115:12, 115:13,
115:17, 115:22,
116:1, 116:23,
129:3, 129:22,
130:4, 130:25,
132:10, 136:23,
138:11, 138:14,
138:17, 140:4,
142:4, 142:12,
142:19, 142:25,
143:8, 143:13,
143:21, 153:24,
154:13, 161:12,
162:22, 163:5,
163:8, 163:25,
164:9, 164:18,
169:3, 169:24,
170:1, 172:21,
173:7, 176:13,
176:22, 177:1
seeking [2] - 75:2,
121:25
seeks [1] - 16:11
sees [1] - 52:1
select [4] - 85:4,
96:12, 96:15, 104:25
selection [1] - 13:2
selective [1] - 118:15

self [1] - 76:4
self-described [1] -
76:4
sell [3] - 92:10,
152:14, 165:12
seller [1] - 92:8
selling [2] - 92:14,
145:21
semi [1] - 68:11
semi-precious [1] -
68:11
send [26] - 28:23,
59:16, 66:11, 66:14,
66:18, 66:19, 83:1,
84:15, 85:5, 86:16,
86:19, 86:20, 87:14,
87:25, 88:2, 88:9,
96:13, 101:25,
102:8, 103:5, 103:6,
103:22, 106:18,
153:5, 153:7, 159:10
sending [1] - 144:21
sends [6] - 66:24,
66:25, 67:9, 67:11,
101:24, 102:19
senior [1] - 29:18
sense [4] - 23:6,
50:21, 115:9, 126:20
sent [37] - 66:4, 76:17,
76:25, 77:4, 77:7,
77:15, 77:17, 77:23,
78:2, 78:6, 94:18,
102:15, 102:18,
106:19, 107:1,
134:10, 134:11,
134:13, 147:16,
148:3, 148:4,
152:12, 152:17,
152:22, 153:2,
153:11, 153:14,
153:17, 153:21,
154:22, 155:16,
161:4, 161:6,
162:25, 163:21,
167:4, 171:14
separate [6] - 74:21,
122:23, 127:23,
128:1, 128:3, 128:6
separate.. [1] - 127:21
September [13] - 69:5,
76:8, 95:20, 106:4,
106:5, 109:22,
109:24, 110:21,
111:14, 136:22,
137:2, 137:5, 137:9
sequence [1] - 115:2
served [1] - 19:2
service [4] - 57:17,
160:18, 160:25,
161:9

services [3] - 35:21,
41:9, 41:12
SESSION [2] - 1:18,
4:2
session [3] - 43:8,
53:20, 80:10
set [9] - 9:7, 9:8,
21:10, 38:23, 42:23,
43:9, 50:24, 170:14,
170:23
settlement [1] - 4:23
seven [3] - 48:10,
56:6, 84:6
several [1] - 117:25
SHAH [1] - 18:14
Shah [5] - 7:24, 8:1,
8:6, 18:14, 71:15
Shah's [1] - 7:12
shake [1] - 19:16
shape [1] - 150:6
share [5] - 84:16,
99:23, 103:11,
106:17, 153:23
shared [1] - 86:16
sharp [1] - 79:22
SHERI [3] - 1:23,
178:9, 178:21
ship [14] - 93:23,
94:14, 102:10,
103:1, 103:7, 112:5,
112:7, 112:9,
112:11, 136:3,
136:18, 144:5,
153:9, 153:24
shipment [35] - 67:17,
67:18, 75:9, 75:10,
86:20, 87:14, 87:17,
91:4, 99:14, 100:23,
102:10, 102:12,
102:14, 103:3,
103:6, 103:20,
103:21, 106:23,
110:16, 112:10,
123:21, 130:12,
130:20, 135:3,
135:5, 135:13,
143:25, 144:6,
145:2, 149:9,
156:24, 156:25,
157:1, 157:2, 157:14
shipment's [1] - 91:15
shipments [7] -
134:16, 134:21,
136:5, 137:1, 137:4,
157:5, 157:12
shipped [2] - 103:25,
147:2
shipper [3] - 102:13,
135:6, 135:18
shipper's [2] - 103:22,

142:5

**shipping** [9] - 85:15, 86:23, 87:2, 87:11, 87:13, 87:17, 103:18, 135:25, 145:3
**ships** [2] - 67:2, 67:15
**short** [4] - 16:16, 52:10, 58:22, 62:5
**show** [35] - 22:1, 22:24, 59:5, 60:17, 60:18, 60:20, 62:9, 62:10, 63:10, 64:8, 68:16, 68:24, 70:9, 73:6, 77:10, 84:21, 84:22, 87:24, 95:20, 95:23, 96:5, 96:6, 96:7, 96:12, 96:24, 97:5, 97:8, 97:9, 140:18, 140:21, 153:13, 154:11, 154:13, 176:3
**showed** [1] - 74:2
**showing** [1] - 60:24
**shown** [8] - 74:3, 130:10, 139:24, 140:6, 141:8, 145:6, 151:25, 152:6
**shows** [7] - 68:18, 85:1, 140:23, 141:5, 157:11, 163:2, 164:2
**sick** [3] - 8:17, 9:9, 34:15
**side** [25] - 5:19, 5:25, 6:10, 6:22, 6:24, 6:25, 7:1, 33:4, 45:21, 46:6, 47:9, 52:1, 52:2, 54:17, 59:1, 60:9, 61:1, 61:6, 64:9, 64:11, 64:18, 65:24, 65:25, 162:8
**sides** [8] - 12:25, 20:22, 27:9, 29:4, 30:21, 32:19, 35:14, 71:22
**Sierra** [1] - 26:4
**sign** [2] - 88:3
**signature** [1] - 65:20
**signed** [2] - 65:20, 96:19
**significant** [1] - 41:24
**similar** [2] - 45:8, 73:18
**simple** [7] - 61:18, 63:8, 70:25, 71:1, 73:7, 102:25, 155:23
**simplify** [1] - 153:12
**simply** [3] - 53:2, 59:4, 175:15

