1                    UNITED STATES OF AMERICA
                 UNITED STATES DISTRICT COURT
2               CENTRAL DISTRICT OF CALIFORNIA
                     WESTERN DIVISION
3
                          - - -
4               HONORABLE R. GARY KLAUSNER,
          UNITED STATES DISTRICT JUDGE PRESIDING
5                         - - -

6
STRONG TRADING, INC.,               )
7                                   )  CERTIFIED COPY
                                    )
8              PLAINTIFF,           )
                                    )  CV 21-04206 RGK
9     VS.                           )
                                    )
10    UNIQUE DESIGNS, INC., et      )
      al.,                          )
11                                  )
                                    )
12             DEFENDANTS.          )
                                    )
13                                  )
                                    )
14                                  )
      _____)
15

16
                     TRIAL DAY 2
17          REPORTER'S TRANSCRIPT OF PROCEEDINGS
               THURSDAY, JUNE 16, 2022
18                  A.M. SESSION
               LOS ANGELES, CALIFORNIA
19

20

21

22

23          SHERI S. KLEEGER, CSR 10340
          FEDERAL OFFICIAL COURT REPORTER
24        312 NORTH SPRING STREET, ROOM 402
           LOS ANGELES, CALIFORNIA 90012
25                PH:  (213)894-6604

1

2

3

4

APPEARANCES OF COUNSEL:

5

ON BEHALF OF PLAINTIFF:

6

                BY:  MICHAEL YORK, ESQUIRE
7                    KATHLEEN APARCE, ATTORNEY AT LAW
                     JESSICA CRABBE, ATTORNEY AT LAW
8

9

ON BEHALF OF DEFENDANT:

10

                BY:  YASHDEEP SINGH, ESQUIRE
11                   GERALD OHN, ESQUIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                    E X A M I N A T I O N
 4
     WITNESS:          DIRECT   CROSS   REDIRECT  RECROSS  REBUTTAL
 5

 6   AMY WEI CHU                 4(CONT.) 20       29

 7   MENG YU CHIEN    31         71       120      140     180

 8   TEJAS SHAH       144 (BY VIDEOTAPE)

 9
                          E X H I B I T S
10
                          NUMBER   PAGE
11
                          100      42
12                        3        53
                          88       86
13                        275      93
                          26       107
14                        108      112
                          274      126
15                        252      128
                          118      133
16                        23       135

17

18

19

20

21

22

23

24

25
```

```
 1              CALIFORNIA, LOS ANGELES, JUNE 16, 2022

 2                        A.M. SESSION

 3

 4

 5              THE COURT:  Okay.  The record will reflect

 6   that all the members of the jury are in their respective

 7   seats in the jury box.

 8              Hope you had a pleasant evening yesterday.

 9   Hope you didn't think about this case and that you're

10   ready to go today.

11              We should -- just so -- your plans.  We

12   should definitely get this case to you by early Friday.

13   I would anticipate at least by early Friday.  Which

14   means that you will be back in deliberation by the end

15   of this week.  Okay?

16              We were at cross-examination.

17              Counsel, you may continue.

18              Remember, you are still under oath.

19              THE WITNESS:  Yes.

20              THE COURT:  Counsel.

21              MR. SINGH:  Thank you, Your Honor.

22                     **CROSS-EXAMINATION**

23   Q.  Good morning, Ms. Chu.

24   A.  Good morning.

25   Q.  Ladies and gentlemen of the jury, good morning.
```

```
 1                    Before we broke yesterday, there was a line

 2       of questioning I wanted to complete, but it's my own

 3       fault I wasn't able to complete it.  So if you could

 4       just bear with me, I will direct you to Exhibit 261.

 5       Excuse me.  This is Exhibit 262.  I'm sorry.

 6                    THE CLERK:  262 or 252?

 7                    MR. SINGH:  262.

 8                    THE CLERK:  Thank you.

 9       BY MR. SINGH:

10          Q.  Ms. Chu, do you recall looking at this document

11       before we took our break yesterday?

12          A.  Yes.

13          Q.  I should be able to finish this line of

14       questioning in about five questions, so let's go through

15       this.

16                    Strong Trading brought -- strike that.

17                    Strong Trading bought the item that's

18       depicted in this photograph from Helzberg Diamonds,

19       right?

20          A.  Yes.

21          Q.  It was advertised by Helzberg as emerald, right?

22                    MR. YORK:  Objection.  No foundation.

23       Hearsay.

24                    THE COURT:  Sustained.  Sustained.

25                    Ladies and gentlemen, let me correct
```

1    something from yesterday.  The contents of this document

2    is not introduced into evidence and will not be received

3    because it's hearsay.  And it's client protected -- the

4    fact that this document was received and somebody saw

5    this document can be considered by you.

6              So the truth of the document, what's in the

7    document, is not evidence.  Okay.  It is only evidence

8    as to somebody received the document and got this

9    information.  Okay.

10             Go ahead, Counsel.

11             MR. SINGH:  Thank you, Your Honor.

12   BY MR. SINGH:

13     Q.  Ms. Chu, do you have an understanding as to what

14   the Helzberg Diamond -- strike that.

15             Do you have an understanding as to what the

16   Helzberg gemstone was when Strong Trading purchased it?

17     A.  No, I'm not really sure.

18     Q.  Strong Trading had that gemstone that it

19   purchased from Helzberg tested, right?  By Mutual

20   Cornell?

21     A.  We bought it.

22     Q.  And then tested it?

23     A.  Yes.

24     Q.  It was tested because Unique complained that an

25   item, an emerald item was the wrong stone; namely,

1  glass, right?

2     A.  No.

3          MR. SINGH:  Your Honor, if I may play the

4  videotaped deposition of Ms. Chu, page 199, line 25 to

5  200, line 3.

6          THE COURT:  Okay.

7          (VIDEO PLAYED.)

8  BY MR. SINGH:

9     Q.  By UD in this testimony at your deposition, you

10 refer to Unique Designs, right?

11    A.  Yes.

12    Q.  That item that you purchased from Helzberg and

13 had tested came back as glass; is that correct?

14          MR. YORK:  Objection, Your Honor,

15 foundation.

16          THE COURT:  Sustained.  There is no

17 testimony as to that, ladies and gentlemen.

18 BY MR. SINGH:

19    Q.  Do you have an understanding as to what the

20 gemstone result was after it was tested --

21          THE COURT:  Counsel, there is no evidence --

22 there is no expert evidence as to what that stone was or

23 was not.  There is -- I allowed you to put it in -- that

24 there is -- they read some -- some document that said

25 that -- what they thought about it.

1              But there is no evidence in front of me as

2    to what the quality or what the stone is.  I just want

3    to make sure you understand that.

4              That's just somebody that has not come in to

5    testify.  And you would have to have an expert come in

6    to testify as to what that stone was.

7              Okay.  Go ahead, Counsel.

8    BY MR. SINGH:

9    Q.  Ms. Chu, I'm now going to direct your attention

10   to Exhibit 261.  Referring only to pages STI 125 to 129.

11             Do you recognize this document?

12   A.  Yes.

13   Q.  This is another inspection report for a

14   particular type of gemstone -- for some gemstones,

15   right?

16   A.  Yes.

17   Q.  Strong Trading hired Mutual Cornell to conduct an

18   inspection of these gemstones, correct?

19   A.  Yes, we used their service.

20   Q.  And these gemstones were provided by Strong

21   Trading to Mutual Cornell, right?

22   A.  Yes.

23   Q.  The specific purpose for hiring Mutual Cornell

24   was to test these gemstones and prepare a report; is

25   that right?

1    A.   We want to find out what the stone was.

2    Q.   Part of the scope of those services was to

3  prepare a report, right?

4    A.   Yes.

5    Q.   At the top left of each of these reports there is

6  an address.

7         Do you see that?

8    A.   Yes.

9    Q.   That's the address of Strong Trading?

10   A.   Yes, it is our address.

11   Q.   Strong Trading received these reports that's

12  marked -- that's identified as Exhibit 261?

13   A.   Yes, we received those report.

14        MR. SINGH:  Your Honor, the defendant moves

15  to admit 261.

16        MR. YORK:  Objection, hearsay, expert

17  testimony, relevance.

18        THE COURT:  Same ruling.  It will be

19  admitted only for the purpose to show that somebody said

20  they thought something was of some quality.  Whether or

21  not something was or was not of that quality is not

22  admissible unless an expert comes in to testify to it.

23        Go ahead, Counsel.

24        MR. SINGH:  Thank you, Your Honor.

25        THE COURT:  It will be limited for that sole

```
 1   limited purpose.

 2   BY MR. SINGH:

 3      Q.  After Strong Trading received these documents

 4   marked as 261, did anybody disagree with anything in the

 5   document?

 6              MR. YORK:  Objection.  Vague.

 7              THE COURT:  Overruled.  What do you mean by

 8   "anybody"?

 9   BY MR. SINGH:

10      Q.  Did anyone disagree with the substance of the

11   findings in these reports?

12              THE COURT:  Are you talking about

13   anybody who had -- who do you mean?

14      Q.  At Strong Trading.  Did you or anyone at Strong

15   Trading disagree -- tell you that they disagreed with

16   it?

17      A.  Oh, we just looked at the report and then looked

18   at what it is, then what it is.

19      Q.  You didn't contact Mutual Cornell and say, We

20   disagree with your findings or anything like that?

21      A.  No.

22      Q.  Directing your attention to STI 127.  Let me know

23   when you are there?

24      A.  Okay.

25      Q.  At the bottom of the page there's a photograph
```

1   there.

2          Do you see that?

3      A.   Yes.

4      Q.   That's a photograph of an earring that Strong

5   Trading sent to Mutual Cornell?

6      A.   Yes.

7      Q.   You came to learn that this earring was actually

8   glass?

9      A.   Yes.   The report says it is glass.

10     Q.   Directing your attention to STI 128, which is the

11   next page, do you see that -- are you there?

12     A.   Yes.

13     Q.   At the bottom of the page there's a photograph

14   there of an earring.

15          Do you see that?

16     A.   Yes.

17     Q.   That is the earring that Strong Trading sent to

18   Mutual Cornell to test, right?

19     A.   Yes.

20     Q.   Did you come to learn that that earring came

21   back -- strike that.

22          Did you come to learn that that earring was

23   actually glass?

24     A.   Yes, it says glass.

25     Q.   Do you agree with me that this earring, the

1    gemstone in this earring -- strike that.

2              Do you agree with me that the glass in this

3    earring being this blue color looks very similar to a

4    sapphire earring?

5    A.   I --

6              THE COURT:  If you know.  If you know.

7              THE WITNESS:  From the picture, I cannot

8    tell.

9    BY MR. SINGH:

10   Q.   Same question for STI 127, this green earring.

11   Does this look very similar to an emerald or lab created

12   emerald earring?

13   A.   For sure it is not the real gemstone.  But either

14   it's glass or create.

15   Q.   Right.  And just to be clear, the appearance, I'm

16   just talking about the appearance.

17   A.   Yes.  The green color is emerald color.

18   Q.   It's true that Strong Trading had glass jewelry

19   in its inventory as of late 2020, correct?

20   A.   Yes.  Early 2021, like that.

21   Q.   Okay.  Yesterday -- well, strike that.

22              Do you know approximately how many orders

23   Strong Jewelry in Hong Kong ships out every year?  Is it

24   over 50,000, 100,000 orders?

25   A.   I didn't count.  A lot.  I would say a lot.

 1 Q. Is your best estimate that it's between that

 2 50,000 to 100,000 range?

 3 A. I don't think so.  I don't think that much.

 4 Q. 25- to 50,000?

 5 A. Uh.

 6 Q. And there's only two employees that work at

 7 Strong Jewelry, right?

 8 A. Yes.

 9 Q. Prior to this lawsuit, Unique Designs and Strong

10 Trading tried to resolve the dispute about the invoices,

11 correct?

12 A. Yes.

13 Q. There was an offer made to Unique Designs for a

14 refund, correct?

15 A. Yes.

16 Q. On certain jewelry items?

17 A. Yes.

18 Q. That credit was for created emerald items?

19 A. Yes.

20 Q. And the credit was also for aquamarine items,

21 right?

22 A. Yes.

23 Q. Do you recall the total amount of that credit?

24 A. I don't remember the amount.

25 Q. Best estimate?

1     A.   Less than 20,000.

2     Q.   Less than 20,000 out of the 369,000.

3     A.   Yes.

4     Q.   When making this offer, did the offer consider

5  how many wrong items may have actually been sent to

6  Unique Design?

7     A.   Can you repeat that?

8     Q.   Yeah.  Did the offer -- did it consider how many

9  wrong items may have actually been sent to Unique

10 Design?

11          MR. YORK:  Objection, Your Honor, assumes

12 facts not in evidence.

13          THE COURT:  Overruled.

14          If you know.

15          THE WITNESS:  No, I don't know.

16 BY MR. SINGH:

17    Q.   When making the offer, was it all considered how

18 much financial damage may have actually been caused to

19 Unique Designs?

20          MR. YORK:  Objection, Your Honor, assumes

21 facts not in evidence.

22          THE COURT:  Why don't you rephrase the

23 question, Counsel.

24          Sustained.

25          So why don't you restate the question.

1    BY MR. SINGH:

2       Q.   To your knowledge, was any -- was the impact to

3    Unique Designs considered at all in making the offer of

4    less than $20,000 in credit?

5            MR. YORK:  Objection.  Assumes facts not in

6    evidence.

7            THE COURT:  Overruled.

8            THE WITNESS:  I don't know what their

9    damages are.

10   BY MR. SINGH:

11      Q.   So it wasn't considered, right?

12      A.   We want to solve the problem.

13      Q.   Strong Trading's return policy, you discussed

14   that yesterday as well.

15           The return policy allows for the return of

16   improper goods, right?

17      A.   Yes.

18      Q.   An improper good includes wrong items that have

19   been sent to a customer, right?

20      A.   Yes.

21      Q.   If a customer orders, for example, an aquamarine

22   item and does not order a topaz item, then delivering a

23   topaz item is an improper good, right?

24      A.   No.  When I say improper goods, like when they

25   order earring, we probably send pendant, like different

1   style.

2   Q.  So let me make this very, very clear, Ms. Chu.

3   If I as the customer, the only item I am ordering is

4   aquamarine, and Strong Trading sends me topaz, I

5   received the wrong item, correct?

6   A.  We have to look at invoice what we bill it to.

7            MR. SINGH:  Your Honor, if I may play a

8   video clip of Ms. Chu's deposition testimony, page 150,

9   lines 7 through 13.

10           THE COURT:  Okay.

11           THE CLERK:  Counsel, do you want me to clear

12   the screen?

13           MS. ALPARCE:  Objection, Your Honor.  For

14   lack of completeness, if Counsel intends to play that

15   portion, we also request that he play page 148, 12

16   through 151, 12.  And then 154, 6 through 158, 20, Your

17   Honor.

18           MR. SINGH:  Your Honor, this is a very

19   limited question about one particular --

20           THE COURT:  I will overrule the objection.

21           But you can play that on redirect

22   examination.

23           MS. ALPARCE:  Thank you, Your Honor.

24           (VIDEO PLAYED.)

25   BY MR. SINGH:

1     Q.   If a customer orders rubies, sapphires or

2  emeralds, but receives glass, they've been sent the

3  wrong items, correct?

4     A.   We have to look at invoice and see what it is

5  wrong.

6     Q.   If the invoice -- strike that.

7          So if I'm actually ordering emerald,

8  sapphire and rubies, and you sent me glass, have you

9  sent me the wrong items just based on what I have told

10  you?

11     A.   We still need to look at the invoice to see what

12  we charge for.  Because -- yeah.

13     Q.   Strong Trading -- I'm sorry.  Did you complete

14  your answer?

15     A.   Yes.

16     Q.   Strong Trading's return policy allows for returns

17  for full refunds even after 30 days, correct?

18     A.   It's 30 days return policy.  But if the customer

19  insist there's a problem and we want to make the

20  customer happy, we still have customer service.  So we

21  can accept a return.

22     Q.   To -- in this case, to return an item after

23  30 days for a full refund, Unique had to test the

24  products at its own expense and provide an inspection

25  report for the items, right?

1     A.   If they can show the proof there is something

2   wrong, then they can return.

3     Q.   So that proof means in order to get that refund,

4   Unique Designs has to test it and provide a report,

5   right?

6     A.   They ultimately have to return it.

7             In this case, they don't return anything

8   back to us.

9     Q.   Understood.

10            But in order to even get to that point, in

11   order to get a return or refund, Strong Trading had

12   to -- Unique Designs had to provide a report and do the

13   inspection on the gemstone, correct?

14    A.   They have to show me -- show us some proof that

15   there is something wrong with the merchandise.

16    Q.   And for each item to be returned, each item had

17   to be tested, correct?

18    A.   Depends on the problem with the return.  If this

19   is only broken bracelet, maybe a picture of the broken

20   bracelet.  But other than that, we have to see each case

21   by each case.

22    Q.   Ms. Chu, we're only talking about wrong items.

23   So wrong items only.

24            If I'm returning -- in this case, for Unique

25   Designs to return an item, a wrong item, it had to test

1   each item individually; is that right?

2       A.   Yes.

3       Q.   Do you agree with me that a small emerald glass

4   jewelry may cost less than $20?

5       A.   Yes.

6       Q.   A glass -- piece of glass jewelry may cost less

7   than $1?

8       A.   I -- I cannot tell because too late.

9       Q.   Something in that range, 1 to 5 dollars?

10      A.   Depends on the size of the stones.  And then the

11  piece of the jewelry.  Because for this I cannot answer

12  the range of the price for the merchandise.

13      Q.   Just the earrings that Unique was ordering, the

14  earrings, pendant and rings, that would be less than $10

15  for a glass jewelry item, right?

16      A.   I -- I cannot tell, because we have to look at

17  the piece.  I know you are saying that Unique Design

18  order.  But everything depends on the -- not only the

19  stones, also the silver price.  So if -- different kinds

20  of different price for it.  And I'm not sure which style

21  that you are saying so I cannot give you the price.  And

22  I'm not a salesperson to have better idea of the range

23  of the silvers merchandise price range.

24      Q.   Given that Strong Trading actually had items

25  inspected and had reports prepared, do you agree that

1    those inspections could cost up to 50 to $60?

2        A.  You mean inspection?

3        Q.  Per item.

4        A.  Yeah.  Around that amount.

5        Q.  So in this case, the return policy of Strong

6    Trading required Unique Designs to pay more for the

7    inspection than the item was actually worth; is that

8    correct?

9        A.  They are -- if they return, they are not only

10   returning one piece.  I think they are going to return

11   whole lot.  Like when we say like under 20,000, the

12   credit, so it should be more than one piece of the

13   return.

14       Q.  Were those items tested, right?

15       A.  Yes.  With some kind of -- some kind of document

16   to show the wrong stones.

17            MR. SINGH:  Thank you.  Nothing further,

18   Your Honor.

19            THE COURT:  Redirect?

20            MS. ALPARCE:  Thank you, Your Honor.

21            **REDIRECT EXAMINATION**

22   BY MS. ALPARCE:

23       Q.  I will try to be brief, Ms. Chu.  I know you have

24   been sitting there for a while.

25            Ms. Chu, earlier today you testified that

1    Strong Trading has some glass inventory.

2       A.   Yes.

3       Q.   Can you tell us why Strong Trading has glass

4    inventory?

5       A.   We just happen to find it in our inventory.

6       Q.   And just -- if a customer requests glass, does

7    Strong Trading sell glass to the customer?

8       A.   If customer asking for glass, we will provide

9    glass.  Depends on what they require.

10      Q.   Thank you.

11           I'm going to direct your attention to

12   Exhibit 262 in which Mr. Singh questioned you about at

13   the start of today and also yesterday.

14           Can you flip through the pages of that.

15      A.   262?

16      Q.   Yes.

17      A.   Yes.

18      Q.   Yes.  Are any of these items on this report the

19   items that Unique Design -- is this item -- strike that.

20           Is this item an item that Unique Design is

21   disputing with Strong Trading?

22      A.   No.

23           MR. SINGH:  Objection; leading.

24           THE COURT:  Overruled.

25           THE WITNESS:  No.

1    BY MS. ALPARCE:

2        Q.   Does Strong Trading sell this type of item that's

3    depicted on this report?

4              MR. SINGH:   Objection; calls for

5    speculation.   Leading.

6              THE WITNESS:   No.

7              THE COURT:   Overruled.

8    BY MS. ALPARCE:

9        Q.   Sorry.   Can you repeat that?

10       A.   No.

11       Q.   Were you the one who ordered the report?

12       A.   No, I'm not.

13       Q.   Who ordered the report?

14       A.   Kurt Chien.

15       Q.   So generally these reports that Mr. Singh showed

16   you, who at Strong Trading ordered the product that was

17   purchased from the retailer to send to the vendor?

18       A.   In this case, Kurt Chien.

19       Q.   Now, I'm going to direct your attention to 262

20   which Mr. Singh just referred to.

21              This is also a report from Mutual Cornell,

22   correct?

23       A.   262 --

24       Q.   261, excuse me.

25       A.   261.   Yes.

1    Q.   This -- who at Strong Trading ordered this

2   report?

3    A.   Sandy Shen.

4    Q.   Who's Sandy Shen?

5    A.   She was the shipping manager.

6    Q.   You say "was."  Is Ms. Shen still working for

7   Strong Trading?

8    A.   No, she is not.

9    Q.   Who was involved in deciding whether this item

10  was to be tested by Mutual Cornell?

11   A.   Sandy Shen.

12   Q.   You recognize that the date of this report is

13  February 18th.  Do you see that, Ms. Chu?

14   A.   Yes.  The sample date.

15   Q.   Was this before or after Unique Designs

16  complained about this bait and switch?

17   A.   Before.

18   Q.   Now, Ms. Chu, Mr. Singh has brought to your

19  attention your deposition transcript and presented it to

20  the Court.

21        Now, these excerpts were taken from a

22  written record from your deposition.

23        Do you recall that?

24   A.   Yes.

25   Q.   Now, when he told you at your deposition that you

1    were going to receive a transcript, he told you that you

2    would be given the opportunity to review the transcript,

3    did he not?

4        A.   Yes.

5        Q.   And part of reviewing that transcript, he also

6    told you that if you made any changes, which you are

7    allowed to do, that he would either scrutinize or

8    comment against your credibility here in Court today?

9        A.   Yes.

10       Q.   So now, given that understanding, Ms. Chu, did

11   you make any corrections to your deposition transcript?

12       A.   Yes, I did.

13       Q.   And why did you make corrections, knowing that

14   Mr. Singh could possibly bring that to the Court's

15   attention?

16       A.   Because I want to make a clear with my answer.

17   And because Chinese is my first language, so I'm better

18   in reading the words compared to when someone speak

19   really fast to me.

20             So I want to be as honest as possible.  So

21   if I say something it's not what I meant, I want to

22   clarify that.

23       Q.   And from what was presented to you so far in your

24   testimony, were you presented the corrections to your --

25   to your statements?

1    A.  Can you repeat that?

2    Q.  The testimony that Mr. Singh read into the Court,

3  did that include any of the corrections that you made?

4    A.  No.

5    Q.  Okay.  I want to direct your attention to your

6  deposition.

7              Counsel, it is page 78, lines 2 through 11.

8              Yesterday Mr. Singh referred to this where

9  he asked you at your deposition, "This agreement marked

10 as -- this agreement marked as Exhibit C, an agreement,

11 it is -- is an agreement between Strong Trading.  I'm

12 sorry.  Strike that.

13             "Is this an agreement marked as Exhibit C an

14 agreement between Strong Jewelry in Hong Kong and Unique

15 Designs?"

16             And you answered "Yes."

17             Okay.  You made a correction to this, did

18 you not, Ms. Chu?

19   A.  Yes, I made the correction.

20   Q.  And your correction to this was?

21   A.  No.  It is Strong Trading.  It's the agreement

22 between Strong Trading and Unique Design.

23   Q.  Why did you make that correction?

24   A.  Because when he -- because he previously say

25 Strong Trading, and then he strike that.  And then I

1   still thinking about Strong Trading, so I answered yes.

2          So when I see the transcript, and you still

3   shows Strong Jewelry so I think I need to correct that.

4   Q.   Okay.  Thank you, Ms. Chu.

5          Now, Mr. Singh also brought up your

6   testimony from page 80, lines 22 through 25 of your

7   deposition.

8          MS. ALPARCE:  Can you pull that up, please.

9          Okay.

10          "QUESTION:  Sure.  Strong Trading isn't owed

11   any money on an invoice that comes from Strong Jewelry

12   Hong Kong, is it?"

13          At your deposition you said no.

14          But you made a change to that as well,

15   Ms. Chu, did you not?

16          THE WITNESS:  Yes.

17   BY MS. ALPARCE:

18   Q.   And the change you made was that you added,

19   "Strong Jewelry Hong Kong does not owe us money.  Unique

20   Designs Inc. owes us money on the invoices."

21          Why did you make that change?

22   A.   The question is not clear.  Because Strong

23   Trading -- Strong Jewelry Hong Kong is our office.  It's

24   not our customer.  So they don't owe us money.

25          The party owe us money is the customer,

 1   Unique Design here.

 2       Q.   Thank you, Ms. Chu.  I will refer you to

 3   Exhibit 56, an exhibit that Mr. Singh showed you

 4   yesterday.

 5       A.   56?

 6       Q.   56, please.

 7            MS. ALPARCE:  Can you pull up the exhibit,

 8   please.

 9   BY MS. ALPARCE:

10       Q.   Ms. Chu, yesterday at the -- during your

11   testimony Mr. Singh referred to the tracking number at

12   the top?

13            Do you see that?

14       A.   Yes.

15       Q.   And this tracking number -- is this tracking

16   number ever sent to the customer?

17       A.   Yes.

18       Q.   And who gives the customer that tracking number?

19       A.   Kurt Chien from Strong Trading.

20       Q.   And how does Kurt do that?

21       A.   By email.

22       Q.   And Mr. Singh also asked you about Unique Designs

23   making payments to Strong Trading through the Hong Kong

24   office.

25            Do you remember that?

1     A.  Yes.

2     Q.  Has Unique Design ever communicated directly with

3  the Hong Kong office?

4     A.  No.

5     Q.  I want to direct your attention to Exhibit 78,

6  Ms. Chu.  Strike that.  Strike that.  Okay.

7               Now, you talked about Mr. Chen.  Mr. Chen

8  only works for Strong Trading?

9     A.  Yes.

10     Q.  He doesn't work for the Hong Kong office, does

11  he?

12     A.  No.

13     Q.  Mr. Singh also asked you yesterday whether Unique

14  ever received the goods from the Hong Kong office.

15               Do you recall that?

16     A.  Yes.

17     Q.  Did Unique Design ever complain about not

18  receiving any goods?

19     A.  No.

20     Q.  Do you believe that Strong Trading sent Unique

21  Designs any wrong items?

22     A.  No.

23     Q.  Do you believe that Unique Design has any damages

24  that they claim?

25     A.  No.

```
 1            MS. ALPARCE:  No further questions, Your
 2    Honor.
 3            THE COURT:  Okay.  Recross?
 4                    CROSS-EXAMINATION
 5    BY MR. SINGH:
 6       Q.  Ms. Chu, just a moment ago, did you testify that
 7    the inspection by Mutual Cornell occurred before the
 8    complaints by Unique Designs?
 9       A.  There are two sets of the reports.
10       Q.  Directing your attention to Exhibit 262.
11            THE COURT:  One of the reports was 262.  The
12    other one was 261.
13            THE WITNESS:  262, I think I saw one is -- I
14    remember one is August.
15    BY MR. SINGH:
16       Q.  One is August 2021, the other is March 2021.
17            Are you saying that those occurred before
18    the complaint by Unique Designs?
19       A.  Those are not the one before.  Those are --
20       Q.  After?
21       A.  I'm not sure the timeline exactly date, but
22    around and after.
23       Q.  In fact, those reports were prepared as a result
24    of complaints by Unique Designs, right?
25       A.  No.
```

```
 1              MR. SINGH:  I will play one last time, Your
 2   Honor, the deposition transcript from Ms. Chu, page 199,
 3   line 25, 200, line 2.
 4              THE COURT:  Has that already been played?
 5              MR. SINGH:  Yeah.
 6              THE COURT:  No.  That's repetitive.
 7   BY MR. SINGH:
 8      Q.  Ms. Chu, Unique Design never communicated with
 9   Strong Jewelry; is that right?
10      A.  No.  They only communicate with Strong Trading.
11      Q.  Did you speak with anyone at Strong Jewelry to
12   find out if anyone ever talked to anyone from Unique
13   Designs?
14      A.  They don't -- they only contact with us.
15      Q.  I'm just asking you the basis of that knowledge.
16   Did you communicate with anybody to find out if somebody
17   communicated with Unique Designs?
18      A.  No.
19              MR. SINGH:  Nothing further.
20              THE COURT:  You may step down.
21              Next witness.
22              MR. YORK:  Your Honor, we call Kurt Chien.
23              THE COURT:  Okay.
24              THE CLERK:  Please raise your right hand.
25              (WITNESS SWORN.)
```

```
 1                 THE WITNESS:  Yes.

 2                 THE CLERK:  Thank you.  Please be seated.

 3                 Please adjust your microphone so that you

 4    are speaking into it at all times.  Pull it forward.

 5                 And please state your full name and spell

 6    your last name.

 7                 THE WITNESS:  My name is Meng Yu Chien.

 8    M-e-n-g Y-u.  Last name C-h-i-e-n.

 9                 THE COURT:  Thank you.

10                 You may inquire, Counsel.

11                 DIRECT EXAMINATION

12    BY MR. YORK:

13       Q.  Do you also go by the name of Kurt Chien?

14       A.  Yes.

15       Q.  When did you first start using the name Kurt

16    Chien?

17       A.  It is about 25 years ago when I attend college in

18    Vancouver, Canada.

19       Q.  What college did you attend in Vancouver?

20       A.  British Columbia Institute of Technology in

21    Vancouver.

22       Q.  Did you graduate?

23       A.  Bachelor degree of business in 2002.

24       Q.  Did you have any college education after that?

25       A.  Yes.  I got my MBA degree in GCU in Phoenix,
```

1   Arizona in 2004.

2       Q.   What is your current occupation?

3       A.   I'm a sales representative in Strong Trading

4   located in Arcadia, California.

5       Q.   How long have you been with Strong Trading?

6       A.   Since 2004.  So it is 18 years.

7       Q.   Have you always worked in sales in Strong

8   Trading?

9       A.   Yes.

10       Q.   And what are your duties or responsibilities as a

11   sales representative at Strong Trading?

12       A.   I communicate with new customers and set up new

13   customer to sign new contract, and set up new account,

14   and also work -- set up new account, and also

15   communicate with customers in factories in Hong Kong

16   office, like everyone involved with the orders, and also

17   provide customer service if there is any issue of the

18   merchandise.

19       Q.   In the 18 years you have been with Strong

20   Trading, approximately how many customers have you

21   worked with?

22       A.   It is around 100 customers.

23       Q.   When Strong Trading receives a new customer, how

24   is the customer assigned?

25       A.   Okay.  I work as inside sales.  So the company,

1   Strong Trading, will assign me the customers.

2      Q.   And was Strong Trading assigned to you?

3           I apologize was Unique Designs assigned to

4   you as one of Strong Trading customers?

5      A.   Yes.

6      Q.   In the 18 years you have been at Strong Trading,

7   approximately how many sales transactions have you been

8   involved in?

9      A.   I would say more than tens of thousands.

10     Q.   And in that 18 years at Strong Trading,

11  approximately how many items of jewelry have you sold?

12     A.   I don't know.  It is a lot.  I say maybe more

13  than 500,000.

14     Q.   What type of goods does Strong Trading sell?

15     A.   We sell silver and brass jewelries.  We sell

16  different kind of stones, like gemstones, semi-precious

17  stones, created stones, glass and CZ.

18     Q.   What do you mean by gemstones?

19     A.   Gemstone is the real stone, genuine stones, such

20  as ruby, sapphire, and emerald.

21     Q.   What are semi-precious stones?

22     A.   Semi-precious stone is also real stone but less

23  value of gemstone; aquamarine, amethyst, topaz, citrine,

24  peridot.

25     Q.   What are created stones?

1     A.   Created stone are manmade stone.   They have same

2     chemical as gemstone, but they created in a lab.

3     Q.   When you started working for Strong Trading, did

4     you receive any kind of training or education regarding

5     gemstones and their classifications?

6     A.   Yes.   When I start working at Strong Trading, we

7     have the sales training program that teach the knowledge

8     of jewelries; like what kind of jewelries.   Like

9     pendant, earrings, rings, bracelet, and what kind of

10    stones we have.   Just like I say, the gemstones,

11    semi-precious stones, all these kind of stones.

12              And we also have the sales meeting every

13    week to discuss the new trend of the -- of silver of the

14    jewelries, and also new trend of the stones.

15              And almost every year, I will attend jewelry

16    trade show in U.S.   And if they have the seminar talking

17    about new information about jewelries and the stone, I

18    will attend.

19              And also, like during my 18 years working in

20    Strong Trading, I have work -- more than 10,000 project

21    with different customers.   So every time we working on

22    new project, we will discuss the stone and merchandise.

23              And if there is any -- since I don't

24    understand, I also do my research to find out what's the

25    information.

1      Q.   Mr. Chen, when Strong Trading receives a new

2   customer and it is assigned to you, what happens first?

3      A.   Okay.  First, I will write an email to new

4   customer to introduce myself.  Like, my name is Kurt

5   Chien.  I am from Strong Trading.  And here is the phone

6   number.  And in California.

7            And after that, I will send the new customer

8   the -- our new customer agreement.  I will ask the

9   customer to read and sign the agreement, send back to me

10  so we can set up the new account and start doing

11  business with new customers.

12     Q.   Now, at this point in time, typically has the new

13  customer already received samples from Strong Trading?

14     A.   Usually we will get the new customer from the

15  jewelry trade show.  So maybe they will select some

16  items that they are interested.  So we'll have list of

17  the item number that customer is interested.

18            So I will have maybe an image of the item

19  they want.  And I will send to customer once they sign

20  agreement that we start doing business.  And I will --

21  either call them or by email to ask them what's the spec

22  they need for this samples.  Like, what is the price

23  point?  And what's the plating?  And what's the design?

24  And what's the stone they want for the samples.

25     Q.   And once the new customer sends you that

1   information, what happens next?

2       A.   I will work on quotation with all these

3   information that I discuss with customer.  And customer

4   confirm.  So that information will have the image of the

5   item number and then the price; the stone, the plating,

6   all this information.  And I will send to customer and

7   ask customer to approve.

8       Q.   And assuming the customer approves the

9   information that you sent to it, what happens next?

10      A.   So if customer confirm that quotation and they

11  want to order the sample, I will key in all these

12  information I just mentioned, to our system, to create

13  the pro forma invoice.  And I will send this pro forma

14  invoice to customer for them to approve this

15  information.

16           Once they approve, we will send out a sample

17  and invoice them.

18      Q.   What is a pro forma invoice?

19      A.   A pro forma invoice is a document, like once we

20  have the confirmation from customer, they want to order

21  either sample of the purchase order, I will key all this

22  information to our internal system.

23           And once all this information is done, it

24  can generate a pro forma invoice.  And I will send this

25  pro forma invoice to customer by email.  And customer

1  will review all the details on this pro forma invoice;

2  like the image, the item number, the price, the

3  quantity, and then the stone information.

4          And once they approve this pro forma

5  invoice, I will send this information to factory and ask

6  factory to start production.

7      Q.  The pro forma invoice, is that a confirmation of

8  what Strong Trading is selling to the customer?

9      A.  Yes.

10     Q.  And you have also sent at this point in time a

11 sample to the customer; is that correct?

12     A.  Yeah.  For -- can you ask me that question again?

13     Q.  Typically when you send a pro forma invoice to a

14 customer.

15         THE COURT:  Let me help.  All cell phones

16 should be turned off any time you're in the courtroom.

17 So if anybody has a cell phone, they should turn it off

18 while they're in the courtroom.

19         Go ahead.

20         MR. YORK:  Thank you, Your Honor.

21 BY MR. YORK:

22     Q.  By the time the pro forma invoice is sent to the

23 customer, has the customer typically also received a

24 sample?

25     A.  If it is --

```
 1                THE COURT:  Juror No. 4, is that a cell
 2   phone that you have?  You have to put it away.  It has
 3   to be turned off and put away.
 4                And I've got to warn everybody that if
 5   that's not adhered to, those cell phones are taken away
 6   and given back to you at the end of the day.
 7                We cannot use do cell phones inside the
 8   courtroom.
 9                Next question.
10   BY MR. YORK:
11     Q.  Mr. Chen, at what point in time in this process
12   is the customer sent a sample?
13     A.  Say that again.
14     Q.  Sure.  Let me go back.  I think we got
15   interrupted.
16                A customer sends you information as to what
17   it is interested in purchasing, correct?
18     A.  Yes.
19     Q.  And you send a pro forma invoice to the customer
20   that confirms what you are selling to the customer,
21   correct?
22     A.  Yes.
23     Q.  Typically, as of that point in time, has the
24   customer also received a sample?
25     A.  It depends.  Like, if it is the first time, they
```

1   want to order the samples, and I will send this pro

2   forma invoice to customer.  Once they approve, I will

3   send them the sample.

4      Q.  So you want confirmation of what you are selling

5   to them before you send them a sample; is that correct?

6      A.  Yes.

7      Q.  And then a sample is sent to the customer,

8   correct?

9      A.  Yes.

10      Q.  Where do you get the sample?

11      A.  If we have sample here in Strong Trading, I will

12   send the sample to customer from Strong Trading, and we

13   will invoice them under the letterhead of Strong

14   Trading.

15           If we don't have sample here, I have to

16   order sample from factories.  And factory will send the

17   sample to our Hong Kong office.  And the Hong Kong

18   office will send the sample to customers and use Strong

19   Jewelry Hong Kong office letterhead on the invoice.

20      Q.  And is the new customer invoiced for the cost of

21   the sample?

22      A.  Yes.  It's the jewelry, so we charge them.

23      Q.  Now, what is Strong Trading's Hong Kong office?

24      A.  It is just an office that help Strong Trading to

25   receive the merchandise from factories.  And they just

1   put -- print out the invoice that I key in all the

2   information to our IntraSystem that generate that

3   invoice.

4              So they print out an invoice which they have

5   and ship out to customer in U.S.

6      Q.   You refer to IntraSystem.   What's the

7   IntraSystem?

8      A.   It is our company's software that we can key in

9   all this informations, this orders.   And then we can

10  share this information to factories, and also share this

11  information to Hong Kong office.

12     Q.   Does your -- does Strong Trading's Hong Kong

13  office have access to the same information that Strong

14  Trading has put into the IntraSystem?

15     A.   They can print out the invoice that -- from

16  that -- from that system, yes.

17     Q.   The invoice that they print out, is that based on

18  the information that is in the system?

19     A.   Yes.   I key in that information in the system.

20     Q.   So you key in information in the system.   And

21  that at some point in time the Hong Kong office prints

22  out an invoice based on the information that you have

23  inputted?

24     A.   Yes.

25     Q.   What happens next after the customer receives a

1    sample?

2        A.   Okay.   Before customer receive the sample, I will

3    email the customer the invoice I just mention about,

4    either from Strong Trading or from Strong Trading Hong

5    Kong.   I will email customer that invoice with tracking

6    number.

7             So customer can follow up that tracking

8    number to make sure they receive the sample.

9             And once they receive the sample, they will

10   review it and make sure the quality stone, everything is

11   correct as they want, and they will place the purchase

12   order.

13       Q.   How are the purchase orders sent to Strong

14   Trading?

15       A.   Customer always send the purchase order by email

16   to me.

17       Q.   Mr. Chien, would you please look at Exhibit 100.

18   Do you have those in front of you, Mr. Chien?

19       A.   You say Exhibit 100?

20       Q.   Yes.

21       A.   Yes.

22       Q.   Do you recognize Exhibit 100?

23       A.   Yes.

24       Q.   What's Exhibit 100?

25       A.   It is email from Unique Design and telling me

1    this is the purchase order they send to me.

2       Q.   Is there an attachment to that email?

3       A.   Should be.  Yes.  Yes.  I saw the attachment.  On

4    the second page.

5       Q.   Did you say seven pages?

6       A.   Second page.

7       Q.   Do you recognize the second page?

8       A.   Yes.  This is Unique Design purchase order.

9       Q.   What's the date of the purchase order?

10      A.   Can you say that again.

11      Q.   What's the date of the purchase order?

12      A.   It is July 10, 2020.

13              MR. YORK:  Your Honor, I would offer

14   Exhibit 100 into evidence and be permitted to publish

15   it.

16              THE COURT:  It will be received and may be

17   published.

18              MR. YORK:  Thank you, Your Honor.

19              (Exhibit 100 is received.)

20   BY MR. YORK:

21      Q.   Now, the first page on the screen is the email

22   you were referring to, correct?

23      A.   Yes.

24      Q.   Let's look at the second page.  And this is a

25   purchase order then from Unique Designs to Strong

1   Trading for jewelry, correct?

2      A.   Yes.

3      Q.   Are the invoices -- excuse me, the purchase

4   orders that Strong Trading receives Unique Designs

5   basically the same format?

6      A.   Yes.

7      Q.   How many invoices has Strong Trading received

8   from Unique Designs -- excuse me, how many purchase

9   orders has Strong Trading received from Unique Designs

10  over the year?

11     A.   Over all these years we do business with Unique

12  Designs?

13     Q.   Yes.

14     A.   I would say more than hundred, maybe thousand

15  orders.

16     Q.   And have the purchase orders for all those orders

17  all followed the same format?

18     A.   Yes.

19     Q.   And who's this purchase order made out to?

20     A.   Can you say that again.

21     Q.   Sure.  What company -- strike that.

22          On the left-hand side it says "Strong

23  Trading," correct?

24     A.   Yes.

25     Q.   This is a purchase order from Unique Designs to

1    Strong Trading, correct?

2        A.   Yes.

3        Q.   And this is a purchase order from Unique designs

4    to Strong Trading in California, correct?

5        A.   Yeah.  You see address, Arcadia, California, also

6    the phone number.

7        Q.   And again, all of the invoices -- excuse me, all

8    of the purchase orders that Unique Design sends to

9    Strong Trading follows the same format?

10       A.   Yes.

11            MR. SINGH:  Objection; leading.

12            THE COURT:  Overruled.

13   BY MR. YORK:

14       Q.   Okay.  So once Strong Trading receives a purchase

15   order, what happens next?

16       A.   Okay.  Like I say, I will key in all this

17   information to our IntraSystem, like the item number,

18   the quantity they order, and then the stone information,

19   and the price.

20            So once I key in all this information in our

21   IntraSystem and create a pro forma invoice, I will email

22   pro forma invoice to customer and ask them to approve.

23       Q.   The pro forma invoice you are talking about now

24   is different than the pro forma invoice for the sample,

25   correct?

1     A.   The information -- you are talking about the same

2   styles or --

3     Q.   Let me ask you differently.

4     A.   Yeah.

5     Q.   You mentioned the pro forma invoice before,

6   correct?

7     A.   Yes.

8     Q.   That's for a sample, correct?

9     A.   Yes.

10    Q.   Is this purchase order -- when you receive these

11   purchase orders, are these purchase orders for samples

12   or are they for bulk orders?

13    A.   This one is for this order.  Like every time

14   either customer order a sample or they place this

15   purchase order, I will create a pro forma invoice based

16   on what customer want, either sample or it is purchase

17   order.  So I will key in this information to our

18   IntraSystem, and it will create it -- it will create a

19   pro forma invoice.  And it has the information that

20   customer want to order.

21    Q.   And once you generate this pro forma invoice,

22   what do you do with it?

23    A.   Okay.  I will email pro forma invoice to

24   customer, ask them to review and approve it.

25    Q.   And if the customer reviews and approves it, what

1    happens next?

2        A.   I will send the information to factories, ask

3    them to start production based on the information I -- I

4    have on the pro forma invoice.

5        Q.   Now, as part of this process, does Strong Trading

6    have any direct contract with the stone vendors, the

7    companies that -- the manufacturers purchases its stones

8    from?

9        A.   No.  I only send this information to factories.

10       Q.   And once the factory manufacture -- manufactures

11   the jewelry, what happens next?

12       A.   Okay.  Once they finish the productions, they

13   will send these merchandise to our Hong Kong office.

14   And Hong Kong office will print out the invoice.  The

15   invoice is sent as the information that I created as the

16   pro forma invoice.

17            So they print out this final invoice, which

18   Hong Kong office later have, and also has the tracking

19   number, so they can ship out the merchandise with this

20   final invoice, go to Custom and send to customers.

21       Q.   Okay.  Where does Strong Trading's Hong Kong

22   office get the information that it uses to generate the

23   invoice?

24       A.   They will have access to our intranet, and they

25   can get the information from the IntraSystem.

1    Q.   And that is the same information that you have

2    inputted into the system?

3    A.   Yes.

4    Q.   And when the Strong Trading Hong Kong office

5    prints out an invoice, what name is on the top?

6    A.   The name is Strong Jewelry Hong Kong.  This is

7    their letterhead.  Because they have to print out this

8    name.  And the invoice is shipper.  So they can ship out

9    this merchandise with the invoice and go through the

10   Custom.

11   Q.   Strong Trading's Hong Kong office then sends out

12   the merchandise along with invoice with Strong -- excuse

13   me, Strong Hong Kong's office letterhead on it -- name

14   on it?

15   A.   Yes.

16   Q.   On your end, do you do anything with the final

17   invoice?

18   A.   Yes.

19   Q.   What do you do?

20   A.   Once Hong Kong office ship out and they have the

21   tracking number information and the final invoice, I

22   will email customer this final email with tracking

23   number.

24   Q.   What information does the final invoice have on

25   it?

1    A.  It has the same information on the pro forma

2    invoice that I sent to customer and customer approve.

3              So the item number, the quantity, the price,

4    the stone information, and then the tracking number.

5    Q.  So is it correct to say the invoice you send out

6    is the same as the pro forma invoice or the prior

7    invoice except the addition is it has the tracking

8    number on it?

9    A.  Yes.

10   Q.  And then once the customer receives the product,

11   what happens next?

12   A.  Okay.  They have to pay this invoice in 30 days

13   because our payment term is 30 days.

14   Q.  Now, in the 18 years or so that you worked for

15   Strong Trading, have you ever received a complaint from

16   any of your customers that you engaged in a bait and

17   switch?

18   A.  No.

19   Q.  Now, you know who Unique Designs is, correct?

20   A.  Yes.

21   Q.  Are you the one that handles the account with

22   Unique Design?

23   A.  Yes.

24   Q.  Was it handled by anyone else?

25   A.  No.

1    Q.  How long did you work with Unique Designs?

2    A.  I think from October 2017 to March 2021, about

3    three and a half to four years.

4    Q.  How did you typically communicate with Unique

5    Designs?

6    A.  By phone and by email.

7    Q.  Now, when you send your emails to Unique Designs,

8    they have your name on them, I assume, correct?

9    A.  Yes.

10   Q.  Do they have any other information other than

11   your name on the email?

12   A.  Okay.  Yeah.  It has my signature, and also says

13   "Strong Trading," and then the phone numbers, 626 --

14   like phone number with area code, showing that, you

15   know, we are from California.

16   Q.  Where is the 626 area code?

17   A.  It's the Los Angeles area code.

18   Q.  And Strong Trading is based in Arcadia, correct?

19   A.  Yes.

20   Q.  When's the first time that you communicated with

21   Unique Designs?

22   A.  I think it is October of 2017 after the September

23   jewelry show.

24   Q.  Okay.  And what is your understanding what

25   happened at the jewelry show?

1    A.   Okay.   Strong Trading went to the jewelry show

2   and meet our general manager Lilly and select some of

3   the items that they are interested.

4            So after the jewelry show, the general

5   manager Lilly assign me this new customer Unique Design.

6    Q.   Did you receive any information from Lilly as to

7   samples that Unique Designs was interested in?

8    A.   Yes.   I have few pages of the item that Strong

9   Trading -- that Unique Design is interested.   They want

10   to order samples.

11    Q.   What did you do next with respect to Unique

12   Designs?

13    A.   I write them an email to introduce myself.   And

14   also email them the new customer agreement.   Ask them to

15   sign as new customers.

16            So once they signed that agreement and send

17   back to me, then we set up new account and start doing

18   business with Unique Design.

19    Q.   Did Unique Design sign the contract and send it

20   back to you?

21    A.   Yes.

22    Q.   When you first communicated with Unique Designs,

23   who did you communicate with?

24    A.   I don't really -- I don't really remember the

25   name, like the first contact.

 1    Q.   Okay.  After you received the signed contract

 2   back from Unique Designs, what happened next?

 3    A.   So I work on the quotation.  I call them to

 4   discuss what kind of merchandise they want based on the

 5   item that they select.  They interested in all the

 6   samples.

 7            So I communicate with their employee, ask

 8   them what kind of stone, the price point they want for

 9   the samples.

10    Q.   At that point in time what was Unique Designs

11   interested in purchasing?

12    A.   I think they interested in order the silver

13   jewelry, like pendant, earrings, rings with color

14   stones.

15    Q.   During this period of time that you were

16   communicating with Unique Designs, did you use a

17   personal email or your office email?

18    A.   I used Strong Trading's email.

19    Q.   This is the email that had the phone number on

20   it?

21    A.   Yes.

22    Q.   Let's go to the period of time October 2020.  At

23   that point in time, did Unique Designs owe Strong

24   Trading any money?

25    A.   Yes.

1    Q.   Was the money owed for unpaid invoices?

2    A.   Yes.

3    Q.   How many unpaid invoices were there?

4    A.   I think around 20, 24 unpaid invoices.

5    Q.   And at that point in time, how much did Unique

6    Design owe Strong Trading on those invoices?

7    A.   Around $350,000.

8    Q.   Now, did Strong Trading stop doing business with

9    Unique Design at that point in time?

10   A.   No.  We still doing business with Unique Design

11   at that time.

12   Q.   Was Unique Design still placing orders with

13   Strong Trading?

14   A.   Yes.

15   Q.   And how long did that go on?

16   A.   I think until January 2021.  We ask Unique Design

17   to pay the payment several times.  But they never paid

18   this overdue payments.

19            So I think in January I discuss with our

20   accounting, Amy Chu, and I write an email to Unique

21   Design to tell them that we cannot process any new

22   orders, and we cannot ship out the merchandise, that

23   factory is complete and ready to ship because they did

24   not pay the overdue payment.

25   Q.   Mr. Chien, would you please look at Exhibit 3.

```
 1      A.  Okay.

 2      Q.  Do you have Exhibit 3 in front of you?

 3      A.  Yes.

 4      Q.  Do you recognize Exhibit 3?

 5      A.  Yes.  This is the email I just talk about.

 6      Q.  What was the purpose of this email?

 7      A.  It is ask customer to pay the overdue payments.

 8  If they don't, you know, we cannot process any new

 9  orders, and we cannot ship out the orders complete.

10      Q.  And you sent this email to Unique Design?

11      A.  Yes.

12              MR. YORK:  Your Honor, I would offer

13  Exhibit 3 into evidence and be allowed to publish it.

14              THE COURT:  It will be received and may be

15  published.

16              (Exhibit 3 is received.)

17  BY MR. YORK:

18      Q.  And Mr. Chien, can you just describe for us what

19  you are saying in this email.

20      A.  This -- okay.  So I have to read everything on

21  the --

22      Q.  Would you just describe what you are trying to

23  communicate to Unique Designs in this email.

24      A.  Okay.  I tried to tell them that you have three

25  purchase orders that complete by factories, but we
```

1   cannot ship out because you do not pay the overdue

2   payments, and also you have five new orders we cannot

3   process because the overdue payments.

4       Q.  By this point in time, how many times did you

5   communicate with Unique Design to try to get Unique

6   Designs to pay what it owed Strong Trading?

7       A.  I would say many times, especially our

8   accounting, Amy Chu, like she email, ask Unique Design

9   to pay the overdue payments.  Yeah.  And I always cc on

10  that emails.  And sometimes I will ask customers, you

11  know, to pay so that we can ship out merchandise.

12      Q.  By the way, Mr. Chien, on this e-mail, you see

13  your name close to the bottom?

14      A.  Yes.

15      Q.  You see the name Strong Trading?

16      A.  Yes.

17      Q.  Do you see the phone number?

18      A.  Yes.

19      Q.  Earlier when you were describing what your email

20  showed, is this the standard format on your email?

21      A.  Yes.

22      Q.  So after you sent this January 21, 2021 email,

23  did Unique Designs pay its outstanding invoices?

24      A.  No.  They still not paying.

25      Q.  Did they even make a partial payment?

1     A.  No.

2     Q.  After you sent this January 21, 2021 email, did

3  you hear from Unique Designs?

4     A.  Yeah.  I think in February they write me an

5  email, says they have stone issues with the created

6  emeralds that they sell to their customers.

7     Q.  How long after you sent the January 21, 2021

8  email did you hear from Unique Designs?

9     A.  I would say more than a month.

10    Q.  What did Unique Designs claim regarding created

11 emeralds?

12    A.  They say the merchandise they sell to their

13 customers and it is glass, and it is not created

14 emerald.

15    Q.  To the best of your knowledge, was the jewelry

16 glass?

17    A.  No.

18    Q.  What did you order from the factory?

19    A.  It depends on like order by order.  But from the

20 order that Unique Designs saying they have issues, we

21 order the created emerald from factories.

22    Q.  And as far as you know, that's what Unique

23 Designs received?

24    A.  Yes.

25    Q.  Was this the first time that Unique Designs had

1   ordered created emeralds?

2       A.   Can you say again.

3       Q.   Was this the first time that Unique Designs had

4   ordered created emerald?

5       A.   No, it is not.

6       Q.   When's the first time Unique Designs ordered

7   created emerald?

8       A.   In 2018.

9       Q.   Had Unique Designs been ordering created emerald

10  between 2018 and 2020?

11      A.   Yes.  They order about 28 times.

12      Q.   28 different times?

13      A.   Yes.

14      Q.   And how many pieces of jewelry is that in those

15  28 orders?

16      A.   It is about 22,000 pieces.

17      Q.   And prior to this time, had Unique Designs ever

18  claimed that the jewelry was glass instead of created

19  emerald?

20      A.   No.

21      Q.   Now, the initial complaint that Unique Designs

22  made was regarding created emerald, correct?

23      A.   Yes.

24      Q.   Did they make some later complaints about other

25  jewelry?

1      A.   I think in -- yeah.   In April they email me and

2   say there's more issues they complain from their

3   customers.   They say the issue is created sapphire.

4      Q.   What did Unique Designs claim was the issue with

5   the created sapphire?

6      A.   I think it is the -- also, the created sapphire

7   they find out is glass.

8      Q.   This is what they claimed?

9      A.   Yes.

10      Q.   To the best of your knowledge, was the jewelry

11   you sold to Unique Designs glass?

12      A.   From the invoice that they says they have issues,

13   that's the created stone we sell them.   So showing on

14   the invoice, that's the created sapphire.

15      Q.   So when they made a complaint to you or claim to

16   you, you went back and looked at the invoice that was

17   the -- that had the jewelry on it?

18      A.   Yes.

19      Q.   And according to the invoice, it said that it was

20   created stone?

21      A.   Yes.

22      Q.   As far as you know that's what was sold to Unique

23   Designs?

24      A.   Yes.

25      Q.   Is that what you ordered from the factory?

1      A.   Yes.

2      Q.   And as far as you know that's what the factory

3  sent to Unique Designs?

4      A.   Yes.

5      Q.   Did Unique Designs make any claims regarding any

6  other types of stones?

7      A.   No.

8      Q.   If you take all the stones together that they are

9  claiming about, the emeralds, the rubies or sapphires,

10  have they been ordering those same items for a number of

11  years?

12      A.   Yes.  For all the created stone they order, I

13  would say they order maybe 130 times, like 130 orders

14  during this three years we doing business with Unique

15  Design.

16      Q.   And how many different pieces of jewelry -- or

17  what's the total pieces of jewelry represented by those

18  130 orders?

19      A.   I would say around 70,000 pieces.

20      Q.   After you received the second complaint was that

21  the first time they had ever made a claim that that

22  particular jewelry was glass instead of something else?

23      A.   Yes.

24      Q.   After all those years, this was the first time

25  they made a claim?

1    A.  Yes.

2    Q.  This was after you sent the email telling Unique

3  Designs that you would not do anymore business with them

4  until they paid their invoices?

5    A.  Yes.

6    Q.  When UDI made these claims that this jewelry was

7  glass instead of created stones, what did you do?

8    A.  As a customer service, I will ask them to return

9  this merchandise so we can look into it to find out what

10  happened.  If it really has issues, we will give them

11  either a refund or exchange the stones, depends on what

12  customer wants.

13    Q.  If it was the wrong stone, did you want to

14  resolve the issue?

15    A.  Yes.

16    Q.  And why did you ask the goods to be returned?

17    A.  We have to look into that merchandise and to

18  maybe send out for stone test to find out what's -- what

19  is that stone is.

20          And we have -- we need to have the

21  merchandise to find out which order this merchandise

22  belongs to.

23    Q.  Would it be fair to say in order to send out for

24  testing you need to have a stone?

25    A.  Yes.  If -- if customer can return all the

1  merchandise they are saying has issues, we can have

2  order quantity, and we can look into it.  If they don't,

3  at least they have to give us some report.

4      Q.  And out of all of these hundreds or thousands of

5  pieces of jewelry that Unique Designs was making an

6  issue about, did they ever return one single piece of

7  jewelry?

8      A.  No.

9      Q.  And because they never received -- returned one

10  single piece of jewelry, were you able to have the

11  jewelry tested?

12      A.  No.

13      Q.  Mr. Chien, let's go to Exhibit 262 that we have

14  been talking about.

15          Do you have those in front of you,

16  Mr. Chien?

17      A.  Yes.

18      Q.  Were you involved in ordering these reports?

19      A.  Yes.

20      Q.  When were these reports ordered?

21      A.  Can you say that again?

22      Q.  When were these reports ordered?

23      A.  It says the sample date is March 9, 2021.

24      Q.  This would be about two months or so after you

25  sent the email to Unique Designs that if they didn't pay

1   their invoices, you were not able to do any more

2   business with them?

3       A.   Yes.

4       Q.   Now, these reports have -- are reports on various

5   items of jewelry, correct?

6       A.   Yes.

7       Q.   Does Strong Trading sell or has it ever sold any

8   of the items that are on these reports?

9            MR. SINGH:   Objection.   Calls for

10  speculation.

11           THE COURT:   Overruled.

12           THE WITNESS:   No.

13  BY MR. YORK:

14      Q.   So if Strong Trading never sold any of the items

15  on any of these reports, where did you get the items to

16  send out for testing?

17      A.   So from these rings, I purchase it from JTV.

18      Q.   What's JTV?

19      A.   JTV is jewelry company that they sell jewelries.

20      Q.   And why did you buy jewelry from JTV if none of

21  these items had ever been sold by Strong Trading?

22      A.   Okay.   In February, Unique Designs tell me there

23  is an issue with the created emerald that they sell to

24  JTV.   And I asked them to send back the merchandise so

25  that we can look into it.   They did not send any of the

1    merchandise.

2              And I ask them to give me any kind of report

3    to show there is an issue with the stone.  But I never

4    see the report.

5              So I went to JTV's website since Unique

6    Designs said they sell to JTV.  I want to look at the

7    merchandise, like Unique Designs says they have issues,

8    like we sell to them the three pieces cushion set.

9              So I search on JTV's website, but I did not

10   find the merchandise that Unique Designs says they have

11   issue.

12             If they do, I want to buy it and, you know,

13   send out for test, to see what's -- what the stone is.

14   But I cannot find that item that we sell on JTV.

15             So I see they do have sell this created

16   emerald green, and it is on sale, so I buy two of them.

17   And we send to Mutual Cornell as a reference, I want to

18   see like what was the stone from JTV like I buy from and

19   they say it is created emerald.

20   Q.   So you have not received any jewelry back from

21   Unique Designs, correct?

22   A.   No, I don't.

23   Q.   So you were not able to test the jewelry that

24   Unique Designs claim there was a problem with, correct?

25   A.   Correct.

1     Q.   So you decided to do some research on your own to

2   see what you could figure out?

3     A.   Yes.

4     Q.   Now, there are -- there is more than one page in

5   Exhibit 262, correct?

6     A.   Yes.

7     Q.   Did you purchase all of the items on those pages

8   from JTV?

9     A.   Okay.   I purchase two rings from JTV.

10     Q.   Did you purchase jewelry from any other source?

11     A.   Yes.   There is one earrings I purchase from

12   Helzberg.

13     Q.   Let's go back.   How many reports are in

14   Exhibit 262?

15     A.   Five.

16     Q.   And so the first four pages are items that you

17   purchased from JTV?

18     A.   Yes.

19     Q.   But the fifth page is an item you purchased from

20   someplace else?

21     A.   Yes.

22     Q.   Where did you purchase Item No. 5 from?

23     A.   From Helzberg.

24     Q.   Who's Helzberg?

25     A.   It is also a jewelry sellers.

 1     Q.   And why did you purchase this item from Helzberg?

 2     A.   Okay.  At that time, I think after May 2021, we

 3   start have this lawsuit, lawsuit against Unique Design.

 4              And at that time I find out Unique Design

 5   say they sell the merchandise to JTV that has issues.

 6              Actually, that's the order from 2018, that

 7   we placed the order and sell to Unique Design in 2018.

 8              And the order was sell to Helzberg.  And at

 9   that time, we did not receive any complaint after we

10   sell them this merchandise they sell to Helzberg.

11              So after two years they say, you know, they

12   have this issues with this colored stones, after two

13   years.  So I'm thinking, maybe I can get the samples

14   from Helzberg since, you know, they say to Helzberg in

15   2018.

16              So I go to the website, and also looking for

17   it if I can get a sample of the cushion set that we sell

18   to Unique Design that they say has issues.  But I still

19   could not find that merchandise.

20              So I also see they have this created

21   earrings.  And if you can see the earring is a

22   round-shape one, round-shaped earrings.  So the stone

23   Unique Design say that has issue is cushion set.  All

24   this report, if you can see, the earring is round shape.

25   It is not the same sample merchandise that we sell to

1    Unique Design.

2              So I also get these earrings and send to

3    Mutual Cornell for stone test to see what it is.  And

4    this is the report.

5    Q.  But, again, this particular item also was not an

6    item that Strong Trading ever sold, correct?

7    A.  No.

8    Q.  Let me say it differently.  Was this item on the

9    fifth page an item ever sold by Strong Trading?

10   A.  No.

11   Q.  And it certainly then wasn't an item that Strong

12   Trading sold to Unique Designs, correct?

13   A.  Correct.

14   Q.  All right.  And to the best of your knowledge,

15   has -- well, strike that.

16              Mr. Chien, let's look at Exhibit 261.

17   A.  Okay.

18   Q.  Mr. Chien, do you have Exhibit 261 in front of

19   you?

20   A.  Yes.

21   Q.  Do you recognize -- strike that.  They are

22   already in evidence.  Never mind.

23              Were you the one at Strong Trading who ordered

24   these reports?

25   A.  No.

1      Q.   Who ordered these reports?

2      A.   I think Sandy Shen order this report.

3      Q.   Were these reports ordered because Unique Designs

4   made a claim that there was some issue with some

5   jewelry?

6      A.   No.

7      Q.   Why were these reports ordered?

8      A.   I think at that time plaintiffs Shen find some

9   samples in our inventory that some say is created stone,

10  some say is glass.  So she try to resell these samples.

11  So she ship out these samples to Mutual Cornell and to

12  make sure this is -- to make sure what is the material

13  of this stones.

14     Q.   Were any of these items items that Strong Trading

15  had sold to Unique Designs?

16     A.   No.

17     Q.   Were any of these items items that Strong

18  Trade -- excuse me.  Were an issue in any of the claims

19  that Unique Designs was making?

20     A.   No.

21     Q.   Do you normally keep an inventory at your Arcadia

22  office?

23     A.   Yes, some samples.  We keep samples.

24     Q.   Is it correct that these reports had nothing to

25  do with Unique Designs claims?

1     A.   Yes.  If you see the sample date, it is

2   February 18.  It is before Unique Design even email me

3   saying there's issue.

4     Q.   Now, did you ever send copies or one of these to

5   Unique Designs?

6     A.   Yes.  I think in April when Unique Design email

7   me says like find out more of these stone issues.  And

8   like from February they say there is stone issues.

9            And I ask them to return or even give me

10   some report to show there is an issue so that we can

11   work on the customer service.

12            But we never get this reply or return.  I

13   really not sure it is -- is there really a stone issue

14   or just making this excuse so not paying the bill?

15            And until April, they told me that they

16   found there's more issues of this stone issues.

17            So I write in an email and attach this stone

18   report as a sample to show Unique Design, if there is

19   any stone issues, you should at least have this kind of

20   stone report, with the day, with the image, and what's

21   the stone and what's the answer.  You should have this

22   report at the time you told me there is an issue or

23   before.

24            THE COURT:  Okay.  Ladies and gentlemen, we

25   are going to break at this time.  It is 10 o'clock.

1           Remember the admonishment not to discuss the

2    case among yourselves or with anybody else or form or

3    express any opinions about the matter until it's

4    submitted to you and you retire to the jury room.

5           See you back in 15 minutes.

6           (OUT OF THE PRESENCE OF THE JURY.)

7           THE COURT:  Let the record reflect the

8    jurors have left the courtroom.  You can have seats.

9           I don't want anyone caught by surprise at

10   this.  This is not the type of case that we would extend

11   the time periods because it's been put on -- not that

12   efficiently or effectively.  So I want to make sure --

13   and I'm not criticizing you.  You put on the case the

14   way that you think that it best appears to the jury.  So

15   that's not a problem.  As long as it's done within the

16   time periods.

17          The plaintiff has used 105 minutes.  You

18   have 75 minutes left.

19          The defendant has used 99 minutes so you

20   have 81 minutes left.

21          And that applies to, as I said before, both

22   the plaintiff's case and the defendant's case.  I want

23   to keep you updated on the timing.  Okay.

24          We will be in recess.

25          (RECESS.)

1          THE COURT:  Okay.  The record will reflect

2    that all jurors are in their respective seats in the

3    jury box.

4          The witness is on the witness stand.

5          Remember, you are still under oath.

6          Counsel, you may continue your direct.

7    BY MR. YORK:

8    Q.  So let's go back to the reports that we were

9    talking about, Mr. Chien.  Just to review where we left

10   off, you sent one or more of these reports to Unique

11   Designs?

12   A.  Yes.

13   Q.  Why did you send one or more of these reports to

14   Unique Designs?

15   A.  I want to show Unique Design this stone report is

16   a sample like if there is any issues that if they cannot

17   return the merchandise at least they can give me this

18   kind of report to prove there is stone issues.

19   Q.  Okay.  So this wasn't a report on any of the

20   jewelry that Strong Trading sent to Unique Designs,

21   correct?

22   A.  Correct.

23          THE COURT:  Counsel, that's been asked and

24   answered a couple of times.

25   BY MR. YORK:

1      Q.   Mr. Chien, did you ever offer to pay for the

2   reports?

3      A.   What do you mean by that?

4      Q.   You were asking Unique Designs to send you some

5   kinds of reports, right?

6      A.   Yes.

7      Q.   Did you ever offer to pay for the reports?

8      A.   Yes.  If there is issues, like we can pay the

9   report.

10      Q.   Why did you offer to pay for the reports?

11      A.   Because Unique Design never send us this kind of

12   report.  And I keep asking them like if you can return

13   the merchandise or you give me this kind of report to

14   show there is issues.  Because we really want to solve

15   this issues that Unique Design explain about from

16   February to April.

17              And the issue for the created emerald is

18   about $3,000.  So Unique Design says, because of this

19   $3,000 issues, they don't pay us the overdue $355,000.

20   So we really want to solve this issues.

21              So even though we find out that 7,000

22   merchandise is from 2018 that we sell to them two years

23   ago, and somehow they still sell to JTV, I really don't

24   know if that's the merchandise.

25              But we still offer a return if they can send

1   back the merchandise.  We try to solve this issue.  And

2   ask them to pay.  And don't make any more excuse not

3   paying us.

4      Q.  Now, as to the 24 invoices that Unique Designs

5   has not paid, are all the items on the 24 invoices

6   created stones?

7      A.  Not everything.

8            MR. YORK:  No further questions, Your Honor.

9            THE COURT:  Okay.  Cross-examination?

10                     **CROSS-EXAMINATION**

11   BY MR. SINGH:

12      Q.  Good morning, Mr. Chien.

13      A.  Good morning.

14      Q.  You are not an employee at Strong Jewelry, right?

15      A.  No.

16      Q.  Is that correct?

17            I should have asked that a better way.

18            Are you an employee of Strong Jewelry?

19      A.  No.

20      Q.  In addition to Strong Jewelry being a shipper,

21   delivering goods, printing invoices, processing through

22   customs, Strong Jewelry also accepts payments from

23   customers, correct?

24      A.  I really not sure about that.  I'm not doing

25   accounting.

1       Q.   Okay.  And part of your job duties -- strike

2   that.

3            To your knowledge, do items in the purchase

4   orders from Unique Designs always match the items in the

5   invoice that's sent to Unique Designs?

6       A.   Can you say that again.

7       Q.   The purchase orders from Unique Designs, will

8   those match the invoices sent to Unique Designs?

9       A.   Not always.

10      Q.   Because the purchase order is what the customer

11   is ordering, right?

12      A.   Sometimes customer will make mistake on the

13   purchase order.

14      Q.   I understand.  But my question is:  The purchase

15   order is what the customer is ordering, right?

16      A.   If they don't make mistake, yes.  But I will send

17   them the pro forma invoice showing them what we going to

18   make for them.

19      Q.   The invoice is what items are actually being

20   shipped to the customer, right?

21      A.   Yes.

22      Q.   If that's -- what you are explaining, the order

23   is changed between purchase order and invoice, that's

24   documented somewhere, right?

25      A.   Can you say that again.

1      Q.   When there is a change to the purchase order from

2   the customer, meaning the items I'm actually -- the

3   customer is actually ordering and then the invoice

4   coming in, is there some document that shows the order

5   has been changed from the purchase order to the time

6   that the product is delivered in the invoice?

7      A.   You mean the final invoice?

8      Q.   Yeah.

9      A.   No.   We do it based on the pro forma invoice that

10   we send to customer and customer confirm.   And the final

11   invoice will show exactly the same on the pro forma

12   invoice.

13      Q.   Every order that Unique Designs placed was based

14   on its own customers' needs and specifications, right?

15      A.   I really not sure because, you know, the purchase

16   order is between Strong Trading and Unique Design, not

17   their customers.   So I really don't know what their

18   customer needs.

19      Q.   Isn't it true that every purchase order

20   identified the customer for Unique Designs is buying the

21   product?

22      A.   You mean Unique Design customer --

23      Q.   Correct.

24      A.   -- or Strong Trading?

25      Q.   So the purchase order that Unique Design is

1    submitting, right, are you with me?

2       A.   Yes.

3       Q.   That purchase order from Unique Designs

4    identifies the customer for whom it is buying that

5    goods, right?

6       A.   I will say not every purchase order.

7       Q.   But that is often shown who they're buying it

8    for?

9       A.   Yes.  Some of them.

10      Q.   So Strong Trading knows who the items are for,

11   right?

12      A.   Yeah.  If we notice that, yeah.  Maybe we know.

13   Yes.

14      Q.   And Strong Trading understands that Unique

15   Designs was not going to accept goods that didn't meet

16   its customers needs and specifications, correct?

17      A.   That I'm not sure.  Because I only handle the

18   transaction between Strong Trading and Unique Design.

19      Q.   You are not sure if the goods -- even if they

20   don't meet Unique Designs customers' specifications --

21      A.   I don't know what Unique Designs' customers

22   request.  I don't know.

23      Q.   The fact that their name appears on the purchase

24   order with the items they are purchasing doesn't give

25   you a hint as to that, right?

1     A.   No.

2     Q.   Sometimes Unique Designs requested a sample,

3  right?

4     A.   Yes.

5     Q.   The sample that was provided to them was either a

6  physical or photograph depicting the item, correct?

7     A.   The sample was always real sample.

8     Q.   The sample was not specifically the item that was

9  going to be bulk ordered though, right?

10    A.   For every bulk order, we will send sample exactly

11 the same as bulk order.

12    Q.   The sample will match exactly the bulk order?

13    A.   Yes.

14    Q.   Always?

15    A.   Yes.  But if they order some sample, it is not

16 for their bulk order.  Maybe they just select some

17 sample from our sample line.  Maybe that stone is not

18 sent as their bulk order.

19    Q.   Okay.  You have no personal knowledge about

20 whether Unique Designs actually received the items they

21 ordered, correct?

22    A.   Can you say that again.

23    Q.   You have no personal knowledge as to whether the

24 items Unique Designs ordered were actually sent to them,

25 correct?

```
 1     A.   The personality?

 2     Q.   Personal knowledge.

 3     A.   Personal knowledge?

 4     Q.   Do you know whether the items sent to Unique

 5   Designs were actually the items they ordered?

 6     A.   Based on the invoice.  So I would know the sample

 7   Unique Design receive is same as we show on the invoice.

 8     Q.   But you are not checking every package, right?

 9     A.   No, I'm not.

10     Q.   But you're not inspecting every package, right?

11     A.   No.

12     Q.   Let's turn to the jewelry items at issue in this

13   case.

14               Since 2018, Unique Designs has purchased lab

15   created emerald jewelry, right?

16     A.   Yes.

17     Q.   Sapphire jewelry?

18     A.   Yes.

19     Q.   Rubies?

20     A.   Yes.

21     Q.   Aquamarine?

22     A.   Yes.

23     Q.   And specifically Unique Designs has been placing

24   orders for what are called three-piece sets, right;

25   pendant, ring and earring?
```

1    A.  Yes.

2    Q.  In all of those gemstones?  Right?

3    A.  Created stones, not gemstones.

4    Q.  I'm sorry.  Those created stones, right?

5    A.  Yes.

6    Q.  Are those the main types of jewelry items that

7  Unique Designs purchased from Strong Trading?

8    A.  Yes.

9    Q.  Would it comprise more than, would you say, 80 to

10  90 percent of those orders with Strong?

11    A.  I would say 60, 70 percent.

12    Q.  If a customer orders emerald but receives red

13  glass, the customer has received the wrong item, right?

14    A.  They receive wrong stone.

15        You say emerald and they receive rubies, is

16  that what you say?  No.

17        THE COURT:  Why don't you ask the question

18  again.

19  BY MR. SINGH:

20    Q.  If a customer orders emerald but receives glass,

21  red glass, the customer has received the wrong item,

22  correct?

23    A.  The wrong stone.  They receive wrong stone.

24    Q.  Okay.  The stone is part of the item, right?

25    A.  Yes.

1     Q.  It is not acceptable to send glass when emerald

2  is ordered, correct?

3     A.  Correct.

4     Q.  Do you agree with me it can be difficult to

5  distinguish between blue topaz and aquamarine, which is

6  also a bluish stone?

7     A.  Yes.

8     Q.  Do you agree with me it is difficult to

9  distinguish between green glass and emerald?

10     A.  Can you say that again?

11     Q.  Do you agree with me that it is difficult to

12  distinguish between green glass and emerald?

13     A.  If it is the real gemstone emerald, it is easy.

14     Q.  What about if it's lab or created emerald like

15  what Unique Designs was ordering?

16     A.  Yeah, it looks green, yes.

17     Q.  They look very similar, glass and lab created

18  emerald?

19     A.  Yeah, they both look green colors.

20     Q.  It is also difficult to distinguish with a naked

21  eye red glass and emerald, lab created emerald -- I'm

22  sorry.  And ruby, correct?

23     A.  Yeah, they both looks red color.

24     Q.  Over the course of Unique Designs' purchase

25  orders, they did order certain cushion cut, which is the

1   -- looks like a pillow case or more of a rectangle,

2   right?

3       A.  Yes.

4       Q.  They also ordered round shaped jewelry, correct?

5       A.  I don't recall.  They don't order too many round

6   shaped.

7       Q.  But they have since 2018, right?

8       A.  I don't recall.

9       Q.  The purchase orders would help you -- would help

10  refresh your recollection as to whether any round items

11  were ordered by -- strike that.

12          Would the purchase orders from Unique

13  Designs help refresh your recollection as to whether it

14  ordered round shaped jewelry?

15      A.  Yes.  I need to see purchase order.

16      Q.  But as you sit here now, you can't deny that over

17  the course of the relationship, it did order some round

18  emerald, rubies and sapphires?

19      A.  I don't recall.

20      Q.  Unique Designs was sent wrong items from Strong

21  Jewelry during that relationship, correct?  And by wrong

22  items, I mean items than what was actually ordered?

23      A.  No.  We send -- everything send as the final

24  invoice shows.

25      Q.  Okay.  During the direct examination from your

1    attorney, you said that by October 2020 -- that was a

2    very specific date, October 2020, there were 20

3    invoices -- or over 20 invoices that were unpaid.  Was

4    that your testimony?

5         A.   Yes.

6         Q.   Mr. Chien, I will direct your attention to what

7    was previously marked as Exhibit 78.

8              Let me know when you are there.

9              These are the aged receivables showing the

10   invoices from Strong Jewelry to Unique Designs.  Do you

11   see that?  It should also be visible on your screen.

12        A.   Yes.

13        Q.   The first -- these are the disputed invoice in

14   this case, right?

15        A.   Not all -- not all -- not every invoice.

16        Q.   And if you can follow along with me here, the

17   first -- the oldest, the oldest invoice here is

18   September 2020.

19              Do you see that?

20        A.   Yes.

21        Q.   And based on your testimony, payment is due after

22   30 days, right?

23        A.   Yes.

24        Q.   So the payment on this would not have been due at

25   least until October 16th, 2020, right?

1     A.   But it says the date due is -- sir, colon, says

2    due date is September 16th.  So I really not sure.

3     Q.   The rest of the invoices are all after October,

4    right?

5     A.   Yes.

6     Q.   So as of October 2020, how many invoices were

7    actually due by Unique Designs?

8     A.   Can you say that again.

9     Q.   As of October 2020, how many invoices were

10   actually due by Unique Designs?

11              THE COURT:  On this list?

12              MR. SINGH:  At all -- yes, based on this

13   list.

14              THE WITNESS:  So from this invoice, I will

15   say it has total maybe -- you want me to count one by

16   one?

17   BY MR. SINGH:

18    Q.   No.  Is it more than one?

19    A.   More than one invoice?

20    Q.   Yes.  That's owed.

21    A.   Yes.  Showing from this report, yes.

22    Q.   And that invoice here is 167,000.  Do you see

23   that?

24    A.   Yes.

25    Q.   And Unique Designs had received invoices for

1   approximately that amount in the past, right?

2       A.   Can you say that again.

3       Q.   Unique Designs had received invoices of

4   approximately that amount in the past, right?

5       A.   What do you mean by in the past?

6       Q.   Before September 2020.

7       A.   Yeah.   They receive the merchandise at this

8   amount, yes.

9       Q.   Are you aware that Unique Designs had paid for

10  about $2 million worth of jewelry prior to

11  September 2020?

12      A.   Yes.

13      Q.   And are you aware that there was a payment made

14  by Unique Designs in about November 2020?

15      A.   Yes.

16      Q.   As of October 2020, Strong Trading was aware that

17  Unique Designs had received topaz when it had ordered

18  aquamarine jewelry, correct?

19      A.   Can you say that again.

20      Q.   As of October 2020, Strong Trading was aware that

21  Unique Designs had received topaz, a lower quality

22  stone, rather than aquamarine, which it had ordered; is

23  that correct?

24      A.   The aquamarine is not lower quality than blue

25  topaz.   They are same quality.   They are the same as

 1   semi-precious stones.

 2        Q.   But different stones, right?

 3        A.   Yes.

 4        Q.   Was Strong Trading aware of Unique Designs'

 5   complaint that they had received topaz instead of

 6   aquamarine?

 7        A.   Yes.   In October I receive an email saying that

 8   the -- their customer complaint that the blue topaz we

 9   sell to Unique, that they want aquamarine.

10        Q.   Directing your attention to Exhibit 88.

11        A.   Yes.

12        Q.   Do you have that before you, Mr. Chien?

13        A.   Yes.

14        Q.   Have you seen that document before?

15        A.   Yes.

16        Q.   This is an email exchange between you and

17   employees of Unique Designs, correct?

18        A.   Yes.

19        Q.   On the first email in the To field, your name

20   appears.

21             Do you see that?

22        A.   You mean first email is --

23        Q.   On the top of the first page.

24        A.   Yes.

25        Q.   You are the sender or recipient of all emails in

1    this exhibit, correct?

2        A.   That means -- can you say that again.

3        Q.   You either sent or received all of the emails in

4    this exhibit, right?

5        A.   Yes.

6        Q.   The emails deal with communications regarding a

7    jewelry order that's the subject of this lawsuit,

8    correct?

9        A.   I do know Unique Design has explain about this

10   aquamarine, blue topaz issues.  But I'm not sure if that

11   involved in this lawsuit or not.

12       Q.   On the email at the top of the page of

13   Exhibit 88, in the sixth row there it says,

14   "Attachments."  Do you see that?  Under "Subject" and

15   before "Hi Kurt."

16       A.   Yes.

17       Q.   The attachment, there is a PDF attached.

18            Do you see that?

19            I'm just asking if you actually see the name

20   of the file that's the attachment.

21       A.   Oh, the VPO?

22       Q.   Correct.

23       A.   Yes.

24       Q.   Directing your attention to the final page of

25   Exhibit 88, that's the VPO -- what is it, vendor

1   purchase order; is that what VPO stands for?

2            Mr. Chien, VPO stands for vendor purchase

3   order?

4       A.   Okay.

5       Q.   Is that what it stands for?

6       A.   I think so.

7       Q.   The document Bates number 8 STI 419, that's the

8   purchase order that was attached to this e-mail,

9   correct?

10      A.   Can you say that again.

11      Q.   The attachment, that purchase order, is the

12  document that was attached to the email, correct?

13      A.   Yes.

14      Q.   You printed out these emails and produced them to

15  your lawyers, correct?

16      A.   I think I forwarded this email too.

17      Q.   The email and the attachment are true correct

18  copies of what was exchanged between you and the other

19  parties between October 9 and October 2020, correct?

20      A.   Can you say that again.

21      Q.   The email that you are looking at, as well as the

22  attachment, those are true and correct copies of what

23  was actually exchanged between you and somebody else

24  between October 9, and October 2020; that's the dates of

25  the emails?

1      A.   I cannot confirm that, because I don't remember

2   what -- at that time, what is the real information

3   between, you know, me and Unique Designs about this.

4      Q.   But -- there is no reason for you to dispute that

5   this is something other than what you gave your lawyers,

6   right?

7      A.   As -- I can tell this is purchase order from

8   Unique Design.

9           THE COURT:   That is not the question.   The

10   question is:   Did you give these emails to your lawyer?

11           THE WITNESS:   Yes.

12           THE COURT:   Okay.

13           MR. SINGH:   Your Honor, Defendant moves to

14   admit Exhibit 88.

15           THE COURT:   It will be received.

16           (Exhibit 88 is received.)

17   BY MR. SINGH:

18      Q.   Mr. Chien, directing your attention to the

19   second-to-last page, which is STI 418, there is -- there

20   is an email there from Vannay Singh.   Vannay Singh is an

21   employee of Unique Designs, right?

22      A.   Yes.

23      Q.   I will refer to Vannay Singh as the Unique

24   Designs employee so we're not talking about Mr. Singh

25   and, you know, confusing me with Mr. Vannay Singh.

1            The employee from Unique Designs is asking

2    you to confirm a certain quality of stone for a

3    birthstone box set.

4            Do you see that?

5    A.   Yes.

6    Q.   A birthstone box set is that three-piece lab --

7    or a certain type of jewel; is that right?

8    A.   Yes.

9    Q.   That's sapphire, emerald, ruby?

10   A.   The birthstone has turf colors.  So it's like

11   turf, different color of the stones.

12   Q.   That email is dated October 8, 2020.

13           Do you see that?

14   A.   Yes.

15   Q.   On October 8 you reply asking for more

16   information about that set.

17           Do you see that?

18   A.   Yes.

19   Q.   The employee from Unique Designs responds, "It's

20   our regular three-piece cushion set."

21           Do you see that?

22   A.   Yes.

23   Q.   You respond to -- this is -- at the bottom of STI

24   416, this is a start of your email, and continues into

25   STI 417.

1          You respond, "Yes.  The birthstone cushion

2     sets are all real gemstone."

3              Do you see that?

4     A.  Yes.

5     Q.  "And there's ruby, emerald, sapphire and opal to

6     be a created stone."

7              Do you see that?

8     A.  Yes.

9     Q.  On October 8, that very same day, the employee

10    from Unique Design states that there is a buyer for that

11    aquamarine set that has made a complaint.

12              Do you see that?

13    A.  Yes.

14    Q.  He's sharing with you that he has learned the

15    birthstone box set was tested and there were topaz

16    gemstones and not aquamarine, correct?  That is the

17    information being shared with you?

18    A.  Yes.

19    Q.  Did Strong Trading consider this to be a

20    complaint about receiving the wrong item?

21    A.  Yes.

22    Q.  Did Strong Trading consider this to be Unique

23    Designs rejecting the goods?

24    A.  They bring out this issue.

25              MR. YORK:  Objection, Your Honor.  Calls for

1    a legal conclusion.

2              THE COURT:  Sustained.

3    BY MR. SINGH:

4      Q.  Did Strong Trading consider this email to mean

5    that Unique Designs did not want to keep these items?

6      A.  They just bring out these issues.

7      Q.  Right.  And I'm asking you about Strong Trading's

8    response to it.

9              Did it consider that to mean that Unique

10   Designs didn't want these items?

11     A.  They bring out this issues, so I will discuss

12   with customers to find out what happened.

13             If possible, we will provide customer

14   service, if there is any issues.

15             And if the customer really want to return

16   the merchandise, and we find out maybe that stone is not

17   what customer want, we will accept the return or

18   exchange.

19     Q.  At the -- your next email is on October 9.  It

20   starts at the bottom of STI 415, it continues into 416.

21             In this email -- take a moment to review

22   it -- you are admitting that for orders placed for

23   aquamarine, Strong Jewelry has sent light blue topaz,

24   right?

25     A.  Yes.  For the three pieces cushion set, not unit

1  design orders.  And we sent to them, the pro forma

2  invoice is a light blue topaz.  And we send them the

3  final invoice as light blue topaz.  And Unique Design

4  receive it as light blue topaz.

5      Q.  Mr. Chien, my questions are very focused.  So if

6  you could try to respond to the question specifically

7  that's being asked, your attorney will also have the

8  opportunity to correct anything.

9      A.  Okay.

10      Q.  At the bottom of STI 415, there's an email from

11  Unique Designs employee.

12              Do you see that?

13      A.  Yes.

14      Q.  He asks you if light blue topaz has been sent to

15  Unique Designs instead of aquamarine since the start of

16  the business relationship.

17              Do you see that?  Do you see that,

18  Mr. Chien?

19      A.  Yes.

20      Q.  You respond later that day -- you respond by

21  saying "yes.  Blue topaz was used for all previous

22  orders and pending orders."

23              Right?

24      A.  I respond --

25      Q.  Is that what the email says?

1    A.  -- for the three pieces cushion set, yes.

2    Q.  That had been the case since 2018, right?

3    A.  I have to look into the orders.  So I'm not sure

4    when they start ordering these light blue topaz.  I have

5    to look into the purchase order.

6    Q.  Mr. -- Mr. Singh.

7         The employee from Unique Designs responds to

8    you that same day, "What should we reply to Signet?"

9         Do you see that?

10   A.  Yes.

11   Q.  You understand Signet was a major customer for

12   Unique Designs?

13   A.  Yes.

14   Q.  Being in the jewelry industry, you know who

15   Signet is, right?

16   A.  Yes.

17   Q.  It's a large, reputable customer, right?

18   A.  I just know they are customers from Unique

19   Designs.

20   Q.  Do you have -- strike that.

21        The employee from Unique Designs is telling

22   you that "You should have informed us that you are using

23   topaz instead of aquamarine."

24        Do you see that?

25   A.  Yes.

1     Q.   Based on these e-mails, did you understand that

2  Unique -- strike that.

3            Based on these emails from the employee at

4  Unique Designs, did you understand that Unique Designs

5  was not not accepting these items as what they ordered?

6     A.   They just tell me this issues.

7     Q.   This is October 2020, right?

8     A.   Yes.

9     Q.   Unique Design -- strike that.

10           Unique Designs also complained that it had

11  received glass jewelry instead of emerald, sapphire, and

12  rubies, right?

13    A.   In April.

14    Q.   In April 2021?

15    A.   Yes.

16    Q.   Directing your attention to Exhibit 275, let me

17  know when you are there.

18           Are you there, Mr. Chien?

19    A.   Yes.

20    Q.   You have seen this document before, right?

21    A.   Yes.

22    Q.   This is an email thread in which you have

23  exchanged emails with employees of Unique Designs,

24  right?

25    A.   Yes.

1    Q.  You were either the sender or recipient of all

2    the emails in this thread, right?

3    A.  Yes.

4    Q.  The emails deal with communications writing a

5    jewelry order that's the subject of this lawsuit?

6    A.  Yes.

7    Q.  These are the type of emails you may receive in

8    the course and scope of your employment at Strong

9    Trading, right?

10   A.  Can you say that again?

11   Q.  These are the type of e-mails that you would

12   receive in the course and scope -- or as part of your

13   employment at Strong Trading, right?

14   A.  Yes.

15   Q.  The Exhibit 275, is it a true and correct copy of

16   the email thread that you turned over to your lawyers?

17   A.  Say that again.

18   Q.  Is this a true and correct copy of an email

19   thread between you and employees of Unique Designs

20   between March 3 and March 23, 2021?

21   A.  Yes.

22           MR. SINGH:  Your Honor.  Defendant moves to

23   admit Exhibit 275.

24           THE COURT:  It will be received.

25           (Exhibit 275 is received.)

1    BY MR. SINGH:

2       Q.   Mr. Chien, directing your attention to the last

3    page of Exhibit 275.   That's UD 8338.

4              Are you there?

5       A.   Yes.

6       Q.   This is an email from you.

7              Do you see that?

8       A.   Yes.

9       Q.   You address this to Tejas.   Do you know who --

10   who's Tejas?   Is that the CEO of Unique Designs?

11      A.   Yes.

12      Q.   In your email you state, "As we discussed this

13   morning, please provide Strong item number and quantity

14   that you will return due to wrong stone issue."

15             Do you see that?

16      A.   Yes.

17      Q.   You continue, "We will need a penalty memo from

18   your customers ASAP."

19             Do you see that?

20      A.   Yes.

21      Q.   You're also offering to complete a credit memo.

22             Do you see that?

23      A.   Yes.

24      Q.   Strong Trading was offering a credit due to the

25   wrong stone issue, right?

1     A.   Yes, if they return the merchandise.

2     Q.   Does it say that in this email?

3     A.   Return the merchandise?

4     Q.   Correct.

5     A.   I'm really not sure, because -- there's so many

6  pages of this emails.

7          But every -- every credit that we issue to

8  customers, we need to receive the merchandise, so we can

9  issue the credit.

10    Q.   "Every order need to receive" -- okay.  Got it.

11         The credit being offered here is because

12  Unique Design was sent the wrong stone, right?

13    A.   From this email, I don't remember.  Because there

14  is really long back and forth emails.

15    Q.   You had a conversation with Mr. Shah, and it was

16  documented in this email, right?

17    A.   Yes.

18    Q.   You wouldn't have made a misstatement in this

19  email, right?

20    A.   Can you say that again?

21    Q.   Would you have inaccurately summarized your

22  conversation in this email?

23    A.   I don't recall, because it is long time ago.

24    Q.   Do you have a tendency to write incorrect

25  information in emails to clients?

 1     A.  No -- sometimes -- my English not my first

 2    language.  So maybe the word I use or the sentence I

 3    write may be is not correct sometimes.

 4     Q.  The goods delivered did not match Unique Designs'

 5    customers needs and specifications, right?

 6               MR. YORK:  Objection.  Vague as to

 7    "customer."

 8               THE COURT:  Overruled.

 9               THE WITNESS:  Can you say that again.

10    BY MR. SINGH:

11     Q.  The goods that were delivered to Unique Designs

12    did not match its customers needs and specifications,

13    right?

14               THE COURT:  If you know.

15               THE WITNESS:  I don't know Unique Designs'

16    customers needs.

17    BY MR. SINGH:

18     Q.  So the wrong stone issue refers only to the

19    gemstone being incorrect, right?

20     A.  You are talking about the wrong stone issue in

21    this email?

22     Q.  Yeah.  It's the wrong gemstone.

23     A.  The wrong stone issue is what Unique Design tell

24    me, there is an issue for the stones.

25     Q.  You also reference in your email a penalty memo

1    from your customers.

2              Do you see that?

3    A.   Yes.

4    Q.   You're aware that Unique Designs are selling

5    these items to a customer, right?

6    A.   Yes.

7    Q.   You are asking for a penalty memo from that

8    customer saying this is the wrong item, right?

9    A.   We want to provide customer service with Unique

10   Design to solve these issues so that they can pay us the

11   overdue payments.

12             So usually we will ask them to return the

13   merchandise, and we will issue a refund or exchange, if

14   there is issues.

15             But we never get any returns from Unique

16   Design.  So we ask them to give me any kind of report or

17   what -- anything we can do to solve this issues so they

18   can pay us.

19   Q.   Mr. Chien --

20   A.   So they told me the customer may be give them

21   some penalties because the stone they sell to their

22   customers is not correct.

23             So we ask them to show me this penalty memo.

24   We just want to see it.  Because we never get any kind

25   of report from customers.

```
 1                  THE COURT:  Next question.
 2   BY MR. SINGH:
 3      Q.  Mr. Chien, please try to focus on the question
 4   I'm asking.
 5                  You received that penalty memo, right?
 6      A.  From this email I really don't remember, because
 7   there's no --
 8      Q.  Did you receive a penalty memo from JTV?
 9      A.  I don't remember.
10      Q.  Isn't that what led you to understand that you
11   needed to order something from JTV?
12      A.  Can you say that again.
13      Q.  When you got the penalty memo -- strike that.
14                  Didn't the penalty memo from JTV lead you to
15   actually buy merchandise from JTV to confirm?
16      A.  I don't recall there is memo.  But customer tell
17   me they sell to JTV.
18      Q.  You are aware that JTV's name did appear on
19   purchase orders, right?
20      A.  From purchase order that customer sent to me?
21      Q.  No.  Purchase orders from Unique Designs,
22   Mr. Chien.  They listed JTV or Jewelry Television on the
23   purchase orders to Strong Trading, right?
24      A.  I'm not aware.  I don't remember.
25      Q.  Okay.  This decision to offer credit to Unique
```

 1    Designs, did Strong Jewelry participate in that

 2    decision?

 3        A.   No.

 4        Q.   Directing your attention to 8337, which is page 3

 5    of this exhibit.

 6             On March 3 you sent another email.

 7             Do you see that?

 8        A.   Yes.

 9        Q.   You're sending an email to two members of Unique

10    Designs' team.

11             Do you see that?

12        A.   Yes.

13        Q.   And you are again referencing the wrong stone

14    issue.

15             Do you see that?

16        A.   Yes.

17        Q.   And you're again requesting the penalty memo,

18    right?

19        A.   Yes.

20        Q.   In this email -- in this email you also ask --

21    you also mention a return merchandise of created aqua

22    and created emerald.

23             Do you see that?

24        A.   Yes.

25        Q.   That was because Unique Designs had informed you

1    that those were the two particular types of stones that

2    were wrong, right?

3        A.   They informed me they are -- there is 325 sets of

4    created aquamarine is wrong.   And the created emerald

5    they sell to JTV is wrong.

6        Q.   So you also knew it was being sold to JTV?

7        A.   Yeah.   From that e-mail.

8        Q.   This is your email to Unique Designs, just to be

9    clear?

10       A.   Yes.

11       Q.   On March 3rd, Mr. Shah responds -- there's an

12   email.   Do you see that email at 4:50 p.m.?

13       A.   Yes.

14       Q.   Mr. Shah states, "At this time, we don't know the

15   extent of issue, so unless you want us to test every

16   single piece and pay for it, I'm fine with that option

17   or return everything."

18                Do you see that?

19       A.   Yes.

20       Q.   Do you understand Mr. Shah to mean by this that

21   he was either asking that you test everything or return

22   everything -- or allow him to return everything?

23       A.   Yeah.   He says he want to test every single piece

24   or return everything.

25       Q.   And he was saying that because that's what was

1   being suggested to him by you, right?

2       A.   No.

3       Q.   Mr. Shah says, "We don't know the extent of the

4   issue."

5            The issue he is referring to is the wrong

6   stone issue, right?

7       A.   Yes.

8       Q.   He also says, "It seems you guys don't understand

9   the magnitude of selling product that was misrepresented

10  and what impact it can have."

11           Do you see that?

12      A.   Yes.

13      Q.   So this was a clear complaint by Unique Designs

14  that the items it was sold did not match what it

15  ordered, right?

16      A.   Yes.

17      Q.   And these same wrong items had been sent to

18  Unique Designs for all pending orders and for all

19  previous orders, right?

20      A.   We send everything based on the final invoice

21  showing the stone.

22      Q.   You understood that buying Strong Jewelry,

23  selling the wrong jewelry to a customer for three years

24  was going to impact that customers' business, right?

25           MR. YORK:   Objection, Your Honor.   Assumes

1   facts not in evidence.

2            THE COURT:  Sustained.

3   BY MR. SINGH:

4     Q.  Directing your attention to your email at the

5   bottom of the second page 8336.

6            Do you see that?

7     A.  Can you say that again?

8     Q.  I'm just directing you to the email -- your email

9   on March 4, 2021 at the bottom of 8336.

10           Do you see that?

11    A.  Yes.

12    Q.  And in this email you state to Mr. Shah, "Only

13   aquamarine has an issue."

14           Do you see that?

15           It just says, "Only aquamarine has issue.

16   And we replaced created aquamarine for you."

17           Do you see that?

18    A.  Yes.

19    Q.  In your next paragraph you write, "Most of

20   gemstone is already tested.  We will only accept return

21   of created emerald."

22           Do you see that?

23    A.  Yes.

24    Q.  You were accepting the return because you knew it

25   was the wrong item, right?

1    A.   No.

2    Q.   It had been sent glass instead of emerald, right?

3    A.   No.   We never receive the merchandise.   And we

4    never saw any report showing this wrong item.

5              We trying to do customer service.   The --

6    the total amount of $7,000.   We rather receive this

7    goods and issue customer $7,000 so they can pay the

8    overdue payment of $350,000.

9              THE COURT:   Next question, Counsel.

10   BY MR. SINGH:

11   Q.   Mr. Shah responds on March 4th, "Your information

12   is not correct.   They have not tested everything."

13             Do you see that?

14   A.   Yes.

15   Q.   He also offers, "If you want, we can send

16   everything for test at your expense," right?

17   A.   Yes.

18   Q.   So if Strong Trading is requiring an inspection

19   report testing, it's fair for Mr. Shah to ask Strong

20   Trading to pay for it, right?

21   A.   That's what you say on this e-mail.

22   Q.   Isn't it true that the cost of the inspection

23   report, the testing is more than each of these items?

24   A.   I don't know how many merchandise has issues.

25   But we -- usually we ship out order by order.

 1          So if customer tell me this 100 pieces of

 2   purchase order has issues, they can send few pieces,

 3   send maybe one or two to get a report.  And if it shows

 4   there is an issue, we can accept this return.

 5          So they can return this order, one order by

 6   one order.  So they can return this 100 pieces back to

 7   us.  And we can give them the return for this

 8   100 pieces.

 9   Q.   Directing your attention to the first page of

10   Exhibit 275.  This is an email from you on March 5.

11          Do you see that?

12   A.   Yes.

13   Q.   You write to Mr. Shah, "From my understanding, it

14   costs $65 each stone."

15          Do you see that?

16   A.   Yes.

17   Q.   And that's how much it cost just to test the

18   stone, right?

19   A.   For one --

20   Q.   Is that right?

21   A.   Yes.

22          MR. SINGH:  Your Honor, may I inquire how

23   much time I have left?

24          THE COURT:  Why don't you ask the next

25   question and I will figure it out.

```
 1                MR. SINGH:  Thank you, Your Honor.

 2   BY MR. SINGH:

 3     Q.  You understood Unique Designs -- strike that.

 4                You understood that Strong Trading -- Unique

 5   Designs informed Strong Trading that it was not

 6   accepting anything other than the actual emerald, ruby

 7   and sapphires that it actually ordered, right?

 8     A.  They informed me there is issue of this stones.

 9   But I never see any report or return of the merchandise.

10                THE COURT:  Counsel, about 45 minutes.

11                MR. SINGH:  Thank you, Your Honor.

12   BY MR. SINGH:

13     Q.  Strong Trading could have easily found out

14   whether Unique Designs had been sent the wrong items,

15   right?

16                MR. YORK:  Objection; argumentative.

17                THE COURT:  Sustained.

18   BY MR. SINGH:

19     Q.  Mr. Chien, was there a list of all items that

20   were specifically delivered from Strong Jewelry Hong

21   Kong to Unique Designs?

22     A.  We only have invoice.  The final invoice.

23     Q.  There is no list maintained by Strong Jewelry

24   Hong Kong showing every item that's sent out of there?

25     A.  No.
```

 1      Q.  The factories you communicate with, do they have

 2   a list of all the items that are actually going out of

 3   there?

 4      A.  I don't know.

 5      Q.  Did you ever ask?

 6      A.  I -- I'm not a factory.  I don't know.

 7      Q.  But you were communicating with factories

 8   regularly, right?

 9      A.  Yes.  Order by order.

10      Q.  Mr. Chien, you earn a commission as an employee

11   of Strong Trading, right?

12      A.  No.  I wish I have.  But not.

13      Q.  Directing your attention to Exhibit 20, are you

14   there?

15      A.  Did you say 20?

16      Q.  Yes.  Two-zero.

17      A.  Okay.

18      Q.  This is an email exchange between you and

19   Mr. Shah, correct?

20      A.  Yes.

21      Q.  You were the sender or recipient in all these

22   emails, correct?

23      A.  Yes.

24      Q.  The e-mails deal with communications regarding

25   the jewelry orders at issue in this case?

 1     A.  Yes.

 2     Q.  You printed out this email thread and produced it

 3  to your lawyers, right?

 4     A.  Yes.

 5     Q.  The email is a true and correct copy of the email

 6  between April 20, 2021, and April 23, 2021?

 7     A.  Yes.

 8     Q.  I understand the first page for some reason the

 9  date is not there.  But to help refresh your

10  recollection, you can refer to Exhibit 26.  Two-six.

11          MR. SINGH:  Your Honor, defendant moves to

12  admit Exhibit 20.

13          THE COURT:  Received.

14          (Exhibit 26 is received.)

15  BY MR. SINGH:

16     Q.  On the first page you were messaging with

17  Mr. Shah.

18          Do you see that?

19     A.  What is the page number again?

20     Q.  The first page of Exhibit 20.  That is an email

21  from you to Mr. Shah; is that correct?

22     A.  Yes.

23     Q.  You're offering -- strike that.

24          Strong is offering a credit and willing to

25  pay lost profit for created aquamarine and emerald sets,

1    right?

2        A.   Yes.

3        Q.   And the total amount that's being offered for the

4    refund is $15,581.75, right?

5        A.   Yes.

6        Q.   And there is a purchase order that's referenced

7    here, 156487.

8               Do you see that?

9        A.   Yes.

10       Q.   That's the purchase order for which there was a

11   credit being offered, right?

12       A.   I have to see it.

13       Q.   Okay.  Well, in the body of your email you're

14   referencing the attached PO, another PO.  Does that help

15   you recall whether it was being offered, a return just

16   for that one PO that's here and here, 156487?

17       A.   I have to see the attachment.  I cannot see it

18   right now.

19       Q.   From the body of the email, can you tell that the

20   credit is only being offered as to that one purchase

21   order that's referenced in the email?

22       A.   No.

23       Q.   There's three created emerald items that are

24   being credited, right?

25       A.   Yes.

1     Q.   I understand each of these represents a different

2     piece of that three-piece cushion set; earring, pendant,

3     and ring, right?  Right, Mr. Chien?

4     A.   Yes.

5     Q.   That's why the cost is different, even though

6     it's all created emerald, right?

7     A.   Yes.

8     Q.   The cost for each item is different?

9     A.   Yes.

10    Q.   So the total amount refunded for that whole set

11    is $17.95.  Okay?  I did the math so just trust me on

12    that.

13         And that's how you reached this -- using

14    these numbers, you've offered a refund of $7,001.75,

15    just for the created emerald, right?

16    A.   Yes.  From that email.

17    Q.   And Strong Trading understood that Unique Designs

18    was losing money because it couldn't sell the items to

19    customers; therefore, it offered a payment for -- which

20    is supposed to be lost sell profit, right?

21    A.   That's what Unique Design request for -- to

22    settle this issues.

23    Q.   There's also an aquamarine set being refunded.

24         Do you see that?

25    A.   Yes.

1    Q.  And based on the amount there, that's the full

2    three-piece set, right?

3    A.  Yes.

4    Q.  You also said in the email that based on a

5    purchase order that the amount that Unique Designs was

6    selling it to a customer was $35.63, right?

7    A.  I cannot see the attachment now.  But that's how

8    it shows on this email.

9    Q.  Correct.  So that's how the profit amount was

10   calculated, is the $35 Unique Designs would have made if

11   it sold it to its customer, how much it cost from Strong

12   Trading, and then that amount I just circled is the lost

13   profit, right?

14   A.  Yeah.  That's based on the calculation.

15   Q.  And Strong Trading is only offering half of that,

16   right, $9.20?

17   A.  Yes.

18   Q.  This was the last amount offered to Unique

19   Designs before Strong Trading filed this lawsuit, right?

20   A.  Can you say that again?

21   Q.  This was the last offer made to resolve these

22   issues before the lawsuit was filed, right?  This email

23   from April 2021, the lawsuit filed May 2021.

24   A.  I really don't remember if there is more emails

25   or phone calls.

1      Q.   All right.   Mr. Chien, last exhibit.

2    Exhibit 108.   Let me know when you are there.

3      A.   Can I have the Exhibit 108?

4      Q.   Correct.

5      A.   I don't have it here.

6      Q.   Can I ask the last few questions about it?   I'm

7    just kidding.

8      A.   Okay.

9      Q.   Great.   This Exhibit 108 is -- the first page is

10   an email from an employee of Unique Designs to you,

11   right?

12     A.   Yes.

13     Q.   And the remaining ten pages of this -- I'm sorry.

14   The second page is also just a final page of that email.

15   And then the remaining nine pages are purchase orders

16   that you received from Unique Designs, right?

17     A.   Yes.

18     Q.   The custom and practice you explained earlier

19   about getting a purchase order by email from Unique

20   Designs, that's what we are looking at in this

21   Exhibit 108, right?

22     A.   Yes.

23              MR. SINGH:   Your Honor, Defendant moves to

24   admit Exhibit 108.

25              THE COURT:   It will be received.

1              (Exhibit 108 is received.)

2              THE COURT:  And it may be published.

3    BY MR. SINGH:

4       Q.  Mr. Chien, the first page of Exhibit 108 is an

5    email that identifies three purchase orders that are

6    attached and then it summarizes all of the items by

7    purchase order.

8              Do you see that?

9       A.  Yes.

10      Q.  These are the items that Unique Designs is

11   ordering from Strong Jewelry or Trade, right?

12      A.  Strong Trading, yes.

13      Q.  I notice that all of the emails addresses here

14   say Strong Jewel, Strong Jewel.

15             Do you see that?

16      A.  Yes.

17      Q.  You're far more sophisticated on this than I am,

18   Mr. Chien, but I assume that because each item ends with

19   SET, SET, that means each of these is a set that Unique

20   Designs was ordering, right?

21      A.  Yes.

22      Q.  So one of the -- the purchase order we just

23   reviewed from your email -- and let me show that to you

24   if it helps you.  In this email, Exhibit 20, the

25   purchase order ended 6487.

1              Do you see that?

2    A.   Yes.

3    Q.   Returning to Exhibit 108, there is a VPO, $6,487.

4              Do you see that?

5    A.   Yes.

6    Q.   That is the purchase order that's being

7    referenced in your email, correct?

8    A.   Yes.

9    Q.   Purchase orders always have new numbers, right?

10   You don't have the same purchase order given -- two

11   different purchase orders given the same number, right?

12   A.   Right.

13   Q.   Directing your attention to STI 492.  Are you

14   with me?

15   A.   What is the number again?

16   Q.   It is just the last three pages of that exhibit

17   we are looking at.  It is going to be STI 492, 493.

18              I also have it on your screen now.

19   A.   Okay.

20   Q.   Do you see that?

21   A.   Yes.

22   Q.   This is a purchase order from Unique Designs,

23   right?

24   A.   Yes.

25   Q.   This is that purchase order we were just talking

1    about ending in 6487.

2              Do you see that?  Do you see that,

3    Mr. Chien?

4        A.  Yes.

5        Q.  The customer name here -- in other words, the

6    customer for whom this purchase order is being placed is

7    Sterling Corp.

8              Do you see that?

9        A.  Yes.

10       Q.  You understand Sterling Corp. is also Signet?

11       A.  I don't know.

12       Q.  The date of this order is July 14, 2020, right?

13       A.  Yes.

14       Q.  There is an emerald three-piece set that's

15   identified in this order.  It is right here.  Are you

16   with me?

17       A.  Yes.

18       Q.  The price shown for how much profit -- strike

19   that.

20              This price shown here is how much Unique

21   Designs is selling it to Signet, right?

22       A.  No.

23       Q.  What's that?

24       A.  No.

25       Q.  Well, according to your email in Exhibit 20 --

1    Okay.  Do you have an understanding as to what that

2    number is, that price amount we were just looking at?

3         A.   What's the number?

4         Q.   $28.75.

5         A.   Okay.

6         Q.   Do you know what that number represents?

7         A.   This is the purchase order that Unique Designs

8    send to us.

9         Q.   Right.

10        A.   So the amount should be if -- if this is correct,

11   the amount should be the price they pay for this

12   merchandise.

13        Q.   To you?  How much they paid to you?

14        A.   If that's correct.  Yeah.  I don't think that

15   amount is the correct amount, as I say.  They always

16   send -- put the wrong information on their purchase

17   order.

18        Q.   Hopefully we can clarify this up.

19             Let's look at STI 493.  Are you with me?

20        A.   Yes.

21        Q.   There is a purchase -- in this purchase order,

22   which is the second page of this purchase order, it

23   shows they are buying genuine aquamarine, right?

24             Do you see that?

25        A.   Yes.

1      Q.   And the amount shown here is $35.63.

2           Do you see that?

3      A.   Yes.

4      Q.   Referring back to your email, that's the amount

5      you used when calculating the loss profit on the

6      aquamarine.

7           Do you see that?

8      A.   Yes.

9      Q.   So you did know how much Unique Designs was

10     selling every item to its customers, right?

11     A.   I assumed.  They never told me.  But I assume.

12     That is why I do this estimate price.

13     Q.   Having now looked at the purchase order 156487

14     and your email, the purchase order -- the items in that

15     purchase order, that's what all of this credit is for,

16     right?  The credit being offered?

17     A.   Can you say that again.

18     Q.   From your email, Exhibit 20, and the purchase

19     order we just looked at, this email shows that the only

20     credit that Unique Designs is being offered is for that

21     one purchase order, correct?  For the items in that

22     purchase order?

23     A.   No.

24     Q.   It says -- we've seen the reference number.

25     We've seen that there's a created emerald in that order.

1    There's an aquamarine in that order.

2              Does that help refresh your recollection

3    whether that was the only order for which it was getting

4    a credit?

5    A.    No.

6    Q.    Directing your attention back to Exhibit 108, you

7    see purchase order 154687.

8              Do you see that?

9    A.    Yes.

10   Q.    This email contains purchase order 156486.

11             Do you see that?   Do you see that?

12   A.    Yes.

13   Q.    Same date.   Do you see that?

14   A.    Yes.

15   Q.    Same customer.   Do you see that?

16   A.    Can you go down so I can --

17   Q.    I'm just showing you the customer.

18             Do you see the same customer as 156487,

19   Sterling Corp.

20   A.    Can you show me the 156487 again.

21   Q.    Sure.

22   A.    Yeah, it shows it is the same.

23   Q.    Okay.   And 156486 also has an order for

24   aquamarine, right?   Right, Mr. Chien?

25   A.    Yes.

1      Q.   It also has an order for three-piece emerald,

2   right?

3      A.   Yes.

4      Q.   And it was ordering on the same date, right?

5      A.   Can you show me the date?  It is not the same

6   date.

7      Q.   July 14, 2020.  July 14, 2020.

8      A.   Oh, okay.

9      Q.   Is there any email or document you are aware of

10  where Unique Designs is offered a refund for 156486?

11     A.   I don't recall.

12     Q.   And there is another purchase order, 156485.

13          Do you see that?

14          This is on STI 488.

15     A.   Yes.

16     Q.   Again, this is a same date, July 14th.

17          Do you see that?

18     A.   Yes.

19     Q.   Same customer, right?

20     A.   Right.

21     Q.   And, again, they order aquamarine, and they order

22  three-piece emerald set.

23          Do you see that?

24     A.   Yes.

25     Q.   And yet no document, no email showing that

1    they're also offered a refund for these items, right?

2        A.   From the email I wrote 325 sets.  Of the -- the

3    created aquamarine.  So I'm not sure if that is the same

4    as this PO.

5        Q.   And my last question, the price here is, as we

6    have established, is the price that Unique Designs is at

7    least saying it is getting from its customer for that

8    product, right?

9        A.   I cannot tell.

10       Q.   This price shown for the emerald is less than

11   what it was sold to Unique Designs for, right?

12       A.   Yes.

13       Q.   To test each of the pieces in this set would have

14   cost at least $180, right?

15       A.   They don't have to test each piece of this set.

16            As I told you, this order is is 36 pieces.

17   They only need to test one, and we will accept the

18   return.  Not all 36 pieces.

19       Q.   Mr. Chien, you weren't responsible for the refund

20   policy, were you?

21       A.   I work in customer service.  So unless customer

22   want to refund, they talk to me.

23       Q.   So is it now your testimony that multiple

24   purchase orders, 50 different purchase orders, all have

25   emerald in them, the customer only needs to test one and

1   all of them will be returned?

2      A.   No.

3            MR. SINGH:  Nothing further.

4            THE COURT:  Okay.  Cross -- excuse me,

5   redirect?

6            MR. YORK:  Okay.

7                    **REDIRECT EXAMINATION**

8   BY MR. YORK:

9      Q.   Mr. Chien.  On Exhibit 275 --

10     A.   275?

11     Q.   Yes.  If we can go back to that.  Exhibit 275,

12  you refer to a wrong stone issue, correct?

13     A.   Yes.

14     Q.   Are those your words or Unique Designs' words?

15     A.   I don't recall.

16     Q.   Did you believe there was a problem with the

17  stones?

18     A.   I need to see the return merchandise or the --

19  any report.  But I don't see any of that.

20           So customers says there is issues.  So I

21  call it wrong stone issue.

22           But I never see the report.

23     Q.   Wrong stone issue, that was the words they used?

24     A.   I don't recall if they use or I use.  But from

25  this emails, I think that means, you know, that is the

1    issue that Unique Designs bring out.

2      Q.  By using those words, were you agreeing that

3    there was a problem with the stones?

4      A.  No.

5              THE COURT:  Okay.  Ladies and gentlemen, it

6    is 11:30.  Excuse me.  We will be breaking for lunch at

7    this time.  See you back at 1 o'clock.

8              Remember the admonishment not to discuss the

9    case among yourselves or with anybody else or form or

10   express any opinions about the matter until it's

11   submitted to you and you retire to the jury room.

12             I will be talking to the attorneys, please

13   leave quietly.

14             You may step down, sir.

15             THE WITNESS:  Thank you.

16             (OUT OF THE PRESENCE OF THE JURY.)

17             THE COURT:  Okay.  The record reflects that

18   the jurors left the courtroom.

19             Counsel, couple things.  Number one, I

20   understand that we did receive the -- you can have

21   seats.

22             We did receive the clean copy of the

23   instructions, is my understanding.  So I will be going

24   through those.

25             Time limits.  The plaintiff has 68 minutes

```
 1   left.  They've used 112 minutes.

 2              The defendant has used 167 minutes.  So you

 3   have 13 minutes left.  And that's for the entire case,

 4   including the -- as we have said before, including any

 5   cross complaints.

 6              So I want to make sure everybody knew what

 7   was going on about the time limits.

 8              MR. SINGH:  Your Honor, may I raise a brief

 9   issue before we take lunch?

10              So for Mr. Shah's live testimony I intend to

11   play just a short snippet of his video deposition.  I

12   designated -- I filed the designation for that.  The

13   audio video of it is not ideal.  The version I got from

14   the depo court reporter that was used by plaintiff's

15   counsel didn't allow me to do what I did yesterday which

16   was just have the manual for the transcript running with

17   the video.  So regrettably I will stand there and kind

18   of do it.  I know it's the least efficient way of doing

19   it.  But it should still come within my 13 minute period

20   of time.

21              THE COURT:  Any testimony, whether it's

22   deposition or not, counts your time on it.  I'm probably

23   going to give you another extra five minutes because

24   this last witness was very slow in answering questions.

25   So rather than 13 minutes, you have 18 minutes on that.
```

1            MR. SINGH:  Thank you, Your Honor.

2            (BREAK TAKEN.)

3            THE COURT:  Let the record reflect all the

4    members of the jury are in their seats in the jury box.

5            The witness is on the stand and is still

6    under oath.

7            Counsel, you may continue.

8            MR. YORK:  Thank you, Your Honor.

9    BY MR. YORK:

10   Q.  Mr. Chien, I would like you to look at

11   Exhibit 275, again.

12   A.  Yes.

13   Q.  You recall that Exhibit 275 were some emails that

14   Mr. Singh showed you about issues with jewelry, correct?

15   A.  Yes.

16   Q.  And you were willing to issue Unique Designs a

17   credit memo for the amount involved if they returned the

18   goods, correct?

19   A.  Yes.

20   Q.  They never returned the goods, correct?

21   A.  No, never returned the goods.

22   Q.  Why were you willing to offer Unique Designs a

23   credit?

24   A.  As I say before, we are willing to offer this

25   customer service to accept their returns so -- and issue

1  then this credit so that they can pay us the overdue

2  amount.

3     Q.  Next, let's look at Exhibit 20.

4         Do you see that, Mr. Chien?

5     A.  Yes.

6     Q.  And this is another email -- or series of emails

7  regarding other credits, correct?

8     A.  Yes.

9     Q.  Now, in terms of the jewelry that was the subject

10  of this email string, did you believe that there was an

11  issue with the stone in the jewelry being wrong?

12     A.  No.

13     Q.  Okay.  And, again, why did you offer to give

14  Unique Designs a credit?

15     A.  It is same answer, because we want to offer them

16  this credit to solve this issue that customer brings up.

17  And we never saw the report -- or they never return this

18  merchandise.  But we want to solve this issues so they

19  can pay the overdue payment.

20     Q.  All right.  Next, let's look at Exhibit -- strike

21  that.

22         Let's go back to Exhibit 20, if we may.

23  Just in the interest of time, rather than showing you

24  more e-mails, you will see there are some purchase order

25  numbers listed in this email, correct?

1      A.   Yes.

2      Q.   And Mr. Singh asked you about a specific purchase

3   order with a specific number on it just before we broke.

4           Do you remember that?

5      A.   Yes.

6      Q.   Is this the same purchase order, the -- one of

7   the purchase orders listed on this email, the same as

8   the purchase order that Mr. Singh was asking you

9   questions about?

10     A.   Yes.

11     Q.   Now, let's talk about paying for the cost of the

12  testing.

13          Would you look at Exhibit 274, please.

14     A.   Okay.

15     Q.   Do you have that?

16     A.   Yes.

17     Q.   Do you recognize Exhibit 274?

18     A.   Yes.

19     Q.   What's Exhibit 274?

20     A.   That is the email that I have answered the

21  questions regarding to solve the issues and get the

22  stone test report.

23     Q.   Mr. Chien, I believe the microphone is a little

24  away from the front.  If you can make sure it's --

25     A.   Okay.

1     Q.  If you can repeat your answer, please.

2     A.  Okay.  This is the email that I saw this morning,

3  discussed the return of the goods that customer -- UDI

4  say there's issues.  And I ask for the stone test

5  report.

6     Q.  And is this an email that you sent to Unique

7  Designs?

8     A.  Yes.

9         MR. YORK:  Your Honor, I would offer 274

10  into evidence and request permission to publish.

11         THE COURT:  Number 274 is received.  And you

12  may publish.

13         (Exhibit 274 is received.)

14         MR. YORK:  Okay.

15  BY MR. YORK:

16     Q.  Mr. Chien, what was the purpose of sending this

17  email?

18     A.  Because customer is saying that a lot of

19  semi-precious stones also has issues.  But we don't have

20  like any report or return merchandise to prove that

21  there is issue.

22         So I ask customer to either return the goods

23  or give me any kind of report.  So I offer that if they

24  send out eight different kind of gemstones on this

25  emails -- the amethyst, the topaz, this kind of

1   semi-precious stones, we will pay the stone test cost.

2       Q.   The highlighted portion, that's what you're

3   referring to?

4       A.   Yes.

5       Q.   Did you ever receive the gems to test?

6       A.   No.

7       Q.   Did you ever receive one single gem to test?

8       A.   No.

9       Q.   Mr. Chien, were there occasions on which Unique

10  Designs wanted something and they actually put in their

11  purchase order?

12      A.   Can you say that again.

13      Q.   Sure.  Were there occasions when Unique Designs

14  actually wanted something different than what they put

15  in their purchase order?

16      A.   Yes.

17      Q.   Would you look at Exhibit 252.

18      A.   Okay.

19      Q.   Do you have that in front of you?

20      A.   Yes.

21      Q.   Do you recognize Exhibit 252?

22      A.   Yes.

23      Q.   Tell us what 252 is.

24      A.   This is the email Unique Design send to me

25  with -- attach the PO for the purchase order.

1    Q.   What is the date on this email?

2    A.   February 2nd, 2018.

3              MR. YORK:  Your Honor, I'd offer it into

4    evidence and ask permission to publish.

5              THE COURT:  It will be received and can be

6    published.

7              (Exhibit 252 is received.)

8    BY MR. YORK:

9    Q.   Now, Mr. Chien, let's look at the attachment

10   first.  Let's look at the purchase order that's

11   attached.

12             MR. SINGH:  Counsel, is this Exhibit 252?

13             MR. YORK:  Yes.

14             THE WITNESS:  Okay.

15   BY MR. YORK:

16   Q.   Okay.  So what page is the purchase order?

17   A.   They have two pages of purchase order.

18   Q.   And what do these purchase orders indicate Unique

19   Designs wanted to purchase?

20   A.   Okay.  So the item number that is the item they

21   want to order.  And also it's the instructions with the

22   stem and then the stones they want to order.

23   Q.   Does Unique Design email indicate that they

24   actually wanted something other than what was in the

25   purchase order?

1     A.   Yes.

2     Q.   Would you tell us, is that on the first page of

3   this exhibit?

4              MR. SINGH:  Your Honor, I will object only

5   on the basis that the exhibit being shown is different

6   than what has been identified in the exhibit list.

7              This document, for example, has no Bates

8   number.  Exhibit 252 is UD 3624 to 647.  None of these

9   documents are in the exhibit.

10             THE COURT:  Counsel.

11             MR. YORK:  Yes, Your Honor.

12             We sent counsel a version of Exhibit 252

13   that did not have attachment to it.

14             THE COURT:  Okay.

15             MR. YORK:  There was another version that

16   had the attachment.  We sent him the correct version

17   about --

18             THE COURT:  May or may not -- show it to him

19   and see if he has that.

20             MR. YORK:  Okay.

21             THE COURT:  If he doesn't have it, show him.

22   If you can give him a copy of it.

23             MR. SINGH:  It's fine, Your Honor.

24             THE COURT:  Thank you, Counsel.

25             MR. YORK:  Thank you also, Counsel.

1             MR. SINGH:   Thank you.

2    BY MR. SINGH:

3       Q.   Mr. Chien, going back to the email.   Is the email

4    on the first page that you are referring to?

5       A.   Yes.

6       Q.   And what does the email say Unique Designs wanted

7    to purchase?

8       A.   Okay.   From the email, the server of the e-mail

9    says, "Attached dimension created emerald.   But we want

10   simulated emerald.   The one we received the sample on

11   today."

12            And simulated means glass.

13      Q.   The email told you that Unique Designs wanted

14   something other than what they put in the purchase

15   order?

16      A.   Yes.

17      Q.   Let's talk now about this aquamarine and blue

18   topaz issue.

19            What is your understanding of Unique

20   Designs' claim regarding the aquamarine versus blue

21   topaz issue?

22      A.   Okay.   They say their customers want aquamarine,

23   but we sell them the light blue topaz.   And based on the

24   invoice, yes we sell them light blue topaz.

25      Q.   So you researched the invoices to figure out

1   exactly what was sold to them?

2       A.   Yes.

3       Q.   And why was light blue topaz sold to Unique

4   Design rather than aquamarine?

5       A.   Okay.   Customers want the price point around $15

6   to $17 per set for that three pieces cushion set.   And

7   they want gemstone for the aquamarine.   But the real

8   aquamarine for that set is very expensive, like $193 per

9   set.   But customer want to pay 15 to $17 per set, so we

10  use aquamarine color blue topaz, and we send this

11  information to customers with the price, like 17.20.   So

12  customers confirm the price and they order sample.

13      Q.   Was it your understanding that the price point,

14  the cost of the jewelry, was important to Unique

15  Designs?

16      A.   Yes.

17      Q.   When Unique Designs orders jewelry from Strong

18  Trading, do they indicate to Strong Trading how much

19  they are willing to pay for the jewelry?

20      A.   Yes.

21      Q.   And is it up to Strong Trading to figure out how

22  to make that work, so to speak?

23      A.   Yes.

24      Q.   And then in this particular case the only way to

25  make it work was to provide light blue topaz instead of

1   aquamarine?

2      A.   Yes.  How many pieces of jewelry are we talking

3   about in terms of this particular issue?

4            From the email, it says 325 pieces.

5      Q.   At about $17.20 a piece?

6      A.   Yes.  The price is 17.20.

7      Q.   Now, in this particular case, did Strong Trading

8   send a sample of the light blue topaz to Unique Designs?

9      A.   Yes.  We do order the sample.  And we send out

10  the sample for the light blue topaz to customers.

11     Q.   Did Strong Trading invoice Unique Designs for the

12  sample?

13     A.   Yes.  We invoice them.

14     Q.   What was the price of the sample?

15     A.   17.20.

16     Q.   Did the invoice for the sample indicate that the

17  stone was light blue topaz instead of aquamarine?

18     A.   Yes.  The stone called for light blue topaz is

19  SBT.  So showing on the invoice, the stone is SBT.

20     Q.   Mr. Chien, would you please look at Exhibit 118.

21     A.   Okay.

22     Q.   Do you recognize Exhibit 118?

23     A.   Yes.  This is the sample invoice I just talk

24  about.

25     Q.   So this is the invoice for the sample that you

1    sent to Unique Designs, correct?

2       A.  Yes.

3               MR. YORK:  Your Honor, I would offer

4    Exhibit 118 into evidence and request permission to

5    publish.

6               THE COURT:  It will be received and may be

7    published.

8               (Exhibit 118 is received.)

9    BY MR. YORK:

10      Q.  Now, Mr. Chien can you show us on this invoice

11   where it indicates that the sample -- or the stone in

12   the sample that was sold to Unique Designs was light

13   blue topaz?

14      A.  Okay.  From description, it has the stone called

15   SBT, that's the stone code for light blue topaz.  And

16   the price 17.20, that's the price for light blue topaz

17   set.

18      Q.  Is it possible to have a sample like this that

19   has aquamarine in it for $17.20?

20      A.  For real aquamarine, no.

21      Q.  If you are to make a sample like this and have

22   aquamarine in it instead of light blue topaz, how much

23   would the sample cost?

24      A.  It's $193.

25      Q.  Did you do anything to confirm that Unique

1  Designs received the sample?

2      A.  On this invoice, it has the tracking number on

3  it.  So we can check the tracking number and make sure

4  the shipment sample arrived to customers.

5      Q.  Did you do that in this case?

6      A.  Yes.

7      Q.  Did the results indicate to you that Unique

8  Designs had received the sample?

9      A.  Yes, they received the sample.

10     Q.  Did Unique Designs approve the sample?

11     A.  Yes, they approve the sample and place the order.

12     Q.  And you previously testified that when a customer

13  places an order you send a pro forma invoice, correct?

14     A.  Yes.

15     Q.  Did you send a pro forma invoice in this

16  particular case?

17     A.  Yes.  When they place the purchase order and I

18  input all the information in our IntraSystem and create

19  a pro forma invoice, and I email that pro forma invoice

20  to customers.

21     Q.  Okay.  Mr. Chien, would you please look at

22  Exhibit 23.

23     A.  Okay.

24     Q.  Do you have that in front of you?

25     A.  Yes.

1    Q.   Do you recognize Exhibit 23?

2    A.   Yes.

3    Q.   What's Exhibit 23?

4    A.   This is the pro forma invoice I just talk about.

5         MR. YORK:  Your Honor, I offer Exhibit 23

6    into evidence and request permission to publish.

7         MR. SINGH:  Objection, hearsay.

8         THE COURT:  Overruled.  It will be received.

9         (Exhibit 23 is received.)

10   BY MR. YORK:

11   Q.   Mr. Chien, can you tell us where on this

12   document, if at all, it indicates that this is -- this

13   is jewelry with blue topaz instead of aquamarine?

14   A.   Okay.  From the sixth item on this invoice, when

15   you say it's -- it has the customer item number

16   KSS0DWHQ, that's what customer needs for aquamarine.

17        We have the stone called SBT, that's for

18   light blue topaz.  And the price is 17.20.

19   Q.   Does this invoice say anywhere on it that Strong

20   Trading was selling aquamarine to Unique Designs?

21   A.   No.

22   Q.   I notice -- strike that.

23        Did Unique Designs approve this pro forma

24   invoice?

25   A.   Yes.

1     Q.   After Unique Designs approved the pro forma

2   invoice, what happened next?

3     A.   I send the information to factory, asked them to

4   start production.  And once factory complete the order,

5   they ship out the merchandise to our Hong Kong office.

6   And then our Hong Kong office ship out the merchandise

7   to Unique Designs.

8     Q.   Was a final invoice sent to Unique Designs for

9   this particular jewelry?

10    A.   Yes.  Once Hong Kong office ship out merchandise,

11  and then I will email the final invoice with tracking

12  number to Unique Designs.

13    Q.   Would you please look at Exhibit 56.

14    A.   Okay.

15    Q.   All right.

16         MR. YORK:  We can bring Exhibit 56 on the

17  screen because it is already in evidence.

18         THE COURT:  Yes.

19         MR. YORK:  Thank you.

20  BY MR. YORK:

21    Q.   Now, Mr. Chien, what's Exhibit 56?

22    A.   This is the final invoice that I email to

23  customers.

24    Q.   And what's this final invoice indicate as to what

25  jewelry was being sold to Unique Designs?

1      A.   From the descriptions, it has all the stone cost

2    for the each item that we send to Unique Design.

3            And from the No. 7, that item number is also

4    the KSS0DWHQ that's the aquamarine code from Unique

5    Design.  And then on the description it has stone code

6    SBT for light blue topaz.  And then the price is 17.20.

7    Same as pro forma invoice.

8      Q.   Unique Designs contacted you about this issue,

9    correct?

10     A.   Yes.

11     Q.   When they contacted you about this issue, what

12    was your response?

13     A.   I tell them, because of the price issues, that

14    they want to pay 15 to 17 dollars, there's no way to get

15    a genuine aquamarine.  So the light blue topaz is the

16    only option we can do for if they need the gemstones.

17    And which the price 17.20.

18     Q.   As far as you are concerned, was it communicated

19    to Unique Designs that they were being sold blue topaz

20    instead of aquamarine?

21     A.   Yes.  From the sample invoice we have the stone

22    code light blue topaz, and customer approve.  And pro

23    forma invoice, we have the same stone code SBT for light

24    blue topaz, which is same price 17.20.  And then the

25    final invoice we have same information; the stone code

1    SBT is the light blue topaz, and priced 17.20.

2              So I tell Unique Design three times that

3    this item is light blue topaz.

4       Q.   Did you receive any indication -- excuse me.  Any

5    communication from Unique Designs that regardless of all

6    this they might want to buy aquamarine?

7       A.   Can you say that again.

8       Q.   Sure.  It Strong Trading offer to do anything to

9    address this issue?

10      A.   Yeah.  When Unique Designs says about this issue,

11   that the customer don't want the light blue topaz even

12   though, you know, we confirm to Unique Designs three

13   times the item we sell to them is light blue topaz.  But

14   we still try to do a good customer service.

15             So I offer Unique Design exchange of stones.

16   So if they want aquamarine, we can accept the return and

17   repair the stone for them.

18      Q.   What type of aquamarine did you offer?

19      A.   Okay.  We have the created aquamarine around $19

20   per set, and the genuine aquamarine for $193 per set.

21   So I give them these two offer.

22      Q.   Did you send them any samples?

23      A.   Yes.

24      Q.   They want to see the sample first.  So I send the

25   sample order these two kind of stones.

1          So you sent them a sample of jewelry with

2   genuine aquamarine?

3      A.   Yes.

4      Q.   And you sent them a sample of jewelry with

5   created aquamarine?

6      A.   Yes.

7      Q.   And what was their response to the samples that

8   you sent them?

9      A.   After they receive a sample and they confirm they

10  want to use created aquamarine.

11         So I ask Unique Design to send back the 325

12  sets so we can repair and change the stone for them.

13         So Unique Design send the 325 sets of

14  merchandise back to our California office.  So I receive

15  the return merchandise.  And prepared the forms.  We

16  give them the credit for this return for 325 pieces.

17         And I send back the merchandise to

18  factories.  Factory repair and change the stone to

19  created aquamarine.  Once they finish the repair they

20  send the merchandise to our Hong Kong office.  And Hong

21  Kong office ship out this created aquamarine set to

22  Unique Design.

23     Q.   So you remove the blue topaz stone from the 325

24  items of jewelry and had it replaced with created

25  aquamarine?

1      A.  Yes.

2      Q.  And did you send an invoice to Unique Designs for

3  the created aquamarine?

4      A.  Yes.

5      Q.  Did they pay it?

6      A.  No.

7           MR. YORK:  No further questions, Your Honor.

8           THE COURT:  Recross?

9                    **RECROSS-EXAMINATION**

10 BY MR. SINGH:

11     Q.  Mr. Chien, did you find out how much Unique

12 Designs paid in penalties to JTV for the wrong item

13 issue?

14     A.  I don't recall.

15     Q.  Do you know how much Unique Design paid to Signet

16 for the wrong stone issue?

17     A.  No.

18     Q.  Strong Trading does not communicate with any of

19 Unique Designs customers, right?

20     A.  No.

21     Q.  Is there anything in the contract that allows

22 Strong Trading to simply swap out any item it places for

23 another item?

24     A.  I don't understand your question.

25     Q.  Is there anything in the contract between Strong

1    Trading and its customers that allows Strong Trading the

2    discretion to pick and choose what item it actually

3    sends despite what's being ordered?

4        A.   I don't know what you mean for that agreement.

5        Q.   If Unique Designs ordering aquamarine for Signet,

6    that's what it's ordering, right?

7        A.   I don't know if Unique Design order these item or

8    stone to what his customers, I just know like the

9    contract between Strong Trading and Unique Design.

10       Q.   You only told Unique Designs about the price hike

11   for topaz versus aquamarine after it complained, right?

12   Like actually told them about it specifically?

13       A.   For the price they want, $17, I think if you work

14   in the jewelry business for a long time, everyone knows

15   the price for genuine aquamarine is like three times or

16   five times higher than other semi-precious stones.

17               THE COURT:   That wasn't the question.

18   Listen very carefully to the question.

19               Counsel.

20   BY MR. SINGH:

21       Q.   You only told Unique Designs specifically about

22   the price difference, the significant price difference

23   between aquamarine genuine or created or topaz only

24   after it complained about the wrong stone issue, right?

25       A.   From this aquamarine says issues, yes.

1            I tell them from the beginning we use the

2    light blue topaz, the stone code.  From the beginning we

3    send them the sample invoice.  The item number is SBT,

4    light blue topaz.

5    Q.  You keep referring to a stone code.  There is no

6    stone code legend or any list showing anybody what the

7    stone code is in your invoices, correct?

8    A.  From our final invoice, no.  But from the

9    quotation, the first time I send to customers, yes.  So

10   most of the time, customer will have our stone code on

11   their purchase order.

12   Q.  Have you ever seen that email to Unique Design

13   where the stone code was spelled out every item?

14   A.  I need to check out the purchase order.

15            MR. SINGH:  Nothing further.  Thank you,

16   Your Honor.

17            MR. YORK:  Nothing further, Your Honor.

18            You may step down.

19            THE WITNESS:  Thank you.

20            THE COURT:  Next witness.

21            MR. YORK:  Your Honor, plaintiff rests.

22            THE COURT:  Defense?

23            MR. SINGH:  Your Honor, before defendants

24   call its first witness, we would like an opportunity to

25   make an oral motion.

```
 1              THE COURT:  Rule 50 motion, Counsel?
 2              MR. SINGH:  Yes.
 3              THE COURT:  You can do this in writing.  The
 4  Court will take it under submission, give the other side
 5  a chance to respond.  Okay.
 6              MR. SINGH:  Understood, Your Honor.
 7              The defendant will call --
 8              THE COURT:  And you're -- the Court is going
 9  to allow you to reserve that time, so you don't have to
10  make it right now.
11              MR. SINGH:  Thank you, Your Honor.
12              Defendant will call Tejas Shah.  And we'll
13  play all by deposition testimony.
14              THE COURT:  Sure.
15              And this is a video deposition; is that
16  correct?
17              MR. SINGH:  That's right, Your Honor.
18              THE COURT:  Ladies and gentlemen, a
19  deposition is testimony that is taken before trial in
20  which the witness is placed under oath.  If for some
21  reason the witness is unavailable, that deposition can
22  be played in Court in front of the jury without that
23  person being here.  And you are to take it as if that
24  person was here testifying just like they do in the
25  deposition.  Okay?  Okay.
```

1              MR. SINGH:  I seem to be having technical

2    issue with this video due to the certain format of it.

3    Is it possible to have a short break?

4              THE COURT:  Five minutes.  You want a

5    five-minute break?

6              MR. SINGH:  Yes.  Five-minutes tops.

7              THE COURT:  We will break for five minutes.

8              (BREAK TAKEN.)

9              THE COURT:  The record will reflect all the

10   jurors are present.

11             And, Counsel, you got it set up?

12             MR. SINGH:  Thank you, Your Honor.

13             THE COURT:  Okay.  And can you name the

14   witness, please, for the record.

15             MR. SINGH:  Yes.  Defendant calls Tejas

16   Shah.

17             THE COURT:  That witness will be called

18   through the video deposition testimony.

19             MR. SINGH:  Your Honor, may I read through

20   what we have designated one by one?

21             THE COURT:  Sure.

22             MR. SINGH:  Starting at page 7, line 18

23   through 19.

24             (PLEASE NOTE "Unintelligible" means I, Sheri

25   Kleeger, the court reporter in court, could not

 1    understand the video that was played.  Please refer to

 2    the video itself.)

 3                (VIDEO PLAYED.)

 4                "THE CLERK:  Please state your name for the

 5    record.

 6                "THE WITNESS:  Tejas Shah."

 7                MR. SINGH:  Page 13, line 4 through page 14,

 8    line 14.

 9                MR. YORK:  Your Honor, there is an objection

10    to that portion of the deposition.

11                THE COURT:  Overruled.

12                (VIDEO PLAYED.)

13                "QUESTION:  "-- interrupt and allow him to

14    answer a question that I asked him.

15                "So, Mr. Shah, I will ask the question

16    again:  What is your understanding of what topics you've

17    been designated to testify about?

18                "MR. YORK:  Objection, vague and ambiguous.

19    Argumentative.  Attorney-client communications.

20                "Go ahead.  You may answer.

21                "THE WITNESS:  So I believe you want to -- I

22    guess the deposition is about the fraudulent merchandise

23    that's been supplied by Strong Hong Kong.  And you want

24    me to (Unintelligible) those regarding that?

25                "QUESTION:  And that is your understanding

1    of what you're here to testify about today?

2                "ANSWER:  Yes.

3                "QUESTION:  What is your title or position

4    with Unique Design?

5                "ANSWER:  Repeat the question.

6                "QUESTION:  Sure.  What is your title or

7    position with Unique Designs?

8                "ANSWER:  CEO of Unique Designs.

9                "QUESTION:  How long have you been the CEO

10   of Unique Designs?

11               "ANSWER:  About 15 years.

12               "QUESTION:  And as CEO of Unique Designs,

13   what are your duties?

14               "ANSWER:  I'm the chief executive officer."

15               MR. SINGH:  Page 38, line 19 through page

16   39, line 13.

17               MR. YORK:  Your Honor, there is also an

18   objection to that portion of the deposition on the

19   grounds of foundation, hearsay.

20               THE COURT:  It will be overruled, subject to

21   a motion to strike.

22               (VIDEO PLAYED.)

23               "QUESTION:  Mr. Shah, let me go back.  I

24   want to make sure that I'm clear on something.  I asked

25   you some questions about aquamarine and blue topaz.

```
 1              "Do you know the difference between genuine

 2   emerald and created emerald?

 3              "ANSWER:  (Inaudible.)

 4              "QUESTION:  I'm sorry?  Mr. Shah, again, I

 5   did not hear.

 6              "ANSWER:  Yes, I do understand.

 7              "QUESTION:  Okay.  What is the difference --

 8              "ANSWER:  Yes, I do understand.

 9              "QUESTION:  What is the difference between

10   genuine emerald and created emerald?"

11              "ANSWER:  Genuine emerald's are mined from

12   the earth.  Created is a separate process which I

13   believe is made from crushed emeralds.  And glass is

14   glass, which is what strong supplied us."

15              MR. YORK:  Your Honor, I move to strike the

16   portion of the answer, lines 10 through 11, which is

17   what Strong supplied us; foundation, hearsay, expert

18   testimony.

19              THE COURT:  Overruled.

20              MR. SINGH:  Page 52, 7 through 53, 6.

21              (VIDEO PLAYED.)

22              "QUESTION:  And then once a product is sold

23   to Unique Designs, Unique Designs receives an invoice,

24   correct?

25              "ANSWER:  Yes.
```

1              "QUESTION:  Did Unique Designs receive

2    invoices in this particular case?

3              "MR. YORK:  Outside the scope.  Vague and

4    ambiguous.

5              "THE WITNESS:  Yes, it must have.

6              "QUESTION:  Okay.  From whom did Unique

7    Designs receive invoices?

8              "MR. YORK:  Outside the scope.  Calls for

9    speculation.  Vague and ambiguous.

10             "ANSWER:  Well, it shipped the goods.

11             "QUESTION:  I'm sorry.  What was that?

12             "ANSWER:  Well, it shipped the goods.

13   (Unintelligible) the goods.

14             "QUESTION:  Again, that wasn't my question.

15             "My question was:  From whom did Unique

16   Designs receive invoices?

17             "ANSWER:  From whoever shipped the goods.

18             "QUESTION:  Who was that in this particular

19   case?

20             "ANSWER:  I believe it was Strong Hong

21   Kong."

22             MR. SINGH:  55, 10, through 56, 23.

23             (VIDEO PLAYED.)

24             "QUESTION:  Next I'm going to show you trial

25   Exhibit 54.

1            "You see trial Exhibit 54 on the screen?

2            "ANSWER:  Yes.

3            "QUESTION:  According to the list that I

4     just showed you, Unique Designs is disputing items 1 and

5     2 on this invoice.  Okay?

6            "You understand that?

7            "ANSWER:  If you say so.

8            "QUESTION:  Okay.

9            "ANSWER:  If you say so.  I don't know.

10           "QUESTION:  Okay.  So referring you to item

11    no. 1 on this exhibit, what does Unique Designs dispute

12    about item no 1?

13           "ANSWER:  I don't know specifics of 1

14    through 4.  I know that the loads of SKUs that were

15    represented as created emerald, created sapphire,

16    created rubies, they were supplied as glass fraudulently

17    without disclosure.  And that's the issue at hand.

18           "I do not know this particular one.  I what

19    disputed on this one.

20           "MR. YORK:  Vague and ambiguous.  Outside

21    the scope.

22           "QUESTION:  What about item no. 2 on this

23    invoice?  What is Unique Designs' dispute about item

24    no. 2 on this invoice?

25           "MR. YORK:  Excuse me.  Same objection.

1  Compound.

2           "ANSWER:  The same answer.  Same answer.  In

3  general the supply goods that are created ruby, created

4  sapphire, created emerald, that supplies glass

5  fraudulently and misrepresented it was.  That's the

6  bigger issue on hand.  I do not know what this

7  particular item is."

8           MR. YORK:  Your Honor, I would like to move

9  to strike page 56, line 4 starting with "they" through

10  the end of line 6.  And move to strike page 56, line 20

11  starting with "they --

12           THE COURT:  As speculation?

13           MR. YORK:  No foundation, hearsay, expert

14  testimony.

15           THE COURT:  Sorry?

16           MR. YORK:  No foundation, hearsay, expert

17  testimony.

18           THE COURT:  Overruled on those grounds.

19           MR. YORK:  Calls for speculation, Your

20  Honor.

21           THE COURT:  Sustained on those grounds.

22  Sustained.  It will be stricken.

23           MR. SINGH:  Page 71, line 23, to page 72,

24  line 4.

25           MR. YORK:  Sorry, Counsel, may have that

```
 1  again.
 2              MR. SINGH:  71, 23; 72, 4.
 3              (VIDEO PLAYED.)
 4              "QUESTION:  Do you have any information
 5  about the contents of any of the open invoices?
 6              "ANSWER:  (Unintelligible) I know that there
 7  was some.  I don't sell them back because we detected
 8  glass in a lot of the merchandise where they were
 9  supposed to supply created emerald, created ruby,
10  created sapphire."
11              MR. YORK:  Again, Your Honor, I'll move to
12  strike.
13              THE COURT:  Overruled.
14              MR. SINGH:  Page 89, line 7, through page
15  90, line 3.
16              (VIDEO PLAYED.)
17              "QUESTION:  Now, Mr. Shah, as I understand
18  it, you're claiming that some created emeralds were sold
19  that are not created emeralds; is that correct?"
20              MR. YORK:  Vague and ambiguous.  Misstates
21  testimony.
22              MR. SINGH:  92 through line 22; 93, 11.
23              (VIDEO PLAYED.)
24              "QUESTION:  Did Unique Designs sell the
25  creative emerald jewelry that you're complaining about?
```

```
 1                "ANSWER:  Yes, we did.

 2                "QUESTION:  Who did you sell the created

 3    emerald jewelry to?

 4                "ANSWER:  I don't -- I think it was JT.

 5                "QUESTION:  Anyone else?

 6                "ANSWER:  We used it on multiple customers.

 7    We used it on multiple customers.  So I don't have an

 8    exact count for you.

 9                "QUESTION:  How many customers?

10                "ANSWER:  Probably three customers; three or

11    four customers.

12                "QUESTION:  Who were the three or four

13    customers?

14                "ANSWER:  I believe it was Signet, JTV.  I

15    do not recollect now those."

16                MR. SINGH:  93, 17 to 95, 25.

17                (VIDEO PLAYED.)

18                "QUESTION:  Did an issue come up regarding

19    the creative emerald jewelry?

20                "MR. YORK:  Asked and answered.

21                "ANSWER:  Yes, it did.

22                "QUESTION:  When did the issue first come

23    up?

24                "ANSWER:  I don't know the date.

25                "QUESTION:  What year?
```

1          "ANSWER:  End of 2020.

2          "QUESTION:  How did the issue come up?"

3          MR. YORK:  Objection to this question, Your

4    Honor.  No foundation.

5          THE COURT:  Overruled.

6          Vvpp vvv

7          "ANSWER:  We got a report from one of the

8    customers showing that it was glass.

9          "QUESTION:  Which customer?

10          "ANSWER:  I believe it was JTV.

11          "QUESTION:  Did you receive a report from

12   any other customer other than JTV?

13          "ANSWER:  Signet send us some reports.

14          "QUESTION:  So you received receipts from

15   JTV and Signet; is that correct?

16          "ANSWER:  Yes.

17          "QUESTION:  Did you receive reports from

18   anyone other than JTV and Signet?

19          "ANSWER:  No.

20          "QUESTION:  What did the report from JTV

21   say?

22          "ANSWER:  (Unintelligible) I don't have the

23   exact technical terms (Unintelligible).

24          "QUESTION:  That's not my question.  My

25   question is:  What did it say?

1              "MR. YORK:  It's been answered.  Vague and

2      ambiguous.

3              "ANSWER:  I don't have the report in front

4      of me, so I cannot read it to you.  I don't know.

5              "It says it stands for created

6      (Unintelligible) -- probably glass."

7              MR. YORK:  Objection to this question, Your

8      Honor.  No foundation.

9              THE COURT:  Overruled.

10             (VIDEO PLAYED.)

11             MR. YORK:  Your Honor, objection.  Move to

12     strike.

13             THE COURT:  Excuse me.  I'm going to

14     overrule the objection.  But with the same comment to

15     the jury:  You need expert testimony to see whether or

16     not it is glass.  This is just somebody's opinion.  If

17     it is not expert, you have to expert testimony as to

18     what the product was one way or another.

19             Go ahead, Counsel.

20             MR. YORK:  Objection, Your Honor, to the

21     last answer, lack of foundation and speculation.

22             THE COURT:  Overruled.

23             (VIDEO PLAYED.)

24             "QUESTION:  After you sent them the reports,

25     what happened?

1               "ANSWER:  I guess it wasn't a big deal that

2    they supplied fake merchandise and they still wanted to

3    pay for the orders.

4               MR. SINGH:  96, 22, to 99, 5.

5               (VIDEO PLAYED.)

6               "QUESTION:  Excuse me.  Did you communicate

7    with Strong Trading regarding the jewelry sold to

8    Signet?

9               "ANSWER:  Yes, we did.

10              "QUESTION:  Did you communicate with Strong

11   Trading regarding the Signet issue at the same time as

12   the JTV issue or separately?

13              "ANSWER:  We didn't know how -- how bad the

14   issue was and how often they had done it.  So we wanted

15   to inquire before -- but we did ask them for

16   information.  We check everything they tell us, what

17   they knew on their end.

18              "QUESTION:  You asked who to check?

19              "ANSWER:  Strong.

20              "QUESTION:  So you communicated with Strong

21   Trading regarding the jewelry sold to Signet; is that

22   what you're saying?

23              "ANSWER:  Yes.

24              "QUESTION:  What was Strong Trading's

25   response?

```
 1                    "ANSWER:  They weren't very responsive.

 2                    "QUESTION:  Did they ask for an inspection

 3     report regarding the jewelry?

 4                    "ANSWER:  Yes, they did.

 5                    "QUESTION:  Was an inspection report sent to

 6     Strong Trading?

 7                    "ANSWER:  Yes, it was.

 8                    "QUESTION:  What did the inspection report

 9     say?

10                    "ANSWER:  *i don't know the exact wording

11     but not being work was supposed to be supplied.

12                    "QUESTION:  What did the report say the

13     jewelry was?

14                    "ANSWER:  I don't have the report in front

15     of me.  I don't know.

16                    "QUESTION:  You don't know what the report

17     said?

18                    "ANSWER:  No.

19                    "QUESTION:  When was the report sent to

20     Strong Trading regarding the signatory?

21                    "ANSWER:  I don't have the dates.

22                    "QUESTION:  "Well, you testified that the

23     report from JTV was at the end of 2020 -- was the

24     (Unintelligible, refer to video itself) report.  Signet

25     report.
```

1                    "ANSWER:  After that."

2                    "QUESTION:  Did Strong Trading ask Unique

3     Designs to return?

4                    Signet.

5                    "ANSWER:  No.

6                    "QUESTION:  Why not?

7                    MR. YORK:  Objection, Your Honor,

8     foundation.

9                    THE COURT:  Sustained.

10                   Hearsay expert testimony.  It is sustained

11    as to that answer.

12                   MR. SINGH:  100, line 3 to 102, line 8.

13                   "QUESTION:  Did the issue of rubies come up

14    before or after the issue of created emeralds come up?

15                   "ANSWER:  It all started coming together.  I

16    don't know which superceded which one.

17                   "QUESTION:  The jewelry concerning created

18    rubies, who was that jewelry sold to?

19                   "ANSWER:  Between these four customers, I

20    don't have the exact information.  But everything has

21    been provided.

22                   "QUESTION:  Was it more than one customer?

23                   "ANSWER:  I don't have the information in

24    front of me.

25                   "QUESTION:  Did you receive some kind of

1   inspection reports from either the customer or those

2   customers?

3            "ANSWER:  Yes.  Signet and JTV.  And we did

4   an internal inspection at IGI, which is the third party

5   independent lab.  And all these reports have been

6   provided to you guys.

7            "QUESTION:  Well, going back to the created

8   emeralds, you received reports from either JTV or Signet

9   or both, correct?

10           "ANSWER:  JT I know for sure.  I'm not --

11   I'm not sure about Signet.  Could have been.

12           "QUESTION:  Did you do any testing on your

13   own or hire any kind of company to do any testing

14   regarding the emeralds?

15           "ANSWER:  Yes.  We tested -- I don't know

16   exactly emerald.  But we tested every product that we

17   had in stock from them.

18           "QUESTION:  Okay.  Well, that wasn't my

19   question.

20           The created -- the created emeralds that

21   were the subject of the reports from JTV and Signet, did

22   you do any testing on your own of that specific jewelry?

23           "ANSWER:  So I don't have the report in

24   front of me.  But as I said, yes, we did do it through a

25   third party.  I don't know exact items were included in

1    those or not, but I believe they must be.

2                "QUESTION:  Did you communicate with Strong

3    Trading regarding the issue with the rubies?

4                "ANSWER:  Yes, I believe so.  That we --

5    everything that had failed, we let them know.

6                "QUESTION:  We what did you send to Strong

7    Trading when you communicated with Strong Trading, if

8    anything?

9                "ANSWER:  We told them that they had not

10   sold us what they're supposed to sell us, and the

11   report's supporting it.

12               "QUESTION:  What was Strong Trading's

13   response?

14               "ANSWER:  "Wait."

15               "QUESTION:  I'm sorry.  What did you say?

16               "ANSWER:  I think they -- I think they said

17   "wait."  I think they said that it was no big deal, a

18   mistake, a couple of thousand bucks on and (inaudible).

19               "COURT REPORTER:  I'm sorry.  I'm not

20   getting that answer.  I got, 'I think they said 'wait.'

21   I think they said 'that it was no big deal, a mistake, a

22   couple thousand'... And then that's all I could

23   understand.

24               "THE WITNESS:  You saved a couple thousand

25   dollars.  It's not a big deal that the consumer got the

```
 1  wrong product.
 2              MR. SINGH:  Almost done, Your Honor.
 3              Page 104, line 23, page 106, line 6.
 4              (VIDEO PLAYED.)
 5              "QUESTION:  Are you saying there is also an
 6  issue regarding sapphires, correct?
 7              "ANSWER:  I believe so.
 8              "QUESTION:  When were the sapphires that are
 9  at issue ordered?
10              "ANSWER:  I do not have a timeline.
11              "QUESTION:  Well, was it before or after the
12  emerald issue?
13              "ANSWER:  But all the issues came up, as I
14  said to you, within the five months.  And the supplies
15  over then, probably 18 or 24 months prior to that.  Some
16  were three months back; some were six months back.  I
17  don't have the dates with me.  But all the information
18  has been provided.
19              "QUESTION:  And how did the issue of
20  sapphires come up?
21              "ANSWER:  I believe Signet did some testing,
22  and it came up from there.
23              "QUESTION:  So it was Signet that raised the
24  issue?
25              "ANSWER:  The ones -- one or two items came
```

1    with -- they had the product with them, so we told them

2    to check everything.  They checked everything and sent

3    us a report of all the items that had an issue.

4              "QUESTION:  And it was Signet that raised

5    the issue?

6              "ANSWER:  The first issue, yes.  After that,

7    because we didn't have the product, we asked them to

8    test and send us some pieces back so we could do the

9    testing here as well.

10             "QUESTION:  Did anyone raise an issue with

11   sapphires other than Signet?

12             "ANSWER:  I do not recollect.

13             "QUESTION:  And so Signet sent you some

14   jewelry back, and you had it tested; is that correct?

15             "ANSWER:  Yes.

16             "QUESTION:  Who did you have it tested by?

17             "ANSWER:  IGI.  It's an independent lab."

18             MR. SINGH:  Page 108, line 2, through page

19   111, line 25.

20             (VIDEO PLAYED.)

21             "QUESTION:  You are claiming -- or Unique

22   Designs is claiming some monetary losses, correct?

23             "ANSWER:  Yes.

24             "QUESTION:  What monetary losses is Unique

25   Designs claiming?"

1                  MR. YORK:  Objection, Your Honor.

2       Foundation, speculation, and expert testimony.

3                  THE COURT:  Sustained.  Excuse me.

4       Overruled.

5                  "THE WITNESS:  To direct credits from our

6       account for the -- for the -- for the goods that didn't

7       have what is the original bill of material.

8                  "And that between Signet and JTVs, close to

9       1.7 million.

10                  "And over the last five years, we probably

11      done $150 million of business with Signet at a

12      15 percent gross margin.

13                  "So just around 22 million bucks in lost --

14      lost profits over the next couple of years.

15                  "And the reason for it is we were defrauded

16      in this product, and we cannot...

17                  "COURT REPORTER:  Sorry.  The last part was

18      'and we cannot'...

19                  "THE WITNESS:  And we lost credibility with

20      our customer.

21                  "COURT REPORTER.  Thank you."

22                  (Unreportable video playing and attorney

23      speaking.)

24                  THE COURT:  I'm sorry.

25                  MR. YORK:  I would like to renew -- now that

1    the answer has been read, I would like to renew my

2    objection and move to strike.

3                    THE COURT:  And it will be stricken.

4                    MR. YORK:  Thank you, Your Honor.

5                    THE COURT:  Next.

6                    Go ahead, Counsel.

7                    (VIDEO PLAYED.)

8                    "ANSWER:  And whatever besides that was not

9    explained on the VPO.  I do not have exact details of

10   all the stones, but these three I know from the top of

11   my head.

12                   "QUESTION:  Can you recall any issues with

13   any stones other than emeralds, rubies and sapphires?

14                   "ANSWER:  There were a few more, I don't

15   have the names in front of me.

16                   "QUESTION:  Okay.  So you came up with a

17   number of 1.7 between Signet and JTV?"

18                   MR. YORK:  Objection, Your Honor.

19                   THE COURT:  Sustained.

20                   Next question.

21                   (VIDEO PLAYED.)

22                   "ANSWER:  For supplying -- (unintelligible.)

23   For supplying -- we mentioned we were selling them flat

24   created emeralds.  But we did not.  And they have a

25   testing mechanism, and that's why it failed.  And that's

1    why they charged us.

2              "QUESTION:  Has Unique Designs paid that

3    $3,000?"

4              MR. YORK:  Objection, Your Honor.

5              THE COURT:  Overruled.

6              "ANSWER:  Yes.

7              "QUESTION:  I'm sorry.  Are you saying yes?

8              "ANSWER:  Yes.

9              "QUESTION:  And as to the Signet

10   1.6 million, what does that -- what does that

11   $1.6 million come from?

12             MR. YORK:  Objection, Your Honor.

13   Foundation.

14             THE COURT:  Overruled.

15             (VIDEO PLAYED.)

16             "ANSWER:  Well, they -- they bought the

17   product for -- for an amount.  And the retail sales that

18   were created from that had to be refunded to the

19   customer.  So that's the account they gave us."

20             MR. YORK:  Now, that the answer has been

21   read, I would like to renew my objection and move to

22   strike on the same grounds.

23             THE COURT:  Overruled.  That's proper for

24   cross-examination.  Overruled.

25             "QUESTION:  How did Signet communicate this

1    $1.6 million number to you?"

2              MR. YORK:  Objection, Your Honor.

3    Foundation.

4              THE COURT:  Overruled.

5              "ANSWER:  Well, there's one --

6              MS. ALPARCE:  Objection.

7              MR. YORK:  Foundation, speculation, hearsay.

8              THE COURT:  Counsel, only one attorney makes

9    objections.  One or the other.

10             Were you making an objection?

11             MR. YORK:  I was making the objection, Your

12   Honor.

13             THE COURT:  Go ahead.

14             MR. YORK:  Foundation speculation, hearsay.

15   Expert testimony.

16             THE COURT:  Overruled.  And, again, I'm

17   assuming you had an opportunity to cross-examine.  We

18   will get to that on cross-examination.

19             Overruled.

20             "(Unintelligible) and the payment portal

21   which also I believe is draw information.

22             "COURT REPORTER: (Unintelligible).

23             MR. SINGH:  Your Honor, just to make it

24   clear for the record, this is Mr. York asking these

25   questions.

1                THE COURT:  Okay.

2                "COURT REPORTER:  I'm sorry.  Stop.  I

3   didn't get -- I don't think I even got the first part of

4   it correctly.

5                "I got:  Question -- Answer, so one they --

6   they took lines by email, which I think is the same

7   information we had given you guys, and' -- and then I

8   didn't get the rest.

9                "THE WITNESS:  Yes, so they gave -- yes, so

10  they gave it two times via email which information we've

11  given them.  And second, it is been deducted off our

12  payable on the portal.  And on the email it shows under

13  whats SKUs what the amount is that they credited.

14                "QUESTION:  So the documentation that

15  supports the $1.6 million is two emails or one email?"

16                MR. YORK:  Objection, Your Honor.  Again --

17                (VIDEO PLAYED.)

18                MR. YORK:  Objection, Your Honor.

19  Speculation.

20                THE COURT:  It will be noted for the record.

21  Overruled.

22                "THE WITNESS:  Actually, credit on

23  the portal.

24                "QUESTION:  I'm sorry.  It's an actual what?

25                "THE WITNESS:  The actual credit on the

 1   portal.  On the payment portal where you can see live

 2   what they deducted so they have taken the money out.

 3              "QUESTION:  Okay.  Well, let me ask you

 4   something, Mr. Shah, you said two emails.

 5              "I see an email that refers to 2.4 million

 6   and then I seen another email that refers to

 7   1.6 million.

 8              "Are those the two emails you are referring

 9   to?

10              "ANSWER:  Probably.  I don't know which two

11   emails you have.  But that's probably the case.

12              "QUESTION:  Well, did you receive any more

13   than two emails from Signet regarding this issue

14   regardless of the amounts?

15              "ANSWER:  No.  They -- we had several Zoom

16   calls.  That was only for -- on e-mails twice.

17              "QUESTION:  Okay.  Now, the -- was the

18   $1.6 million deduction for jewelry that Unique Designs

19   sold to Signet?"

20              MR. YORK:  Objection, again, Your Honor.

21   Foundation, hearsay.

22              THE COURT:  It will be noted.  Overruled.

23              "ANSWER:  Yes."

24              MR. SINGH:  Finally, Your Honor, page 125,

25   line 8, through page 127, line 7.

```
 1                    THE COURT:  Okay.

 2                    (VIDEO PLAYED.)

 3                    "THE WITNESS:  There is nothing more I want

 4     to add.

 5                    "QUESTION:  Well, it is exactly what it

 6     says.  Unique Designs sold some of the jewelry that it

 7     received from Strong Trading, correct?

 8                    "ANSWER:  Right.

 9                    "QUESTION:  And No. 12 is regarding the

10     total profit Unique Designs received from the sale of

11     the jewelry?

12                    "ANSWER:  Right.  I don't -- I don't think

13     anything was discussed there, but --

14                    "QUESTION:  Well, do you have any -- that's

15     not the question.  The question is:  Do you have any

16     information regarding those issues -- or that issue

17     other than what we've talked about?

18                    "ANSWER:  No.  So -- nothing.  'We've been

19     hit with the 1.7 million' --

20                    "COURT REPORTER:  Sorry.  No.  We have been

21     hit with the -- start that again.  Can you start that

22     again, 'We've been hit with the'...

23                    "THE WITNESS:  Yeah.  It will be 1.7 million

24     of penalties and 15 million dollars of future profits."

25                    MR. YORK:  Your Honor, objection.  Move to
```

 1    strike.

 2               THE COURT:  Overruled.

 3               (VIDEO PLAYED.)

 4               "ANSWER:  (Unintelligible) so...

 5               "QUESTION:  Okay.  Now this 15 million

 6    dollars in profit or whatever number you came up with,

 7    who calculated the 15 million?

 8               "ANSWER:  So it was the last three years of

 9    sales and we took a margin of that.  That's what we

10    anticipating losses on.

11               "QUESTION:  Who made those calculations?

12               "ANSWER:  We have them here based on the

13    amount so far in the book.

14               "QUESTION:  And who made the calculations?

15               "MR. SINGH:  Asked and answered.

16               "THE WITNESS:  The accounting team."

17               MR. YORK:  Your Honor, based on the answer

18    that it was made by the accounting team, I renew my

19    objection and move to strike his last several answers

20    regarding penalties and future profits.

21               THE COURT:  Let's finish this page and then

22    I will rule on that.

23               "ANSWER:  I told for cash to give me the

24    sales for last three years and what profits we made on

25    Signet and what will the losses be over the next three

```
 1   years for losing this account due to this issue.
 2                "QUESTION:  Which account was lost?
 3                "ANSWER:  Signet."
 4                MR. YORK:  Objection, Your Honor.  No
 5   foundation.  Speculation.  Hearsay.
 6                THE COURT:  As to your first objection,
 7   Counsel, the information that came from the accountant
 8   who is not testifying will be stricken.
 9                This will be overruled.
10                Go ahead.
11                (VIDEO PLAYED.)
12                "ANSWER:  We've had a 20-year relationship
13   with Signet that they shot us down because of this.  So
14   we are not calculated 20 years, we calculated three
15   years."
16                MR. YORK:  Your Honor --
17                THE COURT:  Okay.
18                MR. YORK:  -- objection to move to strike
19   that "they shot us down because of this."  No
20   foundation.  Speculation.  Hearsay.
21                THE COURT:  Overruled.
22                MR. SINGH:  Nothing further, Your Honor.
23                THE COURT:  Okay.  Next witness.
24                MR. SINGH:  Your Honor, we have a witness
25   who's waiting in the cafeteria on the first floor.  Dare
```

 1   I ask how much time I have to call him?

 2                THE COURT:  You are out of it.

 3                MR. SINGH:  Okay.

 4                Defendant rests, Your Honor.

 5                THE COURT:  Okay.  Any rebuttal witnesses?

 6                MR. YORK:  Yes, Your Honor.  We would like

 7   to read from portions of Mr. Shah's deposition.

 8                THE COURT:  Yes.

 9                I'm sorry.  I should have asked you that

10   earlier.  You may, yes.

11                MR. YORK:  Thank you, Your Honor.

12                First -- the first is page 16, line 15

13   through page 17, line 4.

14                MR. SINGH:  I apologize.  Could you read the

15   lines for me again.

16                MR. YORK:  Page 16, line 15 through page 17,

17   line 4.

18                MS. ALPARCE:  Excuse me, Your Honor.

19                MR. YORK:  Sorry.

20                MS. ALPARCE:  Thank you.

21                (VIDEO PLAYED.)

22                "QUESTION:  Were you involved at all on a

23   day-to-day basis with respect to pro forma invoices that

24   were received from Strong Trading?

25                "MR. SINGH:  Objection.  Compound.  Vague

1   and ambiguous.

2              Go ahead, Mr. Shah.

3              "THE WITNESS:  -- company (unintelligible.)

4              "COURT REPORTER:  I'm sorry.  Sorry,

5   Mr. Shah.

6              Mr. Shah, can you start that answer again.

7   I'm not understanding you.

8              "THE WITNESS:  Sure.  I am the CEO of the

9   company at Unique Designs.  We have 200 people working

10  here.  Every person is assigned a certain task, which

11  I'm aware of.  But I do not do every task in the

12  company.

13             "From this explains probably a lot from the

14  questions (unintelligible.)"

15             MR. YORK:  Next, Your Honor.  Page 57, lines

16  16 to 20.

17             THE COURT:  Okay.

18             (VIDEO PLAYED.)

19             "QUESTION:  Okay.  So as I understand it,

20  you don't know whether the jewelry was sold; is that

21  correct?

22             "MR. SINGH:  Objection.  Vague and ambiguous

23  outside the scope.

24             THE WITNESS:  The jewelry was sold."

25             MR. YORK:  Next, page 96, lines 8 to 20.

1    And page 98, lines 12 to 18.

2                    THE COURT:  Okay.

3                    (VIDEO PLAYED.)

4                    "QUESTION:  Did you return any of the

5    jewelry to Strong Trading?

6                    "ANSWER:  No, I did not.

7                    "QUESTION:  Why not?

8                    "ANSWER:  Well, we are -- we are still

9    holding it here.

10                   "QUESTION:  Isn't it true that Strong

11   Trading asked for the jewelry to be returned to it?

12                   "ANSWER:  I do not collect it.

13                   "QUESTION:  You still have the jewelry?

14                   "ANSWER:  Yes.  Yes, I'm pretty sure.  Not

15   everything, but we have...

16                   "QUESTION:  Strong Trading asked Unique

17   Designs to return the jewelry that was the subject of

18   the issue with Signet?

19                   "ANSWER:  I do not recollect.

20                   "QUESTION:  Did Unique Designs return the

21   jewelry to Strong Trading that was the subject of the

22   issue with Signet?

23                   "ANSWER:  No."

24                   MR. YORK:  Next page, 112, line 11 to 113,

25   line 11.

```
 1                    THE COURT:  Okay.

 2                    (VIDEO PLAYED.)

 3                    "QUESTION:  Did Unique Designs receive the

 4   jewelry back from Signet?

 5                    "ANSWER:  Yes, I believe so.

 6                    "QUESTION:  What did Unique Designs do with

 7   the jewelry?

 8                    "ANSWER:  We put it on the side here.

 9                    "QUESTION:  So you put it what?

10                    "ANSWER:  We put it aside.

11                    "QUESTION:  Does Unique Designs still have

12   it?

13                    "ANSWER:  Yes.

14                    "QUESTION:  Has Unique Designs ever offered

15   to return the jewelry to Strong Trading?

16                    "ANSWER:  We've not been in conversation

17   with Strong in the past -- since they initiated the

18   lawsuit.

19                    "QUESTION:  Did Unique Designs offer to

20   return the jewelry to Strong Trading?

21                    "ANSWER:  I think I answered it.  We have

22   not been in communication with Strong after the lawsuit.

23   And the goods came in after the lawsuit.

24                    "QUESTION:  Okay.  So the answer is no,

25   correct?
```

1                    "MR. SINGH:  Asked and answered.

2                    "THE WITNESS:  The answer is no.

3                    "MR. YORK:  Next.

4                    "QUESTION:  Did Strong Trading ask Unique

5     Designs to return --

6                    "MR. SINGH:  Vague and ambiguous.

7                    "THE WITNESS:  No."

8                    MR. YORK:  Next, page 54, lines 3 to 10.

9                    (VIDEO PLAYED.)

10                    "QUESTION:  Do you understand that Strong

11     Trading claims that there is a balance due of

12     $369,441.12?

13                    "ANSWER:  Yes.  That's what they are

14     claiming.

15                    "QUESTION:  And Unique Design has not paid

16     that amount, correct, to Strong Trading?

17                    MR. SINGH:  Vague and ambiguous.  Outside

18     the scope.

19                    THE WITNESS:  I'm not aware what is owed.

20                    MR. YORK:  Next, page 71, lines 13 to 16,

21     and page 72, lines 5 to 12.

22                    (VIDEO PLAYED.)

23                    "QUESTION:  Do you recall that I earlier

24     asked you about maybe three invoices or so, and you

25     didn't have any information about any of those invoices,

1   correct?

2              "ANSWER:  Yes, I do not know what those

3   invoices are.

4              "QUESTION:  Well, again, Mr. Shah, that

5   wasn't my question.

6              "My question was this:  Do you have any

7   information regarding the contents of any of the open

8   invoices?

9              "MR. SINGH:  Outside the scope.  Vague and

10  ambiguous.  Calls for speculation.

11             "ANSWER:  I don't have the exact

12  information.

13             "QUESTION:  I'm not asking" --

14             MR. YORK:  Next.  Page 50, lines 2 to 19.

15             "QUESTION:  The question was:  Do you have

16  any understanding whether Unique Designs submits samples

17  to its customers?

18             "MR. SINGH:  Vague and ambiguous.

19             "THE WITNESS:  It is on a case-to-case

20  basis.

21             "QUESTION:  Okay.  Well, in your dealings

22  with Strong Trading, did Unique Design submit any of the

23  samples to any of its customers?

24             "MR. SINGH:  Vague and ambiguous.

25             "THE WITNESS:  I'm not aware.  I'm not aware

1    of it.

2                "QUESTION:  So the next step in the process

3    after a purchase order is submitted by Unique Designs to

4    Strong Trading is Unique Designs receives a pro forma

5    invoice from Strong Trading, correct?

6                "ANSWER:  I'm not aware.

7                "QUESTION:  Do you know what --

8                MR. YORK:  Next.  Page 35, line 17 to page

9    38, line 7.

10               "QUESTION:  In this particular case, when

11   Unique Designs placed orders for jewelry to Strong

12   Trading or placed orders for jewelry who did they place

13   the orders with?

14               "ANSWER:  I do not handle day-to-day

15   operations handled by sales and the back office team.

16               "QUESTION:  Okay.  What is your

17   understanding of who the orders were placed with?

18               "ANSWER:  I do not handle day-to-day

19   operations.  It is handled by the sales and the back

20   office team.

21               "QUESTION:  Okay.  That is not my question.

22               "My question is:  What is your understanding

23   of who the orders were placed with?

24               "ANSWER:  Again, I will give the same

25   answer.  I do not know because this is handled by sales

1    and the back office team.

2                "QUESTION:  Were the orders placed with

3    Strong, the California company?  Or were the orders

4    placed with Strong the Hong Kong office?

5                "ANSWER:  I do not know.  The sales team

6    handles it.  And it is placed by the back office.

7                "QUESTION:  What is your understanding of

8    the connection between Strong in California and Strong,

9    the Hong Kong office?

10               "MR. SINGH:  Also speculation.  Vague and

11   ambiguous.  Outside the scope.

12               "THE WITNESS:  I have no clue what the

13   arrangement is.  We used to work with Hong Kong.  I have

14   no clue what the operator what they have.

15               "QUESTION:  Didn't Unique Designs also

16   worked with Strong in California?

17               "ANSWER:  I'm not aware of it.

18               "QUESTION:  Other than -- strike that.

19               "During the course of the time that Strong

20   Trading and Unique Designs were doing business, were

21   there communications between Unique Designs and Strong

22   in California?

23               "ANSWER:  I don't know who Strong in

24   California is.

25               "QUESTION:  Do you understand that in this

1    lawsuit Unique Designs has sued Strong Trading from

2    California?

3              "MR. SINGH:  Outside the scope.  Vague and

4    ambiguous.  Calls for a legal conclusion.

5    Attorney-client communication.

6              "But if you know without me telling you,

7    Mr. Shah, go ahead.

8              "THE WITNESS:  I don't know.  The attorneys

9    are dealing with it.

10             "QUESTION:  So is it correct that you don't

11   know or don't have an understanding as to who Unique

12   Designs has sued in this case?

13             "MR. SINGH:  Argumentative.  Misstates

14   testimony.  Vague and ambiguous, calls for a legal

15   conclusion, attorney-client communication.

16             "Go ahead, Mr. Shah.

17             "THE WITNESS:  When we bought goods from

18   Hong Kong, I don't know what companies they have or what

19   they have to have to sue us.  And we just countersued

20   everyone that sued us.

21             "QUESTION:  You only countersued the people

22   that sued you?

23             "ANSWER:  I believe so.

24             "QUESTION:  Do you understand that you are

25   suing Mr. Chien as an individual?

1                "ANSWER:  I was aware.

2                MR. YORK:  I do not have any more questions

3    of Mr. Shah, Your Honor.

4                THE COURT:  Okay.  Any other rebuttal

5    witness.

6                MR. YORK:  Yes.  One witness, Your Honor,

7    Mr. Chien.

8                THE COURT:  Okay.

9                Swear him again.

10               You have eight minutes on it, Counsel.

11               THE CLERK:  Please raise your right hand.

12               Do you solemnly swear that the testimony you

13   are about to give in the cause now pending before this

14   Court shall be the truth, the whole truth and nothing

15   but the truth, so help you God?

16               THE WITNESS:  Yes.

17               THE CLERK:  Please be seated.

18               Please state your full name and spell your

19   last name.

20               THE WITNESS:  M-e-n-g Y-u.  Last name

21   C-h-i-e-n.

22                     **DIRECT EXAMINATION**

23   BY MR. YORK:

24      Q.  Mr. Chien, you heard Mr. Shah's testimony that

25   reports were sent to Strong Trading?

1     A.   Can you say that again.

2     Q.   Sure.   Did you hear Mr. Shah's testimony that

3  Unique Designs sent inspection reports to Strong

4  Trading?

5     A.   Yes.

6     Q.   When's the first time Unique Designs ever sent

7  Strong Trading an inspection report?

8     A.   I think it is after the lawsuit.   Yeah.   Before

9  the lawsuit I asked for the stone report, but I never

10  receive it.   And after the lawsuit and I've seen maybe

11  two months ago, I saw that they have some report.

12     Q.   Is that the first time you saw any inspection

13  reports from Unique Designs?

14     A.   Yes.

15          MR. YORK:   No further questions Your Honor.

16          THE COURT:   You may step down.

17          THE WITNESS:   Thank you.

18          THE COURT:   Any other witness, Counsel.

19          MR. YORK:   No, Your Honor.

20          THE COURT:   Both sides rested?

21          MR. YORK:   Yes, Your Honor.

22          THE COURT:   In this particular matter,

23  ladies and gentlemen, because of the timing of this, we

24  have to go through jury instructions, and then we will

25  go into argument.   And the Court will instruct you.

 1                There's no way we are going to finish

 2     tonight before 4:30 because it takes about an hour for

 3     jury instructions to be determined, and then argument

 4     and everything else.

 5                So if you don't have any objection, I'm

 6     going to release you now.

 7                I don't hear any objections.

 8                Okay.  We are going to release you now to

 9     come back at 8:30 tomorrow morning.  8:30 we'll go right

10     into argument and instruction.  Argument will be about

11     an hour.  Instruction will be about a half an hour.

12                And then we will give the case to you to

13     determine your verdict on it.

14                Keep in mind, it's particularly important

15     now that you've heard all the evidence that you will not

16     discuss the case among yourselves or with anybody else

17     or form or express any opinions about the matter until

18     it's submitted to you and you retire to the jury room.

19                Have a pleasant evening.  See you back in at

20     8 --

21                THE JUROR:  8:15.

22                THE COURT:  There you go.

23                (OUTSIDE THE PRESENCE OF THE JURY.)

24                THE COURT:  Okay.  The jurors have left the

25     courtroom.

```
 1              Counsel, I am going to be taking a short
 2   break.  I want to come back in about 3 o'clock and give
 3   you what instructions we will be using for tomorrow so
 4   you can prepare your argument on it.
 5              Remember in your argument, always say "I
 6   think the judge is going to instruct you so and so,"
 7   rather than saying, "The judge will instruct you."
 8   Because sometimes I modify it.  Even during the
 9   instructions, sometimes I modify it.
10              I don't want anyone to be embarrassed out
11   there.  So always couch it in terms of "I think the
12   instruction will be so and so."  Okay?
13              MR. YORK:  Your Honor, I wanted to make a
14   make a couple of motions.  Would the Court prefer that I
15   wait until you come back?
16              THE COURT:  Are you talking about motions
17   for judgment?
18              MR. YORK:  That's one, Your Honor.
19              THE COURT:  What's the other one?
20              MR. YORK:  Well, the other one is to renew
21   our objections on motions to strike regarding Mr. Shah's
22   testimony.
23              If I may, Your Honor.  Mr. Shah,
24   testified --
25              THE COURT:  You can have seats.
```

1              MR. YORK:  Thank you, Your Honor.

2              -- and I can go of course through page and

3    line and line if you would like.

4              I understand the Court's ruling on the

5    statements that something was glass or whatever because

6    that's just simply someone's opinion.  And I certainly

7    understand the Court's ruling.

8              Mr. Shah, however, is the only testimony

9    regarding -- excuse me, the only witness regarding

10   damages.

11             And I believe that his answers were -- had

12   no foundation, speculation, hearsay, expert testimony.

13             Now, at one point in time the Court made the

14   comment that that would be the subject of

15   cross-examination.  So I want to clarify --

16             THE COURT:  I did not realize at the time

17   you were actually asking the questions, and he was

18   responding to your questions.

19             MR. YORK:  Right.  And that was exactly my

20   point, Your Honor, is the deposition was taken for

21   discovery purposes.

22             THE COURT:  That's fine.

23             MR. YORK:  And, of course, you ask very

24   broad questions to get as much information to prepare

25   for trial.

1            The problem those questions are very broad.

2     They called for hearsay information, et cetera, which is

3     allowed, of course, in a deposition.

4            It's now been then used against us.  Our

5     objections have been overruled.  And so now there is an

6     abundance -- well, not an abundance, but quite a bit of

7     evidence about damages, certain amounts, certain

8     customers, communications from customers, calculations,

9     loss of profits, loss of business because of what

10    happened, et cetera, et cetera, et cetera.

11           I believe that all of that testimony is --

12    there are foundation problems, speculation.  It's

13    hearsay.  It's expert testimony, which we've already

14    discussed is not allowed.

15           The problem is now the jury has heard all of

16    that because, I think, perhaps of a misunderstanding of

17    the context in which the testimony was given.

18           THE COURT:  I'm not too sure there's a

19    misunderstanding.

20           Counsel, do you want time to respond or

21    just -- you can respond when I come back in 15 minutes?

22           MR. SINGH:  If you don't mind, I'll respond

23    when we return.

24           THE COURT:  That will give you a chance

25    because -- you know, rather than just go from the seat

1    of your pants.  Then I will rule on it when I come back

2    in.

3              I can tell you right now the only objection

4    that I think carries much validity on it -- I'm not

5    saying if it does one way or another -- is the expert

6    testimony objection.  That he is not an expert and it

7    calls for expert testimony.  That's what I would like

8    you both to address when we come back.

9              We will see you back in 15 minutes.

10             (BRIEF RECESS.)

11             THE CLERK:  All rise.  This Court is again

12   in session.

13             THE COURT:  Okay.  First of all, there is a

14   motion that was made before I went into chambers.  I was

15   giving you time to respond.

16             Do you want to be heard?

17             MR. SINGH:  Yes, Your Honor.  Thank you.

18             THE COURT:  Okay.

19             MR. SINGH:  The testimony generally as to

20   the glass, that was based on Mr. Shah being a COO of the

21   company receiving these products.

22             I mean, stone glass will shatter when it

23   hits the floor.  So I don't think that really requires

24   any expert opinion.

25             Also, a lot of the information was coming

1   from Strong Trading.  They provided the Mutual Cornell,

2   which Mr. Chien admitted he sent the Mutual Cornell

3   report which said some of it was glass.

4           THE COURT:  Counsel.  I'm sorry, but the

5   objection mainly was towards damages, I believe.

6           MR. SINGH:  Yes.  So the only two issues

7   about damage, one was that there was 1.6 million dollars

8   from Signet.  That's what was actually charged.

9           He explained that there was an online

10  portal.  We paid it.  It was shown -- the deduction was

11  shown on their account.

12          So it's just the same kind of damages that

13  Strong Trading is claiming.  This is exactly what --

14  what the difference is here is that we charged to the

15  company.  Similarly with JTV, there's a $3,000 penalty

16  that was actually paid which we testified to.  So that

17  actually occurred to the company.

18          THE COURT:  Okay.  In that matter, as to

19  that motion -- first of all, your first motion, you can

20  reserve your Rule 50 motion.  Both sides can reserve it.

21          If you want to make a Rule 50 motion, as

22  long as it's submitted to the Court before next Tuesday

23  at 4 o'clock and any response by next Friday, 12 noon,

24  both sides can reserve the Rule 50 motion.

25          As to the second request, as far as striking

1    that testimony, the Court is going to deny that.  That

2    testimony will not be stricken on it.  But you can

3    obviously argue as far as weight goes as to damages.

4              The Court is going to make some other

5    rulings.

6              First of all, the Court is going to find

7    there is insufficient evidence to go to the jury on

8    several areas.  One is fraud.  Another one is punitive

9    damages that go with fraud.  Another one is the defense

10   of unclean hands or of waiver.

11             The action against Mr. Chien will also be

12   dismissed for insufficient evidence to go to the jury.

13             So what we are left with -- so both sides

14   understand, we're left with a breach of contract by the

15   plaintiff against the defendants and the

16   cross-complainant breach of contract and warranty.

17             So that's what left with the -- what's in

18   front of the Court.

19             Okay.  As to the instructions that will be

20   given -- okay.

21             I'm going to ask, can you go ahead -- can

22   you go in and get the summary, the index?

23             COURT STAFF:  Yes.

24             THE COURT:  It will be faster if I do it off

25   the index.

```
 1               Counsel, I do want to mention one more thing
 2    to you, and I normally talk about the end of the case,
 3    but I'm not going to here, because one side loses, one
 4    side wins, whatever it is.
 5               One of the problems that I foresaw might
 6    happen because of the relationship between the attorneys
 7    and the clients before the case was one the problem with
 8    animosity, lack of civility.
 9               I've got to compliment both sides.  You
10    have -- at least up to this point, both sides have
11    conducted themselves as an officer of the Court in front
12    of the jury, and I appreciate that.  I want to let you
13    know that I was impressed with that.
14               Okay.  These are the jury instructions.  Get
15    a pencil and paper.
16               We are going to be giving the following.
17    And if I don't read it, that means we're not giving it.
18               In fact, if you want, I can just say:  "Not
19    giving it."
20               Number 1 will -- I've got the index for the
21    unclean jury instructions that came in.  So I don't know
22    if everybody has a copy of that or not.
23               MR. SINGH:  Your Honor, the unclean version?
24               THE COURT:  Yes.  The unclean version is
25    what I've got a copy of as far as reading off these
```

1    numbers.  So you'll know what numbers I refer to.  For

2    instance, Instruction No. 1 would not be given because

3    it's already been given.

4              Instruction 2 would be given.

5              I want to make sure you understand what

6    numbers I'm referring to.  Do you have the index?

7              MR. SINGH:  I have the index that was filed

8    May 27th.  That's the only index I have.

9              THE COURT:  I don't know when this was

10   filed.

11             COURT STAFF:  That is this one.

12             THE COURT:  I think it is.

13             MR. SINGH:  Thank you, Your Honor.

14             THE COURT:  If it helps, Instruction No. 1

15   is 1.3, Duty of the Jury.

16             Both have that?

17             So bear with me here, and grab a pencil,

18   because we are going to be going through this quickly.

19             The Court spent several days looking at

20   these instructions.  These are what's going to be given

21   and what's not.

22             Number 1 will not be given.

23             Number 2 will be given.

24             Number 3 will be given, but I'll be

25   modifying it.

```
 1                    Number 4 will be given.

 2                    Number 5 will not be given.

 3                    Number 6 will be given.

 4                    Number 7 will be given.

 5                    Number 8 will be given in a modified manner.

 6                    Number 9 will be given.

 7                    Number 10 will be given.

 8                    Number 11 will be modified but given.

 9                    Number 12, 13, 14, 15, 16, 17, 18, 19, 20

10   will not be given.

11                    Number 21 will be given.

12                    Number 22 will not be given.

13                    Number 23, 24, 25, and 6 -- excuse me, No.

14   23, 24, and 25 will not be given.

15                    26 will be given.

16                    27 will be given as modified.

17                    28 will be given but be modified.

18                    29 will not be given.

19                    30 will be given.

20                    31 will not be given.

21                    Nor will 32, 33, 34, 35, 36, 37, 38 or 39.

22   None of those will be given.

23                    40 will be given.

24                    41 and 42 and 43, 44 and 45 will not be

25   given.
```

1              46 will be modified and given.

2              47 will be given.

3              48 will be given.  It will be modified but

4    it will be given.

5              I'm sorry.  48 will not be given.

6              49 will be given as modified.

7              50 will be given.

8              51, 52, 53 will not be given.

9              54 will be given.

10             55, 56, 57, 58, 59, and 60 will not be

11   given.

12             61, 62, 63, 64 and 65 will not be given.

13             And special instructions, the plaintiff's

14   special instruction will not be given.

15             The defendant's special instruction 1 and 3

16   will not be given.

17             Defendant's special instruction No. 2, will

18   be given.

19             Those are the -- to help you as far as the

20   jury instructions go so you can prepare your argument

21   accordingly.

22             And, again, the admonishment, make sure you

23   say you anticipate the instruction will be given because

24   it may be modified.

25             See you back in tomorrow morning at 8:15,

1   and we'll go right into opening statement.  Half hour

2   each side.  And then we'll go into instruction and give

3   it to the jury.

4           MS. ALPARCE:  Clarification, close can have

5   a half hour?

6           THE COURT:  Half hour each side.

7           MS. ALPARCE:  Thank you, Your Honor.

8           THE COURT:  You can break it up if you want.

9           MS. ALPARCE:  Sure.

10          THE COURT:  Because you do have rebuttal if

11  you don't use your whole half hour.

12          One other question, because attorneys many

13  times appreciate this, sometimes you don't, it's up to

14  you, if either side wants me to give you a five-minute

15  notice before you get towards the end, I will do that

16  for you.

17          MS. ALPARCE:  We'd appreciate it, Your

18  Honor.

19          THE COURT:  Now what I need from the

20  plaintiff, if you want me to give you a five-minute

21  reminder, tell me how much you want on the first as

22  opposed to the second.  Okay.  Okay.  Good luck.

23          See you in the morning.

24          MR. YORK:  Thank you, Your Honor.

25          MR. SINGH:  Thank You, Your Honor.

1                    (PROCEEDINGS CONCLUDED.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    CERTIFICATE OF REPORTER
 3
 4   COUNTY OF LOS ANGELES      )
 5                              )  SS.
 6   STATE OF CALIFORNIA        )
 7
 8   I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN AND FOR
 9   THE UNITED STATES DISTRICT COURT FOR THE CENTRAL
10   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT
11   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE
12   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE
13   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE
14   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE
15   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE
16   JUDICIAL CONFERENCE OF THE UNITED STATES.
17   JUNE 20, 2022
18
19   /S/_____
20   SHERI S. KLEEGER, CSR
21   FEDERAL OFFICIAL COURT REPORTER
22
23
24
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## $

**$10** [1] - 19:14
**$15** [1] - 131:5
**$15,581.75** [1] - 108:4
**$150** [1] - 162:11
**$17** [3] - 131:6, 131:9, 141:13
**$17.20** [2] - 132:5, 133:19
**$17.95** [1] - 109:11
**$180** [1] - 119:14
**$19** [1] - 138:19
**$193** [3] - 131:8, 133:24, 138:20
**$20** [1] - 19:4
**$20,000** [1] - 15:4
**$28.75** [1] - 115:4
**$3,000** [4] - 70:18, 70:19, 164:3, 187:15
**$35** [1] - 110:10
**$35.63** [2] - 110:6, 116:1
**$350,000** [2] - 52:7, 103:8
**$355,000** [1] - 70:19
**$369,441.12** [1] - 175:12
**$6,487** [1] - 113:3
**$60** [1] - 20:1
**$65** [1] - 104:14
**$7,000** [2] - 103:6, 103:7
**$7,001.75** [1] - 109:14
**$9.20** [1] - 110:16

## '

**'and** [1] - 162:18
**'that** [1] - 159:21
**'wait** [1] - 159:20
**'we've** [2] - 168:18, 168:22

## /

**/S** [1] - 195:19

## 1

**1** [12] - 19:7, 19:9, 121:7, 149:4, 149:11, 149:12, 149:13, 189:20, 190:2, 190:14, 190:22, 192:15
**1.3** [1] - 190:15
**1.6** [7] - 164:10, 164:11, 165:1, 166:15, 167:7,
167:18, 187:7
**1.7** [4] - 162:9, 163:17, 168:19, 168:23
**10** [6] - 42:12, 67:25, 147:16, 148:22, 175:8, 191:7
**10,000** [1] - 34:20
**100** [12] - 3:11, 32:22, 41:17, 41:19, 41:22, 41:24, 42:14, 42:19, 104:1, 104:6, 104:8, 157:12
**100,000** [2] - 12:24, 13:2
**102** [1] - 157:12
**10340** [1] - 1:23
**104** [1] - 160:3
**105** [1] - 68:17
**106** [1] - 160:3
**107** [1] - 3:13
**108** [11] - 3:14, 111:2, 111:3, 111:9, 111:21, 111:24, 112:1, 112:4, 113:3, 117:6, 161:18
**11** [6] - 25:7, 147:16, 151:22, 173:24, 173:25, 191:8
**111** [1] - 161:19
**112** [3] - 3:14, 122:1, 173:24
**113** [1] - 173:24
**118** [5] - 3:15, 132:20, 132:22, 133:4, 133:8
**11:30** [1] - 121:6
**12** [7] - 16:15, 16:16, 168:9, 173:1, 175:21, 187:23, 191:9
**120** [1] - 3:7
**125** [2] - 8:10, 167:24
**126** [1] - 3:14
**127** [3] - 12:02, 12:10, 167:25
**128** [2] - 3:15, 11:10
**129** [1] - 8:10
**13** [8] - 16:9, 122:3, 122:19, 122:25, 145:7, 146:16, 175:20, 191:9
**130** [3] - 58:13, 58:18
**133** [1] - 3:15
**135** [1] - 3:16
**14** [6] - 114:12, 118:7, 145:7, 145:8, 191:9
**140** [1] - 3:7
**144** [1] - 3:8
**148** [1] - 16:15
**14th** [1] - 118:16
**15** [13] - 68:5, 131:9,
137:14, 146:11, 162:12, 168:24, 169:5, 169:7, 171:12, 171:16, 185:21, 186:9, 191:9
**150** [1] - 16:8
**151** [1] - 16:16
**154** [1] - 16:16
**154687** [1] - 117:7
**156485** [1] - 118:12
**156486** [3] - 117:10, 117:23, 118:10
**156487** [5] - 108:7, 108:16, 116:13, 117:18, 117:20
**158** [1] - 16:16
**16** [7] - 1:17, 4:1, 171:12, 171:16, 172:16, 175:20, 191:9
**167** [1] - 122:2
**167,000** [1] - 81:22
**16th** [2] - 80:25, 81:2
**17** [6] - 137:14, 152:16, 171:13, 171:16, 177:8, 191:9
**17.20** [9] - 131:11, 132:6, 132:15, 133:16, 135:18, 137:6, 137:17, 137:24, 138:1
**18** [12] - 32:6, 32:19, 33:6, 33:10, 34:19, 48:14, 67:2, 122:25, 144:22, 160:15, 173:1, 191:9
**180** [1] - 3:7
**18th** [1] - 23:13
**19** [4] - 144:23, 146:15, 176:14, 191:9
**199** [2] - 7:4, 30:2

## 2

**2** [12] - 1:16, 25:7, 30:3, 82:10, 149:5, 149:22, 149:24, 161:18, 176:14, 190:4, 190:23, 192:17
**2.4** [1] - 167:5
**20** [21] - 3:6, 16:16, 52:4, 80:2, 80:3, 106:13, 106:15, 107:6, 107:12, 107:20, 112:24, 114:25, 116:18, 124:3, 124:22, 150:10, 170:14,
172:16, 172:25, 191:9, 195:17
**20,000** [3] - 14:1, 14:2, 20:11
**20-year** [1] - 170:12
**200** [3] - 7:5, 30:3, 172:9
**2002** [1] - 31:23
**2004** [2] - 32:1, 32:6
**2017** [2] - 49:2, 49:22
**2018** [10] - 56:8, 56:10, 64:6, 64:7, 64:15, 70:22, 76:14, 79:7, 91:2, 128:2
**2020** [24] - 12:19, 42:12, 51:22, 56:10, 80:1, 80:2, 80:18, 80:25, 81:6, 81:9, 82:6, 82:11, 82:14, 82:16, 82:20, 85:19, 85:24, 87:12, 92:7, 114:12, 118:7, 153:1, 156:23
**2021** [17] - 12:20, 29:16, 49:2, 52:16, 54:22, 55:2, 55:7, 60:23, 64:2, 92:14, 93:20, 102:9, 107:6, 110:23
**2022** [3] - 1:17, 4:1, 195:17
**21** [4] - 54:22, 55:2, 55:7, 191:11
**21-04206** [1] - 1:8
**213)894-6604** [1] - 1:25
**22** [5] - 26:6, 151:22, 155:4, 162:13, 191:12
**22,000** [1] - 56:16
**23** [14] - 3:16, 93:20, 107:6, 134:22, 135:1, 135:3, 135:5, 135:9, 148:22, 150:23, 151:2, 160:3, 191:13, 191:14
**24** [6] - 52:4, 71:4, 71:5, 160:15, 191:13, 191:14
**25** [9] - 7:4, 13:4, 26:6, 30:3, 31:17, 152:16, 161:19, 191:13, 191:14
**252** [9] - 3:15, 5:6, 127:17, 127:21, 127:23, 128:7, 128:12, 129:8, 129:12
**26** [4] - 3:13, 107:10,
172:16, 172:25, 191:9, 195:17
**20,000** [3] - 14:1, 14:2, 20:11
**20-year** [1] - 170:12
**200** [3] - 7:5, 30:3, 172:9
**2002** [1] - 31:23
**2004** [2] - 32:1, 32:6
**2017** [2] - 49:2, 49:22
**2018** [10] - 56:8, 56:10, 64:6, 64:7, 64:15, 70:22, 76:14, 79:7, 91:2, 128:2
**2020** [24] - 12:19, 42:12, 51:22, 56:10, 80:1, 80:2, 80:18, 80:25, 81:6, 81:9, 82:6, 82:11, 82:14, 82:16, 82:20, 85:19, 85:24, 87:12, 92:7, 114:12, 118:7, 153:1, 156:23
**2021** [17] - 12:20, 29:16, 49:2, 52:16, 54:22, 55:2, 55:7, 60:23, 64:2, 92:14, 93:20, 102:9, 107:6, 110:23
**2022** [3] - 1:17, 4:1, 195:17
**21** [4] - 54:22, 55:2, 55:7, 191:11
**21-04206** [1] - 1:8
**213)894-6604** [1] - 1:25
**22** [5] - 26:6, 151:22, 155:4, 162:13, 191:12
**22,000** [1] - 56:16
**23** [14] - 3:16, 93:20, 107:6, 134:22, 135:1, 135:3, 135:5, 135:9, 148:22, 150:23, 151:2, 160:3, 191:13, 191:14
**24** [6] - 52:4, 71:4, 71:5, 160:15, 191:13, 191:14
**25** [9] - 7:4, 13:4, 26:6, 30:3, 31:17, 152:16, 161:19, 191:13, 191:14
**252** [9] - 3:15, 5:6, 127:17, 127:21, 127:23, 128:7, 128:12, 129:8, 129:12
**26** [4] - 3:13, 107:10,

**261** [10] - 5:4, 8:10, 9:12, 9:15, 10:4, 22:24, 22:25, 29:12, 65:16, 65:18
**262** [13] - 5:5, 5:6, 5:7, 21:12, 21:15, 22:19, 22:23, 29:10, 29:11, 29:13, 60:13, 63:5, 63:14
**27** [1] - 191:16
**274** [7] - 3:14, 125:13, 125:17, 125:19, 126:9, 126:11, 126:13
**275** [12] - 3:13, 92:16, 93:15, 93:23, 93:25, 94:3, 104:10, 120:9, 120:10, 120:11, 123:11, 123:13
**27th** [1] - 190:8
**28** [5] - 56:11, 56:12, 56:15, 191:17, 195:11
**29** [2] - 3:6, 191:18
**2nd** [1] - 128:2

## 3

**3** [16] - 3:12, 7:5, 52:25, 53:2, 53:4, 53:13, 53:16, 93:20, 99:4, 99:6, 151:15, 157:12, 175:8, 183:2, 190:24, 192:15
**30** [7] - 17:17, 17:18, 17:23, 48:12, 48:13, 80:22, 191:19
**31** [2] - 3:7, 191:20
**312** [1] - 1:24
**32** [1] - 191:21
**325** [7] - 100:3, 119:2, 132:4, 139:11, 139:13, 139:16, 139:23
**33** [1] - 191:21
**34** [1] - 191:21
**35** [2] - 177:8, 191:21
**36** [3] - 119:16, 119:18, 191:21
**3624** [1] - 129:8
**369,000** [1] - 14:2
**37** [1] - 191:21
**38** [3] - 146:15, 177:9, 191:21
**39** [2] - 146:16, 191:21
**3rd** [1] - 100:11

## 4

**4** [11] - 38:1, 102:9,
145:7, 149:14,
150:9, 150:24,
151:2, 171:13,
171:17, 187:23,
191:1
**4(CONT** [1] - 3:6
**40** [1] - 191:23
**402** [1] - 1:24
**41** [1] - 191:24
**415** [2] - 89:20, 90:10
**416** [2] - 87:24, 89:20
**417** [1] - 87:25
**418** [1] - 86:19
**419** [1] - 85:7
**42** [2] - 3:11, 191:24
**43** [1] - 191:24
**44** [1] - 191:24
**45** [2] - 105:10, 191:24
**46** [1] - 192:1
**47** [1] - 192:2
**48** [2] - 192:3, 192:5
**488** [1] - 118:14
**49** [1] - 192:6
**492** [2] - 113:13,
113:17
**493** [2] - 113:17,
115:19
**4:30** [1] - 182:2
**4:50** [1] - 100:12
**4th** [1] - 103:11

## 5

**5** [6] - 19:9, 63:22,
104:10, 155:4,
175:21, 191:2
**50** [8] - 20:1, 119:24,
143:1, 176:14,
187:20, 187:21,
187:24, 192:7
**50,000** [3] - 12:24,
13:2, 13:4
**500,000** [1] - 33:13
**51** [1] - 192:8
**52** [2] - 147:20, 192:8
**53** [3] - 3:12, 147:20,
192:8
**54** [4] - 148:25, 149:1,
175:8, 192:9
**55** [2] - 148:22, 192:10
**56** [10] - 27:3, 27:5,
27:6, 136:13,
136:16, 136:21,
148:22, 150:9,
150:10, 192:10
**57** [2] - 172:15, 192:10
**58** [1] - 192:10

**59** [1] - 192:10

## 6

**6** [6] - 16:16, 147:20,
150:10, 160:3,
191:3, 191:13
**60** [2] - 77:11, 192:10
**61** [1] - 192:12
**62** [1] - 192:12
**626** [2] - 49:13, 49:16
**63** [1] - 192:12
**64** [1] - 192:12
**647** [1] - 129:8
**6487** [2] - 112:25,
114:1
**65** [1] - 192:12
**68** [1] - 121:25

## 7

**7** [8] - 16:9, 137:3,
144:22, 147:20,
151:14, 167:25,
177:9, 191:4
**7,000** [1] - 70:21
**70** [1] - 77:11
**70,000** [1] - 58:19
**71** [4] - 3:7, 150:23,
151:2, 175:20
**72** [3] - 150:23, 151:2,
175:21
**75** [1] - 68:18
**753** [1] - 195:11
**78** [3] - 25:7, 28:5,
80:7

## 8

**8** [9] - 85:7, 87:12,
87:15, 88:9, 157:12,
167:25, 172:25,
182:20, 191:5
**80** [2] - 26:6, 77:9
**81** [1] - 68:20
**8336** [2] - 102:5, 102:9
**8337** [1] - 99:4
**8338** [1] - 94:3
**86** [1] - 3:12
**88** [6] - 3:12, 83:10,
84:13, 84:25, 86:14,
86:16
**89** [1] - 151:14
**8:15** [2] - 182:21,
192:25
**8:30** [2] - 182:9

## 9

**9** [5] - 60:23, 85:19,

85:24, 89:19, 191:6
**90** [2] - 77:10, 151:15
**90012** [1] - 1:24
**92** [1] - 151:22
**93** [3] - 3:13, 151:22,
152:16
**95** [1] - 152:16
**96** [2] - 155:4, 172:25
**98** [1] - 173:1
**99** [2] - 68:19, 155:4

## A

**A.M** [2] - 1:18, 4:2
**able** [5] - 5:3, 5:13,
60:10, 61:1, 62:23
**ABOVE** [1] - 195:14
**ABOVE-ENTITLED** [1]
- 195:14
**abundance** [2] - 185:6
**accept** [8] - 17:21,
74:15, 89:17,
102:20, 104:4,
119:17, 123:25,
138:16
**acceptable** [1] - 78:1
**accepting** [3] - 92:5,
102:24, 105:6
**accepts** [1] - 71:22
**access** [2] - 40:13,
46:24
**according** [3] - 57:19,
114:25, 149:3
**accordingly** [1] -
192:21
**account** [10] - 32:13,
32:14, 35:10, 48:21,
50:17, 162:6,
164:19, 170:1,
170:2, 187:11
**accountant** [1] - 170:7
**accounting** [5] -
52:20, 54:8, 71:25,
169:16, 169:18
**action** [1] - 188:11
**actual** [3] - 105:6,
166:24, 166:25
**add** [1] - 168:4
**added** [1] - 26:18
**addition** [2] - 48:7,
71:20
**address** [7] - 9:6, 9:9,
9:10, 44:5, 94:9,
138:9, 186:8
**addresses** [1] -
112:13
**adhered** [1] - 38:5
**adjust** [1] - 31:3
**admissible** [1] - 9:22
**admit** [5] - 9:15,

86:14, 93:23,
107:12, 111:24
**admitted** [2] - 9:19,
187:2
**admitting** [1] - 89:22
**admonishment** [3] -
68:1, 121:8, 192:22
**advertised** [1] - 5:21
**aged** [1] - 80:9
**ago** [5] - 29:6, 31:17,
70:23, 95:23, 181:11
**agree** [7] - 11:25,
12:2, 19:3, 19:25,
78:4, 78:8, 78:11
**agreeing** [1] - 121:2
**agreement** [13] - 25:9,
25:10, 25:11, 25:13,
25:14, 25:21, 35:8,
35:9, 35:20, 50:14,
50:16, 141:4
**ahead** [13] - 6:10, 8:7,
9:23, 37:19, 145:20,
154:19, 163:6,
165:13, 170:10,
172:2, 179:7,
179:16, 188:21
**al** [1] - 1:10
**allow** [4] - 100:22,
122:15, 143:9,
145:13
**allowed** [5] - 7:23,
24:7, 53:13, 185:3,
185:14
**allows** [4] - 15:15,
17:16, 140:21, 141:1
**almost** [2] - 34:15,
160:2
**ALPARCE** [18] -
16:13, 16:23, 20:20,
20:22, 22:1, 22:8,
26:8, 26:17, 27:7,
27:9, 29:1, 165:6,
171:18, 171:20,
193:4, 193:7, 193:9,
193:17
**ambiguous** [16] -
145:18, 148:4,
148:9, 149:20,
151:20, 154:2,
172:1, 172:22,
175:6, 175:17,
176:10, 176:18,
176:24, 178:11,
179:4, 179:14
**AMERICA** [1] - 1:1
**amethyst** [2] - 33:23,
126:25
**amount** [27] - 13:23,
13:24, 20:4, 82:1,
82:4, 82:8, 103:6,

108:3, 109:10,
110:1, 110:5, 110:9,
110:12, 110:18,
115:2, 115:10,
115:11, 115:15,
116:1, 116:4,
123:17, 124:2,
164:17, 166:13,
169:13, 175:16
**amounts** [2] - 167:14,
185:7
**Amy** [2] - 52:20, 54:8
**AMY** [1] - 3:6
**AND** [3] - 195:8,
195:12, 195:14
**and'** [1] - 166:7
**Angeles** [1] - 49:17
**ANGELES** [4] - 1:18,
1:24, 4:1, 195:4
**animosity** [1] - 189:8
**answer** [21] - 17:14,
19:11, 24:16, 67:21,
124:15, 126:1,
145:14, 145:20,
147:16, 150:2,
154:21, 157:11,
159:20, 163:1,
164:20, 169:17,
172:6, 174:24,
175:2, 177:25
**Answer** [1] - 166:5
**ANSWER** [113] -
146:2, 146:5, 146:8,
146:11, 146:14,
147:3, 147:6, 147:8,
147:11, 147:25,
148:10, 148:12,
148:17, 148:20,
149:2, 149:7, 149:9,
149:13, 150:2,
151:6, 152:1, 152:4,
152:6, 152:10,
152:14, 152:21,
152:24, 153:1,
153:7, 153:10,
153:13, 153:16,
153:19, 153:22,
154:3, 155:1, 155:9,
155:13, 155:19,
155:23, 156:1,
156:4, 156:7,
156:10, 156:14,
156:18, 156:21,
157:1, 157:5,
157:15, 157:19,
157:23, 158:3,
158:10, 158:15,
158:23, 159:4,
159:9, 159:14,
159:16, 160:7,

160:10, 160:13, 160:21, 160:25, 161:6, 161:12, 161:15, 161:17, 161:23, 163:8, 163:14, 163:22, 164:6, 164:8, 164:16, 165:5, 167:10, 167:15, 167:23, 168:8, 168:12, 168:18, 169:4, 169:8, 169:12, 169:23, 170:3, 170:12, 173:6, 173:8, 173:12, 173:14, 173:19, 173:23, 174:5, 174:8, 174:10, 174:13, 174:16, 174:21, 175:13, 176:2, 176:11, 177:6, 177:14, 177:18, 177:24, 178:5, 178:17, 178:23, 179:23, 180:1

**answered** [9] - 25:16, 26:1, 69:24, 125:20, 152:20, 154:1, 169:15, 174:21, 175:1

**answering** [1] - 122:24

**answers** [2] - 169:19, 184:11

**anticipate** [2] - 4:13, 192:23

**anticipating** [1] - 169:10

**APARCE** [1] - 2:7

**apologize** [2] - 33:3, 171:14

**appear** [1] - 98:18

**appearance** [2] - 12:15, 12:16

**APPEARANCES** [1] - 2:4

**applies** [1] - 68:21

**appreciate** [3] - 189:12, 193:13, 193:17

**approve** [12] - 36:7, 36:14, 36:16, 37:4, 39:2, 44:22, 45:24, 48:2, 134:10, 134:11, 135:23, 137:22

**approved** [1] - 136:1

**approves** [2] - 36:8, 45:25

**April** [9] - 57:1, 67:6, 67:15, 70:16, 92:13, 92:14, 107:6, 110:23

**aqua** [1] - 99:21

**aquamarine** [65] - 13:20, 15:21, 16:4, 33:23, 76:21, 78:5, 82:18, 82:22, 82:24, 83:6, 83:9, 84:10, 88:11, 88:16, 89:23, 90:15, 91:23, 100:4, 102:13, 102:15, 102:16, 107:25, 109:23, 115:23, 116:6, 117:1, 117:24, 118:21, 119:3, 130:17, 130:20, 130:22, 131:4, 131:7, 131:8, 131:10, 132:1, 132:17, 133:19, 133:20, 133:22, 135:13, 135:16, 135:20, 137:4, 137:15, 137:20, 138:6, 138:16, 138:18, 138:19, 138:20, 139:2, 139:5, 139:10, 139:19, 139:21, 139:25, 140:3, 141:5, 141:11, 141:15, 141:23, 141:25, 146:25

**Arcadia** [4] - 32:4, 44:5, 49:18, 66:21

**area** [3] - 49:14, 49:16, 49:17

**areas** [1] - 188:8

**argue** [1] - 188:3

**argument** [7] - 181:25, 182:3, 182:10, 183:4, 183:5, 192:20

**argumentative** [3] - 105:16, 145:19, 179:13

**Arizona** [1] - 32:1

**arrangement** [1] - 178:13

**arrived** [1] - 134:4

**ASAP** [1] - 94:18

**aside** [1] - 174:10

**assign** [2] - 33:1, 50:5

**assigned** [5] - 32:24, 33:2, 33:3, 35:2, 172:10

**assume** [3] - 49:8, 112:18, 116:11

**assumed** [1] - 116:11

**assumes** [4] - 14:11,

14:20, 15:5, 101:25

**assuming** [2] - 36:8, 165:17

**AT** [2] - 2:7, 2:7

**attach** [2] - 67:17, 127:25

**Attached** [1] - 130:9

**attached** [6] - 84:17, 85:8, 85:12, 108:14, 112:6, 128:11

**attachment** [12] - 42:2, 42:3, 84:17, 84:20, 85:11, 85:17, 85:22, 108:17, 110:7, 128:9, 129:13, 129:16

**Attachments** [1] - 84:14

**attend** [4] - 31:17, 31:19, 34:15, 34:18

**attention** [22] - 8:9, 10:22, 11:10, 21:11, 22:19, 23:19, 24:15, 25:5, 28:5, 29:10, 80:6, 83:10, 84:24, 86:18, 92:16, 94:2, 99:4, 102:4, 104:9, 106:13, 113:13, 117:6

**ATTORNEY** [2] - 2:7, 2:7

**attorney** [7] - 80:1, 90:7, 145:19, 162:22, 165:8, 179:5, 179:15

**attorney-client** [3] - 145:19, 179:5, 179:15

**attorneys** [4] - 121:12, 179:8, 189:6, 193:12

**audio** [1] - 122:13

**August** [2] - 29:14, 29:16

**aware** [16] - 82:9, 82:13, 82:16, 82:20, 83:4, 97:4, 98:18, 98:24, 118:9, 172:11, 175:19, 176:25, 177:6, 178:17, 180:1

**B**

**bachelor** [1] - 31:23

**bad** [1] - 155:13

**bait** [2] - 23:16, 48:16

**balance** [1] - 175:11

**based** [22] - 17:9, 40:17, 40:22, 45:15, 46:3, 49:18, 51:4,

73:9, 73:13, 76:6, 80:21, 81:12, 92:1, 92:3, 101:20, 110:1, 110:4, 110:14, 130:23, 169:12, 169:17, 186:20

**basis** [4] - 30:15, 129:5, 171:23, 176:20

**Bates** [2] - 85:7, 129:7

**bear** [2] - 5:4, 190:17

**beginning** [2] - 142:1, 142:2

**BEHALF** [2] - 2:5, 2:9

**belongs** [1] - 59:22

**best** [6] - 13:1, 13:25, 55:15, 57:10, 65:14, 68:14

**better** [3] - 19:22, 24:17, 71:17

**between** [32] - 13:1, 25:11, 25:14, 25:22, 56:10, 72:23, 73:16, 74:18, 78:5, 78:9, 78:12, 83:16, 85:18, 85:19, 85:23, 85:24, 86:3, 93:19, 93:20, 106:18, 107:6, 140:25, 141:9, 141:23, 147:1, 147:9, 157:19, 162:8, 163:17, 178:8, 178:21, 189:6

**big** [4] - 155:1, 159:17, 159:21, 159:25

**bigger** [1] - 150:6

**bill** [3] - 16:6, 67:14, 162:7

**birthstone** [5] - 87:3, 87:6, 87:10, 88:1, 88:15

**bit** [1] - 185:6

**blue** [42] - 12:3, 78:5, 82:24, 83:8, 84:10, 89:23, 90:2, 90:3, 90:4, 90:14, 90:21, 91:4, 130:17, 130:20, 130:23, 130:24, 131:3, 131:10, 131:25, 132:8, 132:10, 132:17, 132:18, 133:13, 133:15, 133:16, 133:22, 135:13, 135:18, 137:6, 137:15, 137:19, 137:22, 137:24, 138:1, 138:3, 138:11, 138:13, 139:23,

142:2, 142:4, 146:25

**bluish** [1] - 78:6

**body** [2] - 108:13, 108:19

**book** [1] - 169:13

**bottom** [8] - 10:25, 11:13, 54:13, 87:23, 89:20, 90:10, 102:5, 102:9

**bought** [4] - 5:17, 6:21, 164:16, 179:17

**box** [6] - 4:7, 69:3, 87:3, 87:6, 88:15, 123:4

**bracelet** [3] - 18:19, 18:20, 34:9

**brass** [1] - 33:15

**breach** [2] - 188:14, 188:16

**BREAK** [2] - 123:2, 144:8

**break** [7] - 5:11, 67:25, 144:3, 144:5, 144:7, 183:2, 193:8

**breaking** [1] - 121:6

**brief** [2] - 20:23, 122:8

**BRIEF** [1] - 186:10

**bring** [6] - 24:14, 88:24, 89:6, 89:11, 121:1, 136:16

**brings** [1] - 124:16

**British** [1] - 31:20

**broad** [2] - 184:24, 185:1

**broke** [2] - 5:1, 125:3

**broken** [2] - 18:19

**brought** [3] - 5:16, 23:18, 26:5

**bucks** [2] - 159:18, 162:13

**bulk** [7] - 45:12, 75:9, 75:10, 75:11, 75:12, 75:16, 75:18

**business** [16] - 31:23, 35:11, 35:20, 43:11, 50:18, 52:8, 52:10, 58:14, 59:3, 61:2, 90:16, 101:24, 141:14, 162:11, 178:20, 185:9

**buy** [6] - 61:20, 62:12, 62:16, 62:18, 98:15, 138:6

**buyer** [1] - 88:10

**buying** [5] - 73:20, 74:4, 74:7, 101:22, 115:23

**BY** [60] - 2:6, 2:10, 3:8, 5:9, 6:12, 7:8, 7:18, 8:8, 10:2, 10:9, 12:9,

14:16, 15:1, 15:10, 16:25, 20:22, 22:1, 22:8, 26:17, 27:9, 29:5, 29:15, 30:7, 31:12, 37:21, 38:10, 42:20, 44:13, 53:17, 61:13, 69:7, 69:25, 71:11, 77:19, 81:17, 86:17, 89:3, 94:1, 96:10, 96:17, 98:2, 102:3, 103:10, 105:2, 105:12, 105:18, 107:15, 112:3, 120:8, 123:9, 126:15, 128:8, 128:15, 130:2, 133:9, 135:10, 136:20, 140:10, 141:20, 180:23

## C

**C-h-i-e-n** [2] - 31:8, 180:21
**cafeteria** [1] - 170:25
**calculated** [4] - 110:10, 169:7, 170:14
**calculating** [1] - 116:5
**calculation** [1] - 110:14
**calculations** [3] - 169:11, 169:14, 185:8
**CALIFORNIA** [6] - 1:2, 1:18, 1:24, 4:1, 195:6, 195:10
**California** [12] - 32:4, 35:6, 44:4, 44:5, 49:15, 139:14, 178:3, 178:8, 178:16, 178:22, 178:24, 179:2
**Canada** [1] - 31:18
**cannot** [19] - 12:7, 19:8, 19:11, 19:16, 19:21, 38:7, 52:21, 52:22, 53:8, 53:9, 54:1, 54:2, 62:14, 69:16, 86:1, 108:17, 110:7, 119:9, 154:4
**cannot'..** [1] - 162:18
**cannot..** [1] - 162:16
**carefully** [1] - 141:18
**carries** [1] - 186:4
**case** [36] - 4:9, 4:12, 17:22, 18:7, 18:20, 18:21, 18:24, 20:5, 22:18, 68:2, 68:10, 68:13, 68:22, 76:13,

79:1, 80:14, 91:2, 106:25, 121:9, 122:3, 131:24, 132:7, 134:5, 134:16, 148:2, 148:19, 167:11, 176:19, 177:10, 179:12, 182:12, 182:16, 189:2, 189:7
**case-to-case** [1] - 176:19
**cash** [1] - 169:23
**caught** [1] - 68:9
**caused** [1] - 14:18
**cc** [1] - 54:9
**cell** [5] - 37:15, 37:17, 38:1, 38:5, 38:7
**CENTRAL** [2] - 1:2, 195:9
**CEO** [5] - 94:10, 146:8, 146:9, 146:12, 172:8
**certain** [8] - 13:16, 78:25, 87:2, 87:7, 144:2, 172:10, 185:7
**certainly** [2] - 65:11, 184:6
**cERTIFICATE** [1] - 195:2
**CERTIFIED** [1] - 1:7
**CERTIFY** [1] - 195:10
**cetera** [4] - 185:2, 185:10
**chambers** [1] - 186:14
**chance** [2] - 143:5, 185:24
**change** [6] - 26:14, 26:18, 26:21, 73:1, 139:12, 139:18
**changed** [2] - 72:23, 73:5
**changes** [1] - 24:6
**charge** [2] - 17:12, 39:22
**charged** [3] - 164:1, 187:8, 187:14
**check** [5] - 134:3, 142:14, 155:16, 155:18, 161:2
**checked** [1] - 161:2
**checking** [1] - 76:8
**chemical** [1] - 34:2
**Chen** [4] - 28:7, 35:1, 38:11
**chief** [1] - 146:14
**CHIEN** [1] - 3:7
**Chien** [59] - 22:14, 22:18, 27:19, 30:22, 31:7, 31:13, 31:16, 35:5, 41:17, 41:18,

52:25, 53:18, 54:12, 60:13, 60:16, 65:16, 65:18, 69:9, 70:11, 71:12, 80:6, 83:12, 85:2, 86:18, 90:5, 90:18, 92:18, 94:2, 97:19, 98:3, 98:22, 105:19, 106:10, 109:3, 111:1, 112:4, 112:18, 114:3, 117:24, 119:19, 120:9, 123:10, 124:4, 125:23, 126:16, 127:9, 128:9, 130:3, 132:20, 133:10, 134:21, 135:11, 136:21, 140:11, 179:25, 180:7, 180:24, 187:2, 188:11
**Chinese** [1] - 24:17
**choose** [1] - 141:2
**CHU** [1] - 3:6
**Chu** [23] - 4:23, 5:10, 6:13, 7:4, 8:9, 16:2, 18:22, 20:23, 20:25, 23:13, 23:18, 24:10, 25:18, 26:4, 26:15, 27:2, 27:10, 28:6, 29:6, 30:2, 30:8, 52:20, 54:8
**Chu's** [1] - 16:8
**circled** [1] - 110:12
**citrine** [1] - 33:23
**civility** [1] - 189:8
**claim** [9] - 28:24, 55:10, 57:4, 57:15, 58:21, 58:25, 62:24, 66:4, 130:20
**claimed** [2] - 56:18, 57:8
**claiming** [7] - 58:9, 151:18, 161:21, 161:22, 161:25, 175:14, 187:13
**claims** [5] - 58:5, 59:6, 66:18, 66:25, 175:11
**clarification** [1] - 193:4
**clarify** [3] - 24:22, 115:18, 184:15
**classifications** [1] - 34:5
**clean** [1] - 121:22
**clear** [9] - 12:15, 16:2, 16:11, 24:16, 26:22, 100:9, 101:13, 146:24, 165:24
**CLERK** [9] - 5:6, 5:8,

16:11, 30:24, 31:2, 145:4, 180:11, 180:17, 186:11
**client** [4] - 6:3, 145:19, 179:5, 179:15
**clients** [2] - 95:25, 189:7
**clip** [1] - 16:8
**close** [3] - 54:13, 162:8, 193:4
**clue** [2] - 178:12, 178:14
**code** [15] - 49:14, 49:16, 49:17, 133:15, 137:4, 137:5, 137:22, 137:23, 137:25, 142:2, 142:5, 142:6, 142:7, 142:10, 142:13
**CODE** [1] - 195:11
**collect** [1] - 173:12
**college** [3] - 31:17, 31:19, 31:24
**colon** [1] - 81:1
**color** [7] - 12:3, 12:17, 51:13, 78:23, 87:11, 131:10
**colored** [1] - 64:12
**colors** [2] - 78:19, 87:10
**Columbia** [1] - 31:20
**coming** [3] - 73:4, 157:15, 186:25
**comment** [3] - 24:8, 154:14, 184:14
**commission** [1] - 106:10
**communicate** [15] - 30:10, 30:16, 32:12, 32:15, 49:4, 50:23, 51:7, 53:23, 54:5, 106:1, 140:18, 155:6, 155:10, 159:2, 164:25
**communicated** [8] - 28:2, 30:8, 30:17, 49:20, 50:22, 137:18, 155:20, 159:7
**communicating** [2] - 51:16, 106:7
**communication** [4] - 138:5, 174:22, 179:5, 179:15
**communications** [6] - 84:6, 93:4, 106:24, 145:19, 178:21, 185:8
**companies** [2] - 46:7,

179:18
**company** [11] - 32:25, 43:21, 61:19, 158:13, 172:3, 172:9, 172:12, 178:3, 186:21, 187:15, 187:17
**company's** [1] - 40:8
**compared** [1] - 24:18
**complain** [2] - 28:17, 57:2
**complainant** [1] - 188:16
**complained** [5] - 6:24, 23:16, 92:10, 141:11, 141:24
**complaining** [1] - 151:25
**complaint** [11] - 29:18, 48:15, 56:21, 57:15, 58:20, 64:9, 83:5, 83:8, 88:11, 88:20, 101:13
**complaints** [4] - 29:8, 29:24, 56:24, 122:5
**complete** [8] - 5:2, 5:3, 17:13, 52:23, 53:9, 53:25, 94:21, 136:4
**completeness** [1] - 16:14
**compliment** [1] - 189:9
**compound** [2] - 150:1, 171:25
**comprise** [1] - 77:9
**concerned** [1] - 137:18
**concerning** [1] - 157:17
**CONCLUDED** [1] - 194:1
**conclusion** [3] - 89:1, 179:4, 179:15
**conduct** [1] - 8:17
**conducted** [1] - 189:11
**CONFERENCE** [1] - 195:16
**confirm** [10] - 36:4, 36:10, 73:10, 86:1, 87:2, 98:15, 131:12, 133:25, 138:12, 139:9
**confirmation** [1] - 36:20, 37:7, 39:4
**confirms** [1] - 38:20
**CONFORMANCE** [1] - 195:15
**confusing** [1] - 86:25

connection [1] - 178:8
consider [6] - 14:4, 14:8, 88:19, 88:22, 89:4, 89:9
considered [4] - 6:5, 14:17, 15:3, 15:11
consumer [1] - 159:25
contact [3] - 10:19, 30:14, 50:25
contacted [2] - 137:8, 137:11
contains [1] - 117:10
contents [3] - 6:1, 151:5, 176:7
context [1] - 185:17
continue [4] - 4:17, 69:6, 94:17, 123:7
continues [2] - 87:24, 89:20
contract [9] - 32:13, 46:6, 50:19, 51:1, 140:21, 140:25, 141:9, 188:14, 188:16
conversation [3] - 95:15, 95:22, 174:16
COO [1] - 186:20
copies [3] - 67:4, 85:18, 85:22
COPY [1] - 1:7
copy [7] - 93:15, 93:18, 107:5, 121:22, 129:22, 189:22, 189:25
Cornell [15] - 6:20, 8:17, 8:21, 8:23, 10:19, 11:5, 11:18, 22:21, 23:10, 29:7, 62:17, 65:3, 66:11, 187:1, 187:2
Corp [3] - 114:7, 114:10, 117:19
correct [114] - 5:25, 7:13, 8:18, 12:19, 13:11, 13:14, 16:5, 17:3, 17:17, 18:13, 18:17, 20:8, 22:22, 26:3, 37:11, 38:17, 38:21, 39:5, 39:8, 41:11, 42:22, 43:1, 43:23, 44:1, 44:4, 44:25, 45:6, 45:8, 48:5, 48:19, 49:8, 49:18, 56:22, 61:5, 62:21, 62:24, 62:25, 63:5, 65:6, 65:12, 65:13, 66:24, 69:21, 69:22, 71:16, 71:23, 73:23, 74:16, 75:6, 75:21, 75:25, 77:22,

78:2, 78:3, 78:22, 79:4, 79:21, 82:18, 82:23, 83:17, 84:1, 84:8, 84:22, 85:9, 85:12, 85:15, 85:17, 85:19, 85:22, 88:16, 90:8, 93:15, 93:18, 95:4, 96:3, 97:22, 103:12, 106:19, 106:22, 107:5, 107:21, 110:9, 111:4, 113:7, 115:10, 115:14, 115:15, 116:21, 120:12, 123:14, 123:18, 123:20, 124:7, 124:25, 129:16, 133:1, 134:13, 137:9, 142:7, 143:16, 147:24, 151:19, 153:15, 158:9, 160:6, 161:14, 161:22, 168:7, 172:21, 174:25, 175:16, 176:1, 177:5, 179:10
CORRECT [1] - 195:12
correction [4] - 25:17, 25:19, 25:20, 25:23
corrections [4] - 24:11, 24:13, 24:24, 25:3
correctly [1] - 166:4
cost [15] - 19:4, 19:6, 20:1, 39:20, 103:22, 104:17, 109:5, 109:8, 110:11, 119:14, 125:11, 127:1, 131:14, 133:23, 137:1
costs [1] - 104:14
couch [1] - 183:11
counsel [19] - 4:17, 4:20, 7:21, 16:11, 69:6, 69:23, 105:10, 121:19, 122:15, 123:7, 128:12, 129:10, 129:12, 141:19, 165:8, 183:1, 185:20, 187:4, 189:1
COUNSEL [1] - 2:4
Counsel [18] - 6:10, 8:7, 9:23, 14:23, 16:14, 25:7, 31:10, 103:9, 129:24, 129:25, 143:1, 144:11, 150:25,

154:19, 163:6, 170:7, 180:10, 181:18
count [3] - 12:25, 81:15, 152:8
countersued [2] - 179:19, 179:21
counts [1] - 122:22
COUNTY [1] - 195:4
couple [7] - 69:24, 121:19, 159:18, 159:22, 159:24, 162:14, 183:14
course [8] - 78:24, 79:17, 93:8, 93:12, 178:19, 184:2, 184:23, 185:3
Court [18] - 23:20, 24:8, 25:2, 143:4, 143:8, 143:22, 180:14, 181:25, 183:14, 184:13, 186:11, 187:22, 188:1, 188:4, 188:6, 188:18, 189:11, 190:19
court [3] - 122:14, 144:25
COURT [168] - 1:1, 1:23, 4:5, 4:20, 5:24, 7:6, 7:16, 7:21, 9:18, 9:25, 10:7, 10:12, 12:6, 14:13, 14:22, 15:7, 16:10, 16:20, 20:19, 21:24, 22:7, 29:3, 29:11, 30:4, 30:6, 30:20, 30:23, 31:9, 37:15, 38:1, 42:16, 44:12, 53:14, 61:11, 67:24, 68:7, 69:1, 69:23, 71:9, 77:17, 81:11, 86:9, 86:12, 86:15, 89:2, 93:24, 96:8, 96:14, 98:1, 102:2, 103:9, 104:24, 105:10, 105:17, 107:13, 111:25, 112:2, 120:4, 121:5, 121:17, 122:21, 123:3, 126:11, 128:5, 129:10, 129:14, 129:18, 129:21, 129:24, 133:6, 135:8, 136:18, 140:8, 141:17, 142:20, 142:22, 143:1, 143:3, 143:8, 143:14, 143:18,

144:4, 144:7, 144:9, 144:13, 144:17, 144:21, 145:11, 146:20, 147:19, 150:12, 150:15, 150:18, 150:21, 151:13, 153:5, 154:9, 154:13, 154:22, 157:9, 159:19, 162:3, 162:17, 162:21, 162:24, 163:3, 163:5, 163:19, 164:5, 164:14, 164:23, 165:4, 165:8, 165:13, 165:16, 165:22, 166:1, 166:2, 166:20, 167:22, 168:1, 168:20, 169:2, 169:21, 170:6, 170:17, 170:21, 170:23, 171:2, 171:5, 171:8, 172:4, 172:17, 173:2, 174:1, 180:4, 180:8, 181:16, 181:18, 181:20, 181:22, 182:22, 182:24, 183:16, 183:19, 183:25, 184:16, 184:22, 185:18, 185:24, 186:13, 186:18, 187:4, 187:18, 188:23, 188:24, 189:24, 190:9, 190:11, 190:12, 190:14, 193:6, 193:8, 193:19, 195:8, 195:9, 195:21
Court's [3] - 24:14, 184:4, 184:7
courtroom [6] - 37:16, 37:18, 38:8, 68:8, 121:18, 182:25
CRABBE [1] - 2:7
create [7] - 12:14, 36:12, 44:21, 45:15, 45:18, 134:18
created [83] - 12:11, 13:18, 33:17, 33:25, 34:1, 34:2, 46:15, 55:5, 55:10, 55:13, 55:21, 56:1, 56:4, 56:7, 56:9, 56:18, 56:22, 57:3, 57:5, 57:6, 57:13, 57:14, 57:20, 58:12, 59:7,

61:23, 62:15, 62:19, 64:20, 66:9, 70:17, 71:6, 76:15, 77:3, 77:4, 78:14, 78:17, 78:21, 88:6, 99:21, 99:22, 100:4, 102:16, 102:21, 107:25, 108:23, 109:6, 109:15, 116:25, 119:3, 130:9, 138:19, 139:5, 139:10, 139:19, 139:21, 139:24, 140:3, 141:23, 147:2, 147:10, 147:12, 149:15, 149:16, 150:3, 150:4, 151:9, 151:10, 151:18, 151:19, 152:2, 154:5, 157:14, 157:17, 158:7, 158:20, 163:24, 164:18
creative [2] - 151:25, 152:19
credibility [2] - 24:8, 162:19
credit [26] - 13:18, 13:20, 13:23, 15:4, 20:12, 94:21, 94:24, 95:7, 95:9, 95:11, 98:25, 107:24, 108:11, 108:20, 116:15, 116:16, 116:20, 117:4, 123:17, 123:23, 124:1, 124:14, 124:16, 139:16, 166:22, 166:25
credited [2] - 108:24, 166:13
credits [2] - 124:7, 162:5
criticizing [1] - 68:13
CROSS [4] - 3:4, 4:22, 29:4, 71:10
cross [9] - 4:16, 71:9, 120:4, 122:5, 164:24, 165:17, 165:18, 184:15, 188:16
cross-complainant [1] - 188:16
cross-examination [5] - 4:16, 71:9, 164:24, 165:18, 184:15
CROSS-EXAMINATION [3] - 4:22, 29:4, 71:10

**cross-examine** [1] - 165:17
**crushed** [1] - 147:13
**CSR** [2] - 1:23, 195:20
**current** [1] - 32:2
**cushion** [10] - 62:8, 64:17, 64:23, 78:25, 87:20, 88:1, 89:25, 91:1, 109:2, 131:6
**Custom** [2] - 46:20, 47:10
**custom** [1] - 111:18
**customer** [140] - 15:19, 15:21, 16:3, 17:1, 17:18, 17:20, 21:6, 21:7, 21:8, 26:24, 26:25, 27:16, 27:18, 32:13, 32:17, 32:23, 32:24, 35:2, 35:4, 35:7, 35:8, 35:9, 35:13, 35:14, 35:17, 35:19, 35:25, 36:3, 36:6, 36:7, 36:8, 36:10, 36:14, 36:20, 36:25, 37:8, 37:11, 37:14, 37:23, 38:12, 38:16, 38:19, 38:20, 38:24, 39:2, 39:7, 39:12, 39:20, 40:5, 40:25, 41:2, 41:3, 41:5, 41:7, 41:15, 44:22, 45:14, 45:16, 45:20, 45:24, 45:25, 47:22, 48:2, 48:10, 50:5, 50:14, 53:7, 59:8, 59:12, 59:25, 67:11, 72:10, 72:12, 72:15, 72:20, 73:2, 73:3, 73:10, 73:18, 73:20, 73:22, 74:4, 77:12, 77:13, 77:20, 77:21, 83:8, 89:13, 89:15, 89:17, 91:11, 91:17, 96:7, 97:5, 97:8, 97:9, 97:20, 98:16, 98:20, 101:23, 103:5, 103:7, 104:1, 110:6, 110:11, 114:5, 114:6, 117:15, 117:17, 117:18, 118:19, 119:7, 119:21, 119:25, 123:25, 124:16, 126:3, 126:18, 126:22, 131:9, 134:12, 135:15, 135:16, 137:22, 138:11, 138:14, 142:10, 153:9,

153:12, 157:22, 158:1, 162:20, 164:19
**customers** [58] - 32:12, 32:15, 32:20, 32:22, 33:1, 33:4, 34:21, 35:11, 39:18, 46:20, 48:16, 50:15, 54:10, 55:6, 55:13, 57:3, 71:23, 73:17, 74:16, 74:21, 89:12, 91:18, 94:18, 95:8, 96:5, 96:12, 96:16, 97:1, 97:22, 97:25, 109:19, 116:10, 120:20, 130:22, 131:5, 131:11, 131:12, 132:10, 134:4, 134:20, 136:23, 140:19, 141:1, 141:8, 142:9, 152:6, 152:7, 152:9, 152:10, 152:11, 152:13, 153:8, 157:19, 158:2, 176:17, 176:23, 185:8
**customers'** [3] - 73:14, 74:20, 101:24
**customs** [1] - 71:22
**cut** [1] - 78:25
**CV** [1] - 1:8
**CZ** [1] - 33:17

# D

**damage** [2] - 14:18, 187:7
**damages** [8] - 15:9, 28:23, 184:10, 185:7, 187:5, 187:12, 188:3, 188:9
**dare** [1] - 170:25
**date** [19] - 23:12, 23:14, 29:21, 42:9, 42:11, 60:23, 67:1, 80:2, 81:1, 81:2, 107:9, 114:12, 117:13, 118:4, 118:5, 118:6, 118:16, 128:1, 152:24
**dated** [1] - 87:12
**dates** [3] - 85:24, 156:21, 160:17
**DAY** [1] - 1:16
**day-to-day** [3] - 171:23, 177:14, 177:18
**days** [7] - 17:17,

17:18, 17:23, 48:12, 48:13, 80:22, 190:19
**deal** [7] - 84:6, 93:4, 106:24, 155:1, 159:17, 159:21, 159:25
**dealing** [1] - 179:9
**dealings** [1] - 176:21
**decided** [1] - 63:1
**deciding** [1] - 23:9
**decision** [2] - 98:25, 99:2
**deducted** [2] - 166:11, 167:2
**deduction** [2] - 167:18, 187:10
**defendant** [9] - 9:14, 68:19, 93:22, 107:11, 122:2, 143:7, 143:12, 144:15, 171:4
**Defendant** [2] - 86:13, 111:23
**DEFENDANT** [1] - 2:9
**defendant's** [3] - 68:22, 192:15, 192:17
**DEFENDANTS** [1] - 1:12
**defendants** [2] - 142:23, 188:15
**defense** [2] - 142:22, 188:9
**definitely** [1] - 4:12
**defrauded** [1] - 162:15
**degree** [2] - 31:23, 31:25
**deliberation** [1] - 4:14
**delivered** [4] - 73:6, 96:4, 96:11, 105:20
**delivering** [2] - 15:22, 71:21
**deny** [2] - 79:16, 188:1
**depicted** [2] - 5:18, 22:3
**depicting** [1] - 75:6
**depo** [1] - 122:14
**deposition** [26] - 7:4, 7:9, 16:8, 23:19, 23:22, 23:25, 24:11, 25:6, 25:9, 26:7, 26:13, 30:2, 122:11, 122:22, 143:13, 143:15, 143:19, 143:21, 143:25, 144:18, 145:10, 145:22, 146:18, 171:7, 184:20, 185:3
**describe** [2] - 53:18, 53:22

**describing** [1] - 54:19
**description** [2] - 133:14, 137:5
**descriptions** [1] - 137:1
**design** [2] - 35:23, 90:1
**Design** [74] - 14:6, 14:10, 19:17, 21:19, 21:20, 25:22, 27:1, 28:2, 28:17, 28:23, 30:8, 41:25, 42:8, 44:8, 48:22, 50:5, 50:9, 50:18, 50:19, 52:6, 52:9, 52:10, 52:12, 52:16, 52:21, 53:10, 54:5, 54:8, 58:15, 64:3, 64:4, 64:7, 64:18, 64:23, 65:1, 67:2, 67:6, 67:18, 69:15, 70:11, 70:15, 70:18, 73:16, 73:22, 73:25, 74:18, 76:7, 84:9, 86:8, 88:10, 90:3, 92:9, 95:12, 96:23, 97:10, 97:16, 109:21, 127:24, 128:23, 131:4, 137:2, 137:5, 138:2, 138:15, 139:11, 139:13, 139:22, 140:15, 141:7, 141:9, 142:12, 146:4, 175:15, 176:22
**designated** [3] - 122:12, 144:20, 145:17
**designation** [1] - 122:12
**Designs** [232] - 7:10, 13:9, 13:13, 14:19, 15:3, 18:4, 18:12, 18:25, 20:6, 23:15, 25:15, 26:20, 27:22, 28:21, 29:8, 29:18, 29:24, 30:13, 30:17, 33:3, 42:25, 43:4, 43:8, 43:9, 43:12, 43:25, 48:19, 49:1, 49:5, 49:7, 49:21, 50:7, 50:12, 50:22, 51:2, 51:10, 51:16, 51:23, 53:23, 54:6, 54:23, 55:3, 55:8, 55:10, 55:20, 55:23, 55:25, 56:3, 56:6, 56:9, 56:17, 56:21, 57:4, 57:11, 57:23, 58:3, 58:5, 59:3,

60:5, 60:25, 61:22, 62:6, 62:7, 62:10, 62:21, 62:24, 65:12, 66:3, 66:15, 66:19, 66:25, 67:5, 69:11, 69:14, 69:20, 70:4, 71:4, 72:4, 72:5, 72:7, 72:8, 73:13, 73:20, 74:3, 74:15, 74:20, 75:2, 75:20, 75:24, 76:5, 76:14, 76:23, 77:7, 78:15, 79:13, 79:20, 80:10, 81:7, 81:10, 81:25, 82:3, 82:9, 82:14, 82:17, 82:21, 83:17, 86:3, 86:21, 86:24, 87:1, 87:19, 88:23, 89:5, 89:10, 90:11, 90:15, 91:7, 91:12, 91:19, 91:21, 92:4, 92:10, 92:23, 93:19, 94:10, 96:11, 97:4, 98:21, 99:1, 99:25, 100:8, 101:13, 101:18, 105:3, 105:5, 105:14, 105:21, 109:17, 110:5, 110:10, 110:19, 111:10, 111:16, 111:20, 112:10, 112:20, 113:22, 114:21, 115:7, 116:9, 116:20, 118:10, 119:6, 119:11, 121:1, 123:16, 123:22, 124:14, 126:7, 127:10, 127:13, 128:19, 130:6, 130:13, 131:15, 131:17, 132:8, 132:11, 133:1, 133:12, 134:1, 134:8, 134:10, 135:20, 135:23, 136:1, 136:7, 136:8, 136:12, 136:25, 137:8, 137:19, 138:5, 138:10, 138:12, 140:2, 140:12, 140:19, 141:5, 141:10, 141:21, 146:7, 146:8, 146:10, 146:12, 147:23, 148:1, 148:7, 148:16, 149:4, 149:11, 151:24, 157:3, 161:22,

161:25, 164:2, 167:18, 168:6, 168:10, 172:9, 173:17, 173:20, 174:3, 174:6, 174:11, 174:14, 174:19, 175:5, 176:16, 177:3, 177:4, 177:11, 178:15, 178:20, 178:21, 179:1, 179:12, 181:3, 181:6, 181:13

**designs** [1] - 44:3

**DESIGNS** [1] - 1:10

**Designs'** [9] - 74:21, 78:24, 83:4, 96:4, 96:15, 99:10, 120:14, 130:20, 149:23

**despite** [1] - 141:3

**details** [2] - 37:1, 163:9

**detected** [1] - 151:7

**determine** [1] - 182:13

**determined** [1] - 182:3

**Diamond** [1] - 6:14

**Diamonds** [1] - 5:18

**difference** [6] - 141:22, 147:1, 147:7, 147:9, 187:14

**different** [18] - 15:25, 19:19, 19:20, 33:16, 34:21, 44:24, 56:12, 58:16, 83:2, 87:11, 109:1, 109:5, 109:8, 113:11, 119:24, 126:24, 127:14, 129:5

**differently** [2] - 45:3, 65:8

**difficult** [4] - 78:4, 78:8, 78:11, 78:20

**dimension** [1] - 130:9

**DIRECT** [3] - 3:4, 31:11, 180:22

**direct** [11] - 5:4, 8:9, 21:11, 22:19, 25:5, 28:5, 46:6, 69:6, 79:25, 80:6, 162:5

**directing** [15] - 10:22, 11:10, 29:10, 83:10, 84:24, 86:18, 92:16, 94:2, 99:4, 102:4, 102:8, 104:9, 106:13, 113:13, 117:6

**directly** [1] - 28:2

**disagree** [4] - 10:4, 10:10, 10:15, 10:20

**disagreed** [1] - 10:15

**disclosure** [1] - 149:17

**discovery** [1] - 184:21

**discretion** [1] - 141:2

**discuss** [9] - 34:13, 34:22, 36:3, 51:4, 52:19, 68:1, 89:11, 121:8, 182:16

**discussed** [5] - 15:13, 94:12, 126:3, 168:13, 185:14

**dismissed** [1] - 188:12

**dispute** [4] - 13:10, 86:4, 149:11, 149:23

**disputed** [2] - 80:13, 149:19

**disputing** [2] - 21:21, 149:4

**distinguish** [4] - 78:5, 78:9, 78:12, 78:20

**DISTRICT** [5] - 1:1, 1:2, 1:4, 195:9, 195:10

**DIVISION** [1] - 1:2

**DO** [1] - 195:10

**document** [21] - 5:10, 6:1, 6:4, 6:5, 6:6, 6:7, 6:8, 7:24, 8:11, 10:5, 20:15, 36:19, 73:4, 83:14, 85:7, 85:12, 92:20, 118:9, 118:25, 129:7, 135:12

**documentation** [1] - 166:14

**documented** [2] - 72:24, 95:16

**documents** [2] - 10:3, 129:9

**dollars** [6] - 19:9, 137:14, 159:25, 168:24, 169:6, 187:7

**done** [5] - 36:23, 68:15, 155:14, 160:2, 162:11

**down** [7] - 30:20, 117:16, 121:14, 142:18, 170:13, 170:19, 181:16

**draw** [1] - 165:21

**due** [11] - 80:21, 80:24, 81:1, 81:2, 81:7, 81:10, 94:14, 94:24, 144:2, 170:1, 175:11

**during** [8] - 27:10, 34:19, 51:15, 58:14, 79:21, 79:25,

178:19, 183:8

**duties** [3] - 32:10, 72:1, 146:13

**Duty** [1] - 190:15

---

## E

**e-mail** [5] - 54:12, 85:8, 100:7, 103:21, 130:8

**e-mails** [5] - 92:1, 93:11, 106:24, 124:24, 167:16

**early** [3] - 4:12, 4:13, 12:20

**earn** [1] - 106:10

**earring** [17] - 11:4, 11:7, 11:14, 11:17, 11:20, 11:22, 11:25, 12:1, 12:3, 12:4, 12:10, 12:12, 15:25, 64:21, 64:24, 76:25, 109:2

**earrings** [8] - 19:13, 19:14, 34:9, 51:13, 63:11, 64:21, 64:22, 65:2

**earth** [1] - 147:12

**easily** [1] - 105:13

**easy** [1] - 78:13

**education** [2] - 31:24, 34:4

**effectively** [1] - 68:12

**efficient** [1] - 122:18

**efficiently** [1] - 68:12

**eight** [2] - 126:24, 180:10

**either** [16] - 12:13, 24:7, 35:21, 36:21, 41:4, 45:14, 45:16, 59:11, 75:5, 84:3, 93:1, 100:21, 126:22, 158:1, 158:8, 193:14

**email** [138] - 27:21, 35:3, 35:21, 36:25, 41:3, 41:5, 41:15, 41:25, 42:2, 42:21, 44:21, 45:23, 47:22, 49:6, 49:11, 50:13, 50:14, 51:17, 51:18, 51:19, 52:20, 53:5, 53:6, 53:10, 53:19, 53:23, 54:8, 54:19, 54:20, 54:22, 55:2, 55:5, 55:8, 57:1, 59:2, 60:25, 67:2, 67:6, 67:17, 83:7, 83:16, 83:19, 83:22, 84:12, 85:12, 85:16,

85:17, 85:21, 86:20, 87:12, 87:24, 89:4, 89:19, 89:21, 90:10, 90:25, 92:22, 93:16, 93:18, 94:6, 94:12, 95:2, 95:13, 95:16, 95:19, 95:22, 96:21, 96:25, 98:6, 99:6, 99:9, 99:20, 100:8, 100:12, 102:4, 102:8, 102:12, 104:10, 106:18, 107:2, 107:5, 107:20, 108:13, 108:19, 108:21, 109:16, 110:4, 110:8, 110:22, 111:10, 111:14, 111:19, 112:5, 112:23, 112:24, 113:7, 114:25, 116:4, 116:14, 116:18, 116:19, 117:10, 118:9, 118:25, 119:2, 124:6, 124:10, 124:25, 125:7, 125:20, 126:2, 126:6, 126:17, 127:24, 128:1, 128:23, 130:3, 130:6, 130:8, 130:13, 132:4, 134:19, 136:11, 136:22, 142:12, 166:6, 166:10, 166:12, 166:15, 167:5, 167:6

**emails** [28] - 49:7, 54:10, 83:25, 84:3, 84:6, 85:14, 85:25, 86:10, 92:3, 92:23, 93:2, 93:4, 93:7, 95:6, 95:14, 95:25, 106:22, 110:24, 112:13, 120:25, 123:13, 124:6, 126:25, 166:15, 167:4, 167:8, 167:11, 167:13

**embarrassed** [1] - 183:10

**emerald** [65] - 5:21, 6:25, 12:11, 12:12, 12:17, 13:18, 17:7, 19:3, 33:20, 55:14, 55:21, 56:4, 56:7, 56:9, 56:19, 56:22, 61:23, 62:16, 62:19, 70:17, 76:15, 77:12, 77:15, 77:20, 78:1,

78:9, 78:12, 78:13, 78:14, 78:18, 78:21, 79:18, 87:9, 88:5, 92:11, 99:22, 100:4, 102:21, 103:2, 105:6, 107:25, 108:23, 109:6, 109:15, 114:14, 116:25, 118:1, 118:22, 119:10, 119:25, 130:9, 130:10, 147:2, 147:10, 149:15, 150:4, 151:9, 151:25, 152:3, 152:19, 158:16, 160:12

**emerald's** [1] - 147:11

**emeralds** [14] - 17:2, 55:6, 55:11, 56:1, 58:9, 147:13, 151:18, 151:19, 157:14, 158:8, 158:14, 158:20, 163:13, 163:24

**employee** [14] - 51:7, 71:14, 71:18, 86:21, 86:24, 87:1, 87:19, 88:9, 90:11, 91:7, 91:21, 92:3, 106:10, 111:10

**employees** [4] - 13:6, 83:17, 92:23, 93:19

**employment** [2] - 93:8, 93:13

**end** [9] - 4:14, 38:6, 47:16, 150:10, 153:1, 155:17, 156:23, 189:2, 193:15

**ended** [1] - 112:25

**ending** [1] - 114:1

**ends** [1] - 112:18

**engaged** [1] - 48:16

**English** [1] - 96:1

**entire** [1] - 122:3

**ENTITLED** [1] - 195:14

**especially** [1] - 54:7

**ESQUIRE** [3] - 2:6, 2:10, 2:11

**established** [1] - 119:6

**estimate** [3] - 13:1, 13:25, 116:12

**et** [5] - 1:10, 185:2, 185:10

**evening** [2] - 4:8, 182:19

**evidence** [22] - 6:2, 6:7, 7:21, 7:22, 8:1,

14:12, 14:21, 15:6, 42:14, 53:13, 65:22, 102:1, 126:10, 128:4, 133:4, 135:6, 136:17, 182:15, 185:7, 188:7, 188:12

**exact** [7] - 152:8, 153:23, 156:10, 157:20, 158:25, 163:9, 176:11

**exactly** [9] - 29:21, 73:11, 75:10, 75:12, 131:1, 158:16, 168:5, 184:19, 187:13

**examination** [7] - 4:16, 16:22, 71:9, 79:25, 164:24, 165:18, 184:15

**EXAMINATION** [8] - 4:22, 20:21, 29:4, 31:11, 71:10, 120:7, 140:9, 180:22

**examine** [1] - 165:17

**example** [2] - 15:21, 129:7

**except** [1] - 48:7

**excerpts** [1] - 23:21

**exchange** [6] - 59:11, 83:16, 89:18, 97:13, 106:18, 138:15

**exchanged** [3] - 85:18, 85:23, 92:23

**excuse** [19] - 5:5, 22:24, 43:3, 43:8, 44:7, 47:12, 66:18, 67:14, 71:2, 120:4, 121:6, 138:4, 149:25, 154:13, 155:6, 162:3, 171:18, 184:9, 191:13

**executive** [1] - 146:14

**exhibit** [12] - 27:3, 27:7, 84:1, 84:4, 99:5, 111:1, 113:16, 129:3, 129:5, 129:6, 129:9, 149:11

**Exhibit** [86] - 5:4, 5:5, 8:10, 9:12, 21:12, 25:10, 25:13, 27:3, 28:5, 29:10, 41:17, 41:19, 41:22, 41:24, 42:14, 42:19, 52:25, 53:2, 53:4, 53:13, 53:16, 60:13, 63:5, 63:14, 65:16, 65:18, 80:7, 83:10, 84:13, 84:25, 86:14, 86:16, 92:16, 93:15, 93:23,

93:25, 94:3, 104:10, 106:13, 107:10, 107:12, 107:14, 107:20, 111:2, 111:3, 111:9, 111:21, 111:24, 112:1, 112:4, 112:24, 113:3, 114:25, 116:18, 117:6, 120:9, 120:11, 123:11, 123:13, 124:3, 124:20, 124:22, 125:13, 125:17, 125:19, 126:13, 127:17, 127:21, 128:7, 128:12, 129:8, 129:12, 132:20, 132:22, 133:4, 133:8, 134:22, 135:1, 135:3, 135:5, 135:9, 136:13, 136:16, 136:21, 148:25, 149:1

**expense** [2] - 17:24, 103:16

**expensive** [1] - 131:8

**expert** [19] - 7:22, 8:5, 9:16, 9:22, 147:17, 150:13, 150:16, 154:15, 154:17, 157:10, 162:2, 165:15, 184:12, 185:13, 186:5, 186:6, 186:7, 186:24

**explain** [2] - 70:15, 84:9

**explained** [3] - 111:18, 163:9, 187:9

**explaining** [1] - 72:22

**explains** [1] - 172:13

**express** [3] - 68:3, 121:10, 182:17

**extend** [1] - 68:10

**extent** [2] - 100:15, 101:3

**extra** [1] - 122:23

**eye** [1] - 78:21

**F**

**fact** [4] - 6:4, 29:23, 74:23, 189:18

**factories** [11] - 32:15, 39:16, 39:25, 40:10, 46:2, 46:9, 53:25, 55:21, 106:1, 106:7, 139:18

**factory** [12] - 37:5,

37:6, 39:16, 46:10, 52:23, 55:18, 57:25, 58:2, 106:6, 136:3, 136:4, 139:18

**facts** [4] - 14:12, 14:21, 15:5, 102:1

**failed** [2] - 159:5, 163:25

**fair** [2] - 59:23, 103:19

**fake** [1] - 155:2

**far** [1] - 24:23, 55:22, 57:22, 58:2, 112:17, 137:18, 169:13, 187:25, 188:3, 189:25, 192:19

**fast** [1] - 24:19

**faster** [1] - 188:24

**fault** [1] - 5:3

**February** [7] - 23:13, 55:4, 61:22, 67:2, 67:8, 70:16, 128:2

**FEDERAL** [2] - 1:23, 195:21

**few** [4] - 50:8, 104:2, 111:6, 163:14

**field** [1] - 83:19

**fifth** [2] - 63:19, 65:9

**figure** [4] - 63:2, 104:25, 130:25, 131:21

**file** [1] - 84:20

**filed** [6] - 110:19, 110:22, 110:23, 122:12, 190:7, 190:10

**final** [20] - 46:17, 46:20, 47:16, 47:21, 47:22, 47:24, 73:7, 73:10, 79:23, 84:24, 90:3, 101:20, 105:22, 111:14, 136:8, 136:11, 136:22, 136:24, 137:25, 142:8

**finally** [1] - 167:24

**financial** [1] - 14:18

**findings** [2] - 10:11, 10:20

**fine** [3] - 100:16, 129:23, 184:22

**finish** [5] - 5:13, 46:12, 139:19, 169:21, 182:1

**first** [47] - 24:17, 31:15, 35:2, 35:3, 38:25, 42:21, 49:20, 50:22, 50:25, 55:25, 56:3, 56:6, 58:21, 58:24, 63:16, 80:13, 80:17, 83:19, 83:22,

83:23, 96:1, 104:9, 107:8, 107:16, 107:20, 111:9, 112:4, 128:10, 129:2, 130:4, 138:24, 142:9, 142:24, 152:22, 161:6, 166:3, 170:6, 170:25, 171:12, 181:6, 181:12, 186:13, 187:19, 188:6, 193:21

**five** [13] - 5:14, 54:2, 63:15, 122:23, 141:16, 144:4, 144:5, 144:6, 144:7, 160:14, 162:10, 193:14, 193:20

**five-minute** [3] - 144:5, 193:14, 193:20

**five-minutes** [1] - 144:6

**flat** [1] - 163:23

**flip** [1] - 21:14

**floor** [2] - 170:25, 186:23

**focus** [1] - 98:3

**focused** [1] - 90:5

**follow** [2] - 41:7, 80:16

**followed** [1] - 43:17

**following** [1] - 189:16

**follows** [1] - 44:9

**FOR** [2] - 195:8, 195:9

**FOREGOING** [1] - 195:12

**foresaw** [1] - 189:5

**form** [3] - 68:2, 121:9, 182:17

**forma** [41] - 36:13, 36:18, 36:19, 36:24, 36:25, 37:1, 37:4, 37:7, 37:13, 37:22, 38:19, 39:2, 44:21, 44:22, 44:23, 44:24, 45:5, 45:15, 45:19, 45:21, 45:23, 46:4, 46:16, 48:1, 48:6, 72:17, 73:9, 73:11, 90:1, 134:13, 134:15, 134:19, 135:4, 135:23, 136:1, 137:7, 137:23, 171:23, 177:4

**FORMAT** [1] - 195:15

**format** [5] - 43:5, 43:17, 44:9, 54:20, 144:2

**forms** [1] - 139:15

**forth** [1] - 95:14

**forward** [1] - 31:4

**forwarded** [1] - 85:16

**foundation** [20] - 5:22, 7:15, 146:19, 147:17, 150:13, 150:16, 153:4, 154:8, 154:21, 157:8, 162:2, 164:13, 165:3, 165:7, 165:14, 167:21, 170:5, 170:20, 184:12, 185:12

**four** [5] - 49:3, 63:16, 152:11, 152:12, 157:19

**fraud** [2] - 188:8, 188:9

**fraudulent** [1] - 145:22

**fraudulently** [2] - 149:16, 150:5

**Friday** [3] - 4:12, 4:13, 187:23

**front** [16] - 8:1, 41:18, 53:2, 60:15, 65:18, 125:24, 127:19, 134:24, 143:22, 154:3, 156:14, 157:24, 158:24, 163:15, 188:18, 189:11

**full** [5] - 17:17, 17:23, 31:5, 110:1, 180:18

**future** [2] - 168:24, 169:20

**G**

**GARY** [1] - 1:4

**GCU** [1] - 31:25

**gem** [1] - 127:7

**gems** [1] - 127:5

**gemstone** [16] - 6:16, 6:18, 7:20, 8:14, 12:1, 12:13, 18:13, 33:19, 33:23, 34:2, 78:13, 88:2, 96:19, 96:22, 102:20, 131:7

**gemstones** [13] - 8:14, 8:18, 8:20, 8:24, 33:16, 33:18, 34:5, 34:10, 77:2, 77:3, 88:16, 126:24, 137:16

**general** [3] - 50:2, 50:4, 150:3

**generally** [2] - 22:15, 186:19

**generate** [4] - 36:24, 40:2, 45:21, 46:22
**gentlemen** [7] - 4:25, 5:25, 7:17, 67:24, 121:5, 143:18, 181:23
**genuine** [10] - 33:19, 115:23, 137:15, 138:20, 139:2, 141:15, 141:23, 147:1, 147:10, 147:11
**GERALD** [1] - 2:11
**given** [53] - 19:24, 24:2, 24:10, 38:6, 113:10, 113:11, 166:7, 166:11, 185:17, 188:20, 190:2, 190:3, 190:4, 190:20, 190:22, 190:23, 190:24, 191:1, 191:2, 191:3, 191:4, 191:5, 191:6, 191:7, 191:8, 191:10, 191:11, 191:12, 191:14, 191:15, 191:16, 191:17, 191:18, 191:19, 191:20, 191:22, 191:23, 191:25, 192:1, 192:2, 192:3, 192:4, 192:5, 192:6, 192:7, 192:8, 192:9, 192:11, 192:12, 192:14, 192:16, 192:18, 192:23
**glass** [53] - 7:1, 7:13, 11:8, 11:9, 11:23, 11:24, 12:2, 12:14, 12:18, 17:2, 17:8, 19:3, 19:6, 19:15, 21:1, 21:3, 21:6, 21:7, 21:8, 21:9, 33:17, 55:13, 55:16, 56:18, 57:7, 57:11, 58:22, 59:7, 66:10, 77:13, 77:20, 77:21, 78:1, 78:9, 78:12, 78:17, 78:21, 92:11, 103:2, 130:12, 147:13, 147:14, 149:16, 150:4, 151:8, 153:8, 154:6, 154:16, 184:5, 186:20, 186:22, 187:3
**God** [1] - 180:15
**goods** [27] - 15:16, 15:24, 28:14, 28:18,

33:14, 59:16, 71:21, 74:5, 74:15, 74:19, 88:23, 96:4, 96:11, 103:7, 123:18, 123:20, 123:21, 126:3, 126:22, 148:10, 148:12, 148:13, 148:17, 150:3, 162:6, 174:23, 179:17
**grab** [1] - 190:17
**graduate** [1] - 31:22
**great** [1] - 111:9
**green** [7] - 12:10, 12:17, 62:16, 78:9, 78:12, 78:16, 78:19
**gross** [1] - 162:12
**grounds** [4] - 146:19, 150:18, 150:21, 164:22
**guess** [2] - 145:22, 155:1
**guys** [3] - 101:8, 158:6, 166:7

## H

**half** [7] - 49:3, 110:15, 182:11, 193:1, 193:5, 193:6, 193:11
**hand** [5] - 30:24, 43:22, 149:17, 150:6, 180:11
**handle** [3] - 74:17, 177:14, 177:18
**handled** [4] - 48:24, 177:15, 177:19, 177:25
**handles** [2] - 48:21, 178:6
**hands** [1] - 188:10
**happy** [1] - 17:20
**have..** [1] - 173:15
**head** [1] - 163:11
**hear** [5] - 55:3, 55:8, 147:5, 181:2, 182:7
**heard** [4] - 180:24, 182:15, 185:15, 186:16
**hearsay** [17] - 5:23, 6:3, 9:16, 135:7, 146:19, 147:17, 150:13, 150:16, 157:10, 165:7, 165:14, 167:21, 170:5, 170:20, 184:12, 185:2, 185:13
**HELD** [1] - 195:13
**help** [10] - 37:15,

39:24, 79:9, 79:13, 107:9, 108:14, 117:2, 180:15, 192:19
**helps** [2] - 112:24, 190:14
**Helzberg** [14] - 5:18, 5:21, 6:14, 6:16, 6:19, 7:12, 63:12, 63:23, 63:24, 64:1, 64:8, 64:10, 64:14
**HEREBY** [1] - 195:10
**Hi** [1] - 84:15
**higher** [1] - 141:16
**highlighted** [1] - 127:2
**hike** [1] - 141:10
**hint** [1] - 74:25
**hire** [1] - 158:13
**hired** [1] - 8:17
**hiring** [1] - 8:23
**hit** [3] - 168:19, 168:21, 168:22
**hits** [1] - 186:23
**holding** [1] - 173:9
**honest** [1] - 24:20
**Hong** [40] - 12:23, 25:14, 26:12, 26:19, 26:23, 27:23, 28:3, 28:10, 28:14, 32:15, 39:17, 39:19, 39:23, 40:11, 40:12, 40:21, 41:4, 46:13, 46:14, 46:18, 46:21, 47:4, 47:6, 47:11, 47:13, 47:20, 105:20, 105:24, 136:5, 136:6, 136:10, 139:20, 145:23, 148:20, 178:4, 178:9, 178:13, 179:18
**Honor** [104] - 4:21, 6:11, 7:3, 7:14, 9:14, 9:24, 14:11, 14:20, 16:7, 16:13, 16:17, 16:18, 16:23, 20:18, 20:20, 29:2, 30:2, 30:22, 37:20, 42:13, 42:18, 53:12, 71:8, 86:13, 88:25, 93:22, 101:25, 104:22, 105:1, 105:11, 107:11, 111:23, 122:8, 123:1, 123:8, 126:9, 128:23, 129:4, 129:11, 129:23, 133:3, 135:5, 140:7, 142:16, 142:17, 142:21, 142:23, 143:6, 143:11,

143:17, 144:12, 144:19, 145:9, 146:17, 147:15, 150:8, 150:20, 151:11, 153:4, 154:8, 154:11, 154:20, 157:7, 160:2, 162:1, 163:4, 163:18, 164:4, 164:12, 165:2, 165:12, 165:23, 166:16, 166:18, 167:20, 167:24, 168:25, 169:17, 170:4, 170:16, 170:22, 170:24, 171:4, 171:6, 171:11, 171:18, 172:15, 180:3, 180:6, 181:15, 181:19, 181:21, 183:13, 183:18, 183:23, 184:1, 184:20, 186:17, 189:23, 190:13, 193:7, 193:18, 193:24, 193:25
**HONORABLE** [1] - 1:4
**hope** [2] - 4:8, 4:9
**hopefully** [1] - 115:18
**hour** [7] - 182:2, 182:11, 193:1, 193:5, 193:6, 193:11
**hundred** [1] - 43:14
**hundreds** [1] - 60:4

## I

**idea** [1] - 19:22
**ideal** [1] - 122:13
**identified** [4] - 9:12, 73:20, 114:15, 129:6
**identifies** [2] - 74:4, 112:5
**IGI** [2] - 158:4, 161:17
**image** [4] - 35:18, 36:4, 37:2, 67:20
**impact** [3] - 15:2, 101:10, 101:24
**important** [2] - 131:14, 182:14
**impressed** [1] - 189:13
**improper** [4] - 15:16, 15:18, 15:23, 15:24
**IN** [3] - 195:8, 195:13, 195:15
**inaccurately** [1] - 95:21
**inaudible** [1] - 147:3

**inaudible)** [1] - 159:18
**INC** [2] - 1:6, 1:10
**Inc** [1] - 26:20
**include** [1] - 25:3
**included** [1] - 158:25
**includes** [1] - 15:18
**including** [2] - 122:4
**incorrect** [2] - 95:24, 96:19
**independent** [2] - 158:5, 161:17
**index** [6] - 188:22, 188:25, 189:20, 190:6, 190:7, 190:8
**indicate** [6] - 128:18, 128:23, 131:18, 132:16, 134:7, 136:24
**indicates** [2] - 133:11, 135:12
**indication** [1] - 138:4
**individual** [1] - 179:25
**individually** [1] - 19:1
**industry** [1] - 91:14
**information** [68] - 6:9, 34:17, 34:25, 36:1, 36:3, 36:4, 36:6, 36:9, 36:12, 36:15, 36:22, 36:23, 37:3, 37:5, 38:16, 40:2, 40:10, 40:11, 40:13, 40:18, 40:19, 40:20, 40:22, 44:17, 44:18, 44:20, 45:1, 45:17, 45:19, 46:2, 46:3, 46:9, 46:15, 46:22, 46:25, 47:1, 47:21, 47:24, 48:1, 48:4, 49:10, 50:6, 86:2, 87:16, 88:17, 95:25, 103:11, 115:16, 131:11, 134:18, 136:3, 137:25, 151:4, 155:16, 157:20, 157:23, 160:17, 165:21, 166:7, 166:10, 168:16, 170:7, 175:25, 176:7, 176:12, 184:24, 185:2, 186:25
**informations** [1] - 40:9
**informed** [5] - 91:22, 99:25, 100:3, 105:5, 105:8
**initial** [1] - 56:21
**initiated** [1] - 174:17
**input** [1] - 134:18
**inputted** [2] - 40:23,

47:2

**inquire** [3] - 31:10,
104:22, 155:15
**inside** [2] - 32:25, 38:7
**insist** [1] - 17:19
**inspected** [1] - 19:25
**inspecting** [1] - 76:10
**inspection** [17] - 8:13,
8:18, 17:24, 18:13,
20:2, 20:7, 29:7,
103:18, 103:22,
156:2, 156:5, 156:8,
158:1, 158:4, 181:3,
181:7, 181:12
**inspections** [1] - 20:1
**instance** [1] - 190:2
**instead** [13] - 56:18,
58:22, 59:7, 83:5,
90:15, 91:23, 92:11,
103:2, 131:25,
132:17, 133:22,
135:13, 137:20
**Institute** [1] - 31:20
**instruct** [3] - 181:25,
183:6, 183:7
**Instruction** [2] -
190:2, 190:14
**instruction** [9] -
182:10, 182:11,
183:12, 190:4,
192:14, 192:15,
192:17, 192:23,
193:2
**instructions** [12] -
121:23, 128:21,
181:24, 182:3,
183:3, 183:9,
188:19, 189:14,
189:21, 190:20,
192:13, 192:20
**insufficient** [2] -
188:7, 188:12
**intend** [1] - 122:10
**intends** [1] - 16:14
**interest** [1] - 124:23
**interested** [9] - 35:16,
35:17, 38:17, 50:3,
50:7, 50:9, 51:5,
51:11, 51:12
**internal** [2] - 36:22,
158:4
**interrupt** [1] - 145:13
**interrupted** [1] - 38:15
**intranet** [1] - 46:24
**IntraSystem** [9] - 40:2,
40:6, 40:7, 40:14,
44:17, 44:21, 45:18,
46:25, 134:18
**introduce** [2] - 35:4,
50:13

**introduced** [1] - 6:2
**inventory** [6] - 12:19,
21:1, 21:4, 21:5,
66:9, 66:21
**invoice** [119] - 16:6,
17:4, 17:6, 17:11,
26:11, 36:13, 36:14,
36:17, 36:18, 36:19,
36:24, 36:25, 37:1,
37:5, 37:7, 37:13,
37:22, 38:19, 39:2,
39:13, 39:19, 40:1,
40:3, 40:4, 40:15,
40:17, 40:22, 41:3,
41:5, 44:21, 44:22,
44:23, 44:24, 45:5,
45:15, 45:19, 45:21,
45:23, 46:4, 46:14,
46:15, 46:16, 46:17,
46:20, 46:23, 47:5,
47:8, 47:9, 47:12,
47:17, 47:21, 47:24,
48:2, 48:5, 48:6,
48:7, 48:12, 57:12,
57:14, 57:16, 57:19,
72:5, 72:17, 72:19,
72:23, 73:3, 73:6,
73:7, 73:9, 73:11,
73:12, 76:6, 76:7,
79:24, 80:13, 80:15,
80:17, 81:14, 81:19,
81:22, 90:2, 90:3,
101:20, 105:22,
130:24, 132:11,
132:13, 132:16,
132:19, 132:23,
132:25, 133:10,
134:2, 134:13,
134:15, 134:19,
135:4, 135:14,
135:19, 135:24,
136:2, 136:8,
136:11, 136:22,
136:24, 137:7,
137:21, 137:23,
137:25, 140:2,
142:3, 142:8,
147:23, 149:5,
149:23, 149:24,
177:5
**invoiced** [1] - 39:20
**invoices** [35] - 13:10,
26:20, 43:3, 43:7,
44:7, 52:1, 52:3,
52:4, 52:6, 54:23,
59:4, 61:1, 71:4,
71:5, 71:21, 72:8,
80:3, 80:10, 81:3,
81:6, 81:9, 81:25,
82:3, 130:25, 142:7,

148:2, 148:7,
148:16, 151:5,
171:23, 175:24,
175:25, 176:3, 176:8
**involved** [7] - 23:9,
32:16, 33:8, 60:18,
84:11, 123:17,
171:22
**IS** [2] - 195:12, 195:15
**issue** [85] - 32:17,
57:3, 57:4, 59:14,
60:6, 61:23, 62:3,
62:11, 64:23, 66:4,
66:18, 67:3, 67:10,
67:13, 67:22, 70:17,
71:1, 76:12, 88:24,
94:14, 94:25, 95:7,
95:9, 96:18, 96:20,
96:23, 96:24, 97:13,
99:14, 100:15,
101:4, 101:5, 101:6,
102:13, 102:15,
103:7, 104:4, 105:8,
106:25, 120:12,
120:21, 120:23,
121:1, 122:9,
123:16, 123:25,
124:11, 124:16,
126:21, 130:18,
130:21, 132:3,
137:8, 137:11,
138:9, 138:10,
140:13, 140:16,
141:24, 144:2,
149:17, 150:6,
152:18, 152:22,
153:2, 155:11,
155:12, 155:14,
157:13, 157:14,
159:3, 160:6, 160:9,
160:12, 160:19,
160:24, 161:3,
161:5, 161:6,
161:10, 167:13,
168:16, 170:1,
173:18, 173:22
**issues** [46] - 55:5,
55:20, 57:2, 57:12,
59:10, 60:1, 62:7,
64:5, 64:12, 64:18,
67:7, 67:8, 67:16,
67:19, 69:16, 69:18,
70:8, 70:14, 70:15,
70:19, 70:20, 84:10,
89:6, 89:11, 89:14,
92:6, 97:10, 97:14,
97:17, 103:24,
104:2, 109:22,
110:22, 120:20,
123:14, 124:18,
125:21, 126:4,

126:19, 137:13,
141:25, 160:13,
163:12, 168:16,
187:6
**Item** [1] - 63:22
**item** [73] - 5:17, 6:25,
7:12, 15:22, 15:23,
16:3, 16:5, 17:22,
18:16, 18:25, 19:1,
19:15, 20:3, 20:7,
21:19, 21:20, 22:2,
23:9, 35:17, 35:18,
36:5, 37:2, 44:17,
48:3, 50:8, 51:5,
62:14, 63:19, 64:1,
65:5, 65:6, 65:8,
65:9, 65:11, 75:6,
75:8, 77:13, 77:21,
77:24, 88:20, 94:13,
97:8, 102:25, 103:4,
105:24, 109:8,
112:18, 116:10,
128:20, 135:14,
135:15, 137:2,
137:3, 138:3,
138:13, 140:12,
140:22, 140:23,
141:2, 141:7, 142:3,
142:13, 149:10,
149:12, 149:22,
149:23, 150:7
**items** [70] - 13:16,
13:18, 13:20, 14:5,
14:9, 15:18, 17:3,
17:9, 17:25, 18:22,
18:23, 19:24, 20:14,
21:18, 21:19, 28:21,
33:11, 35:16, 50:3,
58:10, 61:5, 61:8,
61:14, 61:15, 61:21,
63:7, 63:16, 66:14,
66:17, 71:5, 72:3,
72:4, 72:19, 73:2,
74:10, 74:24, 75:20,
75:24, 76:4, 76:5,
76:12, 77:6, 79:10,
79:20, 79:22, 89:5,
89:10, 92:5, 97:5,
101:14, 101:17,
103:23, 105:14,
105:19, 106:2,
108:23, 109:18,
112:6, 112:10,
116:14, 116:21,
119:1, 139:24,
149:4, 158:25,
160:25, 161:3
**itself** [2] - 145:2,
156:24

**J**

**January** [5] - 52:16,
52:19, 54:22, 55:2,
55:7
**JESSICA** [1] - 2:7
**jewel** [1] - 87:7
**Jewel** [2] - 112:14
**jewelries** [6] - 33:15,
34:8, 34:14, 34:17,
61:19
**jewelry** [95] - 12:18,
13:16, 19:4, 19:6,
19:11, 19:15, 33:11,
34:15, 35:15, 39:22,
43:1, 46:11, 49:23,
49:25, 50:1, 50:4,
51:13, 55:15, 56:14,
56:18, 56:25, 57:10,
57:17, 58:16, 58:17,
58:22, 59:6, 60:5,
60:7, 60:10, 60:11,
61:5, 61:19, 61:20,
62:20, 62:23, 63:10,
63:25, 66:5, 69:20,
76:12, 76:15, 76:17,
77:6, 79:4, 79:14,
82:10, 82:18, 84:7,
91:14, 92:11, 93:5,
101:23, 106:25,
123:14, 124:9,
124:11, 131:14,
131:17, 131:19,
132:2, 135:13,
136:9, 136:25,
139:1, 139:4,
139:24, 141:14,
151:25, 152:3,
152:19, 155:7,
155:21, 156:3,
156:13, 157:17,
157:18, 158:22,
161:14, 167:18,
168:6, 168:11,
172:20, 172:24,
173:5, 173:11,
173:13, 173:17,
173:21, 174:4,
174:7, 174:15,
174:20, 177:11,
177:12
**Jewelry** [24] - 12:23,
13:7, 25:14, 26:3,
26:11, 26:19, 26:23,
30:9, 30:11, 39:19,
47:6, 71:14, 71:18,
71:20, 71:22, 79:21,
80:10, 89:23, 98:22,
99:1, 101:22,
105:20, 105:23,

112:11

**job** [1] - 72:1
**JT** [2] - 152:4, 158:10
**JTV** [35] - 61:17, 61:18, 61:19, 61:20, 61:24, 62:6, 62:14, 62:18, 63:8, 63:9, 63:17, 64:5, 70:23, 98:8, 98:11, 98:14, 98:15, 98:17, 98:22, 100:5, 100:6, 140:12, 152:14, 153:10, 153:12, 153:15, 153:18, 153:20, 155:12, 156:23, 158:3, 158:8, 158:21, 163:17, 187:15
**JTV's** [3] - 62:5, 62:9, 98:18
**JTVs** [1] - 162:8
**judge** [2] - 183:6, 183:7
**JUDGE** [1] - 1:4
**judgment** [1] - 183:17
**JUDICIAL** [1] - 195:16
**July** [5] - 42:12, 114:12, 118:7, 118:16
**JUNE** [3] - 1:17, 4:1, 195:17
**Juror** [1] - 38:1
**JUROR** [1] - 182:21
**jurors** [5] - 68:8, 69:2, 121:18, 144:10, 182:24
**Jury** [1] - 190:15
**JURY** [3] - 68:6, 121:16, 182:23
**jury** [22] - 4:6, 4:7, 4:25, 68:4, 68:14, 69:3, 121:11, 123:4, 143:22, 154:15, 181:24, 182:3, 182:18, 185:15, 188:7, 188:12, 189:12, 189:14, 189:21, 192:20, 193:3

### K

**KATHLEEN** [1] - 2:7
**keep** [7] - 66:21, 66:23, 68:23, 70:12, 89:5, 142:5, 182:14
**key** [9] - 36:11, 36:21, 40:1, 40:8, 40:19, 40:20, 44:16, 44:20, 45:17

**kidding** [1] - 111:7
**kind** [24] - 20:15, 33:16, 34:4, 34:8, 34:9, 34:11, 51:4, 51:8, 62:2, 67:19, 69:18, 70:11, 70:13, 97:16, 97:24, 122:17, 126:23, 126:24, 126:25, 138:25, 157:25, 158:13, 187:12
**kinds** [2] - 19:19, 70:5
**KLAUSNER** [1] - 1:4
**Kleeger** [1] - 144:25
**KLEEGER** [3] - 1:23, 195:8, 195:20
**knowing** [1] - 24:13
**knowledge** [11] - 15:2, 30:15, 34:7, 55:15, 57:10, 65:14, 72:3, 75:19, 75:23, 76:2, 76:3
**knows** [2] - 74:10, 141:14
**Kong** [39] - 12:23, 25:14, 26:12, 26:19, 26:23, 27:23, 28:3, 28:10, 28:14, 32:15, 39:17, 39:19, 39:23, 40:11, 40:12, 40:21, 41:5, 46:13, 46:14, 46:18, 46:21, 47:4, 47:6, 47:11, 47:20, 105:21, 105:24, 136:5, 136:6, 136:10, 139:20, 139:21, 145:23, 148:21, 178:4, 178:9, 178:13, 179:18
**Kong's** [1] - 47:13
**KSS0DWHQ** [2] - 135:16, 137:4
**Kurt** [9] - 22:14, 22:18, 27:19, 27:20, 30:22, 31:13, 31:15, 35:4, 84:15

### L

**lab** [9] - 12:11, 34:2, 76:14, 78:14, 78:17, 78:21, 87:6, 158:5, 161:17
**lack** [3] - 16:14, 154:21, 189:8
**ladies** [7] - 4:25, 5:25, 7:17, 67:24, 121:5, 143:18, 181:23
**language** [2] - 24:17,

96:2
**large** [1] - 91:17
**last** [20] - 30:1, 31:6, 31:8, 86:19, 94:2, 110:18, 110:21, 111:1, 111:6, 113:16, 119:5, 122:24, 154:21, 162:10, 162:17, 169:8, 169:19, 169:24, 180:19, 180:20
**late** [2] - 12:19, 19:8
**LAW** [2] - 2:7, 2:7
**lawsuit** [16] - 13:9, 64:3, 84:7, 84:11, 93:5, 110:19, 110:22, 110:23, 174:18, 174:22, 174:23, 179:1, 181:8, 181:9, 181:10
**lawyer** [1] - 86:10
**lawyers** [4] - 85:15, 86:5, 93:16, 107:3
**lead** [1] - 98:14
**leading** [3] - 21:23, 22:5, 44:11
**learn** [3] - 11:7, 11:20, 11:22
**learned** [1] - 88:14
**least** [9] - 4:13, 60:3, 67:19, 69:17, 80:25, 119:7, 119:14, 122:18, 189:10
**leave** [1] - 121:13
**led** [1] - 98:10
**left** [14] - 9:5, 43:22, 68:8, 68:18, 68:20, 69:9, 104:23, 121:18, 122:1, 122:3, 182:24, 188:13, 188:14, 188:17
**left-hand** [1] - 43:22
**legal** [3] - 89:1, 179:4, 179:14
**legend** [1] - 142:6
**less** [8] - 14:1, 14:2, 15:4, 19:4, 19:6, 19:14, 33:22, 119:10
**letterhead** [4] - 39:13, 39:19, 47:7, 47:13
**light** [29] - 89:23, 90:2, 90:3, 90:4, 90:14, 91:4, 130:23, 130:24, 131:3, 131:25, 132:8, 132:10, 132:17, 132:18, 133:12, 133:15, 133:16,

133:22, 135:18, 137:6, 137:15, 137:22, 137:23, 138:1, 138:3, 138:11, 138:13, 142:2, 142:4
**Lilly** [3] - 50:2, 50:5, 50:6
**limited** [3] - 9:25, 10:1, 16:19
**limits** [2] - 121:25, 122:7
**line** [38] - 5:1, 5:13, 7:4, 7:5, 30:3, 75:17, 144:22, 145:7, 145:8, 146:15, 146:16, 150:9, 150:10, 150:23, 150:24, 151:14, 151:15, 151:22, 157:12, 160:3, 161:18, 161:19, 167:25, 171:12, 171:13, 171:16, 171:17, 173:24, 173:25, 177:8, 177:9, 184:3
**lines** [13] - 16:9, 25:7, 26:6, 147:16, 166:6, 171:15, 172:15, 172:25, 173:1, 175:8, 175:20, 175:21, 176:14
**list** [9] - 35:16, 81:11, 81:13, 105:19, 105:23, 106:2, 129:6, 142:6, 149:3
**listed** [3] - 98:22, 124:25, 125:7
**listen** [1] - 141:18
**live** [2] - 122:10, 167:1
**loads** [1] - 149:14
**located** [1] - 32:4
**look** [29] - 12:11, 16:6, 17:4, 17:11, 19:16, 41:17, 42:24, 52:25, 59:9, 59:17, 60:2, 61:25, 62:6, 65:16, 78:17, 78:19, 91:3, 91:5, 115:19, 123:10, 124:3, 124:20, 125:13, 127:17, 128:9, 128:10, 132:20, 134:21, 136:13
**looked** [5] - 10:17, 57:16, 116:13, 116:19
**looking** [7] - 5:10, 64:16, 85:21,

111:20, 113:17, 115:2, 190:19
**looks** [4] - 12:3, 78:16, 78:23, 79:1
**Los** [1] - 49:17
**LOS** [4] - 1:18, 1:24, 4:1, 195:4
**loses** [1] - 189:3
**losing** [2] - 109:18, 170:1
**loss** [3] - 116:5, 185:9
**losses** [4] - 161:22, 161:24, 169:10, 169:25
**lost** [7] - 107:25, 109:20, 110:12, 162:13, 162:14, 162:19, 170:2
**lower** [2] - 82:21, 82:24
**luck** [1] - 193:22
**lunch** [2] - 121:6, 122:9

### M

**magnitude** [1] - 101:9
**mail** [5] - 54:12, 85:8, 100:7, 103:21, 130:8
**mails** [5] - 92:1, 93:11, 106:24, 124:24, 167:16
**main** [1] - 77:6
**maintained** [1] - 105:23
**major** [1] - 91:11
**manager** [3] - 23:5, 50:2, 50:5
**manmade** [1] - 34:1
**manner** [1] - 191:5
**manual** [1] - 122:16
**manufacture** [1] - 46:10
**manufacturers** [1] - 46:7
**manufactures** [1] - 46:10
**March** [10] - 29:16, 49:2, 60:23, 93:20, 99:6, 100:11, 102:9, 103:11, 104:10
**margin** [1] - 162:12, 169:9
**marked** [6] - 9:12, 10:4, 25:9, 25:10, 25:13, 80:7
**match** [6] - 72:4, 72:8, 75:12, 96:4, 96:12, 101:14
**material** [2] - 66:12,

162:7

**math** [1] - 109:11
**matter** [5] - 68:3,
    121:10, 181:22,
    182:17, 187:18
**MATTER** [1] - 195:14
**MBA** [1] - 31:25
**mean** [15] - 10:7,
    10:13, 20:2, 33:18,
    70:3, 73:7, 73:22,
    79:22, 82:5, 83:22,
    89:4, 89:9, 100:20,
    141:4, 186:22
**meaning** [1] - 73:2
**means** [8] - 4:14, 18:3,
    84:2, 112:19,
    120:25, 130:12,
    144:24, 189:17
**meant** [1] - 24:21
**mechanism** [1] -
    163:25
**meet** [3] - 50:2, 74:15,
    74:20
**meeting** [1] - 34:12
**members** [3] - 4:6,
    99:9, 123:4
**memo** [12] - 94:17,
    94:21, 96:25, 97:7,
    97:23, 98:5, 98:8,
    98:13, 98:14, 98:16,
    99:17, 123:17
**Meng** [1] - 31:7
**MENG** [3] - 3:7, 31:8,
    180:20
**mention** [3] - 41:3,
    99:21, 189:1
**mentioned** [3] - 36:12,
    45:5, 163:23
**merchandise** [57] -
    18:15, 19:12, 19:23,
    32:18, 34:22, 39:25,
    46:13, 46:19, 47:9,
    47:12, 51:4, 52:22,
    54:11, 55:12, 59:9,
    59:17, 59:21, 60:1,
    61:24, 62:1, 62:7,
    62:10, 64:5, 64:10,
    64:19, 64:25, 69:17,
    70:13, 70:22, 70:24,
    71:1, 82:7, 89:16,
    95:1, 95:3, 95:8,
    97:13, 98:15, 99:21,
    103:3, 103:24,
    105:9, 115:12,
    120:18, 124:18,
    126:20, 136:5,
    136:6, 136:10,
    139:14, 139:15,
    139:17, 139:20,
    145:22, 151:8, 155:2

**messaging** [1] -
    107:16
**MICHAEL** [1] - 2:6
**microphone** [2] -
    31:3, 125:23
**might** [2] - 138:6,
    189:5
**million** [16] - 82:10,
    162:9, 162:11,
    162:13, 164:10,
    164:11, 165:1,
    166:15, 167:5,
    167:7, 167:18,
    168:23, 168:24,
    169:5, 169:7, 187:7
**million'** [1] - 168:19
**mind** [3] - 65:22,
    182:14, 185:22
**mined** [1] - 147:11
**minute** [4] - 122:19,
    144:5, 193:14,
    193:20
**minutes** [19] - 68:5,
    68:17, 68:18, 68:19,
    68:20, 105:10,
    121:25, 122:1,
    122:2, 122:3,
    122:23, 122:25,
    144:4, 144:6, 144:7,
    180:10, 185:21,
    186:9
**misrepresented** [2] -
    101:9, 150:5
**misstatement** [1] -
    95:18
**misstates** [2] - 151:20,
    179:13
**mistake** [4] - 72:12,
    72:16, 159:18,
    159:21
**misunderstanding** [2]
    - 185:16, 185:19
**modified** [2] - 191:5,
    191:8, 191:16,
    191:17, 192:1,
    192:3, 192:6, 192:24
**modify** [2] - 183:8,
    183:9
**modifying** [1] - 190:25
**moment** [2] - 29:6,
    89:21
**monetary** [2] - 161:22,
    161:24
**money** [9] - 26:11,
    26:19, 26:20, 26:24,
    26:25, 51:24, 52:1,
    109:18, 167:2
**month** [1] - 55:9
**months** [6] - 60:24,
    160:14, 160:15,

160:16, 181:11
**morning** [10] - 4:23,
    4:24, 4:25, 71:12,
    71:13, 94:13, 126:2,
    182:9, 192:25,
    193:23
**most** [1] - 142:10
**Most** [1] - 102:19
**motion** [9] - 142:25,
    143:1, 146:21,
    186:14, 187:19,
    187:20, 187:21,
    187:24
**motions** [3] - 183:14,
    183:16, 183:21
**move** [10] - 147:15,
    150:8, 150:10,
    151:11, 154:11,
    163:2, 164:21,
    168:25, 169:19,
    170:18
**moves** [5] - 9:14,
    86:13, 93:22,
    107:11, 111:23
**MR** [234] - 4:21, 5:7,
    5:9, 5:22, 6:11, 6:12,
    7:3, 7:8, 7:14, 7:18,
    8:8, 9:14, 9:16, 9:24,
    10:2, 10:6, 10:9,
    12:9, 14:11, 14:16,
    14:20, 15:1, 15:5,
    15:10, 16:7, 16:18,
    16:25, 20:17, 21:23,
    22:4, 29:5, 29:15,
    30:1, 30:5, 30:7,
    30:19, 30:22, 31:12,
    37:20, 37:21, 38:10,
    42:13, 42:18, 42:20,
    44:11, 44:13, 53:12,
    53:17, 61:9, 61:13,
    69:7, 69:25, 71:8,
    71:11, 77:19, 81:12,
    81:17, 86:13, 86:17,
    88:25, 89:3, 93:22,
    94:1, 96:6, 96:10,
    96:17, 98:2, 101:25,
    102:3, 103:10,
    104:22, 105:1,
    105:2, 105:11,
    105:12, 105:16,
    105:18, 107:11,
    107:15, 111:23,
    112:3, 120:3, 120:6,
    120:8, 122:8, 123:1,
    123:8, 123:9, 126:9,
    126:14, 126:15,
    128:3, 128:8,
    128:12, 128:13,
    128:15, 129:4,
    129:11, 129:15,

129:20, 129:23,
    129:25, 130:1,
    130:2, 133:3, 133:9,
    135:5, 135:7,
    135:10, 136:16,
    136:19, 136:20,
    140:7, 140:10,
    141:20, 142:15,
    142:17, 142:21,
    142:23, 143:2,
    143:6, 143:11,
    143:17, 144:1,
    144:6, 144:12,
    144:15, 144:19,
    144:22, 145:7,
    145:9, 145:18,
    146:15, 146:17,
    147:15, 147:20,
    148:3, 148:8,
    148:22, 149:20,
    149:25, 150:8,
    150:13, 150:16,
    150:19, 150:23,
    150:25, 151:2,
    151:11, 151:14,
    151:20, 151:22,
    152:16, 152:20,
    153:3, 154:1, 154:7,
    154:11, 154:20,
    155:4, 157:7,
    157:12, 160:2,
    161:18, 162:1,
    162:25, 163:4,
    163:18, 164:4,
    164:12, 164:20,
    165:2, 165:7,
    165:11, 165:14,
    165:23, 166:16,
    166:18, 167:20,
    167:24, 168:25,
    169:15, 169:17,
    170:4, 170:16,
    170:18, 170:22,
    170:24, 171:3,
    171:6, 171:11,
    171:14, 171:16,
    171:19, 171:25,
    172:15, 172:22,
    172:25, 173:24,
    175:1, 175:3, 175:6,
    175:8, 175:17,
    175:20, 176:9,
    176:14, 176:18,
    176:24, 177:8,
    178:10, 179:3,
    179:13, 180:2,
    180:6, 180:23,
    181:15, 181:19,
    181:21, 183:13,
    183:18, 183:20,
    184:1, 184:19,

184:23, 185:22,
    186:17, 186:19,
    187:6, 189:23,
    190:7, 190:13,
    193:24, 193:25
**MS** [18] - 16:13, 16:23,
    20:20, 20:22, 22:1,
    22:8, 26:8, 26:17,
    27:7, 27:9, 29:1,
    165:6, 171:18,
    171:20, 193:4,
    193:7, 193:9, 193:17
**multiple** [3] - 119:23,
    152:6, 152:7
**must** [2] - 148:5,
    159:1
**Mutual** [15] - 6:19,
    8:17, 8:21, 8:23,
    10:19, 11:5, 11:18,
    22:21, 23:10, 29:7,
    62:17, 65:3, 66:11,
    187:1, 187:2

---

## N

**naked** [1] - 78:20
**name** [26] - 31:5, 31:6,
    31:7, 31:8, 31:13,
    31:15, 35:4, 47:5,
    47:6, 47:8, 47:13,
    49:8, 49:11, 50:25,
    54:13, 54:15, 74:23,
    83:19, 84:19, 98:18,
    114:5, 144:13,
    145:4, 180:18,
    180:19, 180:20
**namely** [1] - 6:25
**names** [1] - 163:15
**need** [15] - 17:11,
    26:3, 35:22, 59:20,
    59:24, 79:15, 94:17,
    95:8, 95:10, 119:17,
    120:18, 137:16,
    142:14, 154:15,
    193:19
**needed** [1] - 98:11
**needs** [8] - 73:14,
    73:18, 74:16, 96:5,
    96:12, 96:16,
    119:25, 135:16
**never** [20] - 30:8,
    52:17, 60:9, 61:14,
    62:3, 65:22, 67:12,
    70:11, 97:15, 97:24,
    103:3, 103:4, 105:9,
    116:11, 120:22,
    123:20, 123:21,
    124:17, 181:9
**new** [28] - 32:12,
    32:13, 32:14, 32:23,

34:13, 34:14, 34:17, 34:22, 35:1, 35:3, 35:7, 35:8, 35:10, 35:11, 35:12, 35:14, 35:25, 39:20, 50:5, 50:14, 50:15, 50:17, 52:21, 53:8, 54:2, 113:9

**next** [38] - 11:11, 30:21, 36:1, 36:9, 38:9, 40:25, 44:15, 46:1, 46:11, 48:11, 50:11, 51:2, 89:19, 98:1, 102:19, 103:9, 104:24, 124:3, 124:20, 136:2, 142:20, 148:24, 162:14, 163:5, 163:20, 169:25, 170:23, 172:15, 172:25, 173:24, 175:3, 175:8, 175:20, 176:14, 177:2, 177:8, 187:22, 187:23

**nine** [1] - 111:15

**none** [3] - 61:20, 129:8, 191:22

**noon** [1] - 187:23

**normally** [2] - 66:21, 189:2

**NORTH** [1] - 1:24

**NOTE** [1] - 144:24

**noted** [2] - 166:20, 167:22

**nothing** [10] - 20:17, 30:19, 66:24, 120:3, 142:15, 142:17, 168:3, 168:18, 170:22, 180:14

**notice** [4] - 74:12, 112:13, 135:22, 193:15

**November** [1] - 82:14

**number** [60] - 27:11, 27:15, 27:16, 27:18, 35:6, 35:17, 36:5, 37:2, 41:6, 41:8, 44:6, 44:17, 46:19, 47:21, 47:23, 48:3, 48:4, 48:8, 49:14, 51:19, 54:17, 58:10, 85:7, 94:13, 107:19, 113:11, 113:15, 115:2, 115:3, 115:6, 116:24, 121:19, 125:3, 126:11, 128:20, 129:8, 134:2, 134:3, 135:15, 136:12,

137:3, 142:3, 163:17, 165:1, 169:6, 189:20, 190:22, 190:24, 191:1, 191:2, 191:3, 191:4, 191:5, 191:6, 191:7, 191:8, 191:9, 191:11, 191:12, 191:13

**Number** [1] - 190:23

**NUMBER** [1] - 3:10

**numbers** [7] - 49:13, 109:14, 113:9, 124:25, 190:1, 190:6

---

# O

**o'clock** [4] - 67:25, 121:7, 183:2, 187:23

**oath** [4] - 4:18, 69:5, 123:6, 143:20

**object** [1] - 129:4

**Objection** [15] - 14:11, 16:13, 88:25, 101:25, 154:20, 157:7, 162:1, 163:18, 164:4, 164:12, 165:2, 165:6, 166:16, 166:18, 170:4

**objection** [37] - 5:22, 7:14, 9:16, 10:6, 14:20, 15:5, 16:20, 21:23, 22:4, 44:11, 61:9, 96:6, 105:16, 135:7, 145:9, 145:18, 146:18, 149:25, 153:3, 154:7, 154:11, 154:14, 163:2, 164:21, 165:10, 165:11, 167:20, 168:25, 169:19, 170:6, 170:18, 171:25, 172:22, 182:5, 186:3, 186:6, 187:5

**objections** [4] - 165:9, 182:7, 183:21, 185:5

**obviously** [1] - 188:3

**occasions** [2] - 127:9, 127:13

**occupation** [1] - 32:2

**occurred** [3] - 29:7, 29:17, 187:17

**October** [21] - 49:2, 49:22, 51:22, 80:1, 80:2, 80:25, 81:3, 81:6, 81:9, 82:16, 82:20, 83:7, 85:19,

85:24, 87:12, 87:15, 88:9, 89:19, 92:7

**OF** [18] - 1:1, 1:2, 1:17, 2:4, 2:5, 2:9, 68:6, 121:16, 182:23, 195:2, 195:4, 195:6, 195:10, 195:12, 195:15, 195:16

**offer** [28] - 13:13, 14:4, 14:8, 14:17, 15:3, 42:13, 53:12, 70:1, 70:7, 70:10, 70:25, 98:25, 110:21, 123:22, 123:24, 124:13, 124:15, 126:9, 126:23, 128:3, 133:3, 135:5, 138:8, 138:15, 138:18, 138:21, 174:19

**offered** [13] - 95:11, 108:3, 108:11, 108:15, 108:20, 109:14, 109:19, 110:18, 116:16, 116:20, 118:10, 119:1, 174:14

**offering** [5] - 94:21, 94:24, 107:23, 107:24, 110:15

**offers** [1] - 103:15

**office** [36] - 26:23, 27:24, 28:3, 28:10, 28:14, 32:16, 39:17, 39:18, 39:19, 39:23, 39:24, 40:11, 40:13, 40:21, 46:13, 46:14, 46:18, 46:22, 47:4, 47:11, 47:13, 47:20, 51:17, 66:22, 136:5, 136:6, 136:10, 139:14, 139:20, 139:21, 177:15, 177:20, 178:1, 178:4, 178:6, 178:9

**officer** [2] - 146:14, 189:11

**OFFICIAL** [3] - 1:23, 195:8, 195:21

**often** [2] - 74:7, 155:14

**OHN** [1] - 2:11

**oldest** [2] - 80:17

**ON** [2] - 2:5, 2:9

**once** [20] - 35:19, 35:25, 36:16, 36:19, 36:23, 37:4, 39:2, 41:9, 44:14, 44:20, 45:21, 46:10, 46:12,

47:20, 48:10, 50:16, 136:4, 136:10, 139:19, 147:22

**one** [72] - 16:19, 20:10, 20:12, 22:11, 29:11, 29:12, 29:13, 29:14, 29:16, 29:19, 30:1, 33:4, 45:13, 48:21, 60:6, 60:9, 63:4, 63:11, 64:22, 65:23, 67:4, 69:10, 69:13, 81:15, 81:16, 81:18, 81:19, 104:3, 104:5, 104:6, 104:19, 108:16, 108:20, 112:22, 116:21, 119:17, 119:25, 121:19, 125:6, 127:7, 130:10, 144:20, 149:18, 149:19, 153:7, 154:18, 157:16, 157:22, 160:25, 165:5, 165:8, 165:9, 166:5, 166:15, 180:6, 183:18, 183:19, 183:20, 184:13, 186:5, 187:7, 188:8, 188:9, 189:1, 189:3, 189:5, 189:7, 190:11, 193:12

**ones** [1] - 160:25

**online** [1] - 187:9

**opal** [1] - 88:5

**open** [2] - 151:5, 176:7

**opening** [1] - 193:1

**operations** [2] - 177:15, 177:19

**operator** [1] - 178:14

**opinion** [3] - 154:16, 184:6, 186:24

**opinions** [3] - 68:3, 121:10, 182:17

**opportunity** [4] - 24:2, 90:8, 142:24, 165:17

**opposed** [1] - 193:22

**option** [2] - 100:16, 137:16

**oral** [1] - 142:25

**order** [151] - 15:22, 15:25, 18:3, 18:10, 18:11, 19:18, 36:11, 36:20, 36:21, 39:1, 39:16, 41:12, 41:15, 42:1, 42:8, 42:9, 42:11, 42:25, 43:19, 43:25, 44:3, 44:15, 44:18, 45:10, 45:13,

45:14, 45:15, 45:17, 45:20, 50:10, 51:12, 55:18, 55:19, 55:20, 55:21, 56:11, 58:12, 58:13, 59:21, 59:23, 60:2, 64:6, 64:7, 64:8, 66:2, 72:10, 72:13, 72:15, 72:22, 72:23, 73:1, 73:4, 73:5, 73:13, 73:16, 73:19, 73:25, 74:3, 74:6, 74:24, 75:10, 75:11, 75:12, 75:15, 75:16, 75:18, 78:25, 79:5, 79:15, 79:17, 84:7, 85:1, 85:3, 85:8, 85:11, 86:7, 91:5, 93:5, 95:10, 98:11, 98:20, 103:25, 104:2, 104:5, 104:6, 106:9, 108:6, 108:10, 108:21, 110:5, 111:19, 112:7, 112:22, 112:25, 113:6, 113:10, 113:22, 113:25, 114:6, 114:12, 114:15, 115:7, 115:17, 115:21, 115:22, 116:13, 116:14, 116:15, 116:19, 116:21, 116:22, 116:25, 117:1, 117:3, 117:7, 117:10, 117:23, 118:1, 118:12, 118:21, 119:16, 124:24, 125:3, 125:6, 125:8, 127:11, 127:15, 127:25, 128:10, 128:16, 128:17, 128:21, 128:22, 128:25, 130:15, 131:12, 132:9, 134:11, 134:13, 134:17, 136:4, 138:25, 141:7, 142:11, 142:14, 177:3

**ordered** [30] - 22:11, 22:13, 22:16, 23:1, 56:1, 56:4, 56:6, 57:25, 60:20, 60:22, 65:23, 66:1, 66:3, 66:7, 75:9, 75:21, 75:24, 76:5, 78:2, 79:4, 79:11, 79:14, 79:22, 82:17, 82:22, 92:5, 101:15, 105:7,

141:3, 160:9
**ordering** [16] - 16:3, 17:7, 19:13, 56:9, 58:10, 60:18, 72:11, 72:15, 73:3, 78:15, 91:4, 112:11, 112:20, 118:4, 141:5, 141:6
**orders** [62] - 12:22, 12:24, 15:21, 17:1, 32:16, 40:9, 41:13, 43:4, 43:9, 43:15, 43:16, 44:8, 45:11, 45:12, 52:12, 52:22, 53:9, 53:25, 54:2, 56:15, 58:13, 58:18, 72:4, 72:7, 76:24, 77:10, 77:12, 77:20, 78:25, 79:9, 79:12, 89:22, 90:1, 90:22, 91:3, 98:19, 98:21, 98:23, 101:18, 101:19, 106:25, 111:15, 112:5, 113:9, 113:11, 119:24, 125:7, 128:18, 131:17, 155:3, 177:11, 177:12, 177:13, 177:17, 177:23, 178:2, 178:3
**original** [1] - 162:7
**OUT** [2] - 68:6, 121:16
**outside** [8] - 148:3, 148:8, 149:20, 172:23, 175:17, 176:9, 178:11, 179:3
**OUTSIDE** [1] - 182:23
**outstanding** [1] - 54:23
**overdue** [11] - 52:18, 52:24, 53:7, 54:1, 54:3, 54:9, 70:19, 97:11, 103:8, 124:1, 124:19
**overrule** [2] - 16:20, 154:14
**overruled** [31] - 10:7, 14:13, 15:7, 21:24, 22:7, 44:12, 61:11, 96:8, 135:8, 145:11, 146:20, 147:19, 150:18, 151:13, 153:5, 154:9, 154:22, 162:4, 164:5, 164:14, 164:23, 164:24, 165:4, 165:16, 165:19, 166:21, 167:22, 169:2,

170:9, 170:21, 185:5
**owe** [5] - 26:19, 26:24, 26:25, 51:23, 52:6
**owed** [2] - 26:10, 52:1, 54:6, 81:20, 175:19
**owes** [1] - 26:20
**own** [6] - 5:2, 17:24, 63:1, 73:14, 158:13, 158:22

---

# P

**p.m** [1] - 100:12
**package** [2] - 76:8, 76:10
**page** [71] - 7:4, 10:25, 11:11, 11:13, 16:8, 16:15, 25:7, 26:6, 30:2, 42:4, 42:6, 42:7, 42:21, 42:24, 63:4, 63:19, 65:9, 83:23, 84:12, 84:24, 86:19, 94:3, 99:4, 102:5, 104:9, 107:8, 107:16, 107:19, 107:20, 111:9, 111:14, 112:4, 115:22, 128:16, 129:2, 130:4, 144:22, 145:7, 146:15, 147:20, 150:9, 150:10, 150:23, 151:14, 160:3, 161:18, 167:24, 167:25, 169:21, 171:12, 171:13, 171:16, 172:15, 172:25, 173:1, 173:24, 175:8, 175:20, 175:21, 176:14, 177:8, 184:2
**PAGE** [2] - 3:10, 195:14
**pages** [11] - 8:10, 21:14, 42:5, 50:8, 63:7, 63:16, 95:6, 111:13, 111:15, 113:16, 128:17
**paid** [11] - 52:17, 59:4, 71:5, 82:9, 115:13, 140:12, 140:15, 164:2, 175:15, 187:10, 187:16
**pants** [1] - 186:1
**paper** [1] - 189:15
**paragraph** [1] - 102:19
**part** [8] - 9:2, 24:5, 46:5, 72:1, 77:24, 93:12, 162:17, 166:3

**partial** [1] - 54:25
**participate** [1] - 99:1
**particular** [16] - 8:14, 16:19, 58:22, 65:5, 100:1, 131:24, 132:3, 132:7, 134:16, 136:9, 148:2, 148:18, 149:18, 150:7, 177:10, 181:22
**particularly** [1] - 182:14
**parties** [1] - 85:19
**party** [3] - 26:25, 158:4, 158:25
**past** [4] - 82:1, 82:4, 82:5, 174:17
**pay** [32] - 20:6, 48:12, 52:17, 52:24, 53:7, 54:1, 54:6, 54:9, 54:11, 54:23, 60:25, 70:1, 70:7, 70:8, 70:10, 70:19, 71:2, 97:10, 97:18, 100:16, 103:7, 103:20, 107:25, 115:11, 124:1, 124:19, 127:1, 131:9, 131:19, 137:14, 140:5, 155:3
**payable** [1] - 166:12
**paying** [4] - 54:24, 67:14, 71:3, 125:11
**payment** [12] - 48:13, 52:17, 52:24, 54:25, 80:21, 80:24, 82:13, 103:8, 109:19, 124:19, 165:20, 167:1
**payments** [8] - 27:23, 52:18, 53:7, 54:2, 54:3, 54:9, 71:22, 97:11
**PDF** [1] - 84:17
**penalties** [4] - 97:21, 140:12, 168:24, 169:20
**penalty** [10] - 94:17, 96:25, 97:7, 97:23, 98:5, 98:8, 98:13, 98:14, 99:17, 187:15
**pencil** [2] - 189:15, 190:17
**pendant** [6] - 15:25, 19:14, 34:9, 51:13, 76:25, 109:2
**pending** [3] - 90:22, 101:18, 180:13
**people** [2] - 172:9, 179:21

**per** [6] - 20:3, 131:6, 131:8, 131:9, 138:20
**percent** [3] - 77:10, 77:11, 162:12
**perhaps** [1] - 185:16
**peridot** [1] - 33:24
**period** [3] - 51:15, 51:22, 122:19
**periods** [2] - 68:11, 68:16
**permission** [4] - 126:10, 128:4, 133:4, 135:6
**permitted** [1] - 42:14
**person** [3] - 143:23, 143:24, 172:10
**personal** [5] - 51:17, 75:19, 75:23, 76:2, 76:3
**personality** [1] - 76:1
**PH** [1] - 1:25
**Phoenix** [1] - 31:25
**phone** [10] - 35:5, 37:17, 38:2, 44:6, 49:6, 49:13, 49:14, 51:19, 54:17, 110:25
**phones** [3] - 37:15, 38:5, 38:7
**photograph** [5] - 5:18, 10:25, 11:4, 11:13, 75:6
**physical** [1] - 75:6
**pick** [1] - 141:2
**picture** [2] - 12:7, 18:19
**piece** [20] - 19:6, 19:11, 19:17, 20:10, 20:12, 60:6, 60:10, 76:24, 87:6, 87:20, 100:16, 100:23, 109:2, 110:2, 114:14, 118:1, 118:22, 119:15, 132:5
**pieces** [21] - 56:14, 56:16, 58:16, 58:17, 58:19, 60:5, 62:8, 89:25, 91:1, 104:1, 104:2, 104:6, 104:8, 119:13, 119:16, 119:18, 131:6, 132:2, 132:4, 139:16, 161:8
**pillow** [1] - 79:1
**place** [5] - 41:11, 45:14, 134:11, 134:17, 177:12
**placed** [12] - 64:7, 73:13, 89:22, 114:6, 143:20, 177:11,

177:12, 177:17, 177:23, 178:2, 178:4, 178:6
**places** [2] - 134:13, 140:22
**placing** [2] - 52:12, 76:23
**plaintiff** [5] - 68:17, 121:25, 142:21, 188:15, 193:20
**PLAINTIFF** [2] - 1:8, 2:5
**plaintiff's** [3] - 68:22, 122:14, 192:13
**plaintiffs** [1] - 66:8
**plans** [1] - 4:11
**plating** [2] - 35:23, 36:5
**play** [8] - 7:3, 16:7, 16:14, 16:15, 16:21, 30:1, 122:11, 143:13
**played** [3] - 30:4, 143:22, 145:1
**PLAYED** [29] - 7:7, 16:24, 145:3, 145:12, 146:22, 147:21, 148:23, 151:3, 151:16, 151:23, 152:17, 154:10, 154:23, 155:5, 160:4, 161:20, 163:7, 163:21, 164:15, 166:17, 168:2, 169:3, 170:11, 171:21, 172:18, 173:3, 174:2, 175:9, 175:22
**playing** [1] - 162:22
**pleasant** [2] - 4:8, 182:19
**PLEASE** [1] - 144:24
**PO** [5] - 108:14, 108:16, 119:4, 127:25
**point** [18] - 18:10, 35:12, 35:23, 37:10, 38:11, 38:23, 40:21, 51:8, 51:10, 51:23, 52:5, 52:9, 54:4, 131:5, 131:13, 184:13, 184:20, 189:10
**policy** [6] - 15:13, 15:15, 17:16, 17:18, 20:5, 119:20
**portal** [6] - 165:20, 166:12, 166:23, 167:1, 187:10
**portion** [5] - 16:15,

127:2, 145:10, 146:18, 147:16
**portions** [1] - 171:7
**position** [2] - 146:3, 146:7
**possible** [4] - 24:20, 89:13, 133:18, 144:3
**possibly** [1] - 24:14
**practice** [1] - 111:18
**precious** [8] - 33:16, 33:21, 33:22, 34:11, 83:1, 126:19, 127:1, 141:16
**prefer** [1] - 183:14
**prepare** [5] - 8:24, 9:3, 183:4, 184:24, 192:20
**prepared** [3] - 19:25, 29:23, 139:15
**PRESENCE** [3] - 68:6, 121:16, 182:23
**present** [1] - 144:10
**presented** [3] - 23:19, 24:23, 24:24
**PRESIDING** [1] - 1:4
**pretty** [1] - 173:14
**previous** [2] - 90:21, 101:19
**previously** [3] - 25:24, 80:7, 134:12
**price** [37] - 19:12, 19:19, 19:20, 19:21, 19:23, 35:22, 36:5, 37:2, 44:19, 48:3, 51:8, 114:18, 114:20, 115:2, 115:11, 116:12, 119:5, 119:6, 119:10, 131:5, 131:11, 131:12, 131:13, 132:6, 132:14, 133:16, 135:18, 137:6, 137:13, 137:17, 137:24, 141:10, 141:13, 141:15, 141:22
**priced** [1] - 138:1
**print** [7] - 40:1, 40:4, 40:15, 40:17, 46:14, 46:17, 47:7
**printed** [2] - 85:14, 107:2
**printing** [1] - 71:21
**prints** [2] - 40:21, 47:5
**pro** [41] - 36:13, 36:18, 36:19, 36:24, 36:25, 37:1, 37:4, 37:7, 37:13, 37:22, 38:19, 39:1, 44:21, 44:22,

44:23, 44:24, 45:5, 45:15, 45:19, 45:21, 45:23, 46:4, 46:16, 48:1, 48:6, 72:17, 73:9, 73:11, 90:1, 134:13, 134:15, 134:19, 135:4, 135:23, 136:1, 137:7, 137:22, 171:23, 177:4
**problem** [10] - 15:12, 17:19, 18:18, 62:24, 68:15, 120:16, 121:3, 185:1, 185:15, 189:7
**problems** [2] - 185:12, 189:5
**PROCEEDINGS** [3] - 1:17, 194:1, 195:13
**process** [7] - 38:11, 46:5, 52:21, 53:8, 54:3, 147:12, 177:2
**processing** [1] - 71:21
**produced** [2] - 85:14, 107:2
**product** [14] - 22:16, 48:10, 73:6, 73:21, 101:9, 119:8, 147:22, 154:18, 158:16, 160:1, 161:1, 161:7, 162:16, 164:17
**production** [3] - 37:6, 46:3, 136:4
**productions** [1] - 46:12
**products** [2] - 17:24, 186:21
**profit** [8] - 107:25, 109:20, 110:9, 110:13, 114:18, 116:5, 168:10, 169:6
**profits** [5] - 162:14, 168:24, 169:20, 169:24, 185:9
**program** [1] - 34:7
**project** [2] - 34:20, 34:22
**proof** [3] - 18:1, 18:3, 18:14
**proper** [1] - 164:23
**protected** [1] - 6:3
**prove** [2] - 69:18, 126:20
**provide** [9] - 17:24, 18:4, 18:12, 21:8, 32:17, 89:13, 94:13, 97:9, 131:25
**provided** [6] - 8:20, 75:5, 157:21, 158:6,

160:18, 187:1
**publish** [7] - 42:14, 53:13, 126:10, 126:12, 128:4, 133:5, 135:6
**published** [5] - 42:17, 53:15, 112:2, 128:6, 133:7
**pull** [3] - 26:8, 27:7, 31:4
**punitive** [1] - 188:8
**purchase** [112] - 36:21, 41:11, 41:13, 41:15, 42:1, 42:8, 42:9, 42:11, 42:25, 43:3, 43:8, 43:16, 43:19, 43:25, 44:3, 44:8, 44:14, 45:10, 45:11, 45:15, 45:16, 53:25, 61:17, 63:7, 63:9, 63:10, 63:11, 63:22, 64:1, 72:3, 72:7, 72:10, 72:13, 72:14, 72:23, 73:1, 73:5, 73:15, 73:19, 73:25, 74:3, 74:6, 74:23, 78:24, 79:9, 79:12, 79:15, 85:1, 85:2, 85:8, 85:11, 86:7, 91:5, 98:19, 98:20, 98:21, 98:23, 104:2, 108:6, 108:10, 108:20, 110:5, 111:15, 111:19, 112:5, 112:7, 112:22, 112:25, 113:6, 113:9, 113:10, 113:11, 113:22, 113:25, 114:6, 115:7, 115:16, 115:21, 115:22, 116:13, 116:14, 116:15, 116:18, 116:21, 116:22, 117:7, 117:10, 118:12, 119:24, 124:24, 125:2, 125:6, 125:7, 125:8, 127:11, 127:15, 127:25, 128:10, 128:16, 128:17, 128:18, 128:19, 128:25, 130:7, 130:14, 134:17, 142:11, 142:14, 177:3
**purchased** [8] - 6:16, 6:19, 7:12, 22:17, 63:17, 63:19, 76:14,

77:7
**purchases** [1] - 46:7
**purchasing** [3] - 38:17, 51:11, 74:24
**purpose** [5] - 8:23, 9:19, 10:1, 53:6, 126:16
**purposes** [1] - 184:21
**PURSUANT** [1] - 195:10
**put** [14] - 7:23, 38:2, 38:3, 40:1, 40:14, 68:11, 68:13, 115:16, 127:10, 127:14, 130:14, 174:8, 174:9, 174:10

---

**Q**

**quality** [8] - 8:2, 9:20, 9:21, 41:10, 82:21, 82:24, 82:25, 87:2
**quantity** [5] - 37:3, 44:18, 48:3, 60:2, 94:13
**QUESTION** [130] - 26:10, 145:13, 145:25, 146:3, 146:6, 146:9, 146:12, 146:23, 147:4, 147:7, 147:9, 147:22, 148:1, 148:6, 148:11, 148:14, 148:18, 148:24, 149:3, 149:8, 149:10, 149:22, 151:4, 151:17, 151:24, 152:2, 152:5, 152:9, 152:12, 152:18, 152:22, 152:25, 153:2, 153:9, 153:11, 153:14, 153:17, 153:20, 153:24, 154:24, 155:6, 155:10, 155:18, 155:20, 155:24, 156:2, 156:5, 156:8, 156:12, 156:16, 156:19, 156:22, 157:2, 157:6, 157:13, 157:17, 157:22, 157:25, 158:7, 158:12, 158:18, 159:2, 159:6, 159:12, 159:15, 160:5, 160:8, 160:11, 160:19, 160:23,

161:4, 161:10, 161:13, 161:16, 161:21, 161:24, 163:12, 163:16, 164:2, 164:7, 164:9, 164:25, 166:14, 166:24, 167:3, 167:12, 167:17, 168:5, 168:9, 168:14, 169:5, 169:11, 169:14, 170:2, 171:22, 172:19, 173:4, 173:7, 173:10, 173:13, 173:16, 173:20, 174:3, 174:6, 174:9, 174:11, 174:14, 174:19, 174:24, 175:4, 175:10, 175:15, 175:23, 176:4, 176:13, 176:15, 176:21, 177:2, 177:7, 177:10, 177:16, 177:21, 178:2, 178:7, 178:15, 178:18, 178:25, 179:10, 179:21, 179:24
**questioned** [1] - 21:12
**questioning** [2] - 5:2, 5:14
**questions** [18] - 5:14, 29:1, 71:8, 90:5, 111:6, 122:24, 125:9, 125:21, 140:7, 146:25, 165:25, 172:14, 180:2, 181:15, 184:17, 184:18, 184:24, 185:1
**quickly** [1] - 190:18
**quietly** [1] - 121:13
**quite** [1] - 185:6
**quotation** [4] - 36:2, 36:10, 51:3, 142:9

---

**R**

**raise** [4] - 30:24, 122:8, 161:10, 180:11
**raised** [2] - 160:23, 161:4
**range** [5] - 13:2, 19:9, 19:12, 19:22, 19:23
**rather** [7] - 82:22, 103:6, 122:25, 124:23, 131:4,

183:7, 185:25
**reached** [1] - 109:13
**read** [11] - 7:24, 25:2,
35:9, 53:20, 144:19,
154:4, 163:1,
164:21, 171:7,
171:14, 189:17
**reading** [2] - 24:18,
189:25
**ready** [2] - 4:10, 52:23
**real** [9] - 12:13, 33:19,
33:22, 75:7, 78:13,
86:2, 88:2, 131:7,
133:20
**realize** [1] - 184:16
**really** [20] - 6:17,
24:19, 50:24, 59:10,
67:13, 70:14, 70:20,
70:23, 71:24, 73:15,
73:17, 81:2, 89:15,
95:5, 95:14, 98:6,
110:24, 186:23
**reason** [4] - 86:4,
107:8, 143:21,
162:15
**REBUTTAL** [1] - 3:4
**rebuttal** [3] - 171:5,
180:4, 193:10
**receipts** [1] - 153:14
**receivables** [1] - 80:9
**receive** [39] - 24:1,
34:4, 39:25, 41:2,
41:8, 41:9, 45:10,
50:6, 64:9, 76:7,
77:14, 77:15, 77:23,
82:7, 83:7, 90:4,
93:7, 93:12, 95:8,
95:10, 98:8, 103:3,
103:6, 121:20,
121:22, 127:5,
127:7, 138:4, 139:9,
139:14, 148:1,
148:7, 148:16,
153:11, 153:17,
157:25, 167:12,
174:3, 181:10
**received** [60] - 6:2,
6:4, 6:8, 9:11, 9:13,
10:3, 16:5, 28:14,
35:13, 37:23, 38:24,
42:16, 42:19, 43:7,
43:9, 48:15, 51:1,
53:14, 53:16, 55:23,
58:20, 60:9, 62:20,
75:20, 77:13, 77:21,
81:25, 82:3, 82:17,
82:21, 83:5, 84:3,
86:15, 86:16, 92:11,
93:24, 93:25, 98:5,
107:13, 107:14,

111:16, 111:25,
112:1, 126:11,
126:13, 128:5,
128:7, 130:10,
133:6, 133:8, 134:1,
134:8, 134:9, 135:8,
135:9, 153:14,
158:8, 168:7,
168:10, 171:24
**receives** [11] - 17:2,
32:23, 35:1, 40:25,
43:4, 44:14, 48:10,
77:12, 77:20,
147:23, 177:4
**receiving** [3] - 28:18,
88:20, 186:21
**recess** [1] - 68:24
**RECESS** [2] - 68:25,
186:10
**recipient** [3] - 83:25,
93:1, 106:21
**recognize** [10] - 8:11,
23:12, 41:22, 42:7,
53:4, 65:21, 125:17,
127:21, 132:22,
135:1
**recollect** [3] - 152:15,
161:12, 173:19
**recollection** [4] -
79:10, 79:13,
107:10, 117:2
**record** [11] - 4:5,
23:22, 68:7, 69:1,
121:17, 123:3,
144:9, 144:14,
145:5, 165:24,
166:20
**recross** [2] - 29:3,
140:8
**RECROSS** [2] - 3:4,
140:9
**RECROSS-
EXAMINATION** [1] -
140:9
**rectangle** [1] - 79:1
**red** [4] - 77:12, 77:21,
78:21, 78:23
**REDIRECT** [3] - 3:4,
20:21, 120:7
**redirect** [3] - 16:21,
20:19, 120:5
**refer** [9] - 7:10, 27:2,
40:6, 86:23, 107:10,
120:12, 145:1,
156:24, 190:1
**reference** [3] - 62:17,
96:25, 116:24
**referenced** [3] - 108:6,
108:21, 113:7
**referencing** [2] -

99:13, 108:14
**referred** [3] - 22:20,
25:8, 27:11
**referring** [10] - 8:10,
42:22, 101:5, 116:4,
127:3, 130:4, 142:5,
149:10, 167:8, 190:6
**refers** [3] - 96:18,
167:5, 167:6
**reflect** [5] - 4:5, 68:7,
69:1, 123:3, 144:9
**reflects** [1] - 121:17
**refresh** [4] - 79:10,
79:13, 107:9, 117:2
**refund** [12] - 13:14,
17:23, 18:3, 18:11,
59:11, 97:13, 108:4,
109:14, 118:10,
119:1, 119:19,
119:22
**refunded** [3] - 109:10,
109:23, 164:18
**refunds** [1] - 17:17
**regarding** [27] - 34:4,
55:10, 56:22, 58:5,
84:6, 106:24, 124:7,
125:21, 130:20,
145:24, 152:18,
155:7, 155:11,
155:21, 156:3,
156:20, 158:14,
159:3, 160:6,
167:13, 168:9,
168:16, 169:20,
176:7, 183:21, 184:9
**regardless** [2] - 138:5,
167:14
**regrettably** [1] -
122:17
**regular** [1] - 87:20
**regularly** [1] - 106:8
**REGULATIONS** [1] -
195:15
**rejecting** [1] - 88:23
**relationship** [5] -
79:17, 79:21, 90:16,
170:12, 189:6
**release** [2] - 182:6,
182:8
**relevance** [1] - 9:17
**remaining** [2] -
111:13, 111:15
**remember** [14] - 4:18,
13:24, 27:25, 29:14,
50:24, 69:5, 86:1,
95:13, 98:6, 98:9,
98:24, 110:24,
125:4, 183:5
**Remember** [2] - 68:1,
121:8

**reminder** [1] - 193:21
**remove** [1] - 139:23
**renew** [5] - 162:25,
163:1, 164:21,
169:18, 183:20
**repair** [2] - 138:17,
139:12, 139:18,
139:19
**repeat** [5] - 14:7, 22:9,
25:1, 126:1, 146:5
**repetitive** [1] - 30:6
**rephrase** [1] - 14:22
**replaced** [2] - 102:16,
139:24
**reply** [3] - 67:12,
87:15, 91:8
**report** [67] - 8:13,
8:24, 9:3, 9:13,
10:17, 11:9, 17:25,
18:4, 18:12, 21:18,
22:3, 22:11, 22:13,
22:21, 23:2, 23:12,
60:3, 62:2, 62:4,
64:24, 65:4, 66:2,
67:10, 67:18, 67:20,
67:22, 69:15, 69:18,
69:19, 70:9, 70:12,
70:13, 81:21, 97:16,
97:25, 103:4,
103:19, 103:23,
104:3, 105:9,
120:19, 120:22,
124:17, 125:22,
126:5, 126:20,
126:23, 153:7,
153:11, 153:20,
154:3, 156:3, 156:5,
156:8, 156:12,
156:14, 156:16,
156:19, 156:23,
156:24, 156:25,
158:23, 161:3,
181:7, 181:9,
181:11, 187:3
**report's** [1] - 159:11
**REPORTED** [1] -
195:13
**REPORTER** [11] -
1:23, 159:19,
162:17, 162:21,
165:22, 166:2,
168:20, 172:4,
195:2, 195:8, 195:21
**reporter** [2] - 122:14,
144:25
**REPORTER'S** [1] -
1:17
**reports** [38] - 9:5,
9:11, 10:11, 19:25,
22:15, 29:9, 29:11,

29:23, 60:18, 60:20,
60:22, 61:4, 61:8,
61:15, 63:13, 65:24,
66:1, 66:3, 66:7,
66:24, 69:8, 69:10,
69:13, 70:2, 70:5,
70:7, 70:10, 153:13,
153:17, 154:24,
158:1, 158:5, 158:8,
158:21, 180:25,
181:3, 181:13
**representative** [2] -
32:3, 32:11
**represented** [2] -
58:17, 149:15
**represents** [2] - 109:1,
115:6
**reputable** [1] - 91:17
**request** [7] - 16:15,
74:22, 109:21,
126:10, 133:4,
135:6, 187:25
**requested** [1] - 75:2
**requesting** [1] - 99:17
**requests** [1] - 21:6
**require** [1] - 21:9
**required** [1] - 20:6
**requires** [1] - 186:23
**requiring** [1] - 103:18
**research** [2] - 34:24,
63:1
**researched** [1] -
130:25
**resell** [1] - 66:10
**reserve** [4] - 143:9,
187:20, 187:24
**resolve** [3] - 13:10,
59:14, 110:21
**respect** [2] - 50:11,
171:23
**respective** [2] - 4:6,
69:2
**respond** [11] - 87:23,
88:1, 90:6, 90:20,
90:24, 143:5,
185:20, 185:21,
185:22, 186:15
**responding** [1] -
184:18
**responds** [4] - 87:19,
91:7, 100:11, 103:11
**response** [6] - 89:8,
137:12, 139:7,
155:25, 159:13,
187:23
**responsibilities** [1] -
32:10
**responsible** [1] -
119:19
**responsive** [1] - 156:1

**rest** [2] - 81:3, 166:8
**restate** [1] - 14:25
**rested** [1] - 181:20
**rests** [2] - 142:21, 171:4
**result** [2] - 7:20, 29:23
**results** [1] - 134:7
**retail** [1] - 164:17
**retailer** [1] - 22:17
**retire** [3] - 68:4, 121:11, 182:18
**return** [61] - 15:13, 15:15, 17:16, 17:18, 17:21, 17:22, 18:2, 18:6, 18:7, 18:11, 18:18, 18:25, 20:5, 20:9, 20:10, 20:13, 59:8, 59:25, 60:6, 67:9, 67:12, 69:17, 70:12, 70:25, 89:15, 89:17, 94:14, 95:1, 95:3, 97:12, 99:21, 100:17, 100:21, 100:22, 100:24, 102:20, 102:24, 104:4, 104:5, 104:6, 104:7, 105:9, 108:15, 119:18, 120:18, 124:17, 126:3, 126:20, 126:22, 138:16, 139:15, 139:16, 157:3, 173:4, 173:17, 173:20, 174:15, 174:20, 175:5, 185:23
**returned** [8] - 18:16, 59:16, 60:9, 120:1, 123:17, 123:20, 123:21, 173:11
**returning** [3] - 18:24, 20:10, 113:3
**returns** [3] - 17:16, 97:15, 123:25
**review** [6] - 24:2, 37:1, 41:10, 45:24, 69:9, 89:21
**reviewed** [1] - 112:23
**reviewing** [1] - 24:5
**reviews** [1] - 45:25
**RGK** [1] - 1:8
**ring** [2] - 76:25, 109:3
**rings** [5] - 19:14, 34:9, 51:13, 61:17, 63:9
**rise** [1] - 186:11
**room** [3] - 68:4, 121:11, 182:18
**ROOM** [1] - 1:24
**round** [8] - 64:22, 64:24, 79:4, 79:5,

79:10, 79:14, 79:17
**round-shape** [1] - 64:22
**round-shaped** [1] - 64:22
**row** [1] - 84:13
**rubies** [12] - 17:1, 17:8, 58:9, 76:19, 77:15, 79:18, 92:12, 149:16, 157:13, 157:18, 159:3, 163:13
**ruby** [7] - 33:20, 78:22, 87:9, 88:5, 105:6, 150:3, 151:9
**Rule** [4] - 143:1, 187:20, 187:21, 187:24
**rule** [2] - 169:22, 186:1
**ruling** [3] - 9:18, 184:4, 184:7
**rulings** [1] - 188:5
**running** [1] - 122:16

## S

**sale** [2] - 62:16, 168:10
**sales** [14] - 32:3, 32:7, 32:11, 32:25, 33:7, 34:7, 34:12, 164:17, 169:9, 169:24, 177:15, 177:19, 177:25, 178:5
**salesperson** [1] - 19:22
**sample** [72] - 23:14, 36:11, 36:16, 36:21, 37:11, 37:24, 38:12, 38:24, 39:3, 39:5, 39:7, 39:10, 39:11, 39:12, 39:15, 39:16, 39:17, 39:18, 39:21, 41:1, 41:2, 41:8, 41:9, 44:24, 45:8, 45:14, 45:16, 60:23, 64:17, 64:25, 67:1, 67:18, 69:16, 75:2, 75:5, 75:7, 75:8, 75:10, 75:12, 75:15, 75:17, 76:6, 130:10, 131:12, 132:8, 132:9, 132:10, 132:12, 132:14, 132:16, 132:23, 132:25, 133:11, 133:12, 133:18, 133:21, 133:23, 134:1, 134:4, 134:8,

134:9, 134:10, 134:11, 137:21, 138:24, 138:25, 139:1, 139:4, 139:9, 142:3
**samples** [19] - 35:13, 35:22, 35:24, 39:1, 45:11, 50:7, 50:10, 51:6, 51:9, 64:13, 66:9, 66:10, 66:11, 66:23, 138:22, 139:7, 176:16, 176:23
**Sandy** [4] - 23:3, 23:4, 23:11, 66:2
**sapphire** [14] - 12:4, 17:8, 33:20, 57:3, 57:5, 57:6, 57:14, 76:17, 87:9, 88:5, 92:11, 149:15, 150:4, 151:10
**sapphires** [9] - 17:1, 58:9, 79:18, 105:7, 160:6, 160:8, 160:20, 161:11, 163:13
**saved** [1] - 159:24
**saw** [8] - 6:4, 29:13, 42:3, 103:4, 124:17, 126:2, 181:11, 181:12
**SBT** [8] - 132:19, 133:15, 135:17, 137:6, 137:23, 138:1, 142:3
**scope** [11] - 9:2, 93:8, 93:12, 148:3, 148:8, 149:21, 172:23, 175:18, 176:9, 178:11, 179:3
**screen** [6] - 16:12, 42:21, 80:11, 113:18, 136:17, 149:1
**scrutinize** [1] - 24:7
**search** [1] - 62:9
**seat** [1] - 185:25
**seated** [2] - 31:2, 180:17
**seats** [6] - 4:7, 68:8, 69:2, 121:21, 123:4, 183:25
**second** [12] - 42:4, 42:6, 42:7, 42:24, 58:20, 86:19, 102:5, 111:14, 115:22, 166:11, 187:25, 193:22
**second-to-last** [1] - 86:19

**SECTION** [1] - 195:11
**see** [111] - 9:7, 11:2, 11:11, 11:15, 17:4, 17:11, 18:20, 23:13, 26:2, 27:13, 44:5, 54:12, 54:15, 54:17, 62:4, 62:13, 62:15, 62:18, 63:2, 64:20, 64:21, 64:24, 65:3, 67:1, 68:5, 79:15, 80:11, 80:19, 81:22, 83:21, 84:14, 84:18, 84:19, 87:4, 87:13, 87:17, 87:21, 88:3, 88:7, 88:12, 90:12, 90:17, 91:9, 91:24, 94:7, 94:15, 94:19, 94:22, 97:2, 97:24, 99:7, 99:11, 99:15, 99:23, 100:12, 100:18, 101:11, 102:6, 102:10, 102:14, 102:17, 102:22, 103:13, 104:11, 104:15, 105:9, 107:18, 108:8, 108:12, 108:17, 109:24, 110:7, 112:8, 112:15, 113:1, 113:4, 113:20, 114:2, 114:8, 115:24, 116:2, 116:7, 117:7, 117:8, 117:11, 117:13, 117:15, 117:18, 118:13, 118:17, 118:23, 120:18, 120:19, 120:22, 121:7, 124:4, 124:24, 129:19, 138:24, 149:1, 154:15, 167:1, 167:5, 182:19, 186:9, 192:25, 193:23
**seem** [1] - 144:1
**select** [4] - 35:15, 50:2, 51:5, 75:16
**sell** [37] - 21:7, 22:2, 33:14, 33:15, 55:6, 55:12, 57:13, 61:7, 61:19, 61:23, 62:6, 62:8, 62:14, 62:15, 64:5, 64:7, 64:8, 64:10, 64:17, 64:25, 70:22, 70:23, 83:9, 97:21, 98:17, 100:5, 109:18, 109:20, 130:23, 130:24,

138:13, 151:7, 151:24, 152:2, 159:10
**sellers** [1] - 63:25
**selling** [11] - 37:8, 38:20, 39:4, 97:4, 101:9, 101:23, 110:6, 114:21, 116:10, 135:20, 163:23
**semi** [8] - 33:16, 33:21, 33:22, 34:11, 83:1, 126:19, 127:1, 141:16
**semi-precious** [8] - 33:16, 33:21, 33:22, 34:11, 83:1, 126:19, 127:1, 141:16
**seminar** [1] - 34:16
**send** [75] - 15:25, 22:17, 35:7, 35:9, 35:19, 36:6, 36:13, 36:16, 36:24, 37:5, 37:13, 38:19, 39:1, 39:3, 39:5, 39:12, 39:16, 39:18, 41:15, 42:1, 46:2, 46:9, 46:13, 46:20, 48:5, 49:7, 50:16, 50:19, 59:18, 59:23, 61:16, 61:24, 61:25, 62:13, 62:17, 65:2, 67:4, 69:13, 70:4, 70:11, 70:25, 72:16, 73:10, 75:10, 78:1, 79:23, 90:2, 101:20, 103:15, 104:2, 104:3, 115:8, 115:16, 126:24, 127:24, 131:10, 132:8, 132:9, 134:13, 134:15, 136:3, 137:2, 138:22, 138:24, 139:11, 139:13, 139:17, 139:20, 140:2, 142:3, 142:9, 153:13, 159:6, 161:8
**sender** [3] - 83:25, 93:1, 106:21
**sending** [2] - 99:9, 126:16
**sends** [6] - 16:4, 35:25, 38:16, 44:8, 47:11, 141:3
**sent** [61] - 11:5, 11:17, 14:5, 14:9, 15:19, 17:2, 17:8, 17:9, 27:16, 28:20, 36:9, 37:10, 37:22, 38:12,

39:7, 41:13, 46:15, 48:2, 53:10, 54:22, 55:2, 55:7, 58:3, 59:2, 60:25, 69:10, 69:20, 72:5, 72:8, 75:18, 75:24, 76:4, 79:20, 84:3, 89:23, 90:1, 90:14, 95:12, 98:20, 99:6, 101:17, 103:2, 105:14, 105:24, 126:6, 129:12, 129:16, 133:1, 136:8, 139:1, 139:4, 139:8, 154:24, 156:5, 156:19, 161:2, 161:13, 180:25, 181:3, 181:6, 187:2

**sentence** [1] - 96:2

**separate** [1] - 147:12

**separately** [1] - 155:12

**September** [5] - 49:22, 80:18, 81:2, 82:6, 82:11

**series** [1] - 124:6

**server** [1] - 130:8

**service** [11] - 8:19, 17:20, 32:17, 59:8, 67:11, 89:14, 97:9, 103:5, 119:21, 123:25, 138:14

**services** [1] - 9:2

**session** [1] - 186:12

**SESSION** [2] - 1:18, 4:2

**set** [35] - 32:12, 32:13, 32:14, 35:10, 50:17, 62:8, 64:17, 64:23, 87:3, 87:6, 87:16, 87:20, 88:11, 88:15, 89:25, 91:1, 109:2, 109:10, 109:23, 110:2, 112:19, 114:14, 118:22, 119:13, 119:15, 131:6, 131:8, 131:9, 133:17, 138:20, 139:21, 144:11

**SET** [2] - 112:19

**sets** [8] - 29:9, 76:24, 88:2, 100:3, 107:25, 119:2, 139:12, 139:13

**settle** [1] - 109:22

**seven** [1] - 42:5

**several** [5] - 52:17, 167:15, 169:19, 188:8, 190:19

**shah** [2] - 146:23,

147:4

**SHAH** [1] - 3:8

**Shah** [28] - 95:15, 100:11, 100:14, 100:20, 101:3, 102:12, 103:11, 103:19, 104:13, 106:19, 107:17, 107:21, 143:12, 144:16, 145:6, 145:15, 151:17, 167:4, 172:2, 172:5, 172:6, 176:4, 179:7, 179:16, 180:3, 183:23, 184:8, 186:20

**Shah's** [5] - 122:10, 171:7, 180:24, 181:2, 183:21

**shall** [1] - 180:14

**shape** [2] - 64:22, 64:24

**shaped** [4] - 64:22, 79:4, 79:6, 79:14

**share** [2] - 40:10

**shared** [1] - 88:17

**sharing** [1] - 88:14

**shatter** [1] - 186:22

**Shen** [6] - 23:3, 23:4, 23:6, 23:11, 66:2, 66:8

**Sheri** [1] - 144:24

**SHERI** [3] - 1:23, 195:8, 195:20

**ship** [15] - 40:5, 46:19, 47:8, 47:20, 52:22, 52:23, 53:9, 54:1, 54:11, 66:11, 103:25, 136:5, 136:6, 136:10, 139:21

**shipment** [1] - 134:4

**shipped** [4] - 72:20, 148:10, 148:12, 148:17

**shipper** [2] - 47:8, 71:20

**shipping** [1] - 23:5

**ships** [1] - 12:23

**short** [3] - 122:11, 144:3, 183:1

**shot** [2] - 170:13, 170:19

**show** [26] - 9:19, 18:1, 18:14, 20:16, 34:16, 35:15, 49:23, 49:25, 50:1, 50:4, 62:3, 67:10, 67:18, 69:15, 70:14, 73:11, 76:7, 97:23, 112:23,

117:20, 118:5, 129:18, 129:21, 133:10, 148:24, 149:4

**showed** [5] - 22:15, 27:3, 54:20, 123:14, 149:4

**showing** [14] - 49:14, 57:13, 72:17, 80:9, 81:21, 101:21, 103:4, 105:24, 117:17, 118:25, 124:23, 132:19, 142:6, 153:8

**shown** [8] - 74:7, 114:18, 114:20, 116:1, 119:10, 129:5, 187:10, 187:11

**shows** [9] - 26:3, 73:4, 79:24, 104:3, 110:8, 115:23, 116:19, 117:22, 166:12

**side** [8] - 43:22, 143:4, 174:8, 189:3, 189:4, 193:2, 193:6, 193:14

**sides** [6] - 181:20, 187:20, 187:24, 188:13, 189:9, 189:10

**sign** [5] - 32:13, 35:9, 35:19, 50:15, 50:19

**signatory** [1] - 156:20

**signature** [1] - 49:12

**signed** [2] - 50:16, 51:1

**Signet** [39] - 91:8, 91:11, 91:15, 114:10, 114:21, 140:15, 141:5, 152:14, 153:13, 153:15, 153:18, 155:8, 155:11, 155:21, 156:24, 157:4, 158:3, 158:8, 158:11, 158:21, 160:21, 160:23, 161:4, 161:11, 161:13, 162:8, 162:11, 163:17, 164:9, 164:25, 167:13, 167:19, 169:25, 170:3, 170:13, 173:18, 173:22, 174:4, 187:8

**significant** [1] - 141:22

**silver** [4] - 19:19, 33:15, 34:13, 51:12

**silvers** [1] - 19:23

**similar** [3] - 12:3,

12:11, 78:17

**similarly** [1] - 187:15

**simply** [2] - 140:22, 184:6

**simulated** [2] - 130:10, 130:12

**Singh** [20] - 21:12, 22:15, 22:20, 23:18, 24:14, 25:2, 25:8, 26:5, 27:3, 27:11, 27:22, 28:13, 86:20, 86:23, 86:25, 91:6, 123:14, 125:2, 125:8

**SINGH** [118] - 2:10, 4:21, 5:7, 5:9, 6:11, 6:12, 7:3, 7:8, 7:18, 8:8, 9:14, 9:24, 10:2, 10:9, 12:9, 14:16, 15:1, 15:10, 16:7, 16:18, 16:25, 20:17, 21:23, 22:4, 29:5, 29:15, 30:1, 30:5, 30:7, 30:19, 44:11, 61:9, 71:11, 77:19, 81:12, 81:17, 86:13, 86:17, 89:3, 93:22, 94:1, 96:10, 96:17, 98:2, 102:3, 103:10, 104:22, 105:1, 105:2, 105:11, 105:12, 105:18, 107:11, 107:15, 111:23, 112:3, 120:3, 122:8, 123:1, 128:12, 129:4, 129:23, 130:1, 130:2, 135:7, 140:10, 141:20, 142:15, 142:23, 143:2, 143:6, 143:11, 143:17, 144:1, 144:6, 144:12, 144:15, 144:19, 144:22, 145:7, 146:15, 147:20, 148:22, 150:23, 151:2, 151:14, 151:22, 152:16, 155:4, 157:12, 160:2, 161:18, 165:23, 167:24, 169:15, 170:22, 170:24, 171:3, 171:14, 171:25, 172:22, 175:1, 175:6, 175:17, 176:9, 176:18, 176:24, 178:10, 179:3, 179:13, 185:22,

186:17, 186:19, 187:6, 189:23, 190:7, 190:13, 193:25

**singh** [1] - 86:24

**single** [5] - 60:6, 60:10, 100:16, 100:23, 127:7

**sit** [1] - 79:16

**sitting** [1] - 20:24

**six** [2] - 107:10, 160:16

**sixth** [2] - 84:13, 135:14

**size** [1] - 19:10

**SKUs** [2] - 149:14, 166:13

**slow** [1] - 122:24

**small** [1] - 19:3

**snippet** [1] - 122:11

**so..** [1] - 169:4

**software** [1] - 40:8

**sold** [29] - 33:11, 57:11, 57:22, 61:7, 61:14, 61:21, 65:6, 65:9, 65:12, 66:15, 100:6, 101:14, 110:11, 119:11, 131:1, 131:3, 133:12, 136:25, 137:19, 147:22, 151:18, 155:7, 155:21, 157:18, 159:10, 167:19, 168:6, 172:20, 172:24

**sole** [1] - 9:25

**solemnly** [1] - 180:12

**solve** [9] - 15:12, 70:14, 70:20, 71:1, 97:10, 97:17, 124:16, 124:18, 125:21

**someone** [1] - 24:18

**someplace** [1] - 63:20

**sometimes** [8] - 54:10, 72:12, 75:2, 96:1, 96:3, 183:8, 183:9, 193:13

**somewhere** [1] - 72:24

**sophisticated** [1] - 112:17

**sorry** [25] - 5:5, 17:13, 22:9, 25:12, 77:4, 78:22, 111:13, 147:4, 148:11, 150:15, 150:25, 159:15, 159:19, 162:17, 162:24,

164:7, 166:2, 166:24, 168:20, 171:9, 171:19, 172:4, 187:4, 192:5
**source** [1] - 63:10
**speaking** [2] - 31:4, 162:23
**spec** [1] - 35:21
**special** [4] - 192:13, 192:14, 192:15, 192:17
**specific** [5] - 8:23, 80:2, 125:2, 125:3, 158:22
**specifically** [6] - 75:8, 76:23, 90:6, 105:20, 141:12, 141:21
**specifications** [5] - 73:14, 74:16, 74:20, 96:5, 96:12
**specifics** [1] - 149:13
**speculation** [16] - 22:5, 61:10, 148:9, 150:12, 150:19, 154:21, 162:2, 165:7, 165:14, 166:19, 170:5, 170:20, 176:10, 178:10, 184:12, 185:12
**spell** [2] - 31:5, 180:18
**spelled** [1] - 142:13
**spent** [1] - 190:19
**SPRING** [1] - 1:24
**SS** [1] - 195:5
**STAFF** [2] - 188:23, 190:11
**stand** [3] - 69:4, 122:17, 123:5
**standard** [1] - 54:20
**stands** [4] - 85:1, 85:2, 85:5, 154:5
**start** [16] - 21:13, 31:15, 34:6, 35:10, 35:20, 37:6, 46:3, 50:17, 64:3, 87:24, 90:15, 91:4, 136:4, 168:21, 172:6
**started** [2] - 34:3, 157:15
**starting** [3] - 144:22, 150:9, 150:11
**starts** [1] - 89:20
**STATE** [1] - 195:6
**state** [5] - 31:5, 94:12, 102:12, 145:4, 180:18
**statement** [1] - 193:1
**statements** [2] - 24:25, 184:5

**STATES** [6] - 1:1, 1:1, 1:4, 195:9, 195:11, 195:16
**states** [2] - 88:10, 100:14
**stem** [1] - 128:22
**STENOGRAPHICALLY** [1] - 195:13
**step** [5] - 30:20, 121:14, 142:18, 177:2, 181:16
**Sterling** [3] - 114:7, 114:10, 117:19
**STI** [14] - 8:10, 10:22, 11:10, 12:10, 85:7, 86:19, 87:23, 87:25, 89:20, 90:10, 113:13, 113:17, 115:19, 118:14
**still** [20] - 4:18, 17:11, 17:20, 23:6, 26:1, 26:2, 52:10, 52:12, 54:24, 64:18, 69:5, 70:23, 70:25, 122:19, 123:5, 138:14, 155:2, 173:8, 173:13, 174:11
**stock** [1] - 158:17
**stone** [100] - 6:25, 7:22, 8:2, 8:6, 9:1, 33:19, 33:22, 34:1, 34:17, 34:22, 35:24, 36:5, 37:3, 41:10, 44:18, 46:6, 48:4, 51:8, 55:5, 57:13, 57:20, 58:12, 59:13, 59:18, 59:19, 59:24, 62:3, 62:13, 62:18, 64:22, 65:3, 66:9, 67:7, 67:8, 67:13, 67:16, 67:17, 67:19, 67:20, 67:21, 69:15, 69:18, 75:17, 77:14, 77:23, 77:24, 78:6, 82:22, 87:2, 88:6, 89:16, 94:14, 94:25, 95:12, 96:18, 96:20, 96:23, 97:21, 99:13, 101:6, 101:21, 104:14, 104:18, 120:12, 120:21, 120:23, 124:11, 125:22, 126:4, 127:1, 132:17, 132:18, 132:19, 133:11, 133:14, 133:15, 135:17, 137:1, 137:5, 137:21, 137:23,

137:25, 138:17, 139:12, 139:18, 139:23, 140:16, 141:8, 141:24, 142:2, 142:5, 142:6, 142:7, 142:10, 142:13, 181:9, 186:22
**stones** [40] - 19:10, 19:19, 20:16, 33:16, 33:17, 33:19, 33:21, 33:25, 34:10, 34:11, 34:14, 46:7, 51:14, 58:6, 58:8, 59:7, 59:11, 64:12, 66:13, 71:6, 77:3, 77:4, 83:1, 83:2, 87:11, 96:24, 100:1, 105:8, 120:17, 121:3, 126:19, 127:1, 128:22, 138:15, 138:25, 141:16, 163:10, 163:13
**stop** [2] - 52:8, 166:2
**STREET** [1] - 1:24
**stricken** [4] - 150:22, 163:3, 170:8, 188:2
**strike** [38] - 5:16, 6:14, 11:21, 12:1, 12:21, 17:6, 21:19, 25:12, 25:25, 28:6, 43:21, 65:15, 65:21, 72:1, 79:11, 91:20, 92:2, 92:9, 98:13, 105:3, 107:23, 114:18, 124:20, 135:22, 146:21, 147:15, 150:9, 150:10, 151:12, 154:12, 163:2, 164:22, 169:1, 169:19, 170:18, 178:18, 183:21
**striking** [1] - 187:25
**string** [1] - 124:10
**STRONG** [1] - 1:6
**Strong** [221] - 5:16, 5:17, 6:16, 6:18, 8:17, 8:20, 9:9, 9:11, 10:3, 10:14, 11:4, 11:17, 12:18, 12:23, 13:7, 13:9, 15:13, 16:4, 17:13, 17:16, 18:11, 19:24, 20:5, 21:1, 21:3, 21:7, 21:21, 22:2, 22:16, 23:1, 23:7, 25:11, 25:14, 25:21, 25:22, 25:25, 26:1, 26:3, 26:10, 26:11, 26:19,

26:22, 26:23, 27:19, 27:23, 28:8, 28:20, 30:9, 30:10, 30:11, 32:3, 32:5, 32:7, 32:11, 32:19, 32:23, 33:1, 33:2, 33:4, 33:6, 33:10, 33:14, 34:3, 34:6, 34:20, 35:1, 35:5, 35:13, 37:8, 39:11, 39:12, 39:13, 39:18, 39:23, 39:24, 40:12, 40:13, 41:4, 41:13, 42:25, 43:4, 43:7, 43:9, 43:22, 44:1, 44:4, 44:9, 44:14, 46:5, 46:21, 47:4, 47:6, 47:11, 47:12, 47:13, 48:15, 49:13, 49:18, 50:1, 50:8, 51:18, 51:23, 52:6, 52:8, 52:13, 54:6, 54:15, 61:7, 61:14, 61:21, 65:6, 65:9, 65:11, 65:23, 66:14, 66:17, 69:20, 71:14, 71:18, 71:20, 71:22, 73:16, 73:24, 74:10, 74:14, 74:18, 77:7, 77:10, 79:20, 80:10, 82:16, 82:20, 83:4, 88:19, 88:22, 89:4, 89:7, 89:23, 93:8, 93:13, 94:13, 94:24, 98:23, 99:1, 101:22, 103:18, 103:19, 105:4, 105:5, 105:13, 105:20, 105:23, 106:11, 107:24, 109:17, 110:11, 110:15, 110:19, 112:11, 112:12, 112:14, 131:17, 131:18, 131:21, 132:7, 132:11, 135:19, 138:8, 140:18, 140:22, 140:25, 141:1, 141:9, 145:23, 147:17, 148:20, 155:7, 155:10, 155:20, 155:24, 156:6, 156:20, 157:2, 159:2, 159:6, 159:7, 159:12, 168:7, 171:24, 173:5, 173:10, 173:16, 173:21, 174:15, 174:17, 174:20, 174:22, 175:4,

175:10, 175:16, 176:22, 177:4, 177:5, 177:11, 178:3, 178:4, 178:8, 178:16, 178:19, 178:21, 178:23, 179:1, 180:25, 181:3, 181:7, 181:1, 187:13
**strong** [2] - 147:14, 155:19
**style** [2] - 16:1, 19:20
**styles** [1] - 45:2
**subject** [8] - 84:7, 93:5, 124:9, 146:20, 158:21, 173:17, 173:21, 184:14
**Subject** [1] - 84:14
**submission** [1] - 143:4
**submit** [1] - 176:22
**submits** [1] - 176:16
**submitted** [5] - 68:4, 121:11, 177:3, 182:18, 187:22
**submitting** [1] - 74:1
**substance** [1] - 10:10
**sue** [1] - 179:19
**sued** [4] - 179:1, 179:12, 179:20, 179:22
**suggested** [1] - 101:1
**suing** [1] - 179:25
**summarized** [1] - 95:21
**summarizes** [1] - 112:6
**summary** [1] - 188:22
**superceded** [1] - 157:16
**supplied** [6] - 145:23, 147:14, 147:17, 149:16, 155:2, 156:11
**supplies** [2] - 150:4, 160:14
**supply** [2] - 150:3, 151:9
**supplying** [2] - 163:22, 163:23
**supporting** [1] - 159:11
**supports** [1] - 166:15
**supposed** [4] - 109:20, 151:9, 156:11, 159:10
**surprise** [1] - 68:9
**sustained** [13] - 5:24, 7:16, 14:24, 89:2, 102:2, 105:17,

150:21, 150:22, 157:9, 157:10, 162:3, 163:19

**swap** [1] - 140:22

**swear** [2] - 180:9, 180:12

**switch** [2] - 23:16, 48:17

**SWORN** [1] - 30:25

**system** [7] - 36:12, 36:22, 40:16, 40:18, 40:19, 40:20, 47:2

## T

**TAKEN** [2] - 123:2, 144:8

**task** [2] - 172:10, 172:11

**teach** [1] - 34:7

**team** [7] - 99:10, 169:16, 169:18, 177:15, 177:20, 178:1, 178:5

**technical** [2] - 144:1, 153:23

**Technology** [1] - 31:20

**Tejas** [5] - 94:9, 94:10, 143:12, 144:15, 145:6

**TEJAS** [1] - 3:8

**Television** [1] - 98:22

**ten** [1] - 111:13

**tendency** [1] - 95:24

**tens** [1] - 33:9

**term** [1] - 48:13

**terms** [4] - 124:9, 132:3, 153:23, 183:11

**test** [24] - 8:24, 11:18, 17:23, 18:4, 18:25, 59:18, 62:13, 62:23, 65:3, 100:15, 100:21, 100:23, 103:16, 104:17, 119:13, 119:15, 119:17, 119:25, 125:22, 126:4, 127:1, 127:5, 127:7, 161:8

**tested** [16] - 6:19, 6:22, 6:24, 7:13, 7:20, 18:17, 20:14, 23:10, 60:11, 88:15, 102:20, 103:12, 158:15, 158:16, 161:14, 161:16

**testified** [5] - 20:25, 134:12, 156:22,

183:24, 187:16

**testify** [6] - 8:5, 8:6, 9:22, 29:6, 145:17, 146:1

**testifying** [2] - 143:24, 170:8

**testimony** [40] - 7:9, 7:17, 9:17, 16:8, 24:24, 25:2, 26:6, 27:11, 80:4, 80:21, 119:23, 122:10, 122:21, 143:13, 143:19, 144:18, 147:18, 150:14, 150:17, 151:21, 154:15, 154:17, 157:10, 162:2, 165:15, 179:14, 180:12, 180:24, 181:2, 183:22, 184:8, 184:12, 185:11, 185:13, 185:17, 186:6, 186:7, 186:19, 188:1, 188:2

**testing** [11] - 59:24, 61:16, 103:19, 103:23, 125:12, 158:12, 158:13, 158:22, 160:21, 161:9, 163:25

**THAT** [2] - 195:10, 195:14

**THE** [223] - 4:5, 4:19, 4:20, 5:6, 5:8, 5:24, 7:6, 7:16, 7:21, 9:18, 9:25, 10:7, 10:12, 12:6, 12:7, 14:13, 14:15, 14:22, 15:7, 15:8, 16:10, 16:11, 16:20, 20:19, 21:24, 21:25, 22:6, 22:7, 26:16, 29:3, 29:11, 29:13, 30:4, 30:6, 30:20, 30:23, 30:24, 31:1, 31:2, 31:7, 31:9, 37:15, 38:1, 42:16, 44:12, 53:14, 61:11, 61:12, 67:24, 68:6, 68:7, 69:1, 69:23, 71:9, 77:17, 81:11, 81:14, 86:9, 86:11, 86:12, 86:15, 89:2, 93:24, 96:8, 96:9, 96:14, 96:15, 98:1, 102:2, 103:9, 104:24, 105:10, 105:17, 107:13, 111:25, 112:2, 120:4, 121:5,

121:15, 121:16, 121:17, 122:21, 123:3, 126:11, 128:5, 128:14, 129:10, 129:14, 129:18, 129:21, 129:24, 133:6, 135:8, 136:18, 140:8, 141:17, 142:19, 142:20, 142:22, 143:1, 143:3, 143:8, 143:14, 143:18, 144:4, 144:7, 144:9, 144:13, 144:17, 144:21, 145:4, 145:6, 145:11, 145:21, 146:20, 147:19, 148:5, 150:12, 150:15, 150:18, 150:21, 151:13, 153:5, 154:9, 154:13, 154:22, 157:9, 159:24, 162:3, 162:5, 162:19, 162:24, 163:3, 163:5, 163:19, 164:5, 164:14, 164:23, 165:4, 165:8, 165:13, 165:16, 166:1, 166:9, 166:20, 166:22, 166:25, 167:22, 168:1, 168:3, 168:23, 169:2, 169:16, 169:21, 170:6, 170:17, 170:21, 170:23, 171:2, 171:5, 171:8, 172:3, 172:8, 172:17, 172:24, 173:2, 174:1, 175:2, 175:7, 175:19, 176:19, 176:25, 178:12, 179:8, 179:17, 180:4, 180:8, 180:11, 180:16, 180:17, 180:20, 181:16, 181:17, 181:18, 181:20, 181:22, 182:21, 182:22, 182:23, 182:24, 183:16, 183:19, 183:25, 184:16, 184:22, 185:18, 185:24, 186:11, 186:13, 186:18, 187:4, 187:18, 188:24,

189:24, 190:9, 190:12, 190:14, 193:6, 193:8, 193:10, 193:19, 195:9, 195:11, 195:12, 195:13, 195:14, 195:15, 195:16

**the'..** [1] - 168:22

**themselves** [1] - 189:11

**therefore** [1] - 109:19

**they've** [2] - 17:2, 122:1

**thinking** [2] - 26:1, 64:13

**third** [2] - 158:4, 158:25

**thousand** [3] - 43:14, 159:18, 159:24

**thousand'..** [1] - 159:22

**thousands** [2] - 33:9, 60:4

**thread** [5] - 92:22, 93:2, 93:16, 93:19, 107:2

**three** [32] - 49:3, 53:24, 58:14, 62:8, 76:24, 87:6, 87:20, 89:25, 91:1, 101:23, 108:23, 109:2, 110:2, 112:5, 113:16, 114:14, 118:1, 118:22, 131:6, 138:2, 138:12, 141:15, 152:10, 152:12, 160:16, 163:10, 169:8, 169:24, 169:25, 170:14, 175:24

**three-piece** [8] - 76:24, 87:6, 87:20, 109:2, 110:2, 114:14, 118:1, 118:22

**THURSDAY** [1] - 1:17

**timeline** [2] - 29:21, 160:10

**timing** [2] - 68:23, 181:23

**title** [2] - 146:3, 146:6

**TITLE** [1] - 195:11

**TO** [1] - 195:11

**today** [6] - 4:10, 20:25, 21:13, 24:8, 130:11, 146:1

**together** [2] - 58:8, 157:15

**tomorrow** [3] - 182:9, 183:3, 192:25

**tonight** [1] - 182:2

**took** [3] - 5:11, 166:6, 169:9

**top** [6] - 9:5, 27:12, 47:5, 83:23, 84:12, 163:10

**topaz** [53] - 15:22, 15:23, 16:4, 33:23, 78:5, 82:17, 82:21, 82:25, 83:5, 83:8, 84:10, 88:15, 89:23, 90:2, 90:3, 90:4, 90:14, 90:21, 91:4, 91:23, 126:25, 130:18, 130:21, 130:23, 130:24, 131:3, 131:10, 131:25, 132:8, 132:10, 132:17, 132:18, 133:13, 133:15, 133:16, 133:22, 135:13, 135:18, 137:6, 137:15, 137:19, 137:22, 137:24, 138:1, 138:3, 138:11, 138:13, 139:23, 141:11, 141:23, 142:2, 142:4, 146:25

**topics** [1] - 145:16

**tops** [1] - 144:6

**total** [7] - 13:23, 58:17, 81:15, 103:6, 108:3, 109:10, 168:10

**towards** [2] - 187:5, 193:15

**tracking** [14] - 27:11, 27:15, 27:18, 41:5, 41:7, 46:18, 47:21, 47:22, 48:4, 48:7, 134:2, 134:3, 136:11

**Trade** [2] - 66:18, 112:11

**trade** [2] - 34:16, 35:15

**Trading** [168] - 5:16, 5:17, 6:16, 6:18, 8:17, 8:21, 9:9, 9:11, 10:3, 10:14, 10:15, 11:5, 11:17, 12:18, 13:10, 16:4, 17:13, 18:11, 19:24, 20:6, 21:1, 21:3, 21:7, 21:21, 22:2, 22:16, 23:1, 23:7, 25:11, 25:21, 25:22, 25:25,

26:1, 26:10, 26:23, 27:19, 27:23, 28:8, 28:20, 30:10, 32:3, 32:5, 32:8, 32:11, 32:20, 32:23, 33:1, 33:2, 33:4, 33:6, 33:10, 33:14, 34:3, 34:6, 34:20, 35:1, 35:5, 35:13, 37:8, 39:11, 39:12, 39:14, 39:24, 40:14, 41:4, 41:14, 43:1, 43:4, 43:7, 43:9, 43:23, 44:1, 44:4, 44:9, 44:14, 46:5, 47:4, 48:15, 49:13, 49:18, 50:1, 50:9, 51:24, 52:6, 52:8, 52:13, 54:6, 54:15, 61:7, 61:14, 61:21, 65:6, 65:9, 65:12, 65:23, 66:14, 69:20, 73:16, 73:24, 74:10, 74:14, 74:18, 77:7, 82:16, 82:20, 83:4, 88:19, 88:22, 89:4, 93:9, 93:13, 94:24, 98:23, 103:18, 103:20, 105:4, 105:5, 105:13, 106:11, 109:17, 110:12, 110:15, 110:19, 112:12, 131:18, 131:21, 132:7, 132:11, 135:20, 138:8, 140:18, 140:22, 141:1, 141:9, 155:7, 155:11, 155:21, 156:6, 156:20, 157:2, 159:3, 159:7, 168:7, 171:24, 173:5, 173:11, 173:16, 173:21, 174:15, 174:20, 175:4, 175:11, 175:16, 176:22, 177:4, 177:5, 177:12, 178:20, 179:1, 180:25, 181:4, 181:7, 187:1, 187:13
**TRADING** [1] - 1:6
**Trading's** [10] - 15:13, 17:16, 39:23, 40:12, 46:21, 47:11, 51:18, 89:7, 155:24, 159:12
**training** [2] - 34:4, 34:7
**transaction** [1] - 74:18

**transactions** [1] - 33:7
**TRANSCRIPT** [3] - 1:17, 195:12, 195:14
**transcript** [8] - 23:19, 24:1, 24:2, 24:5, 24:11, 26:2, 30:2, 122:16
**trend** [2] - 34:13, 34:14
**trial** [4] - 143:19, 148:24, 149:1, 184:25
**TRIAL** [1] - 1:16
**tried** [2] - 13:10, 53:24
**TRUE** [1] - 195:12
**true** [9] - 12:18, 73:19, 85:17, 85:22, 93:15, 93:18, 103:22, 107:5, 173:10
**trust** [1] - 109:11
**truth** [4] - 6:6, 180:14, 180:15
**try** [7] - 20:23, 54:5, 66:10, 71:1, 90:6, 98:3, 138:14
**trying** [2] - 53:22, 103:5
**Tuesday** [1] - 187:22
**turf** [2] - 87:10, 87:11
**turn** [2] - 37:17, 76:12
**turned** [3] - 37:16, 38:3, 93:16
**twice** [1] - 167:16
**two** [26] - 13:6, 29:9, 60:24, 62:16, 63:9, 64:11, 64:12, 70:22, 99:9, 100:1, 104:3, 106:16, 107:10, 113:10, 128:17, 138:21, 138:25, 160:25, 166:10, 166:15, 167:4, 167:8, 167:10, 167:13, 181:11, 187:6
**two-six** [1] - 107:10
**two-zero** [1] - 106:16
**type** [8] - 8:14, 22:2, 33:14, 68:10, 87:7, 93:7, 93:11, 138:18
**types** [3] - 58:6, 77:6, 100:1
**typically** [5] - 35:12, 37:13, 37:23, 38:23, 49:4

---

## U

**U.S** [2] - 34:16, 40:5
**UD** [3] - 7:9, 94:3,

129:8
**UDI** [2] - 59:6, 126:3
**ultimately** [1] - 18:6
**unavailable** [1] - 143:21
**unclean** [4] - 188:10, 189:21, 189:23, 189:24
**under** [9] - 4:18, 20:11, 39:13, 69:5, 84:14, 123:16, 143:4, 143:20, 166:12
**understood** [2] - 18:9, 101:22, 105:3, 105:4, 109:17, 143:6
**Unintelligible** [7] - 144:24, 145:24, 148:13, 154:6, 156:24, 165:20, 169:4
**unintelligible** [5] - 151:6, 153:22, 163:22, 172:3, 172:14
**Unintelligible)** [2] - 153:23, 165:22
**UNIQUE** [1] - 1:10
**Unique** [322] - 6:24, 7:10, 13:9, 13:13, 14:6, 14:9, 14:19, 15:3, 17:23, 18:4, 18:12, 18:24, 19:13, 19:17, 20:6, 21:19, 21:20, 23:15, 25:14, 25:22, 26:19, 27:1, 27:22, 28:2, 28:13, 28:17, 28:20, 28:23, 29:8, 29:18, 29:24, 30:8, 30:12, 30:17, 33:3, 41:25, 42:8, 42:25, 43:4, 43:8, 43:9, 43:11, 43:25, 44:3, 44:8, 48:19, 48:22, 49:1, 49:4, 49:7, 49:21, 50:5, 50:7, 50:9, 50:11, 50:18, 50:19, 50:22, 51:2, 51:10, 51:16, 51:23, 52:5, 52:9, 52:10, 52:12, 52:16, 52:20, 53:10, 53:23, 54:5, 54:8, 54:23, 55:3, 55:8, 55:10, 55:20, 55:22, 55:25, 56:3, 56:6, 56:9, 56:17, 56:21, 57:4, 57:11, 57:22, 58:3, 58:5, 58:14, 59:2, 60:5, 60:25, 61:22, 62:5, 62:7, 62:10,

62:21, 62:24, 64:3, 64:4, 64:7, 64:18, 64:23, 65:1, 65:12, 66:3, 66:15, 66:19, 66:25, 67:2, 67:5, 67:6, 67:18, 69:10, 69:14, 69:15, 69:20, 70:4, 70:11, 70:15, 70:18, 71:4, 72:4, 72:5, 72:7, 72:8, 73:13, 73:16, 73:20, 73:22, 73:25, 74:3, 74:14, 74:18, 74:20, 74:21, 75:2, 75:20, 75:24, 76:4, 76:7, 76:14, 76:23, 77:7, 78:15, 78:24, 79:12, 79:20, 80:10, 81:7, 81:10, 81:25, 82:3, 82:9, 82:14, 82:17, 82:21, 83:4, 83:9, 83:17, 84:9, 86:3, 86:8, 86:21, 86:23, 87:1, 87:19, 88:10, 88:22, 89:5, 89:9, 90:3, 90:11, 90:15, 91:7, 91:12, 91:18, 91:21, 92:2, 92:4, 92:9, 92:10, 92:23, 93:19, 94:10, 95:12, 96:4, 96:11, 96:15, 96:23, 97:4, 97:9, 97:15, 98:21, 98:25, 99:9, 99:25, 100:8, 101:13, 101:18, 105:3, 105:4, 105:14, 105:21, 109:17, 109:21, 110:5, 110:10, 110:18, 111:10, 111:16, 111:19, 112:10, 112:19, 113:22, 114:20, 115:7, 116:9, 116:20, 118:10, 119:6, 119:11, 120:14, 121:1, 123:16, 123:22, 124:14, 126:6, 127:9, 127:13, 127:24, 128:18, 128:23, 130:6, 130:13, 130:19, 131:3, 131:14, 131:17, 132:8, 132:11, 133:1, 133:12, 133:25, 134:7, 134:10, 135:20, 135:23, 136:1, 136:7, 136:8, 136:12, 136:25,

137:2, 137:4, 137:8, 137:19, 138:2, 138:5, 138:10, 138:12, 138:15, 139:11, 139:13, 139:22, 140:2, 140:11, 140:15, 140:19, 141:5, 141:7, 141:9, 141:10, 141:21, 142:12, 146:4, 146:7, 146:8, 146:10, 146:12, 147:23, 148:1, 148:6, 148:15, 149:4, 149:11, 149:23, 151:24, 157:2, 161:21, 161:24, 164:2, 167:18, 168:6, 168:10, 172:9, 173:16, 173:20, 174:3, 174:6, 174:11, 174:14, 174:19, 175:4, 175:15, 176:16, 176:22, 177:3, 177:4, 177:11, 178:15, 178:20, 178:21, 179:1, 179:11, 181:3, 181:6, 181:13
**unit** [1] - 89:25
**UNITED** [6] - 1:1, 1:1, 1:4, 195:9, 195:11, 195:16
**unless** [3] - 9:22, 100:15, 119:21
**unpaid** [4] - 52:1, 52:3, 52:4, 80:3
**Unreportable** [1] - 162:22
**up** [27] - 20:1, 26:5, 26:8, 27:7, 32:12, 32:13, 32:14, 35:10, 41:7, 50:17, 115:18, 124:16, 131:21, 144:11, 152:18, 152:23, 153:2, 157:13, 157:14, 160:13, 160:20, 160:22, 163:16, 169:6, 189:10, 193:8, 193:13
**updated** [1] - 68:23
**uses** [1] - 46:22

---

## V

**vague** [18] - 10:6,

96:6, 145:18, 148:3, 148:9, 149:20, 151:20, 154:1, 171:25, 172:22, 175:6, 175:17, 176:9, 176:18, 176:24, 178:10, 179:3, 179:14
**validity** [1] - 186:4
**value** [1] - 33:23
**Vancouver** [3] - 31:18, 31:19, 31:21
**Vannay** [4] - 86:20, 86:23, 86:25
**various** [1] - 61:4
**vendor** [3] - 22:17, 84:25, 85:2
**vendors** [1] - 46:6
**verdict** [1] - 182:13
**version** [6] - 122:13, 129:12, 129:15, 129:16, 189:23, 189:24
**versus** [2] - 130:20, 141:11
**via** [1] - 166:10
**VIDEO** [29] - 7:7, 16:24, 145:3, 145:12, 146:22, 147:21, 148:23, 151:3, 151:16, 151:23, 152:17, 154:10, 154:23, 155:5, 160:4, 161:20, 163:7, 163:21, 164:15, 166:17, 168:2, 169:3, 170:11, 171:21, 172:18, 173:3, 174:2, 175:9, 175:22
**video** [11] - 16:8, 122:11, 122:13, 122:17, 143:15, 144:2, 144:18, 145:1, 145:2, 156:24, 162:22
**VIDEOTAPE** [1] - 3:8
**videotaped** [1] - 7:4
**visible** [1] - 80:11
**VPO** [6] - 84:21, 84:25, 85:1, 85:2, 113:3, 163:9
**VS** [1] - 1:9
**vvpp** [1] - 153:6
**vvv** [1] - 153:6

## W

**wait** [3] - 159:14,

159:17, 183:15
**waiting** [1] - 170:25
**waiver** [1] - 188:10
**wants** [2] - 59:12, 193:14
**warn** [1] - 38:4
**warranty** [1] - 188:16
**website** [3] - 62:5, 62:9, 64:16
**week** [2] - 4:15, 34:13
**WEI** [1] - 3:6
**weight** [1] - 188:3
**WESTERN** [1] - 1:2
**whole** [4] - 20:11, 109:10, 180:14, 193:11
**willing** [5] - 107:24, 123:16, 123:22, 123:24, 131:19
**wins** [1] - 189:4
**wish** [1] - 106:12
**WITH** [1] - 195:15
**WITNESS** [46] - 3:4, 4:19, 12:7, 14:15, 15:8, 21:25, 22:6, 26:16, 29:13, 30:25, 31:1, 31:7, 61:12, 81:14, 86:11, 96:9, 96:15, 121:15, 128:14, 142:19, 145:6, 145:21, 148:5, 159:24, 162:5, 162:19, 166:9, 166:22, 166:25, 168:3, 168:23, 169:16, 172:3, 172:8, 172:24, 175:2, 175:7, 175:19, 176:19, 176:25, 178:12, 179:8, 179:17, 180:16, 180:20, 181:17
**witness** [17] - 30:21, 69:4, 122:24, 123:5, 142:20, 142:24, 143:20, 143:21, 144:14, 144:17, 170:23, 170:24, 180:5, 180:6, 181:18, 184:9
**witnesses** [1] - 171:5
**word** [1] - 96:2
**wording** [1] - 156:10
**words** [6] - 24:18, 114:5, 120:14, 120:23, 121:2
**works** [1] - 28:8
**worth** [2] - 20:7, 82:10
**write** [9] - 35:3, 50:13,

52:20, 55:4, 67:17, 95:24, 96:3, 102:19, 104:13
**writing** [2] - 93:4, 143:3
**written** [1] - 23:22
**wrote** [1] - 119:2

## Y

**Y-u** [2] - 31:8, 180:20
**YASHDEEP** [1] - 2:10
**year** [4] - 12:23, 34:15, 43:10, 152:25
**years** [24] - 31:17, 32:6, 32:19, 33:6, 33:10, 34:19, 43:11, 48:14, 49:3, 58:11, 58:14, 58:24, 64:11, 64:13, 70:22, 101:23, 146:11, 162:10, 162:14, 169:8, 169:24, 170:1, 170:14, 170:15
**yesterday** [12] - 4:8, 5:1, 5:11, 6:1, 12:21, 15:14, 21:13, 25:8, 27:4, 27:10, 28:13, 122:15
**York** [1] - 165:24
**YORK** [118] - 2:6, 5:22, 7:14, 9:16, 10:6, 14:11, 14:20, 15:5, 30:22, 31:12, 37:20, 37:21, 38:10, 42:13, 42:18, 42:20, 44:13, 53:12, 53:17, 61:13, 69:7, 69:25, 71:8, 88:25, 96:6, 101:25, 105:16, 120:6, 120:8, 123:8, 123:9, 126:9, 126:14, 126:15, 128:3, 128:8, 128:13, 128:15, 129:11, 129:15, 129:20, 129:25, 133:3, 133:9, 135:5, 135:10, 136:16, 136:19, 136:20, 140:7, 142:17, 142:21, 145:9, 145:18, 146:17, 147:15, 148:3, 148:8, 149:20, 149:25, 150:8, 150:13, 150:16, 150:19, 150:25, 151:11, 151:20,

152:20, 153:3, 154:1, 154:7, 154:11, 154:20, 157:7, 162:1, 162:25, 163:4, 163:18, 164:4, 164:12, 164:20, 165:2, 165:7, 165:11, 165:14, 166:16, 166:18, 167:20, 168:25, 169:17, 170:4, 170:16, 170:18, 171:6, 171:11, 171:16, 171:19, 172:15, 172:25, 173:24, 175:3, 175:8, 175:20, 176:14, 177:8, 180:2, 180:6, 180:23, 181:15, 181:19, 181:21, 183:13, 183:18, 183:20, 184:1, 184:19, 184:23, 193:24
**yourselves** [3] - 68:2, 121:9, 182:16
**YU** [1] - 3:7
**Yu** [1] - 31:7

## Z

**zero** [1] - 106:16
**Zoom** [1] - 167:15