**Sincerely** [1] - 91:21
**SINGH** [124] - 2:10, 4:17, 4:21, 5:1, 7:11, 7:19, 7:22, 8:1, 8:14, 9:1, 9:6, 9:11, 12:7, 13:20, 18:8, 47:7, 47:16, 47:18, 47:21, 48:2, 71:8, 74:16, 75:18, 107:19, 109:7, 112:14, 113:24, 114:4, 114:6, 115:20, 117:19, 118:5, 118:7, 118:10, 118:23, 119:6, 119:23, 120:1, 120:12, 120:25, 121:2, 121:12, 121:17, 122:2, 122:5, 122:17, 122:21, 122:22, 123:8, 125:2, 125:10, 125:21, 125:23, 125:25, 126:22, 127:1, 127:22, 128:19, 129:15, 129:16, 132:7, 133:2, 133:15, 133:18, 134:3, 134:7, 135:12, 140:24, 141:19, 141:20, 143:19, 144:12, 146:21, 147:8, 147:12, 147:15, 147:24, 148:2, 148:22, 148:23, 149:5, 150:13, 150:15, 150:23, 151:22, 151:23, 152:5, 152:21, 154:4, 156:2, 156:7, 156:9, 158:18, 158:23, 159:1, 160:9, 160:13, 161:19, 161:23, 162:12, 164:16, 164:21, 164:23, 165:2, 165:24, 166:2, 166:7, 166:15, 167:1, 167:7, 167:11, 167:13, 167:17, 167:22, 169:11, 169:21, 170:11, 171:1, 171:8, 171:11, 171:13, 175:12, 175:24, 176:5
**Singh** [5] - 4:18, 13:20, 18:9, 47:16,

118:1
**single** [5] - 19:7, 19:18, 146:22, 163:17
**sister** [7] - 35:5, 35:8, 37:22, 40:11, 40:12, 40:24, 83:25
**sister-in-law** [2] - 37:22, 40:12
**sit** [1] - 49:18
**sitting** [3] - 33:4, 61:2, 61:9
**situation** [4] - 41:8, 41:11, 41:12, 41:23
**six** [5] - 48:8, 48:9, 48:10, 48:11, 56:4
**skyrocketed** [1] - 69:6
**slide** [7] - 63:10, 64:8, 65:23, 66:23, 68:16, 68:17, 74:18
**slides** [1] - 60:24
**slipped** [1] - 134:12
**slow** [2] - 105:21, 158:3
**slowly** [1] - 105:23
**small** [4] - 64:25, 65:2, 65:25, 102:25
**Smith** [1] - 16:22
**Smithleon** [2] - 14:11, 24:23
**so..** [2] - 131:13, 137:18
**social** [1] - 57:7
**software** [2] - 100:25, 108:14
**sold** [2] - 28:18, 70:9
**solely** [1] - 52:24
**solemnly** [1] - 49:8
**soliciting** [1] - 15:9
**someone** [5] - 168:8, 168:17, 169:5, 169:12, 175:3
**someplace** [2] - 37:5, 66:20
**sometimes** [9] - 21:21, 29:21, 55:8, 87:24, 93:22, 94:13, 98:1, 140:19, 149:19
**somewhere** [1] - 92:18
**son** [1] - 29:19
**soon** [5] - 5:13, 13:3, 50:1, 59:21, 175:18
**sorry** [22] - 38:7, 38:11, 47:18, 82:21, 87:3, 87:9, 110:9, 113:2, 125:8, 125:24, 126:23, 128:17, 133:10, 133:19, 138:12,

147:19, 149:2, 156:13, 157:9, 166:4, 170:19, 171:10
**sort** [1] - 175:17
**sounded** [1] - 28:15
**sounds** [1] - 22:2
**soured** [1] - 76:11
**south** [3] - 27:17, 27:19, 31:2
**Southgate** [1] - 35:18
**speaking** [1] - 81:8
**specialized** [1] - 175:14
**specific** [2] - 20:13, 89:24
**specifically** [2] - 160:23, 170:23
**specifications** [1] - 78:14
**speculating** [1] - 175:17
**spell** [2] - 10:2, 81:10
**spend** [2] - 61:24, 62:1
**SPRING** [1] - 1:24
**springboard** [1] - 24:3
**SS** [1] - 178:6
**st** [1] - 173:24
**stand** [11] - 17:16, 25:2, 25:3, 48:20, 49:2, 49:4, 81:3, 129:12, 144:2, 144:3, 144:9
**standard** [5] - 21:10, 21:14, 44:11, 44:13
**start** [34] - 13:1, 22:15, 24:7, 24:8, 24:21, 42:16, 43:3, 43:5, 43:13, 50:1, 50:2, 57:24, 63:18, 66:22, 76:7, 79:24, 80:6, 82:4, 82:8, 83:13, 83:16, 84:25, 86:2, 105:19, 105:22, 106:21, 106:22, 119:23, 120:20, 120:24, 121:25, 126:22, 138:16, 173:3
**started** [3] - 42:5, 69:24, 114:1
**starting** [8] - 5:12, 42:13, 42:15, 69:10, 118:6, 119:13, 133:24, 134:4
**starts** [2] - 115:5, 115:7
**STATE** [1] - 178:7
**state** [4] - 4:6, 13:10,

81:10, 174:3
**statement** [13] - 5:23, 59:2, 59:3, 59:8, 60:9, 60:10, 62:6, 62:7, 71:7, 72:21, 74:4, 75:6, 77:25
**statements** [6] - 5:24, 53:15, 58:24, 59:8, 59:21, 60:12
**STATES** [6] - 1:1, 1:1, 1:4, 178:10, 178:12, 178:17
**States** [2] - 92:14, 112:11
**STENOGRAPHICAL LY** [1] - 178:14
**step** [2] - 83:24, 173:11
**step-mom** [1] - 83:24
**steps** [4] - 137:12, 137:15, 138:2, 156:10
**STI** [4] - 115:5, 115:12, 116:21, 163:14
**still** [13] - 12:20, 14:7, 15:18, 77:9, 83:18, 94:20, 94:21, 97:10, 97:12, 97:16, 98:21, 98:22, 129:13
**stone** [16] - 76:19, 76:22, 77:2, 77:15, 77:16, 77:19, 77:20, 93:24, 94:18, 94:19, 94:20, 94:22, 159:9, 163:24, 164:2, 167:4
**stones** [14] - 68:2, 68:3, 68:6, 68:7, 68:9, 68:10, 68:11, 68:12, 152:19, 159:3, 159:13, 159:17, 160:24
**stop** [1] - 172:12
**stopped** [2] - 55:1, 97:14
**straight** [1] - 80:19
**street** [1] - 23:15
**STREET** [1] - 1:24
**stress** [2] - 6:16, 79:23
**stricken** [1] - 55:8
**strike** [14] - 47:11, 47:15, 88:20, 90:3, 98:7, 136:25, 141:19, 146:5, 147:17, 151:8, 158:5, 158:12, 165:4, 165:10
**strong** [1] - 85:13
**Strong** [405] - 4:5, 13:8, 13:12, 13:14, 15:21, 17:5, 17:11,

17:13, 17:21, 61:3,
61:10, 61:11, 62:13,
62:14, 62:16, 62:18,
62:19, 62:24, 63:1,
63:6, 63:12, 63:19,
64:3, 64:11, 64:14,
64:17, 65:7, 65:9,
65:10, 65:15, 65:17,
65:22, 66:1, 66:2,
66:4, 66:5, 66:8,
66:9, 66:10, 66:12,
66:13, 66:14, 66:17,
66:24, 66:25, 67:9,
67:11, 67:16, 67:20,
67:21, 67:24, 68:25,
69:14, 69:17, 70:9,
70:14, 71:2, 71:23,
72:3, 72:4, 72:7,
72:10, 72:12, 72:18,
72:23, 72:24, 73:4,
73:8, 73:11, 73:13,
73:14, 73:16, 73:19,
73:25, 74:1, 74:4,
74:6, 74:13, 74:19,
74:20, 74:21, 74:23,
74:25, 75:1, 75:2,
75:5, 75:6, 75:7,
75:14, 75:15, 75:18,
75:21, 76:2, 76:4,
76:6, 76:9, 76:15,
76:18, 76:21, 76:25,
77:4, 77:23, 78:2,
78:9, 78:15, 78:18,
78:23, 79:5, 79:6,
79:7, 79:11, 81:21,
81:24, 82:4, 82:19,
82:24, 83:3, 83:6,
83:12, 83:16, 83:17,
83:21, 84:5, 84:7,
84:12, 85:7, 85:11,
85:14, 85:17, 85:20,
85:23, 85:25, 86:1,
86:2, 86:4, 86:7,
86:14, 86:22, 87:21,
88:22, 88:23, 89:11,
90:6, 90:21, 91:3,
91:6, 91:9, 91:14,
91:15, 91:17, 92:2,
92:3, 92:6, 92:8,
92:10, 92:13, 93:3,
93:7, 94:4, 94:17,
94:24, 95:22, 96:3,
96:4, 96:11, 96:22,
96:24, 97:2, 97:7,
97:10, 97:21, 97:23,
98:3, 98:14, 98:16,
98:17, 98:21, 98:22,
98:25, 99:8, 99:10,
99:18, 100:1, 100:3,
100:6, 100:9,
100:11, 100:15,

101:25, 102:16,
102:19, 102:22,
102:24, 103:7,
103:10, 103:15,
103:24, 104:6,
104:8, 104:10,
104:11, 105:8,
105:17, 105:19,
106:10, 106:13,
107:3, 111:25,
112:3, 113:15,
114:17, 114:20,
115:6, 115:13,
115:21, 116:3,
116:6, 116:11,
116:12, 116:18,
117:1, 117:2, 117:6,
117:7, 117:12,
121:3, 121:4, 122:7,
122:8, 122:10,
122:12, 122:18,
122:19, 122:23,
122:24, 123:15,
123:18, 123:19,
123:20, 123:21,
123:22, 123:23,
123:25, 124:3,
124:6, 124:8, 124:9,
124:10, 124:13,
124:14, 124:15,
124:18, 124:19,
124:21, 124:22,
124:24, 124:25,
125:1, 127:2, 127:7,
127:8, 127:10,
127:11, 127:14,
127:15, 127:25,
128:5, 128:8,
128:11, 128:12,
128:20, 128:21,
129:18, 130:2,
130:7, 130:11,
130:12, 130:15,
130:17, 130:19,
131:6, 131:10,
131:14, 132:12,
132:14, 132:15,
132:19, 132:22,
133:3, 133:8,
134:16, 134:17,
134:18, 134:20,
134:23, 135:13,
135:14, 136:4,
136:6, 136:7,
136:10, 136:14,
137:12, 137:23,
141:7, 141:24,
142:2, 142:7,
142:21, 144:13,
144:16, 144:21,
144:24, 145:17,

146:3, 146:4,
146:15, 146:16,
146:17, 146:23,
147:2, 147:17,
148:4, 148:6, 148:9,
148:24, 148:25,
149:6, 149:7,
149:11, 149:16,
149:18, 150:1,
150:25, 151:5,
151:7, 151:9,
151:11, 151:18,
151:19, 152:11,
152:15, 154:5,
156:10, 156:14,
156:20, 157:5,
157:11, 157:15,
157:20, 157:24,
157:25, 158:2,
158:7, 158:10,
158:14, 159:2,
159:12, 159:16,
159:19, 160:17,
160:20, 161:4,
161:16, 162:13,
162:25, 164:5,
165:5, 165:11,
165:12, 165:19,
166:17, 168:9,
168:17, 169:5,
169:13, 171:14,
171:23, 175:20

**STRONG** [1] - 1:6
**student** [3] - 31:3,
36:14, 37:2
**students** [1] - 32:14
**studies** [1] - 31:22
**study** [1] - 31:23
**stuff** [1] - 101:6
**style** [1] - 167:6
**subject** [3] - 74:12,
134:9, 145:16
**subjects** [1] - 31:14
**submit** [1] - 118:15
**submitted** [9] - 9:25,
12:10, 59:25, 80:4,
117:25, 125:15,
129:8, 172:19
**substantial** [1] - 69:13
**subtle** [2] - 22:2, 22:3
**subtract** [1] - 23:2
**sued** [1] - 70:13
**suffer** [1] - 75:19
**suffered** [3] - 8:11,
16:10, 79:8
**suggest** [1] - 19:11
**suggests** [1] - 62:25
**suing** [2] - 44:14, 61:5
**summarized** [1] -
112:23

**supposed** [3] - 67:22,
67:25, 71:24
**surgical** [2] - 35:5,
35:8
**suspected** [1] - 19:4
**sustain** [2] - 54:20,
54:23
**sustained** [1] - 55:2
**swear** [1] - 49:8
**sweet** [1] - 62:5
**swim** [1] - 38:17
**switch** [2] - 70:2,
70:24
**sworn** [5] - 49:6, 53:8,
53:23, 74:16, 81:5
**system** [21] - 9:8,
86:15, 99:23, 100:7,
100:10, 100:25,
101:3, 101:4,
101:18, 102:7,
104:20, 108:4,
108:8, 108:14,
110:17, 112:8,
131:22, 137:18,
137:24, 142:9,
153:23

---

## T

**table** [2] - 22:15, 27:21
**tags** [1] - 169:24
**Taiwan** [2] - 83:13,
83:19
**TAKEN** [1] - 80:8
**team** [1] - 13:16
**tech** [2] - 35:6, 35:8
**technician** [2] - 29:11,
34:18
**technicians** [1] -
63:17
**technologist** [1] -
29:12
**technology** [1] - 36:19
**Tejas** [2] - 18:13,
71:15
**telephone** [1] - 142:17
**tempted** [1] - 38:24
**ten** [2] - 70:19, 79:20
**term** [4] - 88:16,
92:23, 134:24, 135:2
**Terms** [2] - 65:6,
144:18
**terms** [8] - 65:16,
88:12, 92:17, 143:7,
143:10, 144:14,
172:2, 172:5
**test** [5] - 159:5, 159:6,
159:15, 160:23,
161:2
**tested** [14] - 71:17,

159:16, 159:20,
159:22, 159:23,
160:15, 160:19,
163:17, 167:2,
167:3, 168:20,
175:2, 175:4, 175:20
**testified** [11] - 55:22,
56:12, 77:6, 104:22,
108:6, 132:15,
132:18, 132:21,
133:6, 133:11,
134:19
**testify** [2] - 11:2, 18:3
**testifying** [2] - 42:18,
55:24
**testimony** [53] - 7:12,
8:2, 8:4, 8:15, 8:25,
9:3, 10:5, 10:7, 11:4,
20:19, 41:1, 53:8,
53:17, 53:24, 54:3,
55:15, 55:19, 56:5,
56:7, 56:14, 58:7,
70:17, 74:8, 74:16,
74:20, 77:10, 77:22,
82:22, 117:14,
117:15, 125:3,
125:15, 126:5,
126:7, 133:16,
147:9, 158:19,
164:17, 167:8,
173:5, 174:9,
174:10, 174:16,
174:18, 174:21,
174:23, 174:25,
175:5, 175:7,
175:10, 175:23,
175:24, 176:10
**testing** [7] - 78:9,
159:4, 159:23,
161:15, 163:21,
175:4, 175:15
**tests** [3] - 67:3, 159:7,
159:13
**Thanksgiving** [1] -
19:8
**THAT** [2] - 178:11,
178:15
**THE** [479] - 4:4, 4:10,
4:16, 4:20, 4:22, 5:3,
7:16, 7:20, 7:25,
8:13, 8:16, 9:5, 9:7,
9:13, 9:15, 10:25,
11:7, 11:16, 11:21,
12:6, 12:22, 13:5,
13:7, 13:18, 13:23,
14:11, 15:3, 17:18,
18:6, 18:17, 19:21,
20:3, 21:19, 22:14,
23:8, 24:23, 24:24,
25:1, 25:2, 25:5,

25:6, 25:8, 25:9,
25:15, 25:16, 25:20,
25:21, 25:23, 25:24,
26:2, 26:3, 26:4,
26:5, 26:6, 26:7,
26:9, 26:10, 26:11,
26:12, 26:15, 26:16,
26:19, 26:20, 26:21,
26:23, 26:24, 26:25,
27:1, 27:2, 27:4,
27:5, 27:6, 27:7,
27:11, 27:12, 27:13,
27:14, 27:15, 27:16,
27:19, 27:20, 27:21,
27:22, 27:25, 28:1,
28:2, 28:4, 28:8,
28:11, 28:15, 28:17,
29:2, 29:3, 29:5,
29:6, 29:7, 29:8,
29:9, 29:10, 29:11,
29:13, 29:14, 29:15,
29:17, 29:20, 29:21,
29:22, 30:3, 30:4,
30:5, 30:6, 30:7,
30:8, 30:9, 30:10,
30:11, 30:12, 30:14,
30:15, 30:17, 30:18,
30:22, 30:23, 30:24,
31:1, 31:2, 31:4,
31:6, 31:8, 31:9,
31:11, 31:13, 31:14,
31:16, 31:18, 31:19,
31:20, 31:21, 31:23,
31:25, 32:1, 32:3,
32:4, 32:6, 32:7,
32:10, 32:11, 32:12,
32:15, 32:17, 32:18,
33:2, 33:3, 33:6,
33:7, 33:11, 33:13,
33:14, 33:16, 33:18,
33:19, 33:22, 33:23,
34:8, 34:9, 34:10,
34:12, 34:13, 34:14,
34:17, 34:19, 34:22,
34:23, 34:24, 35:1,
35:2, 35:3, 35:5,
35:7, 35:8, 35:9,
35:12, 35:13, 35:15,
35:16, 35:17, 35:19,
35:20, 35:22, 35:24,
35:25, 36:1, 36:2,
36:5, 36:6, 36:7,
36:8, 36:11, 36:12,
36:13, 36:16, 36:18,
36:20, 36:22, 36:23,
37:9, 37:10, 37:19,
37:20, 37:22, 37:23,
38:3, 38:4, 38:5,
38:7, 38:8, 38:9,
38:11, 38:13, 38:14,
38:15, 38:17, 38:19,

39:1, 39:2, 39:5,
39:6, 39:8, 39:9,
39:11, 39:12, 39:21,
40:9, 40:10, 40:12,
40:13, 40:15, 40:16,
40:22, 40:23, 41:3,
41:4, 41:6, 41:7,
41:16, 42:4, 43:23,
44:2, 44:4, 44:6,
44:7, 44:24, 44:25,
45:3, 45:4, 45:6,
45:7, 45:10, 45:11,
46:5, 46:17, 47:1,
47:8, 47:13, 47:17,
47:19, 47:22, 47:25,
48:3, 48:6, 48:19,
49:7, 49:12, 49:13,
60:4, 63:16, 70:6,
71:5, 79:14, 80:9,
80:11, 80:25, 81:4,
81:6, 81:7, 81:12,
81:13, 86:8, 86:11,
87:5, 87:6, 87:8,
87:9, 89:17, 95:6,
95:9, 107:17,
107:21, 109:8,
109:11, 112:15,
112:20, 112:22,
112:25, 113:2,
113:5, 113:22,
113:25, 115:16,
115:18, 115:19,
117:23, 118:3,
118:6, 118:8,
118:11, 118:18,
118:21, 118:24,
119:9, 119:14,
119:18, 119:22,
119:25, 120:5,
120:8, 120:13,
120:16, 120:19,
120:22, 121:10,
121:15, 121:19,
121:22, 122:1,
122:3, 122:15,
122:20, 123:3,
123:6, 125:5, 125:8,
125:11, 125:20,
125:22, 125:24,
126:1, 126:8,
126:14, 126:18,
126:24, 127:20,
128:16, 128:17,
128:25, 129:10,
131:16, 131:17,
131:19, 131:21,
131:23, 132:1,
132:3, 132:6,
132:25, 133:1,
133:14, 133:17,
133:21, 134:1,

134:5, 135:9,
135:11, 140:14,
140:17, 143:16,
143:17, 144:2,
144:4, 144:7,
144:10, 144:11,
146:18, 146:19,
146:20, 147:13,
147:22, 148:1,
148:15, 148:16,
148:17, 149:4,
150:12, 150:14,
150:21, 150:22,
151:13, 151:16,
151:17, 151:19,
151:21, 152:3,
152:4, 152:20,
153:20, 153:22,
153:25, 154:2,
154:3, 154:18,
155:2, 155:4,
155:10, 155:11,
155:13, 155:14,
155:18, 155:19,
155:24, 155:25,
156:6, 158:21,
160:8, 160:11,
160:12, 161:13,
161:15, 161:16,
161:17, 161:18,
162:1, 162:4,
162:11, 164:18,
164:22, 164:25,
165:22, 165:23,
165:25, 166:4,
166:6, 166:9,
166:12, 166:14,
166:25, 167:10,
167:12, 167:14,
167:16, 167:20,
169:7, 169:9,
169:18, 169:20,
170:8, 170:9,
170:10, 171:5,
171:7, 171:10,
171:12, 172:12,
173:11, 174:1,
174:15, 174:23,
175:11, 175:22,
175:25, 176:6,
178:10, 178:12,
178:13, 178:14,
178:15, 178:16,
178:17

**themselves** [2] -
16:19, 138:6
**therein** [1] - 49:10
**thinks** [1] - 54:17
**third** [6] - 11:10,
23:15, 65:13, 78:8,
159:3, 159:23

**third-party** [3] - 78:8,
159:3, 159:23
**thousands** [2] - 70:19,
76:15, 76:16
**three** [28] - 5:17, 5:18,
5:19, 5:20, 6:3,
11:25, 12:1, 16:17,
20:23, 42:5, 43:10,
43:11, 43:13, 43:17,
53:11, 55:24, 67:13,
68:6, 68:15, 70:6,
76:1, 109:19, 137:8,
159:20, 170:13,
170:23
**three-hour** [3] - 43:10,
43:13, 43:17
**three-piece** [2] -
170:13, 170:23
**three-plus** [1] - 76:1
**throat** [1] - 9:20
**throughout** [2] -
76:11, 115:2
**throw** [1] - 48:19
**timeline** [3] - 68:21,
69:1, 159:10
**timely** [2] - 5:6, 137:9,
137:10
**timing** [2] - 42:9,
176:14
**tip** [1] - 44:17
**tipping** [1] - 44:19
**tired** [1] - 71:11
**TITLE** [1] - 178:12
**TO** [1] - 178:12
**today** [6] - 9:2, 42:13,
71:16, 115:2,
123:12, 132:15
**together** [6] - 22:16,
22:20, 22:23, 23:4,
25:19, 141:14
**tomorrow** [9] - 8:15,
42:13, 42:15, 42:20,
172:21, 173:2,
173:5, 173:8, 176:22
**took** [5] - 10:9, 73:19,
156:10, 163:10,
169:8
**top** [16] - 22:16, 22:18,
22:22, 68:8, 89:10,
90:21, 108:20,
111:10, 112:1,
112:4, 130:2, 132:8,
142:2, 161:10,
163:23
**topaz** [2] - 77:15,
77:20
**total** [4] - 7:4, 109:3,
150:10, 150:16
**touch** [1] - 48:3
**tough** [3] - 23:12,

42:22, 148:17
**towards** [2] - 91:7,
108:25
**track** [4] - 60:19, 64:5,
100:20, 101:4
**tracking** [3] - 144:20,
144:25, 156:25
**trade** [4] - 83:9, 83:10,
83:11, 116:15
**Trading** [247] - 4:5,
13:8, 13:12, 13:14,
15:21, 17:5, 17:11,
17:13, 17:21, 61:4,
61:10, 61:12, 62:13,
62:14, 62:16, 62:18,
62:19, 62:24, 63:1,
63:6, 63:12, 63:19,
64:3, 64:12, 64:14,
64:17, 65:7, 65:9,
65:10, 65:11, 65:15,
65:18, 65:22, 66:1,
66:14, 66:17, 66:25,
67:10, 67:11, 67:16,
67:21, 67:24, 68:25,
69:14, 69:17, 70:9,
70:15, 71:2, 71:23,
72:3, 72:4, 72:7,
72:13, 72:18, 73:14,
73:20, 73:25, 74:1,
74:4, 74:6, 74:19,
74:20, 74:23, 75:1,
75:14, 75:19, 76:4,
76:18, 76:21, 77:5,
77:23, 78:2, 78:9,
78:15, 78:18, 78:23,
79:5, 79:7, 79:11,
81:21, 81:24, 82:4,
82:20, 82:24, 83:6,
83:12, 83:17, 83:21,
84:5, 84:7, 84:12,
85:7, 85:13, 85:14,
85:17, 85:20, 86:2,
86:4, 86:7, 86:14,
87:21, 89:11, 90:22,
91:3, 91:9, 91:14,
91:15, 91:17, 92:2,
92:6, 92:8, 93:7,
94:4, 94:17, 95:22,
96:3, 96:4, 96:11,
97:11, 97:21, 97:23,
98:3, 98:15, 98:16,
98:21, 98:22, 98:25,
99:10, 99:18, 100:1,
100:6, 101:25,
102:16, 102:19,
102:22, 102:25,
103:8, 103:10,
103:15, 104:6,
104:8, 104:11,
105:17, 105:20,

106:10, 106:13, 107:4, 113:15, 114:18, 114:21, 115:6, 115:13, 115:21, 116:3, 117:7, 117:12, 121:4, 122:7, 122:8, 122:24, 123:25, 124:6, 124:8, 124:9, 124:10, 124:11, 124:13, 124:15, 124:18, 124:21, 124:24, 124:25, 127:2, 127:7, 127:10, 127:25, 128:5, 128:8, 128:11, 128:21, 129:18, 132:14, 132:15, 133:3, 134:18, 134:23, 135:13, 136:6, 136:10, 137:12, 141:8, 144:13, 144:16, 144:24, 145:17, 146:4, 148:9, 148:24, 149:6, 149:11, 149:16, 149:18, 151:7, 151:9, 151:11, 152:11, 152:15, 154:5, 156:10, 156:14, 156:21, 158:7, 158:10, 158:14, 158:15, 159:2, 159:13, 159:16, 159:20, 160:17, 160:21, 161:4, 161:16, 162:13, 162:25, 164:6, 165:5, 165:11, 165:19, 166:17, 168:9, 168:17, 169:6, 169:13, 171:14, 171:23, 175:20

**TRADING** [1] - 1:6
**trading** [5] - 62:25, 63:1, 82:24, 84:7, 136:14
**Trading's** [19] - 66:4, 66:6, 66:9, 66:11, 66:12, 67:16, 67:21, 72:10, 75:5, 75:22, 83:4, 86:1, 90:6, 93:3, 94:24, 100:15, 103:24, 104:10, 123:22
**traffic** [2] - 172:25, 176:25

**transaction** [1] - 65:17
**TRANSCRIPT** [3] - 1:17, 178:13, 178:15
**transcript** [4] - 58:5, 117:20, 125:18, 156:3
**transfer** [2] - 151:16, 151:17
**transfers** [1] - 151:18
**transporter** [1] - 33:15
**treat** [2] - 112:15, 176:9
**treated** [1] - 176:10
**trial** [31] - 5:10, 7:12, 7:13, 7:24, 10:18, 16:13, 16:15, 20:15, 32:23, 33:5, 45:23, 45:24, 49:18, 49:19, 50:1, 50:2, 50:8, 52:15, 56:17, 57:12, 57:15, 57:24, 58:2, 58:6, 59:1, 66:3, 68:1, 107:16, 173:15, 174:21
**TRIAL** [1] - 1:16
**trials** [3] - 21:23, 50:23
**tried** [3] - 45:5, 69:14, 72:7
**TRUE** [1] - 178:13
**true** [9] - 49:9, 51:6, 54:7, 137:16, 147:1, 147:5, 152:22, 153:2, 158:13
**truly** [2] - 11:11, 49:8
**trust** [1] - 162:19
**truth** [1] - 176:1
**truthful** [1] - 117:15
**try** [8] - 21:9, 46:15, 49:9, 59:23, 62:2, 71:18, 151:13
**trying** [4] - 36:22, 64:24, 173:25, 174:12
**turn** [10] - 46:9, 64:21, 72:10, 90:11, 90:15, 91:23, 111:4, 158:1, 158:6, 158:8
**turned** [1] - 161:20
**turning** [1] - 46:10
**TV** [1] - 173:7
**twice** [2] - 6:8, 84:21
**twin** [2] - 35:5, 35:8
**two** [42] - 4:4, 5:16, 9:24, 11:25, 12:1, 17:15, 18:13, 19:6, 20:22, 24:8, 25:16, 38:20, 42:21, 50:3, 50:5, 53:10, 55:23, 61:8, 62:12, 64:7, 67:11, 68:14, 73:3, 73:18, 85:24, 92:1, 94:15, 109:19, 110:20, 111:8, 125:16, 128:2, 128:4, 144:8, 150:24, 164:15, 168:14, 168:23, 168:25, 169:24, 174:13
**twofold** [1] - 20:8
**Twohey** [2] - 14:14, 26:21
**TWOHEY** [1] - 14:14
**type** [14] - 15:25, 26:10, 27:5, 28:1, 35:25, 44:1, 88:12, 90:3, 90:5, 93:14, 93:15, 94:15, 96:8, 108:3
**types** [2] - 39:25, 68:2

**U**

**U.S** [12] - 83:15, 83:17, 84:14, 84:19, 85:16, 102:10, 103:8, 135:17, 135:25, 136:3, 136:15, 144:22
**UC** [2] - 82:3, 127:4
**UD** [1] - 115:7
**unambiguously** [1] - 75:17
**unanimous** [1] - 48:8
**unavailability** [1] - 8:20
**unavailable** [4] - 8:17, 8:18, 8:24, 9:10
**uncomfortable** [1] - 52:4
**under** [16] - 10:13, 11:12, 20:20, 45:24, 51:22, 53:24, 73:22, 74:15, 75:17, 77:21, 83:6, 91:12, 129:13, 132:21, 133:6, 174:19
**underlying** [1] - 138:11
**understood** [1] - 9:11
**undisputed** [1] - 76:9
**unemployed** [1] - 23:20
**unequivocally** [1] - 77:21
**unfamiliar** [1] - 135:24
**unintelligible** [1] - 155:24
**UNIQUE** [1] - 1:10

**unique** [1] - 50:23
**Unique** [172] - 4:5, 4:18, 7:23, 10:9, 13:8, 13:22, 15:21, 61:5, 62:13, 62:19, 62:21, 63:2, 63:5, 63:12, 63:19, 63:21, 63:23, 63:25, 64:2, 64:10, 64:13, 64:20, 65:11, 65:14, 65:20, 65:22, 66:24, 67:2, 67:3, 67:9, 67:18, 67:19, 67:20, 67:23, 68:18, 68:24, 69:3, 69:6, 69:15, 69:18, 70:1, 70:9, 70:10, 70:16, 70:20, 70:21, 71:2, 71:14, 71:24, 72:3, 72:16, 72:21, 73:3, 73:8, 73:12, 76:1, 76:6, 76:8, 76:11, 76:14, 76:16, 76:24, 77:3, 77:24, 78:1, 78:6, 78:7, 78:11, 78:13, 78:16, 78:17, 78:19, 78:25, 79:1, 79:4, 79:8, 79:9, 90:2, 92:2, 92:9, 92:11, 95:13, 95:16, 96:4, 96:11, 97:10, 97:20, 98:4, 98:5, 99:7, 104:2, 105:16, 105:25, 106:1, 106:10, 106:13, 106:16, 106:17, 109:5, 110:3, 111:3, 111:8, 113:7, 113:11, 113:14, 114:14, 115:8, 117:5, 117:8, 124:15, 124:16, 130:7, 130:11, 130:16, 130:20, 132:13, 136:24, 137:1, 137:4, 137:8, 138:19, 138:22, 139:21, 140:6, 141:24, 142:1, 146:5, 146:6, 146:10, 147:2, 148:7, 148:8, 148:10, 148:25, 149:7, 149:9, 149:12, 150:11, 150:16, 150:19, 150:24, 151:10, 151:24, 152:1, 152:6, 152:11, 152:16, 152:22, 153:2, 153:11, 153:14, 154:11, 154:14, 155:16, 156:11, 156:15, 157:6, 157:12, 158:10, 159:8, 165:7, 165:9, 165:11, 165:18, 166:16, 167:3
**UNITED** [6] - 1:1, 1:1, 1:4, 178:10, 178:12, 178:17
**United** [2] - 92:14, 112:11
**unless** [4] - 6:4, 39:3, 69:19, 118:16
**Unreportable** [1] - 127:19
**unusual** [1] - 77:22
**up** [48] - 6:3, 6:18, 9:7, 9:8, 9:19, 9:20, 11:1, 11:4, 11:15, 12:24, 12:25, 14:1, 14:4, 14:6, 15:13, 17:17, 21:5, 22:16, 24:1, 24:3, 25:3, 38:1, 42:14, 42:24, 43:5, 45:22, 46:23, 48:20, 49:2, 49:4, 50:24, 62:2, 65:3, 65:4, 65:25, 69:6, 69:7, 69:22, 79:16, 87:24, 88:4, 143:18, 144:19, 149:3, 173:17, 174:5, 176:25
**urge** [1] - 58:6
**utmost** [1] - 6:25

**V**

**V-e-l-a-s-c-o** [1] - 14:20
**Valley** [2] - 17:14, 17:24
**various** [2] - 68:25, 118:16
**Velasco** [2] - 14:20, 30:24
**vendor** [4] - 100:19, 143:15, 143:23, 143:24
**verdict** [7] - 21:16, 44:9, 44:5, 48:8, 49:9, 56:18, 80:16
**verify** [3] - 148:9, 156:10, 156:14
**versus** [4] - 4:5, 13:8, 15:21, 102:22
**via** [1] - 57:6
**Vicente** [2] - 14:17,

29:7
**Vickie** [2] - 14:22,
33:11
**VIDEO** [10] - 119:8,
121:1, 126:21,
126:25, 134:6,
147:14, 156:8,
158:25, 165:1,
167:21
**video** [8] - 9:4, 117:19,
119:7, 121:12,
133:15, 147:9,
158:19, 167:8
**videographer** [1] -
10:10
**videotape** [2] - 10:10,
10:23
**videotaped** [2] -
10:13, 10:24
**Village** [1] - 36:15
**violates** [1] - 57:21
**visit** [1] - 96:17
**visited** [1] - 168:14
**voir** [2] - 6:10, 6:13
**volume** [1] - 89:3
**VS** [1] - 1:9

**W**

**W-a-l-e-a** [1] - 15:2
**Wade** [1] - 73:24
**wait** [4] - 11:25, 39:14,
147:22
**Walea** [2] - 15:2, 38:3
**walnut** [1] - 25:1
**Wang** [1] - 82:23
**wants** [2] - 118:1,
148:19
**warn** [1] - 6:19
**Washington** [1] - 21:6
**watch** [1] - 173:7
**ways** [1] - 19:6
**web** [2] - 168:5,
168:11
**website** [8] - 164:14,
168:12, 168:14,
168:19, 170:6,
171:6, 171:19,
171:22
**WEDNESDAY** [1] -
1:17
**week** [4] - 29:17, 42:7,
42:8, 99:16
**WEI** [1] - 3:6
**Wei** [11] - 18:1, 18:2,
81:2, 81:12, 83:22,
83:23, 83:24, 95:24,
96:21, 98:11, 98:24
**weigh** [1] - 52:19
**weight** [4] - 54:11,

54:12, 56:10, 56:14
**west** [2] - 27:17, 33:12
**WESTERN** [1] - 1:2
**Westlake** [1] - 36:15
**whatsoever** [1] -
136:6
**WHGC** [1] - 17:7
**whispering** [1] - 46:13
**whole** [1] - 28:9
**wholesaler** [2] -
62:21, 64:20
**wholesalers** [1] - 83:5
**wife** [6] - 29:17, 29:20,
36:18, 38:17, 55:2,
55:3
**win** [3] - 44:14, 44:17,
45:24
**wire** [4] - 124:5,
151:16, 151:17
**wish** [7] - 8:24, 58:7,
60:10, 95:2, 119:1,
119:3, 119:10
**wishes** [1] - 119:19
**WITH** [1] - 178:16
**witness** [32] - 5:21,
7:17, 7:24, 8:17,
8:18, 8:24, 9:10,
9:25, 10:1, 10:4,
11:1, 11:2, 11:3,
12:11, 17:16, 42:18,
42:20, 53:8, 54:3,
54:4, 55:17, 55:19,
61:8, 73:21, 80:25,
81:5, 117:11,
129:12, 148:17,
155:25
**WITNESS** [45] - 3:4,
26:19, 34:17, 44:6,
81:6, 81:12, 86:11,
87:6, 87:9, 115:18,
123:6, 128:17,
131:17, 131:21,
132:1, 132:6, 133:1,
135:11, 140:17,
143:17, 144:4,
144:10, 146:19,
148:16, 150:14,
150:22, 151:16,
151:19, 152:4,
153:22, 154:2,
155:2, 155:10,
155:13, 155:18,
155:24, 160:12,
161:15, 161:17,
165:23, 166:6,
166:12, 169:9,
169:20, 170:9
**witness'** [8] - 55:20,
55:23, 55:24, 55:25,
56:2, 56:5, 56:6,

73:24
**witnesses** [15] - 8:20,
12:12, 12:16, 16:20,
17:15, 18:13, 18:21,
20:20, 53:21, 53:24,
56:11, 56:13, 59:10,
59:11, 61:8
**word** [1] - 24:11
**words** [5] - 24:11,
56:16, 66:9, 77:18,
145:9
**works** [21] - 23:24,
25:7, 26:7, 27:3,
27:24, 29:15, 29:17,
29:19, 29:20, 30:13,
31:4, 32:15, 33:16,
34:4, 34:16, 35:3,
35:23, 36:16, 36:18,
96:1, 128:10
**worry** [1] - 64:24
**worth** [1] - 73:4
**writing** [3] - 57:6,
88:7, 88:8
**written** [2] - 52:16,
58:5

**Y**

**Yash** [1] - 18:10
**Yashdeep** [3] - 13:20,
18:9, 47:16
**YASHDEEP** [1] - 2:10
**yashdeep** [1] - 4:18
**year** [5] - 84:21,
116:11, 116:15,
143:17, 143:18
**years** [7] - 6:8, 70:15,
76:1, 81:25, 98:13,
137:8, 159:17
**yesterday** [4] - 7:13,
7:19, 7:23, 71:17
**YORK** [37] - 2:6, 4:7,
4:13, 4:15, 5:2, 9:14,
9:18, 11:5, 11:10,
11:20, 12:3, 13:11,
17:3, 17:19, 47:6,
47:12, 47:23, 48:5,
60:22, 63:18, 70:7,
117:24, 118:13,
118:20, 121:7,
128:14, 160:7,
161:25, 162:2,
162:10, 165:20,
171:3, 171:6,
173:23, 174:7,
174:17, 174:25
**York** [4] - 4:8, 13:12,
17:4, 96:17
**York's** [1] - 72:20
**yourself** [3] - 6:23,

39:7, 47:2
**yourselves** [5] -
50:16, 58:10, 80:3,
129:6, 172:18

**Z**

**zero** [1] - 159:13
**Zoom** [2] - 8:15, 8:22
**zoom** [1] - 115:14
**zoomed** [1] - 115:16